IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

RCVD - USDC COLA SC
MAR 19 '26 PM2:19

**KAROL WIDEMON MONTGOMERY,**

individually and on behalf of **ALLEN UNIVERSITY**,

Plaintiffs,

v.

**THE ALLEN UNIVERSITY BOARD OF TRUSTEES;**

**DR. ERNEST MCNEALEY**, individually;

**BISHOP SAMUEL GREEN**, individually;

**BISHOP JAMES DAVIS**, individually;

**SANDRA ANDERSON**, individually;

**KEITH BRITTON**, individually;

**TAMARA CURRY**, individually;

**NORVEL GOFF**, individually;

**JUENARRL KEITH**, individually;

**ALLEN W. PARROTT**, individually;

**CAESAR R. RICHBURG**, individually;

**DERRICK SCOTT**, individually;

**HERBERT TEMONEY**, individually;

**THE AFRICAN METHODIST EPISCOPAL CHURCH, INC.**
a Pennsylvania nonprofit corporation;

**THE AFRICAN METHODIST EPISCOPAL CHURCH COUNCIL OF BISHOPS**;

**THE FOUNDATION OF ALLEN UNIVERSITY**,
a South Carolina corporation;

**THE PICKNEY CENTER OPERATIONS, LLC**,
a South Carolina limited liability company;

**WAVERLY HOSPITAL OWNER, LLC**,
a South Carolina limited liability company;

**WAVERLY HOSPITAL MM, LLC**,
a South Carolina limited liability company;

**WAVERLY HOSPITAL MT, LLC**,
a South Carolina limited liability company;

**THE VISION CENTER**,
a South Carolina nonprofit corporation;

**DOE CORPORATIONS AND BUSINESS ENTITIES 1–10**, and **JOHN DOES 1–10**,

Defendants.

Civil Action No.: ____________

**VERIFIED CIVIL COMPLAINT**

**JURY TRIAL DEMANDED**

# COMPLAINT

Plaintiff **Karol Widemon Montgomery**, appearing **pro se**, brings this Complaint on behalf of herself and Allen University and alleges as follows:

## I. INTRODUCTION

1. This action arises from a **coordinated scheme of fraud, deception, and abuse of power** carried out by Defendants, who used their positions of authority within Plaintiff **Allen University (hereafter "AU")** and in their religious community to **enrich themselves, secure unlawful financial benefits, and evade accountability**, all at the expense of the University, its students, its donors, and the public.

2. For nearly a decade, Defendants exercised control over the governance, finances, fundraising activities, and institutional decision-making over AU, a nonprofit institution entrusted with charitable and educational responsibilities. Rather than fulfill those charitable obligations, Defendants **exploited their positions to manipulate institutional processes, conceal misconduct, and misuse funds entrusted to the University**.

3. Acting under the authority of positions including Bishop of the Seventh District of Defendant **African Methodist Episcopal Church, Inc.**

3. Acting under the authority of positions including Bishop of the Seventh District of Defendant **African Methodist Episcopal Church, Inc. (hereafter "AMEC")**, Chairman of the Allen University Board of Trustees, President of Allen University, and members of the Board of Trustees, Defendants dominated the University's leadership and used that control to carry out a pattern of misconduct.

4. Defendants used AU's name, reputation, and religious affiliation to solicit trust from donors, trustees, church members, students, faculty, alumni, and the broader University community. Rather than protect the University's interests, Defendants abused that trust to advance their own financial interests and those of affiliated individuals and entities.

4. Through their positions, Defendants exercised substantial authority over AU's financial decisions, including fundraising activities, property transactions, contractual agreements, and the use and disposition of University assets.

5. At the center of this misconduct was Defendants' effort to **obtain and retain approximately $4.2 million in federal grant funds** administered through the **United States Department of Housing and Urban Development ("HUD")**, through the use of **false and misleading documentation**.

6. When federal authorities identified deficiencies in Defendants' initial submissions, Defendants did not correct the underlying issues. Instead, they **submitted altered documentation for the same work, including different dates and representations**, in an effort to create the false appearance of compliance with federal requirements.

7. These actions were not mistakes or administrative errors. They were **deliberate acts designed to mislead the federal government and secure funds to which Defendants were not entitled**, thereby placing federal resources and the University itself at risk.

8. Defendants' misconduct extended beyond federal grant fraud. They engaged in a broader pattern of behavior that included **concealing financial information, misrepresenting the University's financial condition, and preventing meaningful oversight by the Board of Trustees**.

9. Instead of fulfilling their fiduciary duties of loyalty, honesty, and care, Defendants engaged in a sustained course of misconduct that included soliciting funds purportedly for the benefit of AU that were never transferred to the University; diverting or misappropriating University funds to individuals and entities with no legitimate affiliation to the institution; authorizing expenditures unrelated to the University's mission; engaging in

undisclosed self-dealing transactions; and retaining or redirecting funds specifically designated for the benefit of Allen University.

10. Defendant **Allen University Board of Trustees ("BOT")**, together with Defendants **Samuel Green, James Davis, Ernest McNealey, Sandra Anderson, Keith Britton, Tamara Curry, Norvel Goff, Juenarrl Keith, Allen Parrott, Caesar Richburg, Derrick Scott, and Herbert Temoney**, participated in or knowingly permitted the diversion of funds raised in AU's name. These Defendants concealed material financial information from trustees and the University community, caused AU to enter into unauthorized or undisclosed financial transactions, and obstructed efforts to investigate these activities.

11. These Defendants collectively constituted a controlling majority of Defendant BOT and exercised effective control over the governance of Plaintiff AU. Despite their fiduciary responsibilities to safeguard the University's assets and ensure transparency in its financial affairs, they instead enabled, ratified, and concealed misconduct that resulted in substantial financial losses to Allen University.

12. The scheme depended on **control and silence:** Control over the University's governance structure; and silence from those in a position to expose the wrongdoing.

13. When Plaintiff **Karol Widemon Montgomery (hereafter "Montgomery")**, while serving as a trustee on Defendant BOT, attempted to fulfill her fiduciary responsibilities and sought transparency by requesting financial records, raising concerns regarding irregular transactions, and calling for an independent investigation, Defendants responded not with accountability and transparency, but with **retaliation**.

14. Defendants initiated a **coordinated campaign to discredit, isolate, and ultimately remove Plaintiff from the Board of Trustees**, thereby eliminating a critical source of oversight and protecting their ongoing misconduct from exposure.

15. Defendants publicly disparaged Montgomery questioned her competence and credibility, and undertook actions designed to isolate, silence, and ultimately remove her from the Board of Trustees. These retaliatory actions were undertaken to suppress scrutiny and prevent further investigation into Defendants' misconduct.

16. Defendants' campaign included the dissemination of false and defamatory statements, the manipulation of governance procedures, and the deliberate misuse of institutional authority to silence Plaintiff's efforts to fulfill fiduciary responsibilities.

17. Through these actions, Defendants ensured that their conduct would remain concealed while they continued to exercise control over the University's finances and operations.

18. Other Defendants bear liability because they either knowingly permitted the misconduct to continue or directly benefited from it. Certain Defendants were responsible for the appointment or supervision of Defendants **Green** and **Davis** as Bishops of the Seventh District of the Defendant **AMEC** and were aware of prior financial misconduct involving church-related assets yet failed to take corrective action despite their authority and responsibility under the Defendant AMEC's governing Doctrine and Discipline.

19. Additional Defendants received assets, funds, or financial benefits derived from transactions involving AU property or funds that had been diverted through the scheme described herein.

20. The diversion of funds, concealment of financial information, unauthorized financial transactions, and retaliation against a trustee who attempted to investigate those actions were the direct and proximate result of Defendants' breaches of fiduciary duty and their misuse of authority.

21. Defendants **Green, Davis, McNealey, Anderson, Britton, Curry, Goff, Keith, Parrott, Richburg, Scott and Temoney** were fiduciaries,

responsible for oversight of Plaintiff AU and controlled Defendant BOT as they represented the majority of Defendant BOT. These Defendants did not adequately monitor, oversee, or protect the interests of AU. They are each responsible for AU's massive losses.

22. The conduct described herein was not isolated. It constituted a **pattern of unlawful activity carried out over time by individuals acting in concert**, forming an enterprise that used the University as a vehicle for misconduct.

23. Defendants' actions caused substantial harm, including damage to the Plaintiff's reputation and position, financial and institutional harm to the University, and the erosion of trust in an institution dedicated to education and public service.

24. As a result of Defendants' conduct, AU has suffered significant financial losses, the dissipation of institutional assets, and damage to its financial stability and reputation. These losses have harmed the students, faculty, staff, alumni, and supporters who depend upon the integrity and responsible stewardship of the University's resources.

25. Plaintiff Montgomery brings this action both **individually**, for injuries she personally suffered as a result of Defendants' retaliatory and defamatory conduct, and **derivatively on behalf of Allen University**, for

mismanagement of assets, and breaches of fiduciary duty alleged in this Complaint.

26. By bringing this action, Plaintiffs seek to hold Defendants accountable for their misconduct, to expose the full scope of the scheme, and to obtain relief necessary to protect the University, its stakeholders, and the public from further harm.

## II. OVERVIEW OF THE FRAUDULENT SCHEME

27. This case arises from a **deliberate and coordinated scheme** carried out by Defendants and their associates to **seize, maintain, and exploit control over Plaintiff AU** for their personal, financial, and institutional benefit, in violation of federal and state law.

28. The misconduct described in this Complaint was not the result of isolated mistakes or negligent oversight. Rather, it was part of a coordinated scheme carried out over several years by individuals who exercised control over AU and used that control to divert funds, conceal financial transactions, and protect those responsible from scrutiny.

29. The scheme operated through Defendants' domination of the governance structure of AU, particularly through their control of Defendant BOT and the senior leadership of the University.

30. By occupying key leadership roles, including President of Allen University, Chairman of the Board of Trustees, and a majority of members of the Board of Trustees, Defendants were able to control financial reporting, approve or influence transactions involving AU property, and prevent meaningful oversight of their actions.

31. At all times relevant herein, Defendant McNealey, Defendant Green, Defendant Davis (who succeeded Defendant Green), Defendant Anderson, Defendant Britton, Defendant Curry, Defendant Goff, Defendant Keith, Defendant Parrott, Defendant Richburg, Defendant Scott and Defendant Temoney represented the majority of Defendant BOT members and therefore controlled Defendant BOT.

32. Using this control, Defendants engaged in a pattern of conduct designed to extract financial value from AU while concealing the true nature and consequences of their actions from trustees, donors, and the University community. Defendants used their control not to advance the University's educational and charitable mission, but instead to **manipulate governance, conceal financial misconduct, and misuse institutional resources**, including funds derived from donors and federal programs.

33. Through this scheme, Defendants engaged in a coordinated pattern of misconduct that included:

a. soliciting charitable donations in the name of Plaintiff AU while diverting or misappropriating portions of those funds;

b. authorizing the use Plaintiff AU's funds for payments to individuals and entities not affiliated with the University;

c. directing expenditures and/or diverting funds for improvements to properties not owned by or associated with the Plaintiff AU;

d. engaging in undisclosed self-dealing transactions;

e. submitting fraudulent documentation to the federal government in an effort to obtain federal housing funds; and

f. retaliating against a trustee who questioned the legality of these financial activities.

34. Defendants' scheme relied heavily on the trust placed in them by donors, trustees, students, faculty, staff, and the public.

35. By invoking the name and reputation of AU in fundraising and grant applications, Defendants were able to obtain access to funds and opportunities that would not otherwise have been available to them.

36. At the same time, Defendants sought to conceal their misconduct by restricting access to financial records, misrepresenting the use of funds,

and retaliating against individuals who attempted to investigate their activities.

37. A central component of the scheme involved the **misuse and attempted fraudulent retention of approximately $4.2 million in federal grant funds** administered through the **United States Department of Housing and Urban Development** ("HUD").

38. In connection with those funds, Defendants caused documentation to be prepared and submitted to federal authorities that **misrepresented material facts**, including the timing and eligibility of work performed under the grant.

39. When federal officials identified deficiencies in the initial submission, Defendants did not correct the underlying issues. Instead, they caused **altered documentation to be submitted**, including the use of different dates and representations for the same work, in an effort to create the false appearance of compliance with federal requirements.

40. These actions were undertaken knowingly and intentionally, with the objective of **securing and retaining federal funds to which the University was not entitled under the applicable program rules**.

41. Defendants' misconduct extended beyond federal grant fraud. They engaged in a broader pattern of behavior that included **concealing financial information, misrepresenting the University's financial condition, and preventing meaningful oversight by the Board of Trustees**. Defendants' conduct was designed to **conceal financial irregularities**, including withholding information from members of Defendant BOT, misrepresenting financial conditions, and preventing meaningful oversight of the University's finances.

42. The scheme depended upon maintaining control and silence: Control over the University's governance structure; silence from anyone in a position to expose wrongdoing. By exercising control and silence, Defendants effectively prevented scrutiny by individuals who sought transparency and accountability.

43. Another component of the scheme involved the solicitation of funds in the name of AU during church conferences and related events associated with the Seventh District of Defendant **AMEC.**

44. During these events, Defendants publicly represented that donations were being raised for the benefit of AU and that the proceeds would support the University's educational mission.

45. On information and belief, substantial portions of the funds raised in AU's name were not transferred to AU, were not deposited into University accounts, and were not transparently disclosed to all of the members of Defendant BOT.

46. Another and third component of the scheme and related to the **attempted fraudulent retention of approximately $4.2 million in federal grant funds from HUD**, involved the monetization and transfer of valuable University assets through complex financial transactions structured through entities affiliated with or controlled by Defendants.

47. Through these transactions, AU lost ownership or control of significant institutional assets, including valuable real property, while becoming obligated to pay substantial lease payments and other financial obligations associated with those same assets.

48. These transactions were not fully disclosed to members of Defendant BOT and were structured in a manner that prevented meaningful oversight by trustees who were not part of the scheme.

49. Defendants also entered into contractual commitments on behalf of AU that exposed the University to significant financial liability without the knowledge or informed approval of members of Defendant BOT.

50. In addition to concealing material financial information from trustees and University stakeholders, Defendants actively obstructed attempts to investigate the transactions described herein.

51. Trustees who sought transparency were denied access to financial records, prevented from obtaining independent review of the transactions, and discouraged from raising further questions.

52. When Plaintiff **Montgomery**, acting in her capacity as both a trustee and donor to AU, raised concerns regarding financial misconduct and the handling of institutional and federal funds, Defendants perceived Plaintiff as a threat to the continuation of their scheme.

53. When Plaintiff Montgomery, acting in her capacity as a trustee, attempted to fulfill her fiduciary responsibilities and responsibilities by requesting records and calling for an independent investigation, Defendants escalated their efforts to conceal the scheme.

54. In response, Defendants initiated a **coordinated campaign to silence, discredit, and remove Plaintiff Montgomery** from Defendant BOT and from any position that would allow further inquiry into the University's financial affairs.

55. This campaign included the dissemination of false and misleading statements, the manipulation of governance procedures, and the deliberate isolation of Plaintiff from decision-making processes.

56. Rather than respond to legitimate questions regarding the University's finances, Defendants undertook actions designed to discredit, isolate, and silence Montgomery.

57. These actions included publicly disparaging Montgomery, undermining her credibility before other trustees and members of the University community, and ultimately removing her from Defendant BOT.

58. The retaliatory removal of Montgomery was intended to suppress scrutiny of Defendants' activities and to prevent further investigation into the financial transactions described in this Complaint.

59. The removal of Plaintiff and the suppression of Plaintiff's concerns was essential to the continuation of Defendants' scheme, as they eliminated a key source of oversight and accountability within the University's governing body, that is, Defendant BOT.

60. Throughout the duration of this scheme, Defendants were able to divert funds raised in AU's name, conceal material financial information from trustees and stakeholders, and enrich themselves and affiliated

entities while leaving AU burdened with financial losses and diminished institutional assets.

61. The actions described in this Complaint were not isolated events but instead formed part of a continuing pattern of racketeering activity designed to enrich Defendants while concealing their misuse of charitable and institutional funds.

62. Defendants' conduct was not isolated or accidental. Rather, it constituted a **pattern of coordinated activity carried out over a period of years**, involving multiple actors, repeated misrepresentations, and deliberate efforts to conceal wrongdoing.

63. Through this pattern of conduct, Defendants operated as an **enterprise engaged in unlawful activity**, using their positions within Plaintiff AU and affiliated entities to further their objectives.

64. The scheme resulted in harm to Plaintiff, including reputational damage and the loss of Plaintiff's position as Trustee.

65. The scheme described herein resulted in substantial harm to AU and to the students, faculty, staff, alumni, and the public, whose trust in the institution has been undermined.

66. This action seeks to expose that scheme, to hold Defendants accountable for their misconduct, and to restore integrity to the governance and financial administration of Plaintiff AU.

## III. JURISDICTION AND VENUE

67. This Court has **subject matter jurisdiction** over this action pursuant to **28 U.S.C. § 1331** because this action arises under the laws of the United States, including but not limited to claims arising under **18 U.S.C. §§ 1961–1968 (Racketeer Influenced and Corrupt Organizations Act)** and other federal statutes governing fraud involving federal funds and programs.

68. This Court also has jurisdiction pursuant to **28 U.S.C. § 1332** because the matter in controversy exceeds **$75,000**, exclusive of interest and costs, and the parties are citizens of different states.

69. The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to **28 U.S.C. §1367**, because those claims arise from the same nucleus of operative facts as the federal claims, and form part of the same case or controversy.

70. This Court also has jurisdiction pursuant to **28 U.S.C. §1345 and §1346** because the action involves fraud and false statements made in connection with federal funds and federal programs.

71. This Court further has jurisdiction pursuant to **28 U.S.C. § 1343** to redress violations involving conspiracy and deprivation of rights through unlawful conduct undertaken by Defendants acting individually and in concert.

72. Plaintiff has standing to bring this action as a **current and/or former Trustee and donor to the University**, possessing a legally protected interest in the proper administration of charitable assets, donor-restricted funds, and institutional governance.

73. Under **South Carolina law governing charitable trusts and nonprofit corporations**, including **S.C. Code Ann. § 33-31-630** and related provisions of the **South Carolina Nonprofit Corporation Act**, trustees, directors, and persons with a **special interest in charitable assets** have standing to seek judicial relief where fiduciaries misuse, divert, or misappropriate charitable property.

74. Plaintiff also possesses standing as a **donor and beneficiary of restricted charitable contributions** made to the University. South Carolina law recognizes that donors of restricted gifts and individuals entrusted with fiduciary responsibilities over charitable institutions may bring actions to enforce the proper use of charitable funds and to prevent diversion, fraud, or breach of fiduciary duty.

75. Plaintiff further brings this action derivatively and in the public interest to protect the **charitable mission, assets, and governance integrity** of the University, which operates as a nonprofit educational institution and holds assets in trust for the benefit of its students, donors, and the public.

76. Defendants' conduct, as alleged herein, involves a **pattern of racketeering activity, fraud, breach of fiduciary duty, and misuse of charitable assets**, including actions affecting federal programs and funds administered through federal agencies.

77. **Venue is proper** in this Court pursuant to **28 U.S.C. § 1391(b)** because a substantial part of the events or omissions giving rise to the claims occurred within the **State of South Carolina**, and the Defendant University maintains its principal place of business within this District.

78. Venue is also proper because many of the acts forming the basis of the alleged scheme, including governance decisions, financial transactions, and misuse of charitable funds, occurred within the **District of South Carolina**.

79. At all relevant times, the activities of Defendants affected interstate commerce through the use of interstate communications, financial transactions, electronic communications, and federal grant submission systems.

80. The enterprise described in this Complaint operated through and in connection with Allen University, an institution whose activities include fundraising, financial transactions, and communications across state lines.

81. This Court therefore possesses jurisdiction over the subject matter of this action and personal jurisdiction over the Defendants.

## IV. PARTIES

### A. Plaintiffs

82. Plaintiff **Karol Widemon Montgomery (referred to herein as "Montgomery")** is an individual residing in the State of Georgia. Plaintiff Montgomery was admitted as a member of Defendant BOT in October 2021. Since joining Defendant BOT, Plaintiff Montgomery has donated to Plaintiff AU with her time, her skills and financially.

83. Plaintiff **Allen University (referred to herein as "Plaintiff AU" and/or "AU")** is a South Carolina nonprofit corporation with its place of business in Columbia, South Carolina.

### B. University Defendant

84. Defendant **Allen University Board of Trustees (referred to herein as "BOT")** is the governing body of Allen University. At all times relevant herein, Defendant BOT was governed by Bylaws which made it mandatory that the Bishop of the Seventh Episcopal District of Defendant **AMEC** be

appointed to the position of Chairman of the Board of Trustees of Plaintiff AU. *Official Bylaws of the Board of Trustees, Article II, Section 1(a).* In addition, the BOT Bylaws require the membership of the BOT to include representation from each of annual conference of the Seventh Episcopal District of Defendant **AMEC.** *Official Bylaws of the Board of Trustees, Article II, Section 1(b).*

**C. Individual Defendants**

85. Defendant **Ernest McNealey (hereafter "McNealey")** is an individual residing in Columbia, South Carolina. Defendant McNealey is the President of the Defendant **Foundation of Allen University (hereafter "Foundation"),** President of Defendant **Pinkney Center Operations, LLC (hereafter "POC"),** President of Defendant **Waverly Hospital Owner (hereafter "Waverly Owner"),** President of Defendant **Waverly Hospital MM, LLC (hereafter "WHMM"),** and President of Defendant **Waverly Hospital MT, LLC (hereafter "WMT").** At all times relevant herein, Defendant McNealey was an ex-officio member of Defendant **BOT.** In addition, Defendant McNealey is married to Ernestine Green McNealey. On information and belief, Ernestine Green McNealey shares a familial connection to Defendant **Samuel Green**.

86. Defendant **Samuel Green (hereafter "Green")** is an individual residing in the State of New York. Defendant Green is a Bishop of Defendant **AMEC** and a member of Defendant **African Methodist Episcopal Church Council of Bishops (hereafter "Council of Bishops")**. Defendant Green is the former Bishop of Defendant **AMEC's** Seventh Episcopal District and former Chairman of Defendant **BOT**. On information and belief, Defendant Green recommended Defendant McNealey for the position of President of AU. At all times relevant herein, Defendant Green was a member of the Board of Managers of Defendant **POC**. Defendant Green is the President of Defendant **Vision Center**. Defendant Green was a named individual defendant in the retirement plan case filed to recover more than ninety million dollars fraudulently misappropriated from Defendant AMEC's retirement plan. *In re: AME Church Employee Retirement Fund Litigation,* No. 1:22–md–03035–STA–jay (W.D. Tenn) (hereafter Retirement Plan Case). Defendant Green was dismissed as a defendant from the Retirement Plan Case after he settled with the Plaintiffs in that case.

87. Defendant **James Davis (hereafter "Davis")** is an individual residing in the State of South Carolina. Defendant Davis is a Bishop of Defendant **AMEC**, and a member of Defendant **Council of Bishops**. Defendant

Davis is the current Bishop of Defendant **AMEC's** Seventh Episcopal District and current Chairman of Defendant **BOT**. Defendant Davis was a named individual defendant in the retirement plan case filed to recover more than ninety million dollars fraudulently misappropriated from Defendant AMEC's retirement plan. *In re: AME Church Employee Retirement Fund Litigation*, No. 1:22–md–03035–STA–jay (W.D. Tenn) (Retirement Plan Case). Defendant Davis was dismissed as a defendant from the Retirement Plan Case after he settled with the Plaintiffs in that case.

88. Defendant **Sandra Anderson (hereafter "Anderson")** is an individual residing in the State of South Carolina. Defendant Anderson is a member of Defendant **BOT**. Defendant Anderson was or continues to be a member of the Board of Managers of Defendant **POC**. Defendant Anderson is President of The Women Missionary Society of Defendant **AMEC** in South Carolina. Defendant Anderson was appointed to this position by Defendant **Davis**.

89. Defendant **Keith Britton (hereafter "Britton")** is an individual residing in the State of South Carolina. Defendant Britton currently serves as Vice President of Defendant **BOT**. Defendant Britton was appointed to this position by Defendant **Davis.** Defendant Britton is President of the

Seventh Episcopal District Lay Organization Defendant **AMEC** in South Carolina. Defendant Britton is under the supervision of Defendant **Davis**.

90. Defendant **Tamara Curry (hereafter "Curry")** is an individual residing in the State of South Carolina. Defendant Curry is a member of the Defendant **BOT.** Defendant Curry is the Associate Vice President of the Women Missionary Society of Defendant **AMEC** in South Carolina. Defendant Curry was appointed to this position by Defendant **Davis**. Defendant Curry's husband, Attorney Eduardo Curry, is the Pastor of the Grace Metropolitan African Methodist Episcopal Church at Adams Chapel in North Charleston, South Carolina. Defendant Curry's husband was appointed to this position by Defendant **Davis.** Defendant Curry's husband serves as General Counsel for the Seventh Episcopal District of Defendant **AMEC** and Legal Counsel for Allen University in Columbia, South Carolina.

91. Defendant **Norvel Goff (hereafter "Goff")** is an individual residing in the State of South Carolina. Defendant Goff is Presiding Elder of the Edisto District for the South Carolina Annual Conference of Defendant **AMEC** in South Carolina. Defendant Goff is a member of Defendant **BOT.** Defendant Goff was appointed to this position by Defendant **Davis.**

92. Defendant **Juenarrl Keith (hereafter "Keith")** is an individual residing in the State of South Carolina. Defendant Keith is a member of

Defendant **BOT.** Defendant Keith is Presiding Elder of the Palmetto District for the South Carolina Annual Conference of Defendant **AMEC**. Defendant Keith was appointed by Defendant **Davis**. Defendant Keith was or continues to be a member of the Board of Managers of Defendant **POC**. Defendant Keith was an original director of Defendant **Vision Center.**

93. Defendant **Allen W. Parrott (hereafter "Parrott")** is an individual residing in the State of South Carolina. Defendant Parrott is a member of Defendant **BOT**. Defendant Parrott was or continues to be a member of the Board of Managers of Defendant **POC.** Defendant Parrot is a Presiding Elder in the Seventh District of Defendant **AMEC.** Defendant Parrott was appointed to this position by Defendant **Davis.** Defendant Parrott previously served as the Vice Chair of Defendant **BOT.** Defendant Parrott was appointed to this position by Defendant **Davis.** Defendant Parrott is also the President of the Presiding Elders of Defendant **AMEC** in South Carolina.

94. Defendant **Caesar R. Richburg (hereafter "Richburg")** is an individual residing in the State of South Carolina. Defendant Richburg is a member of Defendant **BOT**. Defendant Richburg is a Pastor and Presiding Elder in the Seventh District of Defendant **AMEC.** Defendant Richburg was appointed to these positions by Defendant **Davis.**

95. Defendant **Derrick Scott** is an individual residing in the State of South Carolina and/or New York. Defendant Scott is a member of Defendant **BOT.** Defendant Scott is a Pastor and Presiding Elder in the Seventh District of Defendant **AMEC.** Defendant Scott was appointed to these positions by Defendant **Davis.**

96. Defendant **Herbert Temoney** is an individual residing in the State of South Carolina. Defendant Temoney is a member of Defendant **BOT.** Defendant Temoney is a Pastor and Presiding Elder in the Seventh District of Defendant **AMEC.** Defendant Temoney was appointed to these positions by Defendant **Davis.**

**D. Institutional Defendants**

97. Defendant **The African Methodist Episcopal Church, Inc. (referred to herein as "AMEC")** is a Pennsylvania nonprofit corporation. Defendant AMEC includes the Seventh Episcopal District, which encompasses the State of South Carolina. Defendant AMEC is a named defendant in the retirement plan case filed to recover more than ninety million dollars fraudulently misappropriated from Defendant AMEC's retirement plan. *In re: AME Church Employee Retirement Fund Litigation*, No. 1:22–md–03035–STA–jay (W.D. Tenn) (Retirement Plan Case).

98. Defendant **The African Methodist Episcopal Church Council of Bishops (referred to herein as "Council of Bishops")** Defendant Council of Bishops is the executive body of Defendant **AMEC,** consisting of all the Bishops of the Church. Defendant Council of Bishops has and exercises the general oversight authority of the Church. Defendant Council of Bishops assigns Bishops to their Episcopal Districts. Defendant Council of Bishops assigned Defendant Green and later Defendant Davis to the Seventh Episcopal District. Defendant Council of Bishops is responsible for enforcing the Church's Doctrine and Discipline, which, among other things, includes the authority to suspend bishops for wrongdoing. Defendant Council of Bishops is a named defendant in the retirement plan case filed to recover more than ninety million dollars fraudulently misappropriated from Defendant AMEC's retirement plan. *In re: AME Church Employee Retirement Fund Litigation,* No. 1:22–md–03035–STA–jay (W.D. Tenn) (Retirement Plan Case).

99. Defendant **Foundation of Allen University (referred to herein as "Foundation")** is a South Carolina corporation. Defendant **McNealey** is the President of Defendant Foundation.

100. Defendant **Pickney Center Operations, LLC (referred to herein as "POC")** is a South Carolina limited liability company.

101. Defendant **Waverly Hospital Owner, LLC (referred to herein as "Waverly Owner")** is a South Carolina limited liability company. Defendant **McNealey** is the President of Defendant Waverly Owner. Defendant **McNealey** while President of Plaintiff AU, transferred ownership of the Waverly Building from Plaintiff AU to Defendant Waverly Owner.

102. Defendant **Waverly Hospital MM, LLC (referred to herein as "WHMM")** is a South Carolina limited liability company. Defendant **McNealey** is the President of Defendant WHMM.

103. Defendant **Waverly Hospital MT, LLC (referred to herein as "WMT")** is a South Carolina limited liability company. Defendant **McNealey** is the President of Defendant WMT.

104. Defendant **The Vision Center** is a South Carolina nonprofit corporation. Defendant **Green** is the incorporator and President of Defendant Vision Center.

105. Defendant **Doe Corporations and Business Entities 1-10** are business affiliates or subsidiaries of Defendants here that may be responsible for the conduct alleged herein or exercised fiduciary authority with respect to allegations contained herein that are unknown to Plaintiffs. Such parties are named in a "Doe" capacity pending discovery in this case.

106. Defendants **John Doe Individuals 1-10** are individuals, affiliates or subsidiaries of Defendants here that may be responsible for the conduct alleged herein or exercised fiduciary authority with respect to conduct alleged herein that are unknown to Plaintiffs. Such parties are named in a "John Doe" capacity pending discovery in this case.

## V. PLAINTIFF'S STANDING

107. Plaintiff Montgomery brings this action as a **former member of Defendant BOT**, a **donor of charitable funds**, and an individual with a **special interest in the proper administration of the University's charitable assets**.

108. As a Trustee, Plaintiff Montgomery owed fiduciary duties to the University and its beneficiaries, including students, faculty, donors, and the public, and was legally obligated to ensure that the University's funds and assets were used in accordance with law and the University's charitable mission.

109. Plaintiff Montgomery became aware of serious financial irregularities, including but not limited to an **attempt to defraud the federal government**, and the **misuse, diversion, and misrepresentation of University funds and assets**, including funds connected to federal grants and restricted charitable donations.

110. After raising concerns regarding these financial activities and requesting transparency and investigation, Plaintiff Montgomery was subjected to retaliation, including removal from Defendant BOT and efforts by Defendants to discredit and silence Plaintiff.

111. Plaintiff Montgomery therefore has **direct standing** because Defendants' conduct caused Plaintiff Montgomery personal and reputational harm, interfered with Plaintiff Montgomery's fiduciary duties as a Trustee, and deprived Plaintiff Montgomery of the ability to fulfill legally imposed oversight responsibilities.

112. Plaintiff Montgomery also possesses **standing as a donor** whose charitable contributions were intended to support the educational and charitable mission of the Plaintiff AU and were not intended to be diverted, misused, or misrepresented by those entrusted with the management of the institution.

113. Courts recognize that individuals with a **special interest in a charitable institution**, including trustees and donors, may bring actions to protect charitable assets when those entrusted with governance misuse or divert such assets.

114. Plaintiff Montgomery's interests are distinct from those of the general public because Plaintiff was directly involved in the governance of the

institution, contributed financial resources to its mission, and was personally affected by Defendants' unlawful conduct.

115. Accordingly, Plaintiff Montgomery has standing to bring this action to protect both **personal interests and the charitable interests of the University and its beneficiaries**.

## VI. FACTUAL ALLEGATIONS

### Brief History of Defendant AMEC

116. Defendant **AMEC** was the first formally organized African American Christian denomination in the United States.

117. The geographical spread of the AMEC prior to the Civil War was mainly restricted to the Northeast and Midwest.

118. The most significant era of AMEC denominational development occurred during the Civil War and Reconstruction. Many times, with the permission of Union army officials, AMEC clergy moved into the states of the collapsing Confederacy to pull newly freed slaves into their denomination.

119. The first AMEC congregation in South Carolina was established around 1865, after the Civil War.

120. Defendant AMEC grew rapidly in South Carolina during the Reconstruction era. By the late 19th century, the AMEC had established numerous congregations throughout the state.

121. Defendant **AMEC** established Plaintiff **AU** in 1870 in Cokesbury, South Carolina. It was initially named Payne Institute. The newly founded school was named Payne Institute in honor of Bishop Daniel A. Payne, a South Carolinian and noted advocate for Black education.

122. In 1880, Defendant AMEC voted to move Payne Institute from Cokesbury, South Carolina to Columbia, South Carolina.

123. On information and belief, in or around 1917, the name of the university was changed from Payne Institute to Allen University.

124. Currently, Defendant **AMEC** has a structure that includes numerous departments, of which the Department of Retirement Services is one. It is the department responsible for administering the retirement plan. Reverend Dr. Jerome Harris served as Executive Director of the AMEC Department of Retirement Services from 2000-2021.

125. Defendant **Davis** served as Chair of the Department of Retirement Services from 2012 - 2016.

126. Defendant **Green** served as Chair of the Department of Retirement Services from 2016 - 2021.

127. During the nine years that Defendant Davis and Defendant Green served as Chairman, they oversaw and supervised Dr. Harris, the Executive Director.

**Background of Defendant McNealey**

**A. Prior Known Misconduct**

128. **Defendant Ernest McNealey ("Defendant McNealey")** served as President of Plaintiff AU during the time period relevant to this action and exercised substantial authority over the University's operations, finances, and external relations.

129. Prior to his appointment as President of Allen University, Defendant McNealey served as President of Stillman College in Tuscaloosa, Alabama.

130. In or around 2013, Defendant McNealey's tenure at Stillman College ended under circumstances involving significant institutional challenges, including financial instability and declining student enrollment.

131. During that same period, Defendant McNealey was also the subject of allegations of sexual harassment.

132. The circumstances surrounding Defendant McNealey's departure from Stillman College, including the financial condition of the institution and the allegations of misconduct, were matters that were known or reasonably

discoverable at the time he was considered for leadership at Allen University.

133. Upon information and belief, Defendant McNealey is married to Ernestine Green McNealey.

134. Upon information and belief, Ernestine Green McNealey shares a familial relationship with Defendant **Green.**

135. Upon information and belief, this familial relationship was known, or reasonably should have been known, to individuals involved in the recommendation and hiring of Defendant McNealey.

136. Notwithstanding Defendant McNealey's prior history and the existence of such relationships, Defendant Green recommended Defendant McNealey for the position of President of Allen University.

137. Upon information and belief, Defendant **Green** knew, or should have known, of Defendant McNealey's prior performance and the circumstances surrounding his departure from Stillman College at the time he made that recommendation.

138. Defendant **BOT**, acting on the recommendation of Defendant **Green** and others, approved the hiring of Defendant **McNealey** as President of Allen University.

139. As President, Defendant McNealey owed duties to Allen University, including duties of honesty, transparency, and fidelity in his communications with the Board of Trustees and in the management of the University's affairs

## B. Repetition of Known Issues at Allen University

140. During Defendant McNealey's tenure as President of Allen University, the University experienced substantial financial difficulties, including issues relating to financial management and institutional stability.

141. The University also experienced declining enrollment during this period.

142. In addition, Defendant McNealey was again the subject of allegations of sexual harassment while serving as President of Plaintiff AU.

143. These issues were known to members of Defendant **BOT**, including Defendants **Green** and **Davis.**

144. The recurrence of financial instability, declining enrollment, and allegations of misconduct mirrored the issues associated with Defendant McNealey's prior tenure at Stillman College.

## C. Failure to Investigate or Remove Defendant McNealey

145. Despite knowledge of Defendant McNealey's prior history and the recurrence of similar issues at Allen University, Defendant BOT failed to take appropriate action.

146. Defendant **BOT**, under the leadership of Defendant **Green** and later Defendant **Davis**, did not conduct a meaningful investigation into Defendant **McNealey's** conduct.

147. Defendant BOT also failed to take steps to remove Defendant McNealey or otherwise mitigate the risks posed by his continued leadership.

148. Defendant **Davis**, upon assuming the role of Chairman of Defendant BOT, became aware of these issues and likewise failed to take corrective action.

149. Instead, Defendant **Davis** continued to support Defendant **McNealey** and permitted him to remain in his position despite mounting concerns.

150. Despite knowledge of Defendant McNealey's prior history, the existence of relationships creating potential conflicts of interest, and the recurrence of similar issues at Plaintiff AU, Defendants failed to take appropriate action to investigate, discipline, or remove Defendant McNealey.

151. The continued retention of Defendant McNealey as President, despite known risks and repeated misconduct, contributed to and enabled the broader pattern of conduct described in this Complaint, including financial mismanagement, misrepresentations, and exposure of Allen University to substantial liability.

152. The failure to act in the face of known risks and repeated misconduct constitutes a breach of fiduciary duty and a failure of governance and enabled the continuation of the misconduct described throughout this Complaint.

**Background of Allen University**

153. Payne Institute was incorporated in 1881 as a nonprofit organization. Defendant AMEC, as its original founder, no longer owned the institution.

154. Plaintiff AU, to this day, is an independent nonprofit corporation located in Columbia, South Carolina.

155. Plaintiff AU is governed by a Board of Trustees (Defendant BOT) responsible for oversight of the University's operations, finances, and adherence to its charitable mission.

156. Plaintiff AU has Bylaws which governs its operations. Per the Official Bylaws of the Board of Trustees of Allen University, adopted on May 11, 2018: "The Presiding Bishop of the Seventh (7th) Episcopal District of the

African Methodist Episcopal Church shall serve as Chairman of the Board of Allen University." Board of Trustees Bylaws, Article II, Section 1(a).

157. The Bylaws further provide: "The membership of the Board of Trustees shall have representation from each of the annual conference of the 7th Episcopal District African Episcopal Methodist Church in South Carolina." Board of Trustees Bylaws, Article II, Section 1(b).

158. The terms of the members of Defendant BOT are limited. "Trustees shall serve for one, two or three-year terms or until their successors shall be duly elected, any may succeed themselves in office. *However, trustees who have served for three (3) consecutive terms (including any partial term), shall not be eligible for re-election to the Board, until one (1) year has elapsed after the end of their term.*" Board of Trustees Bylaws, Article II, Section 3. [Emphasis added.]

159. On information and belief, one or more of Defendants **Anderson, Britton, Curry, Goff, Keith, Parrott, Richburg, Scott and Temoney** served as members of Defendant BOT for the entire 8 years that Defendant Green was Bishop of the Seventh Episcopal District of Defendant AMEC.

160. Even if each of Defendants **Anderson, Britton, Curry, Goff, Keith, Parrott, Richburg, Scott and Temoney** were elected for the maximum term of 3 years, each served at least two and two thirds terms at the

conclusion of Defendant Green's 8 year term as Chairman of Defendant BOT.

161. Each of Defendants **Anderson, Britton, Curry, Goff, Keith, Parrott, Richburg, Scott and Temoney** have served as members of Defendant BOT since Defendant Davis became Bishop of the Seventh Episcopal District for Defendant AMEC, thereby exceeding the three consecutive authorized by Defendant BOT Bylaws.

162. On information and belief, Defendants **Anderson, Britton, Curry, Goff, Keith, Parrott, Richburg, Scott and Temoney** are holding trustee positions on Defendant BOT in violation of Defendant BOT's Bylaws.

### A. Governance Structure and Concentration of Control

163. At all relevant times, the governance structure of the University was not independent, but instead functioned as a **closed and controlled system**, dominated by individuals whose authority and positions were subject to external control.

164. Specifically, the governance structure was heavily influenced and controlled by leadership associated with Defendant **AMEC**, which maintained authority over the composition and functioning of Defendant BOT.

165. Within this structure, clergy members of the Board of Trustees were **appointed by the Bishop of Defendant AMEC**, who also exercised authority over their ministerial assignments, employment status, and professional advancement within the Church.

166. During the approximate period of August 2016 through August 2024, the Bishop of the Seventh Episcopal District of Defendant **AMEC** was Defendant **Green.**

167. During the approximate period of August 2024 to the present, the Bishop of the Seventh Episcopal District of Defendant **AMEC** is Defendant **Davis.**

168. As a result, these clergy Trustees were not independent fiduciaries, but instead operated under the **direct authority and supervision of the Bishop**, *i.e.*, Defendant **Green** and Defendant **Davis**, who had the power to influence or determine their professional futures.

169. The Bishop of the Seventh Episcopal District also served, at relevant times, as **Chairman of the Board of Trustees**, thereby consolidating control over both the governance of the University and the professional status of clergy Trustees.

170. In addition to clergy members, lay members of Defendant BOT were also subject to influence through appointment processes controlled or heavily influenced by the same leadership structure.

171. In addition to members of Defendant BOT, the Bishop of the Seventh Episcopal District of Defendant AMEC appointed familial members to positions in the Seventh Episcopal District. Specifically, Defendant **Davis** appointed Defendant **Curry's** spouse to positions as a pastor and as an attorney. Defendant **Curry's** husband, Attorney Eduardo Curry, was appointed to the position of Pastor of the Grace Metropolitan African Methodist Episcopal Church at Adams Chapel in North Charleston, South Carolina. Defendant Curry's husband was appointed to this position by Defendant **Davis.** Defendant Curry's husband serves as General Counsel for the Seventh Episcopal District of Defendant **AMEC** and Legal Counsel for Allen University in Columbia, South Carolina. Mr. Curry was appointed to these positions by Defendant **Davis.**

172. This arrangement created a governance system in which a single individual, or a small group acting in concert, exercised **substantial and disproportionate control over the Board of Trustees**.

## B. The "Closed System" of Governance

173. The governance structure described above functioned as a **closed system**, in which decision-making authority was concentrated among individuals whose positions depended upon maintaining favor with Defendants **Green** and **Davis**, and the aligned leadership.

174. Within this system, dissent, independent oversight, and inquiry into financial or governance matters were discouraged and, in some instances, actively suppressed.

175. Trustees who depended upon Defendant **Green** and/or Defendant **Davis** for employment, assignments, or advancement had a **strong personal incentive to align with the directives of Defendant Green and Defendant Davis**, regardless of whether those directives were consistent with their fiduciary duties to the University.

176. As a result, Defendant BOT did not operate as an independent governing body exercising objective oversight, but instead functioned in many instances as a body that **ratified or acquiesced to decisions made by those in control**.

177. This lack of independence undermined the Board's ability to:

a. Provide meaningful financial oversight;

b. Investigate irregularities or misconduct;

c. Ensure compliance with legal and fiduciary obligations; and

d. Protect the University's assets and mission.

178. The closed nature of this governance system enabled Defendants to **operate without meaningful accountability**, including in connection with the financial misconduct and fraudulent activities described herein.

## C. Trustees Serving Beyond Authorized Terms

179. Upon information and belief, one or more of Defendants **Anderson, Britton, Curry, Goff, Keith, Parrott, Richburg, Scott and Temoney** continued to serve as members of the Board of Trustees **beyond the expiration of their authorized terms**, in violation of the University's governing documents and applicable rules.

180. The continuation of these individuals in their roles was not the result of oversight or administrative error, but rather reflected a **deliberate disregard for governance requirements**.

181. Allowing Trustees to remain in office beyond their terms enabled Defendants to **maintain control over the Board and prevent the appointment of independent or dissenting members**.

182. These actions further entrenched the closed system of governance and ensured that individuals aligned with Defendant **Green** and Defendant

**Davis** and the existing leadership structure retained decision-making authority.

183. The failure to enforce term limits deprived the University of fresh oversight and independent judgment, and instead preserved a Board composition that was **loyal to those in control rather than to the institution itself**.

## D. Domination and Control Over Trustees

184. At all relevant times, Defendants **Green** and **Davis,** as the Bishop of the Seventh Episcopal District of Defendant **AMEC**, exercised **substantial control over the composition, leadership, and functioning of the Board of Trustees**.

185. This control extended beyond ordinary governance influence and included the ability to affect the **employment, assignments, and professional standing** of clergy Trustees within Defendant **AMEC**.

186. As a result, clergy Trustees were placed in a position where their continued employment and career advancement were **directly tied to their relationship with the Bishop, that is Defendant Green and Defendant Davis.**

187. This dynamic created an irreconcilable conflict of interest for the clergy and lay member appointees of Defendant AMEC who were also

members of Defendant BOT. The dynamic caused a conflict between the Trustees' fiduciary duties to the University and their personal interests in maintaining favor with Defendant **Green** and Defendant **Davis**.

188. Rather than acting independently in the best interests of the University, Defendants **Goff, Keith, Parrott, Richburg, Scott and Temoney** all Defendant **AMEC** clergy Trustees, **aligned their actions with the preferences and directives of Defendant Green and Defendant Davis**, even where doing so required ignoring or violating their fiduciary obligations.

189. Defendant **Britton,** who is supervised by Defendant **Davis**, Defendant **Anderson** and Defendant **Curry**, all Lay Trustees, whose appointments and continued service were influenced by the same governance structure, were similarly subject to pressure to conform to the decisions of those in control.

190. Through this system of control and influence, Defendants ensured that Defendant BOT would **not provide meaningful resistance or oversight**, even in the face of significant financial irregularities and misconduct.

**E. Effect on Fiduciary Oversight and Accountability**

191. The concentration of control described above directly impaired Defendant BOT's ability to fulfill its fiduciary responsibilities.

192. Defendants **Anderson, Britton, Curry, Goff, Keith, Parrott, Richburg, Scott and Temoney,** member Trustees of Defendant BOT who were subject to Defendant **Green's** and Defendant **Davis'** authority or influence failed to:

a. Investigate credible allegations of financial misconduct;

b. Demand transparency regarding the use of institutional and federal funds;

c. Enforce compliance with governance rules, including term limits; and

d. Protect the University from fraudulent or improper activities.

193. Instead, these Trustees permitted and, in some instances, facilitated conduct that benefited those in control while exposing Plaintiff AU to legal, financial, and reputational harm.

194. The closed governance system also enabled Defendants to **retaliate against individuals who attempted to raise concerns**, including Plaintiff Montgomery, without fear of meaningful internal opposition.

195. The actions described herein demonstrate that Defendant BOT, as constituted and controlled, was **incapable of exercising independent judgment**, thereby rendering internal corrective mechanisms ineffective.

196. As a result, Plaintiff Montgomery's efforts to raise concerns and seek accountability were met not with investigation, but with resistance, concealment, and retaliation.

197. As a result, Plaintiff AU was left defenseless, with the University leadership and the governing entity charged with protecting its financial interests, fiscal integrity, and reputation failing and/or refusing to act in the best interests of AU.

**The Waverly Building Project at Plaintiff AU**

**A. Defendants' Prior Knowledge of a Fraudulent Financial Scheme**

198. The factual allegations set forth herein are informed, in part, by publicly filed materials in *In re AME Church Employee Retirement Fund Litigation*, Lead Case No. 1:22-md-03035-STA-jay (W.D. Tenn. 2023), including orders addressing motions to dismiss the consolidated amended complaint.

199. That litigation concerned the administration of the retirement fund of Defendant AMEC including allegations of large-scale diversion and misuse of retirement assets.

200. Defendant **AMEC** maintained a Department of Retirement Services responsible for administering retirement plan assets for clergy and employees.

201. From approximately 2012 through 2016, Defendant **Davis** served as Chair of the Department of Retirement Services, and from approximately 2016 through 2021, Defendant **Green** served in that same role.

202. In those roles, Defendants Davis and Green exercised supervisory authority over the Executive Director of the Department of Retirement Services, including oversight of the administration and investment of retirement plan assets.

203. During that period, the Executive Director created and implemented a financial structure involving the formation of multiple business entities to which retirement plan funds were transferred.

204. Upon information and belief, those entities were controlled by the Executive Director and were used to receive and transfer funds originating from the retirement plan.

205. Funds were transferred from legitimate investment accounts into these entities, including entities created and controlled by the Executive

Director, and were subsequently used in transactions that lacked transparency and, in many instances, were not repaid.

206. These activities occurred over a period of years during which the Defendants **Davis** and **Green** were responsible for oversight of the retirement plan.

207. Upon information and belief, Defendant **AMEC** and Defendant **Council of Bishops** were fiduciaries to the retirement plan and had a duty to protect the integrity of the funds obtained by the retirement plan.

208. As a result of the activities by the Executive Director and the failure to properly supervise the Executive Director, substantial losses were incurred by the retirement plan, and litigation was filed by beneficiaries of the plan.

209. Defendant **AMEC,** Defendant **Council of Bishops,** Defendant **Green** and Defendant **Davis** were all named as defendants in that litigation, which alleged, among other things, failures of oversight and involvement in the administration of the retirement system.

210. Through their roles and their involvement in that litigation, Defendants **Davis, Green, AMEC and Council of Bishops**, became aware of the structure and methods used to create multiple entities and transfer funds

among them in a manner that obscured the origin, control, and ultimate use of those funds.

211. Upon information and belief, this structure functioned as a template or model for the movement and control of funds through a network of affiliated entities.

**B. Replication of the Scheme at Allen University**

212. Upon information and belief, Defendant **Green** later caused or directed the use of a substantially similar structural model in connection with financial activities at Plaintiff AU.

213. At all relevant times, Defendant **Green** exercised significant control over the governance of Plaintiff AU as Chairman of Defendant BOT.

214. In that capacity, Defendant **Green** directed Defendant **McNealey,** then President of Plaintiff AU, regarding the structure of financial transactions associated with the Waverly Project.

215. Specifically, Defendant Green instructed Defendant McNealey to establish a structure involving multiple affiliated entities, each receiving and transferring funds associated with the project.

216. Upon information and belief, this structure mirrored, in material respects, the model previously used within the AME retirement plan system, including:

a. The creation of multiple limited liability companies;

b. The transfer of funds among those entities;

c. Centralized control of the entities and their finances by a single individual or small group; and

d. A lack of transparency regarding the ultimate disposition of funds.

217. Defendant **McNealey** subsequently created multiple entities in connection with the Waverly Project, including:

a. Defendant **The Foundation of Allen University (referred to herein as "Foundation")**: President Defendant **McNealey;**

b. Defendant **Pickney Center Operations, LLC (referred to herein as "POC")**: President Defendant **McNealey**

c. Defendant **Waverly Hospital Owner, LLC (referred to herein as "Waverly Owner")**: President Defendant **McNealey;**

d. Defendant **Waverly Hospital MM, LLC (referred to herein as "WHMM")**: President Defendant **McNealey;**

e. Defendant **Waverly Hospital MT, LLC (referred to herein as "WMT")**: President Defendant **McNealey**.

218. Each of these entities received funds from various sources, including funds originating from Plaintiff AU and third-party financing sources.

219. Defendant McNealey maintained control over these entities and their financial accounts and refused repeated requests to provide financial documentation or accounting to Plaintiff Montgomery or Defendant BOT.

220. The structure and operation of these entities resulted in the transfer and control of significant funds without meaningful oversight or transparency.

221. The structure and operation of these entities resulted in substantial undisclosed financial liability to Plaintiff AU incurred by Defendant **McNealey** and approved by Defendant **Green**.

### C. Defendants' Knowledge and Participation

222. Defendant **Green's** prior role in supervising the retirement system, and his involvement in litigation concerning that system, provided him with knowledge of the risks and potential for misuse associated with such multi-entity financial structures.

223. Despite that knowledge, Defendant **Green** directed or approved the use of a similar structure at Plaintiff AU.

224. Defendant **Davis,** who also served in a supervisory role within the retirement system and was named in the related litigation, likewise possessed knowledge of the structure and its potential for misuse.

225. In or around August 2024, Defendant **Davis** became Bishop of the Seventh Episcopal District of Defendant AMEC, and thus, Chairman of the Board of Trustees of Allen University.

226. In that role, Defendant **Davis** was responsible for ensuring transparency, accountability, and compliance with fiduciary obligations.

227. Instead of facilitating oversight, Defendant Davis actively prevented inquiry into the financial structure and transactions associated with the Waverly Project.

228. Plaintiff Montgomery repeatedly requested information regarding:

a. The structure of the entities involved in the project;

b. The source and use of funds;

c. The existence of any encumbrances on University property; and

d. The financial obligations incurred in connection with the project.

229. These requests were made both verbally and in writing and were directed to Defendants **McNealey, Green, and Davis**, as well as counsel associated with the University.

230. Defendants refused to provide responsive information.

231. When Plaintiff **Montgomery's** inquiries became more specific, including questions regarding mortgages and the identity of lenders,

Defendant **Davis** intervened to halt discussion and prevent further inquiry during Board meetings.

232. Defendant **Davis,** acting as Chairman of Defendant BOT, did not act as a neutral presiding officer but instead used his position to control the flow of information and suppress discussion.

233. At the same time, Defendant Davis exercised authority as a Bishop within the AME Church, reinforcing his influence over clergy and lay leader Trustees whose employment and assignments were subject to his control.

234. This dual role further ensured that member Trustees of Defendant BOT would not challenge the actions of Defendants or demand transparency.

### D. Refusal to Disclose Financial Information and Resulting Harm

235. Despite the involvement of substantial funds, including millions of dollars in project financing and University assets, Defendants have failed and refused to provide a full accounting of:

a. The total funds received by each entity;

b. The distribution and use of those funds;

c. The obligations incurred by the University; and

d. Whether funds advanced by the University were repaid.

236. Upon information and belief, University funds were contributed to the project without full disclosure to, or approval by, Defendant BOT.

237. The lack of transparency and refusal to provide documentation prevented the members of Defendant BOT from exercising their fiduciary responsibilities.

238. The structure employed by Defendants enabled the movement and control of funds in a manner that obscured their origin, purpose, and ultimate use, thereby facilitating misuse and preventing accountability.

239. Defendants' actions were consistent with a deliberate effort to replicate and implement a financial structure known to permit the diversion and concealment of funds, while avoiding scrutiny by those charged with oversight.

**E. Fraudulent Scheme to Obtain Federal Funds Through the Waverly Project**

240. In or around 2022, federal funding in the approximate amount of **$4.2 million** was secured for the Waverly Building Project through efforts of Congressman **James Clyburn**, who at all relevant times served as a member of the Board of Trustees of Allen University (Defendant BOT).

241. In or around 2022, Plaintiff AU sought to obtain federal funding in the approximate amount of $4.2 million in connection with the Waverly Building

Project (the "Waverly Project"), a development initiative involving University-owned property.

242. The funding was administered through the **United States Department of Housing and Urban Development ("HUD")** and was subject to strict eligibility requirements, including requirements governing the timing of work performed and the documentation supporting such work.

243. Defendant **McNealey,** acting in his capacity as President of Allen University (Plaintiff AU), was responsible for preparing and submitting the documentation required to obtain disbursement of the federal funds.

244. In or around 2022, Defendant McNealey caused an initial submission to be made to HUD that included invoices and related documentation purporting to demonstrate that work associated with the Waverly Project satisfied HUD's eligibility requirements.

245. The initial submission identified specific dates on which the work was allegedly performed and represented that such work qualified under HUD program guidelines.

246. HUD reviewed the submission and notified Defendant McNealey that the documentation did not meet the program's requirements, including that the dates reflected in the invoices and supporting materials fell outside the timeframe necessary for eligibility.

247. As a result of these deficiencies, HUD declined to approve or release the requested funds based on the initial submission.

248. Rather than disclose the ineligibility of the work or correct the underlying deficiencies, Defendant **McNealey,** upon information and belief, conferred with a contractor and/or other third parties involved in the Waverly Project regarding how to address the rejection.

249. Following this communication, Defendant **McNealey** caused a second submission to be prepared and transmitted to HUD.

250. The second submission included the same or substantially similar invoices and supporting documentation, but with material alterations to the dates and related representations.

251. These altered dates were selected to make it appear that the work had been performed within the timeframe required for eligibility under the HUD program.

252. Defendant **McNealey** knew, or acted with reckless disregard for the truth, that the revised dates did not accurately reflect when the work was performed.

253. The alteration of dates and resubmission of the documentation was undertaken with the intent to mislead HUD into believing that the Waverly Project satisfied program requirements, when in fact it did not.

254. The timing of the work was a material condition of eligibility, and the altered information was therefore capable of influencing HUD's decision to approve or deny funding.

255. The second submission was transmitted through interstate means, including electronic communications and document transmissions, in furtherance of the effort to obtain federal funds.

256. Upon information and belief, HUD identified discrepancies between the original and revised submissions, including inconsistencies in dates and documentation.

257. As a result, HUD determined that the submission was irregular and unreliable, and declined to release the requested funds.

258. The conduct described herein constituted an attempt to obtain federal funds through materially false and misleading representations, including the alteration of documentation submitted to a federal agency.

259. These actions were not the result of clerical error or misunderstanding but rather reflect a deliberate effort to modify material information after rejection in order to satisfy eligibility requirements artificially.

**F. Knowledge, Ratification, and Failure to Act by the Board of Trustees (Defendant BOT)**

260. The actions of Defendant **McNealey** in submitting altered documentation to HUD were known to members of Defendant BOT.

261. Upon information and belief, members of Defendant Board, including Congressman James Clyburn, were informed that:

a. The initial submission to HUD had been rejected due to noncompliant dates; and

b. A second submission containing revised or altered dates had been made in response.

262. The submission of altered documentation to a federal agency in connection with a request for funding presented a serious issue of legal compliance and institutional integrity.

263. Notwithstanding this knowledge, Defendant **BOT** failed to:

a. Initiate an independent investigation into the conduct;

b. Require production of the underlying documentation;

c. Report the matter to appropriate authorities; or

d. Remove or discipline Defendant McNealey.

264. Instead, Defendant **McNealey** remained President of Plaintiff AU with the support of **Defendant Green, Defendant Davis, and a majority of Defendant BOT.**

265. Defendant **Davis**, acting as Chairman of Defendant BOT, further exercised control over Board proceedings and limited or prevented discussion of financial matters, including issues related to the Waverly Project.

266. Defendant **BOT's** failure to act in the face of known misconduct constitutes ratification of Defendant **McNealey's** conduct and reflects the absence of independent oversight within the University's governance structure.

267. By permitting Defendant **McNealey** to remain in his position after engaging in conduct that raised substantial concerns of fraud, **Defendant Green, Defendant Davis and Defendant BOT** enabled the continuation of the broader scheme described herein.

**Allen Days Fundraising**

**A. Misappropriation of Funds Raised for Allen University ("Allen Days" Fundraising)**

268. At all relevant times, Plaintiff AU was a nonprofit educational institution that relied, in part, on charitable contributions to support its students, faculty, programs, and operations.

269. From approximately 2016 through 2024, Defendant **Green** served as Bishop of the Seventh Episcopal District of the Defendant **AMEC** and, concurrently, as Chairman of Defendant BOT.

270. The Seventh District is comprised of multiple Annual Conferences, which are large, organized gatherings of clergy and members at which fundraising activities regularly occur.

271. During each year of Defendant **Green's** tenure as Bishop, Annual Conferences were held at which funds were solicited and raised during events commonly referred to as "Allen Days."

272. Defendant McNealey spoke during Allen Days, AU students performed, faculty and staff provided updates to clergy and members of Defendant AMEC who attended the Annual Conferences.

273. At these events, funds were solicited **in the name of Allen University and for the stated benefit of Allen University**, including its students, faculty, and institutional programs.

274. These fundraising efforts were publicly promoted and widely disseminated, including through live-streamed events and social media, where the amounts raised for Plaintiff AU were announced.

275. Upon information and belief, from approximately 2017 through 2024, **in excess of one million dollars per year** was raised during Allen Days events at the Annual Conferences.

276. Members of Defendant BOT, including **Defendants Anderson, Britton, Curry, Goff, Keith, Parrot, Richburg, Scott, and Temoney,** attended one or more of these Annual Conferences and were aware that substantial funds were being raised for Plaintiff AU.

277. Despite being raised in the name of and for the benefit of Allen University, the funds collected during Allen Days were **not collected by, deposited into, or controlled by Plaintiff AU**.

278. Instead, upon information and belief, such funds were collected and retained by or through entities associated with Defendant **Green** and/or Defendant **AMEC.**

279. Donors who contributed funds during Allen Days reasonably believed that their contributions were being made directly to Allen University and would be used for its benefit.

280. In connection with these fundraising activities, checks were accepted from donors that referenced Plaintiff AU or were made payable in a manner suggesting that they were intended for Allen University.

281. Upon information and belief, such checks were deposited into accounts that included Plaintiff AU's name but were **not accounts owned, controlled, or authorized by Allen University**.

282. The use of accounts bearing the name of Allen University created the false impression that donations were being received and managed by the University.

283. Donors who sought receipts or confirmation of their charitable contributions were not provided documentation from Plaintiff AU.

284. Instead, Allen University staff were instructed to direct donors seeking receipts to the office of the Bishop, where receipts would be issued outside the University's financial systems.

285. This process further removed the collection and documentation of charitable contributions from the oversight and control of Allen University.

286. As a result, Plaintiff AU did not receive, record, or account for substantial funds raised in its name.

**B. Knowledge, Participation, and Continuation of the Scheme**

287. **Defendant McNealey, Defendant Green, Defendant Davis, and the Trustee Defendants** identified above knew or had reason to know that

funds raised during Allen Days were **not being collected by or transferred to Allen University**.

288. Despite this knowledge, none of these Defendants informed the full Board of Trustees, University administration, or the University community, including students, faculty, staff, or alumni, that funds raised in the University's name were being retained outside the University.

289. In addition to Annual Conferences, Defendant **Green** conducted periodic district meetings at which additional funds were solicited for Allen University.

290. Upon information and belief, funds raised at these meetings were likewise **not collected by or transferred to Plaintiff AU.**

291. In or around August 2024, Defendant **Davis** became Bishop of the Seventh District and Chairman of the Board of Trustees of Allen University.

292. As early as September 2024, Defendant Davis became aware that funds raised during Allen Days events had not been collected by or transferred to Allen University.

293. On or about September 13, 2024, Defendant **Davis** met with Defendant **McNealey** to discuss the disposition of funds raised during Allen Days.

294. During that meeting, Defendant **Davis** acknowledged that funds raised for Plaintiff AU had been distributed among multiple entities rather than being delivered to the University.

295. Rather than taking steps to investigate, disclose, or correct this conduct, Defendant Davis and Defendant McNealey agreed, upon information and belief, to continue the practice of distributing such funds outside the University, including by allocating portions of the funds between Allen University and other entities.

296. This meeting was not disclosed to the full Board of Trustees.

297. This agreement and the underlying disposition of funds were not disclosed to the full Board of Trustees or to the University community.

298. Following his assumption of leadership, Defendant **Davis** continued to conduct Annual Conferences at which funds were raised in the name of Plaintiff AU.

299. Upon information and belief, in 2024 and 2025, more than one million dollars was raised at each such Annual Conference for the stated benefit of Plaintiff AU.

300. As with prior years, these funds were collected by or through personnel associated with Defendant **Davis** and/or Defendant **AMEC** and were **not collected by or transferred to Allen University**.

301. The Trustee Defendants who attended these conferences were aware of the fundraising activities and the amounts raised.

302. **Defendant McNealey, Defendant Davis, and the Trustee Defendants** knew or had reason to know that the funds raised in Allen University's name were not being received or controlled by the University.

303. Despite this knowledge, Defendants failed to disclose the diversion of funds, failed to ensure that such funds were delivered to Allen University, and failed to implement any corrective measures.

304. The conduct described herein resulted in the diversion of substantial charitable funds away from Plaintiff AU and deprived the University, its students, and its programs of resources intended for their benefit.

305. The actions of Defendants were undertaken in a manner that **misrepresented to donors the true recipient and use of their contributions**, and concealed the disposition of funds from those charged with oversight.

**50 + 1 Sports-Columbia, LLC**

**A. Fraudulent Inducement, Breach of Contract, Defamation, and Board Ratification – 50+1 Sports-Columbia LLC**

306. On or about July 13, 2023, Defendant McNealey, acting in his capacity as President of Plaintiff AU, entered into a Memorandum of

Understanding ("MOU") with 50+1 Sports-Columbia LLC ("501S"), pursuant to which 501S agreed to construct a football stadium and student union for the benefit of AU.

307. The parties subsequently entered into a Master Ground Lease under which 501S would develop income-producing facilities on University-owned land, with revenues to be shared between AU and 501S.

308. The original agreement contemplated completion of the football stadium by approximately August 2025.

**B. Fraudulent Inducement of Accelerated Construction**

309. On or about October 13, 2023, Defendant McNealey met with Monti Valrie, Chief Executive Officer of 501S, in the presence of Dr. Dub Taylor.

310. During that meeting, Defendant McNealey requested that 501S accelerate construction of the football stadium.

311. In support of that request, Defendant McNealey represented that his employment as President of AU was in jeopardy and that he would be terminated by Defendant BOT if the stadium was not completed by 2024.

312. That representation was **false.** Upon information and belief, no such threat had been made by Defendant BOT.

313. Defendant McNealey further offered to pay 501S an additional **$3,000,000 "expedite fee"** in exchange for accelerating the construction timeline to October 2024.

314. At the time he made this representation and offer, Defendant McNealey **knew, or recklessly disregarded the fact, that Plaintiff AU lacked sufficient funds to pay the promised $3,000,000.00**. Defendant McNealey made this offer **without disclosing** Plaintiff AU's inability to perform.

315. Defendant McNealey intended that 501S rely on these representations.

316. In reliance on Defendant McNealey's statements and promises, 501S agreed to accelerate the project and began work in or around October 2023, incurring substantial costs.

### C. Execution of Agreement Despite Known Inability to Perform

317. On or about January 16, 2024, Defendant McNealey executed an amended MOU reflecting the accelerated timeline and the $3,000,000 expedite fee.

318. The amended agreement required payment beginning on or about January 26, 2024.

319. At the time he executed the amended MOU, Defendant McNealey **knew that neither he nor Plaintiff AU had the funds necessary to perform the agreement**, including the required payments.

320. Despite this knowledge, Defendant McNealey allowed 501S to continue performance and incur additional costs.

321. In reliance on Defendant **McNealey's** representations and promises, 501S agreed to accelerate the project and began work in or around October 2023, incurring substantial costs.

**D. Concealment of Breach of Contract and Escalation of Liability**

322. Defendant McNealey failed to make the required payments under the amended MOU, including the $3,000,000 expedite fee.

323. As a result, Plaintiff AU was placed in breach of contract and exposed to significant financial liability.

324. Defendant Green was aware of the agreement and the failure to make payment.

325. Neither Defendant McNealey nor Defendant Green disclosed the breach to Defendant BOT at the Spring 2024 Board meeting.

326. In or around May 2024, 501S issued a demand for payment to Defendant Green, which was not disclosed to members of Defendant BOT.

327. On or about July 26, 2024, 501S sent a demand to the Board of Trustees seeking approximately $4.2 million for costs incurred.

328. Defendant BOT failed to respond and failed to convene a special meeting despite requests from members of the Board.

**E. False Statements and Defamation of Mr. Valrie**

329. After Defendant McNealey entered into the amended MOU with 50+1 Sports-Columbia LLC ("501S") and failed to perform the payment obligations required under that agreement, Defendant McNealey made a series of statements concerning Monti Valrie, the Chief Executive Officer of 501S.

330. These statements were made in the presence of third parties, including members of Defendant BOT and legal counsel for Allen University.

331. On or about August 8, 2024, during a meeting attended by Defendant McNealey, Defendant Richburg, Plaintiff Montgomery, and legal counsel, Defendant McNealey repeatedly referred to Mr. Valrie as a "thug," or words to that effect.

332. Upon information and belief, Defendant McNealey, as President of Plaintiff AU and ex-officio member of Defendant BOT, made similar

statements about Mr. Valrie on other occasions in the presence of Board members and others associated with Plaintiff AU.

333. In addition to these statements, Defendant McNealey stated or implied that invoices submitted by or on behalf of 501S were false, inflated, or otherwise unreliable.

334. Defendant McNealey further stated or implied that Mr. Valrie engaged in improper or questionable business practices.

335. These statements were made in connection with discussions regarding Plaintiff AU's contractual obligations to 501S and the claims asserted by 501S for payment.

336. At the time Defendant McNealey made these statements, he knew or should have known that:

a. He had offered the $3,000,000 expedite fee to 501S;

b. 501S had relied on that agreement and incurred substantial costs; and

c. Allen University had failed to make required payments under the amended MOU.

337. Defendant McNealey's statements regarding Mr. Valrie and 501S were false or made with reckless disregard for their truth or falsity.

338. The statements were made for the purpose of **discrediting Mr. Valrie and 501S**, and to deflect attention from Defendant McNealey's own conduct in entering into agreements that Plaintiff AU could not perform.

339. Defendant Richburg, during the same August 8, 2024 meeting, also referred to Mr. Valrie as a "thug," despite having no prior dealings with or knowledge of Mr. Valrie.

340. These statements were made to third parties and were not privileged.

341. The statements were reasonably understood by those who heard them to mean that Mr. Valrie was dishonest, untrustworthy, or engaged in improper or unlawful business conduct.

342. Defendant McNealey made these statements in an effort to discredit 501S and deflect attention from his own conduct and AU's breach of contract.

343. Such statements, if false, are defamatory per se in that they impute unfitness in one's profession and business practices.

344. The dissemination of these statements caused harm to Mr. Valrie and 501S, including damage to reputation and interference with business relationships.

345. The timing and content of these statements further demonstrate an effort by Defendants to **undermine the credibility of 501S's claims** and avoid accountability for Allen University's contractual obligations.

### F. False Statements to the Board of Trustees

346. On or about September 17, 2024, Defendant McNealey denied to Defendant BOT that he had offered the $3,000,000 expedite fee and implied that the fee had been requested by 501S.

347. These statements were false.

348. On or about October 4, 2024, Defendant McNealey admitted to Defendant BOT that he had offered the expedite fee and that 501S had not requested it.

349. Defendant McNealey further admitted that he had not paid the fee and stated, in substance, that he did not have the funds to do so.

350. Defendant McNealey, as President of Plaintiff AU, had a duty to provide truthful and complete information to the Board of Trustees and breached that duty by making false and misleading statements.

### G. Board Notice of Defamatory Statements, Ratification and Failure to Act

351. On or about October 4, 2024, Plaintiff Montgomery informed members of Defendant BOT that Defendant McNealey had referred to

Monti Valrie, Chief Executive Officer of 50+1 Sports-Columbia LLC, as a "thug," and had made statements questioning the legitimacy of invoices submitted by or on behalf of 501S.

352. Plaintiff Montgomery further informed Defendant BOT that such statements were false, damaging, and made in the context of Plaintiff AU's contractual dispute with 501S.

353. On or about December 2, 2024, Plaintiff Montgomery again raised these concerns to Defendant BOT, reiterating that Defendant McNealey had made defamatory statements concerning Mr. Valrie and had improperly questioned the validity of 501S's invoices and business practices.

354. These disclosures placed Defendant BOT on **actual notice** that Defendant McNealey had made statements that were potentially false, misleading, and harmful to the reputation of a contractual counterparty.

355. Despite this notice, Defendant BOT failed to:

a. Investigate Defendant McNealey's conduct;

b. Correct or repudiate his statements;

c. Convene a special meeting; or

d. Take disciplinary action or remove him.

356. Defendant BOT did not issue any clarification to third parties and did not disavow Defendant McNealey's statements.

357. Defendant Davis, as Chairman of the Board of Trustees, was present for or aware of Plaintiff Montgomery's disclosures and likewise failed to take any action.

358. Instead, Defendant Davis and a majority of Defendant BOT continued to support Defendant McNealey

359. Defendant BOT's failure to act, despite repeated notice, constitutes a **ratification of Defendant McNealey's conduct** and reflects a lack of independent oversight and governance.

360. The inaction of Defendant BOT further enabled Defendant McNealey to continue making statements and taking actions without accountability and contributed to the broader pattern of misconduct described in this Complaint.

### H. Knowledge, Defamation, and Failure to Act by Defendant Davis and the Board

361. Defendant **Davis** was present for both the September 17, 2024, denial and the October 4, 2024 admission by Defendant McNealey.

362. Defendant Davis therefore knew that Defendant McNealey had made **materially false statements to the governing body of Allen University**.

363. Defendant Davis further knew, or had reason to know, that Defendant McNealey had made **defamatory statements** concerning Monti Valrie, including referring to him as a "thug" and questioning the legitimacy of invoices submitted by or on behalf of 501S.

364. Despite this knowledge, Defendant Davis took no action to:

a. Investigate Defendant McNealey's false statements;

b. Address or correct the defamatory statements made about Mr. Valrie;

c. Convene a special meeting of the Board of Trustees;

d. Initiate disciplinary action; or

e. Remove Defendant McNealey from his position.

365. Instead, Defendant Davis continued to support Defendant McNealey and permitted him to remain in control of the University's operations and financial affairs..

366. Defendant BOT, despite being presented with evidence of the agreement, the breach, and the resulting liability, likewise failed to take corrective action.

367. Defendant BOT received a legal opinion confirming the validity of the amended MOU and the potential liability of Plaintiff AU yet remained silent.

368. Defendant McNealey, as President of Allen University, owed a duty to provide **truthful, complete, and accurate information** to the Board of Trustees and breached that duty by:

a. Making false statements regarding the existence and terms of the expedite fee;

b. Concealing material facts concerning the University's inability to perform under the contract;

c. Making defamatory statements in an effort to discredit a contractual counterparty and deflect responsibility; and

d. Entering into agreements he knew Plaintiff AU could not perform.

369. Notwithstanding Defendant McNealey's breach of his duty to Defendant BOT, Defendant BOT continued to remain silent and took no action to correct or discipline Defendant McNealey.

370. As a direct and proximate result of Defendants' conduct, Plaintiff AU has been exposed to **substantial financial liability**, including damages that may amount to **tens of millions of dollars**.

## I. Resulting Harm

371. As a direct and proximate result of Defendants' conduct:

a. Plaintiff AU has been exposed to **substantial financial liability**, including damages that may amount to tens of millions of

dollars;

b. 501S incurred significant financial losses in reliance on Defendant McNealey's representations; and

c. The integrity and governance of Allen University have been materially compromised.

**Retaliation Against Dr. Dub Taylor and Failure of the Board to Act**

372. During the approximate period from July 19, 2019, through April 15, 2025, Dr. Dub Taylor served as Vice President of Institutional Development at Allen University ("AU").

373. In that role, Dr. Taylor worked closely with Defendant **McNealey** and was involved in fundraising and institutional development activities, including matters relating to the Waverly Building Project and the 50+1 Sports-Columbia LLC ("501S") project.

374. Dr. Taylor was present at the October 13, 2023, meeting between Defendant McNealey and Monti Valrie, Chief Executive Officer of 501S, and personally witnessed the statements made by Defendant McNealey during that meeting.

375. After Defendant **McNealey** made conflicting and false statements to the Board of Trustees regarding the 501S agreement, members of Defendant BOT sought independent verification of the facts.

376. Following the September 17, 2024, informal Board meeting, multiple members of the Board requested that Defendant **Davis** contact Dr. Taylor to obtain truthful information regarding the 501S agreement.

377. Defendant Davis refused to contact Dr. Taylor despite these requests.

378. On or about October 4, 2024, at the Fall meeting of the Board of Trustees (Defendant BOT), Plaintiff Montgomery requested that the Board hear directly from Dr. Taylor regarding the 501S agreement.

379. Defendant Davis required a motion and vote on that request, and the Board voted to hear from Dr. Taylor.

380. Dr. Taylor appeared before Defendant BOT at its request to provide information concerning the 501S agreement.

381. Prior to Dr. Taylor's appearance, Defendant McNealey communicated with Dr. Taylor and attempted to influence his testimony.

382. Defendant McNealey sent Dr. Taylor a message stating, in substance, that Plaintiff Montgomery was "killing" him by seeking his testimony and asked Dr. Taylor to provide false or misleading information to the Board.

383. Dr. Taylor did not comply with Defendant McNealey's request and instead provided truthful information to Defendant BOT.

384. In response to questions from Plaintiff Montgomery, Dr. Taylor confirmed that Defendant McNealey had stated to Mr. Valrie: "Brother, I need your help," and had represented that he would be terminated if the stadium was not completed by 2024.

385. Dr. Taylor further confirmed that Defendant McNealey offered a $3,000,000 expedite fee to 501S.

386. Dr. Taylor also informed Defendant Davis and Defendant BOT that, based on his knowledge of the University's financial condition, Plaintiff AU did not have the funds necessary to pay the promised expedite fee at the time it was offered.

### A. Retaliation by Defendant McNealey

387. Shortly after Dr. Taylor provided truthful information to the Board, Defendant McNealey began retaliating against him.

388. On or about October 4, 2024, following the Board meeting, Defendant McNealey convened a meeting of senior University staff and made statements accusing a member of the leadership team of being a "Judas" and "Benedict Arnold."

389. Upon information and belief, these statements were understood by those present, including Dr. Taylor, to be directed at Dr. Taylor.

390. Defendant McNealey subsequently informed Dr. Taylor on or about October 4, 2024, that he intended to terminate his employment and that Defendant BOT either could not or would not intervene.

391. In furtherance of his retaliatory conduct, Defendant McNealey made **false and defamatory statements concerning Dr. Taylor** to third parties, including other employees of Allen University and members of the University community.

392. Upon information and belief, Defendant McNealey communicated statements, both directly and indirectly, that **impugned Dr. Taylor's honesty, loyalty, and professional integrity**, including statements suggesting that Dr. Taylor was disloyal, untrustworthy, or had acted improperly in connection with Plaintiff AU matters.

393. These statements were made in the presence of, and communicated to, University staff and others within the Allen University community, thereby **publishing the statements to third parties**.

394. The statements were false or were made with reckless disregard for their truth or falsity, and were made for the purpose of **discrediting Dr. Taylor and justifying Defendant McNealey's retaliatory actions**, including his eventual termination.

395. The statements were understood by those who heard them to mean that Dr. Taylor was unfit for his professional role and had engaged in improper conduct.

396. Such statements constitute **defamation per se**, as they impute unfitness in one's profession and dishonesty in the performance of one's duties.

397. As a direct and proximate result of Defendant McNealey's defamatory statements, Dr. Taylor suffered harm to his reputation, standing within the University community, and professional relationships.

398. Dr. Taylor sought assistance from members Defendant BOT, including the individually named Defendants, and requested protection from retaliation.

399. Defendant McNealey's retaliatory conduct was undertaken because Dr. Taylor, who attended the Board meeting at the request of Defendant BOT, provided truthful information to Defendant BOT concerning the 501S agreement.

### B. Notice to the Board and Failure to Act

400. Plaintiff Montgomery informed Defendant Davis and members of the Board of Trustees that Defendant McNealey was engaging in retaliatory conduct against Dr. Taylor.

401. Plaintiff Montgomery further warned that termination of Dr. Taylor under these circumstances would likely constitute wrongful termination and expose Plaintiff AU to liability.

402. Dr. Taylor also informed the Board of Trustees that he had retained legal counsel and was seeking assistance.

403. Dr. Taylor made multiple requests to Defendant BOT for intervention and protection.

404. Defendant Davis and the Board of Trustees failed to respond to these requests.

405. In or around December 2024, Plaintiff Montgomery again raised the issue of retaliation against Dr. Taylor at a Board meeting and warned that the University would have no viable defense if the retaliatory conduct continued.

406. Defendant Davis dismissed these concerns and stated, in substance, that the matter was within Defendant McNealey's discretion.

407. The remaining members of the Board of Trustees failed to take any action.

### C. Continued Retaliation and Termination

408. Defendant McNealey continued his retaliatory conduct against Dr. Taylor.

409. On or about April 15, 2025, Defendant McNealey terminated Dr. Taylor's employment without cause.

410. Dr. Taylor again appealed to the Board of Trustees and requested that his termination be reviewed and reversed.

411. Defendant BOT failed to respond and allowed the termination to stand.

**D. Resulting Harm to Allen University**

412. As a direct result of Defendant McNealey's retaliatory conduct and Defendant Davis' and Defendant BOT's failure to act, Plaintiff AU was exposed to legal claims for wrongful termination and retaliatory discharge.

413. Dr. Taylor, through counsel, pursued claims against Plaintiff AU arising from his termination.

414. Upon information and belief, Plaintiff AU ultimately resolved these claims through a settlement in excess of one million dollars.

415. The damages incurred by Plaintiff AU as a result of this conduct were substantial and avoidable.

416. The termination of Dr. Taylor, and the resulting financial harm, would not have occurred had Defendant Davis and Defendant BOT fulfilled their fiduciary duties to investigate misconduct, prevent retaliation, and protect the interests of Plaintiff AU.

417. Instead, Defendant Davis and Defendant AU failed to act, thereby ratifying Defendant McNealey's conduct and enabling further harm to the Plaintiff AU.

**Retaliatory and Wrongful Removal of Plaintiff Montgomery from the Board of Trustees**

418. In or around August 2024, Plaintiff Montgomery, in her capacity as a member of Defendant BOT, began raising questions concerning financial improprieties, including matters related to the Waverly Building project, the HUD grant, and funds raised during "Allen Days."

419. Plaintiff Montgomery's actions were undertaken in good faith and in furtherance of her fiduciary duties to protect the financial integrity and institutional interests of Allen University.

420. At the time she raised these concerns, Plaintiff Montgomery was unaware that Defendant Davis and Defendant McNealey had reached an undisclosed agreement regarding the distribution of funds raised during Allen Days. Plaintiff Montgomery believed that Defendant Davis was working in the best interests of Plaintiff AU.

421. Plaintiff Montgomery was also unaware that certain Defendants knew that funds raised in the name of Allen University had not been delivered to or controlled by the University.

422. Plaintiff Montgomery trusted the Defendants individually named, and thought they would act in the best interests of Plaintiff AU.

**A. Obstruction of Governance and Refusal to Convene Meetings**

423. On or about October 4, 2024, Defendant Davis recessed a meeting of Defendant BOT and represented that the meeting would reconvene the following week.

424. Defendant Davis did not reconvene the meeting as promised.

425. Plaintiff Montgomery contacted Defendant Davis asking him to reconvene the meeting. Defendant Davis did not respond.

426. Plaintiff Montgomery requested Defendant Davis to reconvene to reduce Plaintiff AU's liability to 501S, by entering into a settlement agreement with 501S. The settlement agreement could not be entered into without Defendant BOT's approval.

427. Plaintiff Montgomery contacted Defendant Davis multiple times. Defendant Davis did not respond, and he did not reconvene the meeting.

428. Plaintiff Montgomery then requested that a Special Meeting be called pursuant to the Official Bylaws of Defendant BOT.

429. The Bylaws expressly provide that a Special Meeting may be called upon the request of one-third of the members of the Board of Trustees.

430. One-third of the members of Defendant BOT agreed to hold a Special Meeting.

431. Plaintiff Montgomery sought to coordinate the scheduling of the meeting with Defendant Davis, but Defendant Davis again failed to respond.

432. Instead, Defendant Davis communicated with the full Board and falsely stated that only the Chairman had authority to call a meeting.

433. Defendant Davis knew this statement was false, as Plaintiff Montgomery had cited the governing Bylaw provision permitting trustees to call a Special Meeting.

434. These actions obstructed the Board's ability to conduct oversight and address the financial issues raised by Plaintiff Montgomery.

**B. Escalation of Retaliation and Public Targeting of Plaintiff Montgomery**

435. Plaintiff Montgomery reported concerns regarding governance failures and financial improprieties to Defendant **Council of Bishops** of Defendant **AMEC**.

436. Despite receiving this information, Defendant Council of Bishops, who had assigned Defendant Davis to the Seventh Episcopal District of

Defendant AMEC and had the power to discipline or remove him, failed to respond or take action.

437. On or about December 2, 2024, Defendant Davis reconvened a meeting of the Board of Trustees.

438. At the outset of the meeting, Defendant Davis announced that trustee qualifications would be reviewed, signaling an intent to target certain members of the Board, including Plaintiff Montgomery.

439. During the meeting, Defendant Goff made statements implying that Plaintiff Montgomery had violated accreditation standards, including those of SACSCOC.

440. When Plaintiff Montgomery objected, Defendant Davis intervened and escalated the criticism.

441. Defendant Davis, in his capacity as Chairman of the Board and Prelate of the Seventh District, repeatedly criticized, interrupted, and attempted to discredit Plaintiff Montgomery in the presence of the full Board.

442. Defendant Davis falsely accused Plaintiff Montgomery of manipulating him into violating accreditation standards and asserted, without substantiation, that unnamed attorneys supported that claim.

443. Defendant Davis further characterized Plaintiff Montgomery's communications and efforts to raise concerns as "inappropriate," including her efforts to inform the Board of retaliation against Dr. Taylor.

444. Defendant Davis also suggested that Plaintiff Montgomery had improperly communicated with external parties, including the media, which Plaintiff Montgomery denied.

445. These statements were made publicly before Defendant BOT and were intended to discredit, humiliate, and isolate Plaintiff Montgomery.

### C. Suppression of Inquiry and Refusal to Investigate

446. During the December 2, 2024, meeting, Plaintiff Montgomery attempted to raise substantive questions regarding financial matters, including whether encumbrances existed on University property.

447. Defendant Davis terminated such inquiries, preventing further discussion.

448. Plaintiff Montgomery also raised concerns regarding Defendant McNealey's retaliation against Dr. Taylor.

449. Defendant Davis dismissed those concerns, stating, in substance, that such matters were within Defendant McNealey's discretion.

450. Plaintiff Montgomery moved for an independent investigation into financial matters, including the 50+1 agreement, the Waverly Building project, and Allen Days funds.

451. Defendant Davis actively opposed the motion and discouraged its adoption.

452. The majority of Defendant BOT voted against the motion, thereby refusing to investigate the issues raised.

453. Defendant Davis further stated that he was satisfied with the Waverly Building matter despite the absence of financial documentation or transparency.

454. When Plaintiff Montgomery offered to provide documentary evidence supporting her concerns, Defendant Davis instructed her not to do so.

### D. Retaliatory Removal in Violation of Bylaws

455. In or around February 2025, Plaintiff Montgomery was interviewed by a Special Agent of the Federal Bureau of Investigation regarding matters involving Allen University.

456. On or about March 20, 2025, Defendant Davis convened a Special Meeting of the Board of Trustees.

457. The notice of the meeting failed to comply with the Bylaws, as it did not include the purpose of the meeting or an agenda describing the business to be conducted.

458. Plaintiff Montgomery requested information regarding the purpose of the meeting, but Defendant Davis failed to respond.

459. During the meeting, Defendant Davis inquired whether any Board members had been contacted by the FBI. Plaintiff Montgomery disclosed that she had been interviewed.

460. Immediately thereafter, Defendant Davis proceeded to introduce actions relating to Plaintiff Montgomery without prior notice.

461. Defendant Curry recommended the removal of Plaintiff Montgomery for "cause," but did not identify any valid basis for such cause under the Bylaws.

462. Plaintiff Montgomery was not afforded a meaningful opportunity to respond or defend herself.

463. A motion to remove Plaintiff Montgomery was made and seconded by members of Defendant BOT aligned with and appointed by Defendant Davis.

464. The named Defendants present voted to remove Plaintiff Montgomery from the Defendant BOT.

465. The removal was conducted in violation of the Board's governing Bylaws and without due process.

466. Upon information and belief, Plaintiff Montgomery is the only trustee who has been removed from the Board of Trustees during the relevant period, and her removal occurred only after she raised concerns regarding financial misconduct, demanded transparency, and sought to initiate investigations. No other trustee, including those who engaged in or ratified the misconduct described herein, was investigated, disciplined, or removed.

**E. Retaliatory Motive and Resulting Harm**

467. Plaintiff Montgomery's removal was not based on legitimate governance concerns.

468. Rather, it was undertaken in retaliation for her efforts to:

a. Investigate financial improprieties;

b. Demand transparency and accountability;

c. Expose misconduct relating to the 50+1 agreement, Waverly Project, and Allen Days funds; and

d. Report concerns to appropriate authorities.

469. Defendants acted in concert to remove Plaintiff Montgomery in order to silence her and prevent further scrutiny of their conduct.

470. The removal of Plaintiff Montgomery was intended to intimidate other trustees and deter further inquiry into the matters described in this Complaint.

471. As a direct and proximate result of Defendants' actions, Plaintiff Montgomery suffered harm, including damage to her reputation, professional standing, and emotional well-being.

472. Defendants' conduct also deprived Allen University of independent oversight and further enabled the continuation of the misconduct described herein.

## VII. DERIVATIVE ALLEGATIONS ON BEHALF OF ALLEN UNIVERSITY

473. Plaintiff Montgomery brings this action derivatively on behalf of Plaintiff AU to redress injuries inflicted upon AU by Defendants' fraud, misuse of charitable assets, concealment of financial information, self-dealing, retaliatory governance practices, and related misconduct described herein.

474. At all relevant times, AU was governed by Defendant BOT, which owed fiduciary duties to AU and was charged with protecting the University's assets, ensuring legal compliance, and preserving AU's charitable and educational mission.

475. As alleged above, Defendants Green, Davis, McNealey, Anderson, Britton, Curry, Goff, Keith, Parrott, Richburg, Scott, and Temoney constituted a controlling block within Defendant BOT and exercised effective control over the governance of AU.

476. The same Defendants who controlled Defendant BOT also participated in, knowingly approved, ratified, concealed, or deliberately failed to prevent the misconduct alleged in this Complaint, including the concealment of financial information, diversion of charitable funds, attempted fraud involving HUD funds, exposure of AU to contractual liability, retaliation against truth-tellers, and retaliatory removal of Plaintiff Montgomery.

477. Because Defendant BOT was dominated by individuals who were themselves implicated in the challenged conduct, Defendant BOT was incapable of exercising disinterested and independent judgment concerning whether AU should pursue claims arising from that conduct.

478. Plaintiff Montgomery repeatedly demanded oversight, transparency, investigation, and corrective action, including:

a. Requests for financial records and explanations regarding the Waverly Project;

b. Requests for information regarding Allen Days fundraising

proceeds;

c. Requests that Defendant BOT investigate Defendant McNealey's conduct concerning the 50+1/501S agreement;

d. Requests that Defendant BOT investigate retaliation against Dr. Taylor;

e. Requests that Defendant BOT conduct an independent investigation; and

f. Requests that Defendant BOT convene meetings authorized by the Bylaws to address these matters.

479. Those requests were ignored, obstructed, voted down, suppressed, or met with retaliation.

480. Any further demand on Defendant BOT to initiate this action would have been futile because:

a. The majority of Defendant BOT was controlled by Defendants Davis and Green;

b. Multiple members of Defendant BOT were personally involved in, benefited from, or ratified the misconduct alleged herein;

c. Defendant BOT failed to act despite actual notice of misconduct, including notice of the HUD submission irregularities, diversion of Allen Days funds, breach of the 50+1/501S agreement, retaliation

against Dr. Taylor, and retaliation against Plaintiff Montgomery;

d. Defendant BOT was incapable of acting independently because of structural domination, conflicts of interest, ecclesiastical control, and service beyond authorized terms; and

e. Defendant BOT demonstrated hostility toward Plaintiff Montgomery for raising the very concerns that form the basis of this action.

481. Plaintiff Montgomery fairly and adequately represents the interests of Plaintiff AU in seeking redress for injuries to the University, including diversion of funds, misuse of assets, exposure to liability, impairment of governance, and damage to Plaintiff AU's financial stability and institutional integrity.

## VIII. ENFORCEMENT OF CHARITABLE TRUST OBLIGATIONS

482. Allen University (Plaintiff AU) is a nonprofit educational institution organized and operated for charitable and educational purposes.

483. The funds, assets, gifts, restricted donations, fundraising proceeds, and real property of Plaintiff AU are held and administered for charitable purposes and for the benefit of Plaintiff AU, its students, faculty, programs, and the public.

484. Persons who control, manage, or direct such assets for Plaintiff AU, including trustees, officers, and those exercising de facto control over the

University, owe fiduciary and trust-like obligations to ensure that such assets are used solely for Plaintiff AU's lawful charitable purposes.

485. The funds raised during Allen Days were solicited expressly in the name of Allen University and for the stated benefit of Allen University, its students, faculty, and programs.

486. As alleged above, those funds were not collected by, deposited into, or accounted for by Plaintiff AU, but instead were retained outside the University and outside Plaintiff AU's financial controls.

487. Donors were led to believe that they were making charitable contributions to Plaintiff AU, and checks were accepted in a manner suggesting that they were intended for Plaintiff AU, including through accounts bearing Plaintiff AU's name but not owned, controlled, or authorized by Plaintiff AU.

488. Defendants also used Plaintiff AU's charitable status, name, assets, and governance structure in connection with the Waverly Project, the HUD funding effort, and affiliated entities created to receive and control funds associated with Plaintiff AU property and Plaintiff AU transactions.

489. By diverting, concealing, misapplying, encumbering, or exposing Plaintiff AU's assets and charitable funds to unauthorized purposes,

Defendants breached charitable trust obligations owed to Plaintiff AU and its beneficiaries.

490. Plaintiff Montgomery, as a former trustee, donor, and person with a special interest in the proper administration of Plaintiff AU's charitable assets, is entitled to seek equitable relief to protect those assets, prevent further misuse, obtain an accounting, impose restitution remedies, and restore Plaintiff AU's assets to their proper charitable purposes.

491. Plaintiff seeks equitable relief to protect and restore charitable assets, including, but not limited to, an accounting, restitution, imposition of a constructive trust, removal or suspension of fiduciaries who have breached their duties, and such other relief as may be necessary to ensure that Plaintiff AU's assets are used for their intended charitable purposes.

## IX. CAUSES OF ACTION

## COUNT I

## BREACH OF FIDUCIARY DUTY

**(Derivative on Behalf of Allen University Against McNealey, Green, Davis, Anderson, Britton, Curry, Goff, Keith, Parrott, Richburg, Scott, Temoney, and BOT)**

492. Plaintiffs repeat and reallege all preceding paragraphs, including the Derivative Allegations and Charitable Trust Allegations, as if fully set forth herein.

493. At all relevant times, Defendants owed fiduciary duties to Plaintiff Allen University, including duties of loyalty, care, candor, good faith, obedience to governing documents, and protection of charitable assets and institutional interests.

494. Defendant McNealey owed fiduciary duties to Plaintiff AU as President, including duties of honesty, full disclosure, and faithful stewardship of AU's assets, finances, contracts, and legal affairs.

495. Defendant Green and Defendant Davis owed fiduciary duties through their positions as Chairmen of Defendant BOT and through their exercise of actual control over AU governance.

496. The remaining trustee Defendants owed fiduciary duties as members of Defendant BOT.

497. Defendants breached those fiduciary duties by, among other things:

a. Failing to investigate known misconduct by Defendant McNealey;

b. Permitting trustees to continue serving beyond authorized terms in violation of the Bylaws;

c. Concealing material financial information from AU and the Board;

d. Permitting or ratifying diversion of Allen Days funds away from AU;

e. Permitting or ratifying the use of AU's name and charitable status to solicit funds not delivered to AU;

f. Permitting or ratifying use of affiliated entities to receive and control Plaintiff AU-related funds without transparency;

g. Permitting or ratifying the attempted use of altered documents to obtain federal HUD funds;

h. Allowing Plaintiff AU to be exposed to substantial contractual liability in connection with the 501S agreement;

i. Failing to act after receiving notice of Defendant McNealey's false statements to the Board;

j. Failing to act after receiving notice of retaliation against Dr. Taylor;

k. Retaliating against Plaintiff Montgomery for raising concerns; and

l. Placing personal, ecclesiastical, or relational loyalty above Plaintiff AU's interests.

498. Defendants' breaches were knowing, willful, in bad faith, and contrary to Plaintiff AU's interests.

499. As a direct and proximate result of these breaches, Plaintiff AU suffered damages, including diversion of funds, loss of charitable assets,

exposure to substantial contractual and employment-related liability, impairment of governance, and reputational harm.

## COUNT II

## CIVIL CONSPIRACY

### (Individual and Derivative Claims Against All Defendants)

500. Plaintiffs repeat and reallege all preceding paragraphs, including the Derivative Allegations and Charitable Trust Allegations, as if fully set forth herein.

501. Defendants combined, agreed, and acted in concert for the purpose of accomplishing unlawful objectives, including concealing financial misconduct, preventing investigation, preserving control over Plaintiff AU, retaliating against dissenters, and diverting or retaining funds outside Plaintiff AU's lawful control.

502. In furtherance of that agreement, Defendants committed overt acts, including:

a. Concealing the disposition of Allen Days funds;

b. Creating and using affiliated entities to obscure AU-related transactions;

c. Submitting altered HUD-related documents;

d. Concealing the 501S breach and resulting liability;

e. Making false statements to Defendant BOT;

f. Discrediting Mr. Valrie, Dr. Taylor, and Plaintiff Montgomery;

g. Refusing to convene meetings or permit investigation; and

h. Removing Plaintiff Montgomery from Defendant BOT.

503. Plaintiff Montgomery suffered special damages distinct from Plaintiff AU's damages, including wrongful removal from the Board, reputational injury, and emotional distress.

504. Plaintiff AU suffered direct and proximate injury from the conspiracy, including financial losses, exposure to liability, and damage to its governance and reputation.

**COUNT III**

**FRAUD / FRAUDULENT MISREPRESENTATION**

**(Derivative on Behalf of Allen University Against McNealey, Green, Davis, and Others Participating Therein)**

505. Plaintiffs repeat and reallege all preceding paragraphs, including the Derivative Allegations and Charitable Trust Allegations, as if fully set forth herein.

506. Defendants made material misrepresentations and omissions, including:

a. Misrepresentations and omissions to HUD concerning the timing

and eligibility of Waverly Project work;

b. Misrepresentations and omissions concerning Plaintiff AU's receipt and control of Allen Days funds;

c. Misrepresentations and omissions concerning Plaintiff AU's financial capacity to pay the 501S expedite fee;

d. Misrepresentations by Defendant McNealey to Defendant BOT concerning whether he offered the expedite fee and whether 501S requested it; and

e. Concealment of material financial obligations, encumbrances, and project structures from Defendant BOT.

507. These representations and omissions concerned material facts.

508. Defendants knew the representations were false or acted with reckless disregard for their truth or falsity.

509. Defendants intended that Plaintiff AU, Defendant BOT members, donors, counterparties, and federal authorities rely on these misrepresentations or be misled by the omissions.

510. Plaintiff AU and others did rely, or were deprived of truthful information necessary to act, investigate, protect Plaintiff AU, or avoid loss.

511. Plaintiffs plead fraud with particularity, including the identity of the principal speakers and actors, the subject matter of the misrepresentations,

the relevant timeframe, and the manner in which the statements were made through submissions, meetings, written communications, and proceedings of Defendant BOT.

512. As a direct and proximate result, Plaintiff AU suffered damages, including financial loss, liability exposure, and injury to its property and governance interests.

**COUNT IV**

**BREACH OF TRUST WITH FRAUDULENT INTENT**

**(Derivative on Behalf of Allen University Against McNealey, Green, Davis, and All Defendants Exercising Dominion Over Plaintiff AU Assets)**

513. Plaintiffs repeat and reallege all preceding paragraphs, including the Derivative Allegations and Charitable Trust Allegations, as if fully set forth herein.

514. Plaintiff AU's funds, fundraising proceeds, gifts, and assets were entrusted to Defendants for Plaintiff AU's use and benefit.

515. Defendants accepted, controlled, or directed those funds and assets in positions of trust.

516. Defendants intentionally dealt with those funds and assets contrary to Plaintiff AU's rights and contrary to the purposes for which the funds were entrusted.

517. Defendants acted with fraudulent intent by diverting, concealing, misdirecting, and failing to account for those assets.

518. South Carolina recognizes the offense of breach of trust with fraudulent intent in Section 16-13-230, which is built around misuse of property entrusted to another with fraudulent intent; your allegations mirror that theory in civil form.

519. As a direct and proximate result, Plaintiff AU suffered loss of funds, impairment of charitable assets, and exposure to further liability.

## COUNT V

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

## (Individual Claim by Plaintiff Montgomery Against Davis, McNealey, and Others Personally Participating)

520. Plaintiffs repeat and reallege all preceding paragraphs, including the Derivative Allegations and Charitable Trust Allegations, as if fully set forth herein.

521. Defendants engaged in extreme and outrageous conduct toward Plaintiff Montgomery, including public humiliation, false accusations,

repeated interruption and disparagement in Board meetings, suppression of her efforts to carry out fiduciary duties, and retaliatory removal from the Board.

522. Defendants intended to cause Plaintiff Montgomery emotional distress or acted in reckless disregard of the probability of causing such distress.

523. Defendants' conduct exceeded all possible bounds of decency and was intolerable in a civilized community.

524. Plaintiff Montgomery suffered severe emotional distress as a direct and proximate result.

**COUNT VI**

**DEFAMATION**

**(Individual Claim by Plaintiff Montgomery Against Davis, McNealey, Goff and Others Personally Participating)**

525. Plaintiffs repeat and reallege all preceding paragraphs, including the Derivative Allegations and Charitable Trust Allegations, as if fully set forth herein.

526. Defendants Davis and Goff made false statements concerning Plaintiff Montgomery, including statements implying she violated SACSCOC standards, manipulated Defendant Davis into violating

accreditation rules, acted improperly, or engaged in conduct inconsistent with her fiduciary role.

527. These statements were communicated to third parties, including the full Board.

528. The statements were false.

529. Defendants Davis and Goff made the statements negligently, recklessly, or with actual malice.

530. Plaintiff Montgomery sought clarification from SACSCOC, and the Chief of Staff confirmed her actions were appropriate and within her fiduciary obligations, yet Defendant Davis did not retract his accusations and continued to criticize Plaintiff Montgomery thereafter.

531. Defendants made false statements about Plaintiff Montgomery's integrity, competence, and conduct in order to discredit her and justify her removal from the Board.

532. These statements were communicated to third parties and were made with actual malice or reckless disregard for the truth.

533. The statements injured Plaintiff Montgomery's reputation, standing, and credibility.

## COUNT VII

## FRAUDULENT MISREPRESENTATION

**(Contract-Related Fraud Claim Against McNealey Concerning 501S)**

534. Plaintiffs repeat and reallege all preceding paragraphs, including the Derivative Allegations and Charitable Trust Allegations, as if fully set forth herein.

535. Defendant McNealey represented to 501S that:

a. He needed accelerated completion to preserve his presidency; and

b. Plaintiff AU would pay a $3,000,000 expedite fee.

536. Those representations were false, or were made with reckless disregard for the truth, because Defendant McNealey knew Plaintiff AU lacked the funds necessary to perform and knew Defendant BOT had not threatened to terminate him on that basis.

537. Defendant McNealey intended that 501S rely on those representations and accelerate performance.

538. 501S did rely by accelerating work and incurring substantial costs, thereby exposing Plaintiff AU to claims and damages.

539. Plaintiff AU suffered direct injury as a result of Defendant McNealey's fraudulent conduct, including contractual liability and loss.

**COUNT VIII**

**UNJUST ENRICHMENT**

**(Derivative on Behalf of Allen University Against All Defendants Who Received or Retained Benefits)**

540. Plaintiffs repeat and reallege all preceding paragraphs, including the Derivative Allegations and Charitable Trust Allegations, as if fully set forth herein.

541. Plaintiff AU conferred benefits, directly or indirectly, through funds, property, opportunities, control of accounts, or use of Plaintiff AU's name and charitable status.

542. Defendants knowingly accepted, retained, or enjoyed those benefits.

543. Under the circumstances alleged, it would be inequitable for Defendants to retain such benefits without restitution.

544. Plaintiff AU is entitled to restitution, disgorgement, and related equitable relief.

**COUNT IX**

**CONVERSION**

**(Derivative on Behalf of Allen University Against Defendants Who Exercised Unauthorized Dominion Over Plaintiff AU Property or Funds)**

545. Plaintiffs repeat and reallege all preceding paragraphs, including the Derivative Allegations and Charitable Trust Allegations, as if fully set forth herein.

546. Plaintiff AU had ownership of, or the immediate right to possess, specific funds, accounts, charitable proceeds, personal and real property interests described herein.

547. Defendants exercised unauthorized dominion and control over that property inconsistent with Plaintiff AU's rights.

548. Such conduct included diverting Allen Days funds, placing Plaintiff AU-related funds into unauthorized accounts or entities, and retaining funds raised in Plaintiff AU's name outside Plaintiff AU's control.

549. As a direct and proximate result, Plaintiff AU suffered damages.

## COUNT X

## VIOLATION OF THE SOUTH CAROLINA SOLICITATION OF CHARITABLE FUNDS ACT

**(Derivative on Behalf of Allen University Against Defendants Involved in Allen Days Solicitations)**

550. Plaintiffs repeat and reallege all preceding paragraphs, including the Derivative Allegations and Charitable Trust Allegations, as if fully set forth herein.

551. The South Carolina Solicitation of Charitable Funds Act regulates charitable solicitations, requires registration before solicitation in most circumstances, and prohibits misleading or false representations in connection with charitable solicitations.

552. Defendants solicited contributions in the name of Plaintiff AU and for Plaintiff AU's stated benefit.

553. In connection with those solicitations, Defendants represented, or caused donors to believe, that the solicited funds were being collected for Plaintiff AU and would be controlled and used by Plaintiff AU.

554. Those representations were false or misleading because the funds were not collected by, transferred to, or accounted for by Plaintiff AU.

555. Defendants also used Plaintiff AU's name in a manner that misled donors about sponsorship, recipient identity, and control over the donations.

556. South Carolina law expressly prohibits misleading or misrepresenting a charitable solicitation, including misleading persons into believing a charity sponsors or endorses the solicitation when that representation is false.

557. As a direct and proximate result, Plaintiff AU suffered loss of charitable funds, donor goodwill, and reputational injury.

## COUNT XI

## CONSTRUCTIVE TRUST

**(Equitable Relief Against All Defendants Who Hold or Controlled Diverted Plaintiff AU Assets)**

558. Plaintiffs repeat and reallege all preceding paragraphs, including the Derivative Allegations and Charitable Trust Allegations, as if fully set forth herein.

559. Defendants acquired, retained, or controlled funds, property, or benefits derived from Plaintiff AU assets or funds raised in Plaintiff AU's name.

560. Equity and good conscience require that those funds and assets be impressed with a constructive trust in favor of Plaintiff AU.

561. Plaintiff AU is entitled to an accounting, tracing, disgorgement, and imposition of a constructive trust over all such identifiable assets and proceeds.

## COUNT XII

## FUNDRAISER / BOARD MISCONDUCT

**(Declaratory and Injunctive Relief Based on Governance Violations, Bylaw Violations, and Misconduct in Solicitation and Oversight)**

562. Plaintiffs repeat and reallege all preceding paragraphs, including the Derivative Allegations and Charitable Trust Allegations, as if fully set forth herein.

563. Defendants engaged in misconduct in connection with:

a. Solicitation of charitable funds in Plaintiff AU's name;

b. Failure to account for funds so solicited;

c. Board governance and bylaw compliance;

d. Trustees serving beyond authorized terms;

e. Permitting the unauthorized transfer of the Waverly Building;

f. Suppression of special meetings and investigation; and

g. Retaliatory use of Board procedures to silence oversight.

564. An actual and justiciable controversy exists concerning the legality of Defendants' governance actions, the validity of continued trustee service beyond authorized terms, the validity of Plaintiff Montgomery's removal, and the proper control and use of funds solicited in Plaintiff AU's name.

565. Plaintiff Montgomery and Plaintiff AU are entitled to declaratory and injunctive relief, including relief requiring compliance with the Bylaws, proper accounting, restoration of trustee processes, and prohibition of further unauthorized fundraising or diversion.

## COUNT XIII

## CIVIL CONSPIRACY

**(Individualized Conspiracy Count on Behalf of Plaintiff Montgomery)**

566. Plaintiffs repeat and reallege all preceding paragraphs, including the Derivative Allegations and Charitable Trust Allegations, as if fully set forth herein.

567. Defendants combined and acted in concert specifically to discredit, isolate, and remove Plaintiff Montgomery because she sought transparency and accountability.

568. Overt acts in furtherance of that conspiracy included false accusations, suppression of meetings, opposition to investigation, public criticism, and retaliatory removal from the Defendant BOT.

569. Plaintiff Montgomery suffered special damages, including loss of her board position, reputational harm, and emotional injury.

## COUNT XIV

## RETALIATORY DISCHARGE

**(Derivative Claim for Harm to Plaintiff AU Arising from Defendants' Ratification of Retaliatory Termination of Dr. Taylor)**

570. Plaintiffs repeat and reallege all preceding paragraphs, including the Derivative Allegations and Charitable Trust Allegations, as if fully set forth herein.

571. Defendants had actual notice that Defendant McNealey was retaliating against Dr. Taylor because Dr. Taylor provided truthful information to Defendant BOT.

572. Defendants also had notice that termination of Dr. Taylor under those circumstances would likely expose Plaintiff AU to claims and liability.

573. Despite that notice, Defendants Davis and Defendant BOT failed to intervene, prevent the retaliatory discharge, or reverse the termination.

574. As a direct and proximate result, Plaintiff AU was exposed to and incurred substantial damages, including settlement in excess of one million dollars.

## COUNT XV

## SCHEME TO SILENCE WHISTLEBLOWER / RETALIATION

**(Individual Claim by Plaintiff Montgomery and Derivative Claim on Behalf of Plaintiff AU Against All Defendants)**

575. Plaintiffs repeat and reallege all preceding paragraphs, including the Derivative Allegations and Charitable Trust Allegations, as if fully set forth herein.

576. At all relevant times, Plaintiff Montgomery acted as a fiduciary of Allen University and engaged in protected activity by:

a. Raising concerns regarding financial improprieties, including the Waverly Project, HUD submissions, Allen Days funds, and the 501S agreement;

b. Requesting financial records, transparency, and Board action;

c. Seeking to convene meetings pursuant to the Bylaws;

d. Reporting concerns to higher ecclesiastical authorities; and

e. Cooperating with law enforcement inquiries, including an interview with the Federal Bureau of Investigation.

577. Defendants knew of Plaintiff Montgomery's protected activity.

578. Defendants acted in concert to silence, discredit, and remove Plaintiff Montgomery to prevent further investigation and disclosure of misconduct.

579. Defendants engaged in a pattern of retaliatory and coercive conduct, including:

a. Refusing to reconvene Board meetings and obstructing governance procedures;

b. Misrepresenting the Bylaws to prevent a special meeting;

c. Publicly criticizing, interrupting, humiliating, and discrediting Plaintiff Montgomery during Board meetings;

d. Falsely accusing Plaintiff Montgomery of violating accreditation standards;

e. Suppressing discussion of financial issues and preventing production of documents;

f. Opposing and defeating motions for independent investigation;

g. Implying misconduct to third parties, including allegations of improper external communications;

h. Targeting Plaintiff Montgomery through reinstatement of "trustee qualifications" processes; and

i. Orchestrating a Special Meeting without proper notice or agenda for the purpose of removing Plaintiff Montgomery.

580. Defendants' conduct culminated in the removal of Plaintiff Montgomery from Defendant BOT without due process, in violation of the Bylaws, and for retaliatory purposes.

581. The removal was pretextual and was not based on legitimate governance concerns.

582. Plaintiff Montgomery was singled out for removal, and upon information and belief, she was the only trustee removed during the relevant time period, demonstrating that Defendants' actions were not

based on neutral governance principles but were instead retaliatory in nature.

583. Defendants' actions were intended to:

a. Silence Plaintiff Montgomery;

b. Prevent further inquiry into financial misconduct;

c. Deter other trustees from raising similar concerns; and

d. Preserve Defendants' control over Plaintiff AU and its assets.

584. Defendants' conduct was willful, malicious, and undertaken with reckless disregard of Plaintiff Montgomery's rights.

585. As a direct and proximate result:

a. Plaintiff Montgomery suffered reputational harm, loss of position, and emotional distress; and

b. Plaintiff AU suffered harm through the elimination of independent oversight, increased exposure to liability, and continued misconduct.

586. Plaintiff is entitled to compensatory damages, punitive damages, and equitable relief, including reinstatement and injunctive protection against further retaliation.

**COUNT XVI**

**RICO – 18 U.S.C. § 1962(c) and (d)**

**(Against All Defendants)**

587. Plaintiffs repeat and reallege all preceding paragraphs, including the Derivative Allegations and Charitable Trust Allegations, as if fully set forth herein.

**A. The Enterprise**

588. Defendants constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4), consisting of an association-in-fact including:

a. Defendant AMEC;

b. Defendant Council of Bishops;

c. Defendant BOT;

d. Defendants Davis, Green, McNealey, and the Trustee Defendants; and

e. The affiliated entities created in connection with the Waverly Project, including the Foundation, POC, Waverly Owner, WHMM, and WMT.

589. The enterprise was engaged in, and its activities affected, interstate commerce.

590. The enterprise had a common purpose, including:

a. Exercising control over Plaintiff AU and its assets;

b. Generating and controlling funds through fundraising, federal programs, and contractual arrangements;

c. Concealing the movement and disposition of funds;

d. Avoiding oversight and accountability; and

e. Silencing individuals who attempted to expose misconduct.

591. The enterprise had relationships among its members and sufficient longevity to pursue its purpose.

**B. Conduct of the Enterprise**

591. Each Defendant participated in the conduct of the enterprise's affairs through a pattern of racketeering activity.

**C. Pattern of Racketeering Activity**

592. Defendants engaged in a pattern of racketeering activity consisting of multiple predicate acts, including:

**1. Wire Fraud (18 U.S.C. § 1343)**

593. Defendants used interstate wire communications to further schemes to defraud, including:

a. Transmission of altered documentation to HUD in connection with the Waverly Project;

b. Electronic communications relating to fundraising and handling of Allen Days funds;

c. Communications concerning the creation and operation of affiliated entities used to move funds; and

d. Communications used to conceal financial information and mislead Board members and others.

**2. Mail Fraud (18 U.S.C. § 1341)**

594. Defendants used mail or interstate carriers to transmit documents, solicitations, and communications related to:

a. Fundraising activities conducted in the name of Plaintiff AU; and

b. Financial transactions and agreements associated with the Waverly Project and 501S.

**3. Financial Institution / Federal Program Fraud (including attempted fraud involving HUD funds)**

595. Defendants engaged in a scheme to obtain federal funds by means of materially false and misleading representations, including the alteration and resubmission of invoices and documentation to satisfy HUD eligibility requirements.

**4. Witness Tampering / Retaliation (18 U.S.C. §§ 1512, 1513)**

596. Defendants engaged in efforts to influence, intimidate, and retaliate against individuals providing truthful information, including:

a. Attempting to induce Dr. Taylor to provide false testimony;

b. Retaliating against Dr. Taylor after he provided truthful information; and

c. Removing Plaintiff Montgomery after she raised concerns and cooperated with law enforcement.

597. The removal of Plaintiff Montgomery, the only trustee removed during the relevant time period, constituted an act of retaliation designed to silence a whistleblower and prevent further disclosure of the enterprise's activities.

**D. Continuity**

598. Defendants' racketeering acts were related and formed a continuous pattern.

599. The pattern exhibited both:

a. **Closed-ended continuity**, spanning multiple years; and

b. **Open-ended continuity**, posing a threat of continued acts that transmitting materially false information through interstate communications in furtherance of a scheme to obtain money and property and continued control over Plaintiff AU governance.

**E. Injury**

600. Plaintiff Montgomery and Plaintiff AU suffered injury to business and property as a direct and proximate result of Defendants' RICO violations, including:

a. Diversion and loss of charitable funds;

b. Exposure to contractual and employment-related liability;

c. Costs associated with defending claims and settlements;

d. Loss of governance integrity; and

e. Removal of Plaintiff Montgomery from her position.

**F. RICO Conspiracy (18 U.S.C. § 1962(d))**

601. Defendants agreed to participate in the enterprise and to commit the predicate acts described herein.

601. Each Defendant knew of and agreed to the overall objectives of the enterprise.

**G. Damages**

602. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs seek:

a. Treble damages;

b. Costs and attorneys' fees; and

c. Injunctive and equitable relief to prevent and restrain further violations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Montgomery on behalf of herself and derivatively on behalf of Plaintiff Allen University, respectfully requests that this Court:

**A. Declaratory Relief**

1. Declare Defendants breached fiduciary duties;

2. Declare Defendants engaged in unlawful and fraudulent conduct;

3. Declare Plaintiff Montgomery's removal unlawful and void;

4. Declare that Bylaw provisions making the Bishop automatic Chairman of Plaintiff AU's Board of Trustees are **void and unenforceable** to the extent they:

   - eliminate Board independence
   - create conflicts of interest
   - concentrate control

5. Declare that Bylaw provisions requiring Board membership tied to the Seventh Episcopal District are **void and unenforceable**;

**B. Injunctive / Governance Relief**

6. Remove or suspend Defendant Trustees who breached fiduciary duties;

7. Reinstate Plaintiff Montgomery;

8. Enjoin enforcement of the Bishop-as-Chair provision;

9. Enjoin enforcement of AMEC-controlled Board composition;

10. Require independent governance structure;

11. Appoint receiver / monitor / special master;

12. Enjoin retaliation;

## C. Forensic Audit / Accounting

13. Order a **full forensic audit** of:

- Allen Days funds
- Waverly Project
- HUD funds
- 50+1 transactions
- All related entities

14. Order full document production and tracing of funds;

## D. Financial / Equitable Relief

15. Impose constructive trust;

16. Order restitution and disgorgement;

17. Return all diverted funds to Plaintiff AU;

## E. Damages

18. Compensatory damages;

19. Consequential damages;

20. Punitive damages;

**F. RICO Relief**

21. Treble damages;

22. Attorneys' fees;

23. Injunctive relief;

**G. Statutory Relief**

24. SC Charitable Funds Act remedies;

**H. Other Relief**

25. Costs;

26. Attorneys' fees;

27. Any other relief deemed just.

**IX. JURY DEMAND**

Plaintiff demands trial by jury.

Dated: March 19, 2026

Respectfully submitted,

**Karol Widemon Montgomery**
Plaintiff, Pro Se

# VERIFICATION

I, **Karol Widemon Montgomery**, declare as follows:

1. I am the Plaintiff in this action.
2. I have read the foregoing **Verified Civil Complaint** and know the contents thereof.
3. The facts stated in the Complaint are true and correct to the best of my personal knowledge, information, and belief.
4. I make this Verification pursuant to **Federal Rule of Civil Procedure 23.1**.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 19th day of March, 2026, in Fayetteville, Georgia.

**Karol Widemon Montgomery**

Plaintiff, Pro Se