**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

**KAROL WIDEMON MONTGOMERY,**
individually
and
derivatively on behalf of
**ALLEN UNIVERSITY,**

Plaintiffs,
v.
**THE ALLEN UNIVERSITY BOARD OF TRUSTEES;**
**DR. ERNEST MCNEALEY,** individually;
**BISHOP SAMUEL GREEN,** individually;
**BISHOP JAMES DAVIS,** individually;
**SANDRA ANDERSON,** individually;
**KEITH BRITTON,** individually;
**TAMARA CURRY,** individually;
**NORVEL GOFF,** individually;
**JUENARRL KEITH,** individually;
**ALLEN W. PARROTT,** individually;
**CAESAR R. RICHBURG,** individually;
**DERRICK SCOTT,** individually;
**HERBERT TEMONEY,** individually;
**THE AFRICAN METHODIST EPISCOPAL CHURCH, INC.,**
a Pennsylvania nonprofit corporation;
**THE AFRICAN METHODIST EPISCOPAL CHURCH COUNCIL OF BISHOPS;**
**THE FOUNDATION OF ALLEN UNIVERSITY,**
a South Carolina corporation;
**THE PICKNEY CENTER OPERATIONS, LLC,**
a South Carolina limited liability company;
**WAVERLY HOSPITAL OWNER, LLC,**
a South Carolina limited liability company;
**WAVERLY HOSPITAL MM, LLC,**
a South Carolina limited liability company;
**WAVERLY HOSPITAL MT, LLC,**

**Civil Action No.: 3:26-cv-01157-SAC-KDW**
**FIRST AMENDED VERIFIED COMPLAINT**
**JURY TRIAL DEMANDED**

RCVD - USDC COLA SC
AUG 21 '26 AM9:1

a South Carolina limited liability company;
**VISION CENTER,**
a South Carolina nonprofit corporation;
**DOE CORPORATIONS AND BUSINESS ENTITIES 1-10,**
and
**JOHN DOES 1-10,**
Defendants.

## FIRST AMENDED VERIFIED COMPLAINT

Plaintiff Karol Widemon Montgomery brings this action individually and derivatively on behalf of Allen University. Plaintiffs allege that persons entrusted with Allen University's governance, finances, property, and charitable assets abused that authority, diverted or misused University property and funds, concealed material financial information, prevented meaningful investigation, and retaliated against Montgomery when she sought investigation and accountability. Montgomery brings the derivative claims because the persons controlling Allen University failed or refused to cause the University to investigate or pursue claims arising from the alleged misconduct.

## I. INTRODUCTION

1. This case concerns the alleged misuse of Allen University's property, funds, charitable resources, and governance by persons entrusted to protect them. Plaintiffs allege that Defendants used positions of authority within Allen University, AMEC, its Seventh Episcopal District, the Council of Bishops, and affiliated entities to control the University's affairs, conceal material financial information, prevent meaningful oversight, and protect the persons and transactions being questioned.

2. Plaintiffs bring this action in both individual and derivative capacities.

3. Allen University is the principal institutional victim of the alleged misconduct. Plaintiffs allege that the University lost property and funds, was deprived of charitable funds raised in its name and for its benefit, was exposed to substantial financial obligations and liabilities, and was denied the independent governance and financial oversight necessary to protect its interests.

4. The same persons whose conduct required investigation also exercised substantial control over whether that conduct would be investigated, disclosed, or corrected.

5. Plaintiffs allege that this control allowed the conduct to continue and prevented Allen University from acting to protect itself.

6. Montgomery was also a direct victim of the alleged misconduct.

7. As a trustee of Allen University, Montgomery sought financial records, accountings, investigation, compliance with Allen University's Bylaws, and corrective action concerning conduct she believed was harming the University. She did not participate in the alleged misconduct and instead sought to expose, prevent, and correct it.

8. Plaintiffs allege that, because Montgomery continued those efforts, Defendants acted to silence and discredit her, interfere with her duties as a trustee, prevent or limit her efforts to obtain information and independent investigation, retaliate against her, and ultimately purported to remove her from Defendant BOT.

9. Montgomery alleges that this conduct caused direct and substantial injury to her, including loss of her trustee position, injury to her reputation, severe emotional distress, and other personal harm alleged throughout this First Amended Complaint.

10. The conduct alleged herein was not confined to a single transaction or event.

11. Plaintiffs allege that it occurred over a period of years through interrelated financial transactions, charitable fundraising activities, affiliated entities, contractual relationships, and governance structures that enabled certain Defendants to exercise substantial control over Allen University's assets and affairs while concealing material information and limiting meaningful independent oversight.

**A. The Historical Relationship Between AMEC and Allen University**

12. Allen University is a historically Black university founded in 1870 by ministers of the African Methodist Episcopal Church ("AMEC") to educate formerly enslaved African Americans and their descendants. Originally established as Payne Institute, the institution was later renamed Allen University in honor of Richard Allen, the founder and first Bishop of AMEC. Allen University and AMEC have maintained a historical, cultural, and religious relationship since the University's founding.

13. That relationship also gave AMEC leadership substantial influence over Allen University's governance. Allen University is located within AMEC's Seventh Episcopal District. The Presiding Bishop of the Seventh Episcopal District has traditionally served as Chairman of Allen University's Board of Trustees and exercised substantial authority over the composition and governance of Defendant BOT.

14. During the periods relevant to this action, Green and Davis successively served as Presiding Bishops of AMEC's Seventh Episcopal District and as Chairmen of Defendant BOT. They therefore held authority within both the AMEC structure through which substantial funds were raised for Allen University and the University governance structure responsible for protecting those funds and Allen University's other property and assets.

15. Plaintiffs allege that certain Defendants used the authority arising from this relationship to control Allen University's governance and financial affairs and prevent or limit independent oversight of the conduct alleged herein.

16. Plaintiffs do not challenge Allen University's historical, cultural, or religious affiliation with AMEC. Plaintiffs challenge the alleged misuse of authority arising from that relationship and the failure of persons and entities with responsibility for oversight to protect Allen University when that authority was used against the University's interests.

## B. Alleged Abuse of Institutional Authority and University Assets

17. Plaintiffs allege that certain Defendants used their positions of trust and authority to exercise control over Allen University's governance, finances, property, charitable assets, contractual relationships, and institutional decisions in ways that harmed the University.

18. Plaintiffs allege that certain Defendants caused, approved, or enabled the transfer, encumbrance, diversion, retention, or misuse of Allen University's property and funds; exposed the University to substantial financial and contractual obligations; and obtained or conferred financial

benefits or other advantages upon themselves or affiliated persons and entities.

19. The same concentration of authority that allowed the alleged conduct to occur also allowed certain Defendants to control or influence whether that conduct would be investigated, disclosed, or corrected.

20. Plaintiffs allege that persons responsible for protecting Allen University knew of, participated in, approved, enabled, or received notice of serious financial and governance issues but failed or refused to require independent investigation, complete financial disclosure, an accounting, or meaningful corrective action.

21. The resulting harm to Allen University was substantial.

22. Plaintiffs allege that Allen University lost property, funds, and financial benefits; incurred substantial debt and contractual liabilities; spent University funds on obligations arising from the challenged conduct; and suffered other financial and institutional harm.

23. The alleged misconduct included:

a. the transfer, financing, encumbrance, and use of Allen University's Waverly property and related funds;

b. the collection, retention, and alleged diversion of charitable funds raised in Allen University's name and for its benefit, including funds allegedly received or retained by Vision Center;

c. alleged fraud involving federal HUD funds;

d. contractual conduct involving 501S that exposed Allen University to substantial financial liability; and

e. the use of affiliated entities to receive, transfer, control, or retain Allen University's property, funds, proceeds, or other financial benefits.

24. Plaintiffs allege that these events were connected by overlapping participants and positions of authority and by certain Defendants' ability to control financial information, University assets, governance decisions, and the response when their conduct was questioned.

25. Plaintiffs allege that the misconduct continued because persons and entities responsible for protecting Allen University failed or refused to require independent oversight, financial transparency, investigation, and corrective action after receiving notice of conduct threatening the University's property, funds, finances, and institutional interests.

26. Members of Defendant BOT owed fiduciary duties to protect Allen University's property and funds, oversee its financial affairs, exercise independent judgment, and act in the University's best interests.

27. Plaintiffs allege that certain Trustee Defendants instead participated in, approved, enabled, or failed to investigate and correct conduct that caused substantial injury to Allen University.

28. Plaintiffs allege that the Trustee Defendants knew or received information concerning serious matters requiring investigation, including the transfer and use of Allen University's property; the disposition of substantial funds raised in the University's name; significant financial obligations undertaken on the University's behalf; the alleged submission of false or misleading information to obtain federal HUD funds; and representations concerning Allen University's contractual obligations.

29. Despite that knowledge, Plaintiffs allege that members of the controlling Board majority repeatedly failed or refused to require complete financial disclosure, independent investigation, an accounting of Allen University's property and funds, or meaningful corrective action.

30. When questions were raised concerning the conduct of persons exercising substantial authority over Allen University's affairs, members of the controlling majority instead acted to prevent, limit, or end further inquiry.

**C. AMEC and the Council of Bishops: Authority, Notice, and Failure to Intervene**

31. Plaintiffs allege that Defendant AMEC and Defendant Council of Bishops were not remote from the institutional structure through which the challenged conduct occurred.

32. At all relevant times, Green and Davis were Bishops and members of Defendant AMEC and members of Defendant Council of Bishops.

33. Through AMEC's ecclesiastical structure, Green and later Davis were assigned as successive Presiding Bishops of the Seventh Episcopal District and thereby obtained substantial authority affecting Allen University and its governance.

34. The same AMEC ecclesiastical structure that placed Green and Davis in these positions of institutional trust retained authority over them as AMEC Bishops.

35. Plaintiffs allege that the Council of Bishops possessed executive, administrative, and disciplinary authority over AMEC Bishops, including authority, by the vote required under AMEC's governing provisions, to remove or transfer a Bishop from a district or give directions the Council determined appropriate for the good of the Church.

36. AMEC and the Council of Bishops also had particular reason to understand the consequences of failures in financial oversight and fiduciary accountability.

37. Before Montgomery reported the alleged misconduct at Allen University to the Council of Bishops, Defendants AMEC, Council of Bishops, Green, and Davis had each been named as defendants in litigation concerning the AMEC retirement plan and the alleged misappropriation or loss of tens of millions of dollars in retirement assets.

38. During relevant periods, Green and Davis served as AMEC managers of the retirement plan and exercised responsibilities concerning its administration and oversight.

39. Plaintiffs allege that the retirement-plan litigation gave AMEC and the Council of Bishops specific reason for heightened concern when allegations of financial impropriety, failures of fiduciary oversight, and misuse or diversion of institutional assets were later reported at Allen University, an institution over which Green and Davis successively exercised substantial governance authority.

40. Plaintiffs allege that the allegations concerning Allen University were sufficiently similar in character to require serious and independent inquiry, particularly because they involved Green and Davis, whose

exercise of financial and institutional authority had previously been placed at issue in the retirement-plan litigation.

41. Against that background, Montgomery gave the Council of Bishops written notice of alleged financial and governance misconduct affecting Allen University.

42. Her notice included allegations concerning Davis's conduct as Presiding Bishop of the Seventh Episcopal District and Chairman of Defendant BOT. Montgomery sought intervention from the ecclesiastical body that possessed authority over Davis as an AMEC Bishop.

43. Plaintiffs allege that, despite the prior notice described above, Montgomery's specific written notice, and its authority over Davis, the Council of Bishops failed to require an independent investigation, exercise its available administrative or disciplinary authority, or otherwise intervene concerning the conduct reported to it.

44. Plaintiffs allege that the Council of Bishops' failure to act allowed Davis to remain in the ecclesiastical and institutional positions through which he continued to exercise substantial influence over Allen University's governance and over whether the financial and governance matters reported by Montgomery would be investigated, disclosed, or corrected.

45. Plaintiffs further allege that this failure occurred within the AMEC institutional structure that assigned Davis to the Seventh Episcopal District and through which he obtained the authority and influence over Allen University described above.

**D. Efforts to Obtain Accountability and Retaliation**

46. While serving as an Allen University trustee, Montgomery sought to fulfill her fiduciary responsibilities by questioning financial and governance irregularities, requesting information and accountings, seeking independent investigation, and urging the Board to take corrective action concerning conduct she believed was harming the University.

47. Montgomery's concerns were not limited to a single transaction or individual. She sought investigation and Board action concerning the disposition and encumbrance of University assets, funds raised in Allen University's name, alleged fraud involving federal funds, substantial contractual obligations undertaken on the University's behalf, representations made to the Board concerning those matters, and compliance with Allen University's governing documents.

48. When representations made by McNealey concerning material matters affecting Allen University were contradicted by documents, communications, or persons possessing firsthand knowledge, Montgomery

sought to have the Board obtain and consider independent information rather than rely exclusively upon representations made by the person whose conduct was being questioned.

49. Plaintiffs allege that Montgomery's efforts increasingly brought her into conflict with Defendants whose conduct she questioned and with members of the controlling Board majority who resisted further investigation, disclosure, accounting, or corrective action.

50. Plaintiffs further allege that efforts to obtain independent oversight were impeded through resistance to investigation, interference with Board procedures, restriction or discouragement of access to persons possessing relevant information, and failure to carry forward Board action concerning matters that trustees had voted to consider.

51. When internal efforts failed, Montgomery invoked Allen University's Bylaws in an effort to obtain further Board consideration and thereafter sought intervention from the Council of Bishops concerning Davis's conduct and the financial and governance matters affecting Allen University.

52. Plaintiffs allege that, rather than resulting in meaningful investigation or corrective action, Montgomery's efforts were followed by retaliation and disparagement directed toward her, including statements

challenging her conduct and credibility and efforts to characterize her attempts to obtain independent information, enforce the Bylaws, and discharge her fiduciary responsibilities as improper.

53. Montgomery thereafter obtained written guidance from the Southern Association of Colleges and Schools Commission on Colleges ("SACSCOC") concerning the governance issues that had been raised. SACSCOC advised, among other things, that institutional officers and Board members are expected to act with integrity, that a governing board must carry out its fiduciary responsibilities, that institutions are expected to operate in accordance with their own bylaws and policies, and that a president should not hamper a board's ability to carry out its fiduciary responsibilities.

54. Montgomery provided the SACSCOC response to the Board. Plaintiffs allege that, notwithstanding that guidance, Davis did not retract his prior allegations concerning Montgomery's conduct, acknowledge that his characterization of her efforts was inaccurate, or apologize for the disparaging statements directed toward her.

55. In March 2025, Montgomery was removed from Allen University's Board of Trustees after continuing to seek investigation, financial transparency, compliance with the University's Bylaws,

accountability concerning McNealey's conduct, and intervention concerning Davis's conduct.

56. Plaintiffs allege that Montgomery was singled out for removal. Other trustees had supported one or more of Montgomery's motions or efforts to obtain further Board consideration, yet they were not removed as a consequence of those actions.

57. Plaintiffs further allege that Montgomery's removal was undertaken without the advance notice and agenda required by Allen University's Bylaws and without identification before the vote of the conduct allegedly constituting "cause" forher removal.

58. Although Defendant Curry, as Chair of the Trusteeship Committee, recommended that Montgomery be removed "for cause," the Bylaws did not define "cause," and no act, omission, violation, or other conduct constituting the purported cause was identified to Montgomery before the vote. Montgomery was therefore afforded no meaningful opportunity to respond to or contest the asserted basis for her removal.

59. Plaintiffs allege that Montgomery's removal was arbitrary, capricious, retaliatory, and contrary to Allen University's Bylaws, and constituted the culmination of efforts to suppress the trustee who

persistently sought investigation, disclosure, independent oversight, and accountability concerning the conduct alleged herein.

**E. The Resulting Harm and Basis for This Action**

60. Plaintiffs allege that the conduct described herein caused substantial and distinct injuries to Allen University and Montgomery.

61. Allen University suffered financial and institutional harm, including the loss, diversion, dissipation, or unauthorized use of funds and assets intended for its benefit; the loss or encumbrance of valuable property; substantial financial and contractual liabilities, including liability arising from the conduct involving 501S; and other injury to its financial and institutional interests.

62. Montgomery suffered separate personal and reputational injury arising from the retaliatory, defamatory, and other wrongful conduct allegedly directed toward her.

63. Montgomery brings this action individually for injuries she personally suffered and derivatively on behalf of Allen University for injuries inflicted upon the University. Plaintiffs allege that derivative action became necessary because persons entrusted with Allen University's governance caused or enabled injuries to the University and thereafter failed or refused to protect the University, require an accounting, investigate the disposition

of its assets, address substantial contractual and financial liabilities, or take meaningful corrective action despite the knowledge and notice alleged herein.

64. Plaintiffs allege that the conduct described herein gives rise to violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), as well as claims arising from fraud, breaches of fiduciary duty, tortious misconduct, unjust enrichment, and other violations of federal and state law set forth more fully below.

65. Through this action, Plaintiffs seek to hold the responsible Defendants accountable, recover and trace funds and assets alleged to belong to Allen University, obtain redress for the individual injuries suffered by Montgomery and the derivative injuries inflicted upon Allen University, restore lawful and independent governance, and obtain the other legal and equitable relief set forth herein. The structure, participants, methods, and operation of the alleged fraudulent scheme are set forth more fully below.

## II. OVERVIEW OF THE ALLEGED FRAUDULENT SCHEME

### A. Structure and Operation of the Alleged Scheme

66. The misconduct alleged in this action was not confined to a single transaction, Defendant, or source of funds. Plaintiffs allege that the challenged conduct operated through an interconnected structure involving

individuals and entities occupying overlapping positions of authority or control within Allen University, AMEC, the Seventh Episcopal District, the Council of Bishops, Defendant Vision Center, and the five Waverly-related entity Defendants, each headed and controlled by McNealey as its President.

67. Plaintiffs allege that these institutional, ecclesiastical, nonprofit, corporate, and limited liability company structures provided mechanisms through which certain Defendants exercised or influenced control over University governance, financial information, charitable fundraising, institutional assets, contractual relationships, and the receipt, transfer, retention, or disposition of substantial funds and financial benefits derived from or connected to Allen University.

68. Plaintiffs allege that this concentration of authority enabled certain Defendants to obtain, transfer, encumber, divert, retain, use, or confer financial benefits derived from Allen University's property, funds, charitable relationships, and institutional resources while limiting the ability of independent trustees and other persons charged with protecting the University to determine the nature, amount, disposition, or beneficiaries of the transactions involved.

69. The alleged scheme operated through several interrelated channels, including: (a) the transfer, financing, encumbrance, and monetization of Allen University's Waverly property through affiliated entities; (b) the solicitation and collection of charitable contributions in Allen University's name and the alleged retention, diversion, or use of those funds outside the University's control, including for the alleged benefit of Defendant Vision Center; (c) alleged fraudulent representations and altered documentation submitted in connection with approximately $4.2 million in federal HUD funding; (d) fraudulent inducement and contractual conduct involving 501S, a third party contracting with Allen University, that allegedly obtained substantial performance from 501S while creating substantial contractual and financial liability for Allen University; and (e) the failure of persons charged with protecting Allen University to intervene in allegedly wrongful employment conduct by McNealey despite repeated requests for Board intervention, thereby exposing the University to substantial and avoidable financial liability.

70. Plaintiffs allege that these channels were connected by common or overlapping participants, positions of institutional authority, financial relationships, affiliated entities, methods of concealment, and mechanisms for suppressing independent oversight. The precise

participants and conduct associated with each transaction are alleged separately below; Plaintiffs do not allege that every Defendant personally participated in every transaction or committed every act alleged in this Complaint.

71. Central to the alleged scheme was the ability of certain Defendants not only to participate in, cause, or enable transactions and other conduct that injured Allen University, but also to influence whether that conduct would be disclosed to the full Board, independently investigated, subjected to an accounting, corrected, or otherwise remedied. Plaintiffs allege that the alleged wrongdoers or enablers were thereby positioned to influence the response to the wrongdoing itself.

72. Plaintiffs allege that this concentration of authority created a self-protecting structure in which persons whose conduct, interests, or potential responsibility were implicated in questioned transactions could exercise or influence institutional authority over the investigation and response to those same transactions.

73. As a result, the persons and mechanisms ordinarily responsible for protecting Allen University and enforcing its rights were allegedly compromised, impaired, or controlled by persons whose own conduct or interests were subject to investigation.

74. Plaintiffs further allege that the scheme depended upon fraudulent or materially misleading representations and omissions, deception, concealment of financial information and conflicts of interest, movement or retention of funds and assets outside Allen University's ordinary control, and resistance to independent inquiry when trustees or others sought information concerning the challenged conduct.

75. Allen University was not a participant in the alleged fraudulent scheme. Plaintiffs allege that Defendants used Allen University's institutional identity, property, charitable relationships, contractual authority, and financial resources as means through which value was obtained, transferred, encumbered, or controlled, while the resulting financial obligations, losses, and institutional consequences were borne substantially by the University.

76. Plaintiffs allege that Montgomery likewise was not a participant in the alleged scheme but suffered direct and distinct injuries from conduct directed toward her.

77. Montgomery allegedly became a target of retaliation and defamation after attempting to investigate and expose the conduct.

78. Plaintiffs further allege that 501S, although not a party to this action, was induced through material misrepresentations and omissions to

undertake and accelerate contractual performance, conduct that allegedly resulted in substantial contractual and financial liability to Allen University and forms part of the broader course of conduct alleged herein.

79. Plaintiffs allege that the concealment and suppression of oversight described herein were not merely consequences of the underlying financial misconduct but were mechanisms through which the alleged scheme was protected from detection, investigation, accounting, and corrective action.

**B. Concentration of Governance Authority and Suppression of Independent Oversight**

80. Plaintiffs allege that certain Defendants maintained substantial control over Allen University's governance through their positions as University officers, successive Chairmen of the Board of Trustees, and members of a controlling Board majority. That concentration of authority enabled those Defendants to influence Board action concerning financial transactions, requests for information, investigations of suspected misconduct, enforcement of the University's Bylaws, and proposed corrective action.

81. Defendants Green and Davis successively occupied the dual positions of Presiding Bishop of AMEC's Seventh Episcopal District and

Chairman of Allen University's Board of Trustees and, during their respective tenures, each also served as President or otherwise exercised leadership and control over Defendant Vision Center. Defendant McNealey served as President of Allen University and simultaneously served as President of and controlled the five Waverly-related entity Defendants described herein. Plaintiffs allege that these overlapping positions concentrated substantial governance, financial, fundraising, and institutional authority among persons whose own conduct, interests, and relationships with affiliated entities were implicated in matters requiring independent Board review.

82. Plaintiffs allege that, during their respective tenures, Green and Davis each occupied positions on three sides of the financial relationships challenged herein: the AMEC and Seventh Episcopal District side through which Allen University fundraising was conducted; the Allen University governance side charged with protecting the University's interests and charitable assets; and the Vision Center side that Plaintiffs allege received, retained, used, or benefited from funds raised or designated for Allen University.

83. Plaintiffs allege that these overlapping positions placed Green and Davis in positions to influence both the collection and disposition of

funds raised in Allen University's name and the University's governance response to questions concerning whether those funds had been received by, accounted for, or improperly diverted from Allen University.

84. Plaintiffs further allege that Green and Davis, during their respective tenures as Presiding Bishop, possessed and exercised authority to appoint trustees to Allen University's Board and thereby exercised substantial influence over its composition.

85. Plaintiffs allege that a controlling group of Trustee Defendants, including trustees appointed through this structure, repeatedly acted to prevent or reject meaningful investigation, financial disclosure, accounting, or corrective action concerning matters affecting Allen University's assets and financial interests.

86. Plaintiffs allege that the resulting governance structure impaired the Board's ability to function as an independent fiduciary safeguard. When material questions arose concerning transactions or conduct involving McNealey, Green, Davis, or affiliated entities, persons possessing authority over the University's response were themselves implicated in, had interests connected to, or were allegedly responsible for causing or enabling the conduct requiring investigation.

87. Requests for financial information, accountings, independent investigation, and inquiry into material irregularities were allegedly ignored, obstructed, discouraged, or affirmatively rejected.

88. Plaintiffs further allege that efforts to obtain information from persons possessing firsthand knowledge were resisted or discouraged, thereby limiting the Board's access to information independent of the persons whose conduct was being questioned.

89. Plaintiffs allege that this suppression of independent information was particularly significant where McNealey's own conduct was under review. When trustees sought information from University employees possessing firsthand knowledge capable of confirming or contradicting McNealey's representations, Davis allegedly sought to restrict or discourage those communications, thereby interfering with the Board's ability to obtain information independent of the University President whose conduct the Board was being asked to investigate.

90. The alleged failure of independent oversight was not limited to financial transactions. Plaintiffs allege that the Board was repeatedly asked to intervene concerning McNealey's treatment and eventual termination of Dr. Dub Taylor, yet failed to take effective action, thereby permitting

conduct that allegedly resulted in substantial and avoidable financial liability to Allen University.

91. When Montgomery continued to seek investigation, financial transparency, enforcement of the University's Bylaws, and independent information necessary to discharge her fiduciary responsibilities, Plaintiffs allege that she was subjected to disparagement, resistance to Board procedures, and other retaliatory conduct designed to discredit or impede her efforts.

92. Plaintiffs allege that Montgomery's eventual removal from the Board eliminated a trustee who had persistently demanded investigation and accountability concerning the challenged conduct and further impaired independent oversight by the University's governing body.

93. Plaintiffs allege that this governance structure also provided a means of shielding the conduct challenged herein from investigation, disclosure, accounting, and corrective action.

94. By concentrating authority among persons whose own conduct or interests were implicated in, or who allegedly enabled, the conduct requiring investigation, and by impairing independent access to information and institutional remedies, the governance structure allegedly provided a

mechanism through which the broader fraudulent scheme could be concealed, protected, and perpetuated.

### C. Transfer, Monetization, and Encumbrance of University Assets (Waverly Project)

95. Plaintiffs allege that Allen University's Waverly Building, a valuable real estate asset owned by the University, free and clear of any mortgage or other encumbrance, became a central vehicle through which University property was transferred, encumbered, and monetized outside ordinary University control and oversight.

96. Plaintiffs allege that McNealey caused or participated in the transfer of ownership or control of the Waverly Building from Allen University to Defendant Waverly Owner, an entity of which McNealey was President and over which he exercised control. The transfer removed a valuable University asset from Allen University's direct ownership or control without full disclosure to, informed approval by, or independent review of the transaction by the Board of Trustees.

97. McNealey simultaneously served as President of Allen University and as President of each of the five Waverly-related entity Defendants—Foundation, POC, Waverly Owner, WHMM, and WMT. Plaintiffs allege that this overlapping control placed McNealey on both the

University side of transactions involving the Waverly property and the side of the affiliated entities that received, controlled, distributed, or benefited from funds, property interests, contractual rights, or other financial benefits generated through those transactions.

98. After the Waverly property was transferred, Plaintiffs allege that the property and related transactions were used to obtain substantial financing and financial benefits through loans, mortgages, investments, private funding, and approximately $12 million in New Markets Tax Credits ("NMTC"), generating or making available tens of millions of dollars in connection with the Waverly Project.

99. Plaintiffs allege that funds and financial benefits generated through the Waverly Project were received, transferred, distributed, retained, or controlled through Foundation, POC, Waverly Owner, WHMM, WMT, or other participants in the transactions, while Allen University did not receive the corresponding financial benefit that Plaintiffs allege should have flowed from the use and monetization of its property.

100. Despite the substantial funds and financial benefits generated through the Waverly transactions, Plaintiffs allege that little, if any, of those externally generated funds was ultimately used to pay the costs of renovating the Waverly Building. Instead, approximately $8 million of Allen

University's own operating funds were allegedly used to finance the renovations.

101. Plaintiffs further allege that Allen University was subjected to substantial continuing financial obligations associated with the Waverly transactions, including mortgage and lease obligations requiring payments connected to entities controlled by McNealey. These obligations allegedly were not fully disclosed to, independently reviewed by, or properly approved by the Board of Trustees and were not reflected in the University's budget.

102. Plaintiffs allege that the financial structure of the Waverly Project therefore produced a substantial disparity.

103. Allen University began with ownership of the Waverly Building free and clear of any mortgage or other encumbrance; the property was transferred from the University and thereafter monetized and encumbered; substantial funds and financial benefits were generated through transactions involving that property; and affiliated entities controlled by McNealey received, controlled, or participated in the disposition of those benefits.

104. Allen University nevertheless supplied approximately $8 million of its own operating funds for renovation; and the University was left

subject to continuing financial obligations associated with property it had previously owned free and clear.

105. Plaintiffs allege that requests for documentation and an accounting sufficient to determine the sources, amounts, recipients, transfers, distributions, and ultimate disposition of funds generated through the Waverly Project were not satisfied, preventing Allen University and its independent trustees from determining the complete financial consequences of the transactions and the ultimate disposition of funds generated through the use of University property.

106. Plaintiffs allege that the Waverly transactions furthered the alleged fraudulent scheme by removing a valuable asset from Allen University's direct ownership and control, using that asset to generate substantial financing and financial benefits through entities controlled by McNealey, requiring Allen University nevertheless to expend substantial operating funds and assume continuing financial obligations, and preventing independent trustees from obtaining a complete accounting sufficient to determine the ultimate disposition and beneficiaries of funds generated through University property.

**D. Diversion of Charitable Funds (Allen Days, Vision Center, and Related Fundraising)**

107. Plaintiffs allege that substantial charitable contributions were assessed, solicited, and collected through AMEC's Seventh Episcopal District in Allen University's name and for the stated benefit of the University and its students, including through annual fundraising known as "Allen Days."

108. Allen Days was not an isolated fundraising event. Annual Conferences occur throughout the Seventh Episcopal District, and fundraising for Allen University was conducted as part of that established AMEC conference structure rather than independently of the denomination's organizational framework.

109. Plaintiffs allege that the funds raised through Allen Days were represented to participating churches, congregations, donors, and contributors as funds being raised for Allen University. Annual Conferences within the Seventh Episcopal District publicly reported substantial amounts raised for Allen University, with aggregate contributions exceeding $1 million in certain years.

110. Plaintiffs allege that substantial portions of funds assessed, solicited, or collected specifically for Allen University were not transferred to, deposited with, or placed under the control of the University. Instead,

funds allegedly were retained in or transferred through accounts and entities outside Allen University's control and oversight.

111. Plaintiffs further allege that Defendant Vision Center was among the entities that received, retained, used, or received the benefit of funds assessed, solicited, or collected for Allen University. Vision Center was not merely an unrelated recipient of those funds but was an entity whose leadership overlapped directly with the AMEC and Allen University governance structure through which the fundraising was conducted and overseen.

112. Defendant Green incorporated Vision Center and served in a leadership capacity with that entity while also serving as Presiding Bishop of AMEC's Seventh Episcopal District and Chairman of Allen University's Board of Trustees. Defendant Davis subsequently succeeded Green as Presiding Bishop and Chairman of Allen University's Board and has admitted in his Answer in this action that he serves as President of Defendant Vision Center.

113. Plaintiffs allege that, during their respective tenures, Green and Davis therefore occupied positions on each side of the challenged fundraising relationships: within the AMEC and Seventh Episcopal District structure through which funds were assessed, solicited, and collected for

Allen University; within Allen University's governance structure charged with protecting the University's charitable assets; and within Vision Center, an entity Plaintiffs allege received, retained, used, or benefited from Allen-designated funds.

114. Plaintiffs further allege that the Seventh Episcopal District separately required or solicited financial support for Vision Center. Funds designated for Vision Center therefore constituted a financial obligation or charitable purpose separate and distinct from funds assessed, solicited, or collected specifically for Allen University.

115. Plaintiffs allege that the existence of a separate fundraising obligation or purpose benefiting Vision Center did not authorize Green, Davis, McNealey, or any other Defendant to satisfy that obligation using funds assessed, solicited, or collected specifically for Allen University.

116. Plaintiffs allege that Green and Davis did not disclose to the full Allen University Board of Trustees their simultaneous leadership relationships with Vision Center in connection with the collection, disposition, division, or alleged diversion of Allen-designated funds, nor did they provide the Board with a complete accounting identifying the amounts of Allen-designated funds received, retained, transferred, or used for the benefit of Vision Center or other entities.

117. Plaintiffs further allege that donors and participating AMEC congregations were not informed when their contributions were solicited for Allen University that funds so designated could instead be retained, divided, redirected, transferred, or used for the benefit of Vision Center or other entities outside Allen University's control.

118. Plaintiffs allege that Green, Davis, McNealey, and members of the controlling Trustee group knew or received notice that funds raised in Allen University's name were not being received or controlled by the University, yet failed to require a complete accounting or corrective action.

119. When Montgomery sought investigation of the discrepancy, members of the controlling Board majority allegedly rejected or prevented meaningful investigation.

120. The relationship between Vision Center and the challenged conduct extended beyond Allen Days. During the period in which 501S was pursuing its development project with Allen University, Green and McNealey separately requested that representatives of 501S make a financial investment in Vision Center. 501S declined the request.

121. Plaintiffs allege that the foregoing circumstances—including the solicitation of funds specifically for Allen University, the University's alleged failure to receive substantial portions of those funds, the alleged receipt or

benefit of Allen-designated funds by Vision Center, Green's and Davis's overlapping positions on the fundraising, University-governance, and Vision Center sides of the transactions, and the failure to provide a complete accounting—support Plaintiffs' allegations that charitable funds intended for Allen University were diverted, retained, or used outside the University's control and for purposes not disclosed to the persons from whom those funds were solicited.

122. Plaintiffs allege that the Allen Days and Vision Center conduct furthered the alleged fraudulent scheme by using Allen University's name, charitable mission, and relationship with AMEC congregations to generate contributions represented as being for the University's benefit while permitting funds so designated to be retained, transferred, divided, or used outside Allen University's control.

123. Plaintiffs further allege that the overlapping positions held by Green and Davis enabled them to exercise influence over the fundraising structure through which Allen-designated funds were generated, the Vision Center structure alleged to have received or benefited from those funds, and the Allen University governance mechanisms responsible for discovering, investigating, accounting for, and remedying the alleged diversion.

**E. Fraudulent Inducement and Contractual Exploitation (501S Agreement)**

124. Plaintiffs allege that Allen University's contractual authority and institutional credibility were used as another mechanism through which value was obtained from a third party while material information concerning the University's ability and intent to perform its contractual obligations was withheld or misrepresented.

125. In July 2023, Allen University and 501S entered into an agreement concerning the proposed development of a stadium and student union for the University. Plaintiffs allege that 501S thereafter devoted substantial time, resources, professional services, and business opportunities to the Allen University project in reliance upon representations made by persons acting with actual or apparent authority on behalf of the University.

126. In October 2023, McNealey proposed that 501S accelerate the development project in exchange for an additional $3,000,000 expedite fee to be paid by Allen University. Plaintiffs allege that Green knew of McNealey's proposal and the resulting accelerated arrangement.

127. In reliance upon those representations, 501S agreed to accelerate its performance, undertook additional work and obligations, and

continued committing substantial resources to the Allen University project. The parties subsequently executed an amended agreement memorializing, among other terms, Allen University's obligation to pay the $3,000,000 expedite fee.

128. Plaintiffs allege that, at the time these representations were made, McNealey knew that Allen University lacked the financial capacity to perform and that the promised $3,000,000 expedite payment had not received Board approval and was not supported by secured funding.

129. Plaintiffs allege that these material facts were not disclosed to 501S before it agreed to accelerate performance. In reliance upon the representations concerning Allen University's payment and performance, 501S continued to expend substantial resources, undertake additional work, and incur obligations in connection with the project.

130. In December 2023, after McNealey had offered 501S the $3,000,000 expedite payment in exchange for accelerated performance, McNealey sought Board approval of the payment by email.

131. Plaintiffs allege that McNealey did not disclose to the Board that he had proposed and offered the $3,000,000 payment to induce 501S to accelerate the project. Instead, the language of McNealey's email allegedly presented the proposed payment in a manner that implied that the request

for additional compensation originated with 501S, although the payment had been proposed and offered by McNealey.

132. Plaintiffs allege that McNealey's December 2023 request for Board approval is further evidence that, when he offered the $3,000,000 expedite payment and induced 501S to accelerate performance, the promised payment had not yet received Board approval.

133. Plaintiffs further allege that McNealey's failure to disclose to the Board that he had offered the payment deprived the Board of material information concerning the origin and circumstances of the obligation for which he subsequently sought approval.

134. During the same general period, Green and McNealey separately requested that representatives of 501S make a financial investment in Defendant Vision Center, an entity whose relationship to Green, Davis, AMEC fundraising, and Allen-designated charitable funds is alleged above. 501S declined the requested investment.

135. Allen University thereafter failed to make the required payments to 501S. Plaintiffs allege that McNealey subsequently denied or misrepresented the existence, terms, or status of the amended agreement to members of the Board of Trustees, notwithstanding his participation in the negotiations and execution of the contractual arrangement.

136. In October 2024, McNealey acknowledged during a meeting of Allen University's Board of Trustees that the University did not have the money necessary to satisfy the obligation. Dr. Dub Taylor likewise informed the Board that Allen University did not have the funds and stated that he was surprised the $3,000,000 payment had been offered.

137. Plaintiffs allege that the Board was placed on notice of the amended agreement, Allen University's nonpayment, and the University's resulting contractual exposure.

138. The Board subsequently received a legal opinion concerning the validity and enforceability of the amended agreement and Allen University's resulting contractual liability, yet persons charged with protecting the University failed to require timely corrective action sufficient to prevent or mitigate the resulting liability.

139. Plaintiffs allege that, as a result of the alleged inducement and reliance, 501S undertook substantial performance, incurred costs and obligations, and committed resources to the Allen University project that it otherwise would not have undertaken on the represented terms. Plaintiffs further allege that Allen University's subsequent nonpayment of the resulting obligations exposed the University to substantial and avoidable contractual and financial liability.

140. Plaintiffs allege that the 501S conduct furthered the broader fraudulent scheme by using Allen University's institutional identity and contractual authority to induce 501S to provide and accelerate substantial performance based upon a promised $3,000,000 payment that McNealey allegedly knew the University lacked the financial ability and secured funding to make and for which Board approval had not been obtained, thereby obtaining the benefit of 501S's performance while creating substantial contractual and financial exposure for Allen University.

141. Plaintiffs further allege that the fraudulent inducement of 501S and the subsequent concealment, misrepresentation, and failure to remedy the resulting contractual liability perpetuated the broader fraudulent scheme by allowing persons responsible for creating or enabling the obligation to avoid timely accountability, preventing meaningful Board intervention after the challenged conduct and resulting liability became known to the Board, and causing Allen University to bear substantial financial and contractual consequences arising from conduct allegedly created or enabled by persons entrusted with protecting the University's interests.

**F. Federal Fraud and Misuse of Government Funds (HUD Scheme)**

142. Plaintiffs allege that Defendant McNealey caused Allen University to seek approximately $4.2 million in federal funds made

available through the United States Department of Housing and Urban Development ("HUD") to Allen University in connection with the Waverly Project by submitting documentation that did not satisfy applicable eligibility requirements.

143. Plaintiffs allege that, after the initial submission was rejected because the dates associated with the work did not satisfy HUD's requirements, McNealey caused documentation concerning the same work to be resubmitted with altered dates and representations designed to create the appearance that the expenditures qualified for federal reimbursement.

144. Plaintiffs allege that the altered documentation and representations were materially false and were submitted for the purpose of causing HUD to approve approximately $4.2 million in federal funding that would not have been payable based upon the actual dates and circumstances of the underlying work.

145. Plaintiffs further allege that Green knew of and approved McNealey's conduct. On August 8, 2024, while discussing questions concerning McNealey's conduct as President of Allen University, McNealey stated, in substance, that everything he had done had been done with the approval of the Chairman, referring to Green, who had served as Chairman

of Allen University's Board of Trustees during the period in which the challenged HUD submissions were made.

146. HUD did not approve payment of the requested funds. Plaintiffs allege that the attempted use of altered documentation nevertheless exposed Allen University, its institutional reputation, and its relationship with federal funding authorities to substantial risk arising from conduct undertaken in the University's name.

147. Plaintiffs further allege that members of Allen University's Board of Trustees became aware of the questioned HUD submissions and the circumstances surrounding them, yet persons charged with protecting the University failed or refused to require an independent investigation or meaningful corrective action concerning the conduct.

148. Plaintiffs allege that the HUD conduct furthered the broader fraudulent scheme by using Allen University's institutional identity and access to federal funding as a means of attempting to obtain approximately $4.2 million through allegedly false or altered documentation, while the governance structure described above allegedly prevented meaningful independent investigation and accountability after the conduct became known.

**G. Pattern of Concealment, Retaliation, and Enterprise Conduct**

149. Plaintiffs allege that the success and continuation of the fraudulent scheme described above depended upon concealment, coordination, concentration of authority, control, and the suppression of independent oversight. The alleged financial misconduct and the mechanisms used to prevent its investigation and correction were therefore interconnected components of the same course of conduct.

150. Plaintiffs allege that certain Defendants used or exercised influence over Allen University's governance structures, financial information, affiliated entities, charitable relationships, Board processes, personnel, and institutional decision-making both to carry out or enable the challenged conduct and to restrict access to information, suppress meaningful inquiry, discourage or prevent disclosure, and impede detection, independent investigation, accounting, corrective action, and accountability.

151. Plaintiffs further allege that the alleged wrongdoers or enablers were positioned to influence the response to the wrongdoing itself, thereby allowing persons whose conduct or interests were implicated to participate in or influence the institutional mechanisms responsible for determining whether the challenged conduct would be investigated, disclosed, corrected, or remedied.

152. The alleged suppression of oversight included resistance to requests for financial information and independent investigation, concealment or misrepresentation of material information, interference with access to persons possessing firsthand knowledge, rejection of efforts to obtain accountings or corrective action, and retaliation against persons who continued to question, investigate, or seek disclosure of the challenged conduct.

153. Plaintiffs allege that the scheme could continue only so long as those positioned to discover, disclose, investigate, or challenge the alleged misconduct were prevented, discouraged, or deterred from doing so.

154. Plaintiffs allege that the concentration of control and the resulting demand for silence were not incidental consequences of the fraudulent scheme, but mechanisms through which the scheme was concealed, protected, and perpetuated.

155. Plaintiffs allege that Montgomery was subjected to retaliation, disparagement, interference with the performance of her fiduciary responsibilities, and ultimately purported removal from the Board after persistently seeking investigation, financial transparency, enforcement of the University's Bylaws, and accountability concerning the matters alleged herein.

156. Plaintiffs further allege that Dr. Dub Taylor was subjected to retaliatory employment conduct after possessing or providing information relevant to matters under Board review.

157. Plaintiffs allege that the conduct described herein was not isolated but constituted a coordinated and continuing pattern of activity carried out through an association-in-fact enterprise consisting of certain Defendants and affiliated persons and entities that shared relationships, overlapping authority, financial interests, or functions relevant to the operation or protection of the alleged scheme.

158. Plaintiffs do not allege that every Defendant participated in every transaction or committed every alleged wrongful act. Rather, Plaintiffs allege that the participants performed different roles within the alleged enterprise, including directing or carrying out transactions; controlling, receiving, transferring, or retaining funds or financial benefits; making, withholding, or concealing material representations or information; enabling challenged conduct; exercising governance, institutional, or ecclesiastical authority; failing or refusing to take action upon receiving notice of suspected financial or institutional misconduct despite possessing authority and responsibility to investigate, intervene, direct corrective action, or exercise available supervisory or disciplinary authority; and

preventing or resisting investigation, disclosure, accounting, and corrective action.

159. Allen University was not a participant in the alleged fraudulent scheme.

160. Plaintiffs allege that the University was used as an instrumentality through which its institutional identity, property, charitable relationships, access to federal funding, contractual authority, and financial resources were exploited, while Allen University remained a principal victim of the resulting financial losses, liabilities, diversion or dissipation of assets, and institutional harm.

161. Plaintiffs allege that the Waverly transactions, diversion of Allen-designated charitable funds, attempted acquisition of federal funds through allegedly false or altered documentation, fraudulent inducement and contractual exploitation of 501S, suppression of independent oversight, and retaliation against persons seeking accountability were connected through overlapping participants, relationships, positions of authority, methods of concealment, financial interests, and mechanisms for preventing detection and corrective action.

162. Through the alleged enterprise, Plaintiffs allege that certain Defendants and other alleged participants performed different but

interconnected roles involving fraud, misrepresentation, concealment, misuse or diversion of funds and assets, suppression of oversight, and resistance to corrective action, while Allen University and Montgomery suffered the distinct financial, institutional, reputational, and other injuries for which relief is sought in this action.

163. Plaintiffs allege that concealment, retaliation, and suppression of independent oversight were not merely consequences of the alleged fraudulent scheme but mechanisms through which the scheme was protected and perpetuated by limiting the ability of Allen University's independent trustees and other responsible persons to discover the complete nature and extent of the challenged conduct, determine the disposition of University assets and funds, identify the persons and entities that benefited, and obtain timely corrective relief.

164. Plaintiffs allege that the resulting harm extended beyond the immediate Plaintiffs because the alleged diversion, dissipation, misuse, and encumbrance of University assets and resources impaired an educational institution whose students, donors, faculty, staff, alumni, and other stakeholders depend upon the lawful stewardship of its charitable and institutional resources.

165. This action seeks to expose Defendants' coordinated and unlawful scheme, hold the responsible Defendants accountable for their respective misconduct, recover and trace misappropriated or diverted funds and assets, and obtain damages and equitable relief for the injuries suffered by Plaintiffs, including injury to Allen University arising from the contractual and financial liabilities allegedly created through the conduct involving 501S.

166. This action also seeks to restore lawful and independent governance and financial integrity to Plaintiff Allen University, protect and recover University assets, and prevent further harm to the University, its students, donors, and other stakeholders.

## III. PARTIES

### A. Plaintiffs

167. Plaintiff **Karol Widemon Montgomery (referred to herein as "Montgomery")** is an individual residing in the State of Georgia. Montgomery became a member of Allen University's Board of Trustees in or about October 2021 and, during her tenure, contributed time, professional services, and financial support to Allen University. Montgomery brings this action in her individual capacity for the separate

and distinct injuries allegedly inflicted upon her and derivatively on behalf of Allen University for injuries allegedly inflicted upon the University.

168. Plaintiff **Allen University (referred to herein as "Allen," "AU," or the "University")** is a South Carolina nonprofit corporation with its principal place of business in Columbia, South Carolina. Allen University is the real party in interest with respect to the derivative claims asserted by Montgomery on its behalf and is alleged to be a principal institutional victim of the conduct challenged herein. Montgomery asserts the derivative claims on behalf of Allen University because, as alleged more fully herein, persons entrusted with the University's governance failed or refused to cause the University to investigate, remedy, or pursue claims arising from the alleged misconduct.

**B. University Defendant**

169. Defendant **Allen University Board of Trustees (referred to herein as "BOT")** is the governing body of Allen University and is charged with oversight of the University's governance, property, finances, institutional affairs, and protection of its interests. At all relevant times, the Board operated pursuant to Bylaws providing that the Presiding Bishop of Defendant AMEC's Seventh Episcopal District serve as Chairman of the Board and requiring Board representation from the Annual Conferences

comprising the Seventh Episcopal District. These provisions placed the governance of Allen University in a structural relationship with AMEC's Seventh Episcopal District and the persons exercising ecclesiastical authority within that District.

### C. Individual Defendants

170. Defendant **Ernest McNealey (hereafter "McNealey")** is an individual residing in Columbia, South Carolina. McNealey served as President of Allen University from approximately 2017 through January 2026 and, at relevant times, served as an ex officio member of the University's Board of Trustees. At all relevant times, McNealey also served as President of each of the five Waverly-related entity Defendants—**Foundation of Allen University, Pinckney Center Operations, LLC ("POC"), Waverly Hospital Owner, LLC ("Waverly Owner"), Waverly Hospital MM, LLC ("WHMM")**, and **Waverly Hospital MT, LLC ("WMT")**—and exercised authority or control over those entities as alleged herein. McNealey is married to Ernestine Green McNealey, who, upon information and belief, has a familial relationship with Defendant Samuel Green. As alleged more fully herein, Green was instrumental in McNealey's selection as President of Allen University and thereafter supported McNealey's continued leadership despite receiving notice of conduct and

circumstances that Plaintiffs allege warranted independent investigation and corrective action.

171. Defendant **Samuel Green (hereafter "Green")** is an individual who, during relevant periods, served as Presiding Bishop of AMEC's Seventh Episcopal District and, by virtue of that position, served as Chairman of **Defendant Allen University's Board of Trustees**. Green also incorporated **Defendant Vision Center** and served as its President or otherwise exercised leadership and control over that entity. During his tenure as Presiding Bishop, Green possessed and exercised authority to appoint trustees to Allen University's Board and thereby exercised substantial influence over the composition and governance of the Board. Green recommended McNealey for the position of President of Allen University after McNealey's prior service as President of Stillman College in Tuscaloosa, Alabama, had ended. As alleged more fully herein, Plaintiffs allege that Green was aware of material circumstances concerning McNealey's prior tenure at Stillman College before recommending him for the presidency of Allen University. Further, as alleged herein, Green exercised substantial authority and influence concerning Allen University's governance, financial affairs, charitable fundraising, institutional decision-

making, and the Board's response to matters involving McNealey and other conduct challenged in this action.

172. At all relevant times, Green was and remains a Bishop of **Defendant AMEC** and a member of **Defendant Council of Bishops**. During relevant periods, Green also served as a member of the Board of Managers of **Defendant POC**.

173. During relevant periods, Green also served as an AMEC manager of the denomination's retirement plan and exercised responsibilities concerning its administration and oversight. Green was subsequently named as a defendant, together with AMEC, the Council of Bishops, Davis, and others, in litigation concerning the alleged misappropriation or loss of tens of millions of dollars in AMEC retirement-plan assets. Plaintiffs allege that Green's prior responsibilities and experience concerning those matters are relevant to his knowledge, notice, and understanding of the significance of the financial irregularities, fiduciary concerns, and requests for investigation subsequently raised concerning Allen University.

174. Defendant **James Davis (hereafter "Davis")** is an individual who, during relevant periods, succeeded Green as Presiding Bishop of **AMEC's** Seventh Episcopal District and, by virtue of that position, became

Chairman of **Allen University's Board of Trustees**. Davis also serves as President of **Defendant Vision Center**. During his tenure as Presiding Bishop, Davis possessed and exercised authority to appoint trustees to Allen University's Board and thereby exercised substantial influence over the composition and governance of the Board. As alleged more fully herein, Davis exercised substantial authority and influence concerning Allen University's governance, financial affairs, charitable fundraising, institutional decision-making, and the Board's response to allegations of financial and governance misconduct involving McNealey, Green, Vision Center, and other persons and entities identified herein.

175. At all times relevant herein, Davis was a Bishop of **Defendant AMEC** and a member of **Defendant Council of Bishops.** Through his simultaneous positions as Presiding Bishop of the Seventh Episcopal District, Chairman of Allen University's Board of Trustees, and President of **Defendant Vision Center**, Davis occupied positions on each side of the challenged fundraising relationships: within the AMEC and Seventh Episcopal District structure through which funds were assessed, solicited, and collected for Allen University; within Allen University's governance structure charged with protecting the University's charitable assets; and

within Vision Center, an entity Plaintiffs allege received, retained, used, or benefited from Allen-designated funds.

176. During relevant periods, Davis also served as an AMEC manager of the denomination's retirement plan and exercised responsibilities concerning its administration and oversight. Davis was subsequently named as a defendant, together with AMEC, the Council of Bishops, Green, and others, in litigation concerning the alleged misappropriation or loss of tens of millions of dollars in AMEC retirement-plan assets. Plaintiffs allege that Davis's prior responsibilities and experience concerning those matters are relevant to his knowledge, notice, and understanding of the significance of the financial irregularities, fiduciary concerns, and requests for investigation subsequently raised concerning Allen University.

177. Plaintiffs allege that Davis received repeated notice of alleged financial, contractual, governance, and fiduciary irregularities affecting Allen University and was repeatedly requested to exercise his authority as Chairman of the Board to require investigation, disclosure, Board action, and corrective measures. Plaintiffs further allege that, notwithstanding such notice and requests, Davis failed or refused to require meaningful independent investigation or corrective action and, as alleged more fully

herein, used or exercised his authority and influence to restrict independent inquiry, impede access to information and persons possessing firsthand knowledge, resist enforcement of Board procedures, and suppress or prevent institutional action concerning matters implicating McNealey, Green, Davis himself, Vision Center, and other persons or entities.

178. Defendant **Sandra Anderson (hereafter "Anderson")** is an individual who, at all times relevant herein, served as a member of Allen University's Board of Trustees and owed fiduciary duties to Plaintiff Allen University arising from her position as a trustee. Anderson was a member of the controlling group of Trustee Defendants alleged herein and participated in Board decisions concerning matters affecting Allen University's governance, finances, assets, contractual obligations, and institutional affairs.

179. During relevant periods, Anderson was or continues to be a member of the Board of Managers of **Defendant Pinckney Center Operations, LLC ("POC"),** one of the Waverly-related entities of which Defendant McNealey served as President and over which Plaintiffs allege he exercised control. Anderson also serves as President of the Women's Missionary Society of Defendant AMEC in South Carolina, a position to which Plaintiffs allege she was appointed by Defendant Davis.

180. Plaintiffs allege that Anderson's simultaneous or overlapping positions within Allen University's governance structure, AMEC, and POC placed her in positions through which she had access to information and institutional relationships relevant to matters challenged herein, including Allen University's financial affairs, the Waverly-related entities, and AMEC-related fundraising and institutional activities.

181. As alleged more fully herein, Anderson received notice of material financial, governance, contractual, and fiduciary concerns affecting Allen University and participated in, supported, or failed to take corrective action concerning matters for which Plaintiffs allege independent investigation, accounting, disclosure, or other Board action was required.

182. Defendant **Keith Britton (hereafter "Britton")** is an individual residing in the State of South Carolina and a member of Allen University's **Board of Trustees**. During relevant periods, Britton served as Vice President of the Board, a position to which Plaintiffs allege he was appointed by **Defendant Davis**. Britton also serves as President of the Seventh Episcopal District Lay Organization of **Defendant AMEC** and, in that capacity, serves within the ecclesiastical structure of the Seventh Episcopal District under the supervision of Davis.

183. Plaintiffs allege that Britton's simultaneous leadership positions within **Allen University's Board of Trustees** and **AMEC's** Seventh Episcopal District placed him within both institutional structures relevant to the challenged conduct. As President of the Seventh Episcopal District Lay Organization, Britton participated in the AMEC structure through which Allen University fundraising and Annual Conference activities occurred, while as an Allen University trustee and Vice President of the Board he owed fiduciary duties to the University and participated in its governance and oversight.

184. As alleged more fully herein, Britton attended one or more Annual Conferences at which substantial amounts raised for Plaintiff Allen University were publicly announced and, through his simultaneous service as an Allen University trustee, received or had access to information concerning the University's finances and the amounts actually received by the University. Plaintiffs allege that Britton received notice of material financial and governance concerns affecting Allen University but failed to require an accounting, meaningful independent investigation, or corrective action concerning the disposition of funds and other matters affecting the University's financial interests.

185. Defendant **Tamara Curry (hereafter "Curry")** is an individual residing in the State of South Carolina and a member of **Defendant Allen University's Board of Trustees.** Curry also serves as Associate Vice President of the Women's Missionary Society of **Defendant AMEC** in South Carolina, a position to which Plaintiffs allege she was appointed by **Defendant Davis.**

186. Curry's husband, Attorney Eduardo Curry, serves as Pastor of Grace Metropolitan African Methodist Episcopal Church at Adams Chapel in North Charleston, South Carolina, as General Counsel for **AMEC's** Seventh Episcopal District, and as legal counsel for Allen University. **Defendant Davis** appointed Attorney Curry to his pastoral position and to his positions as counsel for the Seventh Episcopal District and Allen University.

187. Plaintiffs allege that Curry's simultaneous positions within Allen University's governance structure and AMEC, together with her husband's positions as counsel to both the Seventh Episcopal District and Allen University, placed Curry within overlapping institutional and professional relationships relevant to the governance and financial matters challenged herein. Curry participated in AMEC Annual Conferences while simultaneously serving as a fiduciary of Allen University and receiving or

having access to information concerning the University's finances and institutional affairs.

188. As alleged more fully herein, Curry attended one or more Annual Conferences at which substantial amounts raised for Allen University were publicly announced and received notice of material financial and governance concerns affecting the University. Plaintiffs allege that, notwithstanding such knowledge and notice, Curry failed to require a complete accounting, meaningful independent investigation, or corrective action concerning the disposition of Allen-designated funds and other matters affecting Allen University's assets and financial interests.

189. Defendant **Norvel Goff (hereafter "Goff")** is an individual residing in the State of South Carolina and a member of **Defendant Allen University's Board of Trustees.** Goff served as Presiding Elder of the Edisto District for the South Carolina Annual Conference of **Defendant AMEC,** a position to which he was appointed by **Defendant Davis.**

190. Plaintiffs allege that Goff's simultaneous service as an Allen University trustee and as an **AMEC** Presiding Elder placed him within both the University's governance structure and the Seventh Episcopal District ecclesiastical structure through which Allen University fundraising and Annual Conference activities were conducted. As a Presiding Elder, Goff

served within the ecclesiastical structure headed by Davis while simultaneously owing fiduciary duties to Allen University as a member of its Board of Trustees.

191. Defendant **Juenarrl Keith (hereafter "Keith")** is an individual residing in the State of South Carolina and a member of Allen University's Board of Trustees. Keith served as Presiding Elder of the Palmetto District for the South Carolina Annual Conference of **Defendant AMEC,** a position to which he was appointed by **Defendant Davis.**

192. During relevant periods, Keith was or continues to be a member of the Board of Managers of **Defendant POC,** one of the Waverly-related entities of which **Defendant McNealey** served as President and over which Plaintiffs allege McNealey exercised control. Keith was also an original director of **Defendant Vision Center**.

193. Plaintiffs allege that Keith's simultaneous or overlapping positions as an **Allen University trustee**, an **AMEC** Presiding Elder, a member of **POC's Board of Managers**, and an original director of **Vision Center** placed him within multiple institutional and financial structures directly relevant to the conduct challenged herein. Those positions connected Keith to Allen University's governance, the Seventh Episcopal District structure through which Allen-designated charitable fundraising was

conducted, a Waverly-related entity involved in transactions concerning University property, and Vision Center, an entity Plaintiffs allege received, retained, used, or benefited from funds designated for Allen University.

194. As alleged more fully herein, Keith received or had access to information concerning material financial and governance matters affecting Allen University and was positioned to know of matters requiring independent Board inquiry, accounting, or corrective action. Plaintiffs allege that, notwithstanding such knowledge or notice, Keith participated in, supported, or failed to take corrective action concerning decisions of the controlling Board majority that prevented or rejected meaningful investigation, financial disclosure, accounting, or other action necessary to protect Allen University's assets and financial interests.

195. Defendant **Allen W. Parrott (hereafter "Parrott")** is an individual residing in the State of South Carolina and a member of **Defendant Allen University's Board of Trustees.** During relevant periods, Parrott was or continues to be a member of the Board of Managers of **Defendant POC**, one of the Waverly-related entities of which **Defendant McNealey** served as President and over which Plaintiffs allege McNealey exercised control. Parrott also serves as a Presiding Elder in **AMEC's** Seventh Episcopal District, a position to which he was appointed

by Defendant Davis. Parrott previously served as Vice Chairman of Allen University's Board of Trustees, a position to which he was appointed by **Defendant Davis** and also serves as President of the Presiding Elders of **Defendant AMEC** in South Carolina. Plaintiffs allege that Parrott's simultaneous or overlapping positions within Allen University's governance structure, AMEC's Seventh Episcopal District, and POC placed him within institutional and financial structures directly relevant to the conduct challenged herein.

196. Defendant **Caesar R. Richburg (hereafter "Richburg")** is an individual residing in the State of South Carolina and a member of **Defendant Allen University's Board of Trustees**. Richburg serves as a Pastor and Presiding Elder within **AMEC's** Seventh Episcopal District, positions to which Plaintiffs allege he was appointed by **Defendant Davis**. Plaintiffs allege that Richburg's simultaneous service as an Allen University trustee and as an AMEC Presiding Elder placed him within both the University's governance structure and the Seventh Episcopal District ecclesiastical structure through which Allen University fundraising and Annual Conference activities were conducted, while he simultaneously owed fiduciary duties to Allen University as a member of its Board.

197. Defendant **Derrick Scott (hereafter "Scott")** is an individual residing in the State of South Carolina and/or New York and a member of **Defendant Allen University's Board of Trustees**. Scott serves as a Pastor and Presiding Elder within **AMEC's** Seventh Episcopal District, positions to which Plaintiffs allege he was appointed by **Defendant Davis**. Plaintiffs allege that Scott's simultaneous service as an Allen University trustee and as an AMEC Presiding Elder placed him within both the University's governance structure and the Seventh Episcopal District ecclesiastical structure through which Allen University fundraising and Annual Conference activities were conducted, while he simultaneously owed fiduciary duties to Allen University as a member of its Board.

198. Defendant **Herbert Temoney (hereafter "Temoney")** is an individual residing in the State of South Carolina and a member of **Defendant Allen University's Board of Trustees**. Temoney serves as a Pastor and Presiding Elder within **AMEC's** Seventh Episcopal District, positions to which Plaintiffs allege he was appointed by **Defendant Davis**. Plaintiffs allege that Temoney's simultaneous service as an Allen University trustee and as an AMEC Presiding Elder placed him within both the University's governance structure and the Seventh Episcopal District ecclesiastical structure through which Allen University fundraising and

Annual Conference activities were conducted, while he simultaneously owed fiduciary duties to Allen University as a member of its Board.

**D. Institutional and Entity Defendants**

199. Defendant **The African Methodist Episcopal Church, Inc. (referred to herein as "AMEC")** is a nonprofit religious organization incorporated in the Commonwealth of Pennsylvania and operating through episcopal districts, including the Seventh Episcopal District encompassing South Carolina. AMEC conducts its affairs through an established ecclesiastical and organizational structure that includes its Bishops, the Council of Bishops, Episcopal Districts, Annual Conferences, Presiding Elders, pastors, and other officers and organizations.

200. At all relevant times, **Defendants Green and Davis** were members of and Bishops of **Defendant AMEC** and members of **Defendant Council of Bishops.** During their respective tenures as Presiding Bishop of AMEC's Seventh Episcopal District, Green and Davis exercised authority within the District and simultaneously served, by virtue of that position, as Chairman of Allen University's Board of Trustees. Plaintiffs allege that this organizational structure created a direct and continuing relationship between AMEC's Seventh Episcopal District and the governance of Allen University.

201. AMEC's organizational structure also provided the framework through which charitable contributions were assessed, solicited, collected, and reported for the stated benefit of Allen University. Annual Conferences occurred throughout the Seventh Episcopal District, and Allen University fundraising, including Allen Days, was conducted as part of that established AMEC conference structure rather than independently of the denomination's organizational framework.

202. Defendant AMEC was a named defendant in litigation brought to recover more than $90 million allegedly misappropriated or lost from AMEC's employee retirement plan. In re: AME Church Employee Retirement Fund Litigation, No. 1:22-md-03035-STA-jay (W.D. Tenn.) (hereafter “Retirement Plan Case”). The Retirement Plan Case involved allegations concerning the administration, oversight, investment, and disposition of substantial funds entrusted to AMEC and persons serving in positions of authority within the denomination.

203. Plaintiffs allege that AMEC's involvement in the Retirement Plan Case is relevant to its institutional knowledge and notice concerning the risks associated with inadequate financial oversight, the handling and disposition of entrusted funds, conflicts involving persons exercising institutional authority, and the need for independent investigation and

corrective action when allegations of substantial financial irregularities are reported.

204. Plaintiffs allege that AMEC, through its governing and ecclesiastical structures, possessed authority and mechanisms to receive information concerning the conduct of its Bishops and other ecclesiastical officers and to exercise supervisory, administrative, disciplinary, or other institutional authority in response to conduct falling within its jurisdiction. As alleged more fully herein, AMEC received notice of suspected financial, governance, and fiduciary misconduct involving Green, Davis, McNealey, Allen University, Allen-designated charitable funds, and other matters challenged herein.

205. Plaintiffs allege that, notwithstanding such notice, AMEC failed or refused to exercise available institutional authority sufficient to require meaningful investigation, accounting, disclosure, corrective action, or other appropriate response to the alleged misconduct. Plaintiffs further allege that this failure permitted persons occupying positions within AMEC's ecclesiastical structure also to continue exercising substantial authority or influence over Allen University's governance and over the institutional response to the wrongdoing itself.

206. Defendant **African Methodist Episcopal Church Council of Bishops (hereafter "Council of Bishops")** is an organizational and governing body of **Defendant AMEC** composed of the Bishops of AMEC. At all relevant times, Defendants Green and Davis were members of and Bishops of **AMEC** and members of **Defendant Council of Bishops**.

207. Plaintiffs allege that, under AMEC's governing structure, the Council of Bishops possessed supervisory, administrative, and disciplinary authority concerning AMEC Bishops and possessed institutional mechanisms through which allegations of misconduct by Bishops could be received, investigated, addressed, or referred for appropriate action. Such authority included, as applicable under AMEC's governing rules and procedures, the ability to investigate or cause investigation of alleged misconduct and to initiate, recommend, impose, or pursue available supervisory or disciplinary measures.

208. **Defendant Council of Bishops** was also a named defendant in the Retirement Plan Case, In re: AME Church Employee Retirement Fund Litigation, No. 1:22-md-03035-STA-jay (W.D. Tenn.), involving allegations concerning the misappropriation or loss of more than $90 million from AMEC's employee retirement plan. **Defendants Green and Davis** were likewise named as defendants in that litigation. Plaintiffs allege

that the Council's involvement in the Retirement Plan Case is relevant to its institutional knowledge and notice concerning allegations of financial misconduct involving entrusted funds, the responsibilities of persons occupying positions of ecclesiastical authority, and the importance of independent investigation and corrective action when substantial financial irregularities are reported.

209. As alleged more fully herein, **Defendant Council of Bishops** subsequently received notice of alleged financial, governance, fiduciary, and other misconduct involving **Green and Davis** in connection with Allen University, including allegations concerning the collection and disposition of charitable funds raised for Allen University and the exercise of ecclesiastical and governance authority affecting the University's financial interests and institutional oversight.

210. Plaintiffs allege that the notice provided to the Council of Bishops was sufficient to place it on notice that the alleged conduct implicated not merely private actions by Green or Davis, but conduct connected to positions and authority they held within **AMEC** and its Seventh Episcopal District, including their successive service as Presiding Bishop of the Seventh Episcopal District and, by virtue of that position, Chairman of Allen University's Board of Trustees.

211. Plaintiffs allege that, notwithstanding such notice and its prior institutional experience concerning allegations of substantial financial misconduct involving AMEC funds and leadership, the Council of Bishops failed or refused to exercise available supervisory, investigative, disciplinary, or other institutional authority sufficient to require meaningful independent investigation, accounting, disclosure, corrective action, or other appropriate response concerning the conduct reported to it.

212. Plaintiffs further allege that the Council of Bishops' failure to act after receiving notice enabled Green and Davis to retain or continue exercising ecclesiastical authority and institutional influence relevant to Allen University and impaired an effective institutional response to the alleged misconduct. In this manner, Plaintiffs allege that the Council's failure to exercise available authority after receiving notice contributed to the conditions through which the alleged wrongdoers or enablers remained positioned to influence the response to the wrongdoing itself.

213. Defendant **Vision Center (hereafter "Vision Center")** is a nonprofit entity organized in the State of South Carolina. **Defendant Green** incorporated Vision Center and served as its President or otherwise exercised leadership and control over the entity during relevant periods. **Defendant Davis** subsequently succeeded Green as President of Vision

Center and has admitted in his Answer filed in this action that he serves as President of Vision Center. Plaintiffs allege that Vision Center is relevant to the conduct challenged herein because it operated within overlapping relationships involving Green, Davis, AMEC's Seventh Episcopal District, Allen University governance, and charitable fundraising conducted within the Seventh Episcopal District.

214. Plaintiffs allege that Vision Center received, retained, used, or benefited from funds assessed, solicited, or collected for Allen University, notwithstanding that the Seventh Episcopal District separately assessed or solicited financial support for Vision Center as a charitable purpose distinct from fundraising conducted for Allen University. Plaintiffs further allege that Green's and Davis's overlapping leadership positions placed each, during his respective tenure, on the AMEC and Seventh Episcopal District fundraising side, the Allen University governance side charged with protecting the University's charitable assets, and the Vision Center side alleged to have received, retained, used, or benefited from Allen-designated funds.

215. Plaintiffs further allege that Vision Center's relationship to the challenged conduct was not limited to Allen Days or other charitable fundraising. During the period in which 501S was performing or pursuing its

development project with Allen University, Green and McNealey separately requested that representatives of 501S make a financial investment in Vision Center. 501S declined those requests. As alleged more fully herein, the requests occurred during the same general period in which McNealey had induced 501S to accelerate performance on the Allen University project through the promised $3,000,000 expedite payment.

**E. Waverly-Related Entity Defendants**

216. Defendant **Foundation of Allen University (hereafter "Foundation")** is an entity affiliated with Allen University and one of the five Waverly-related entity Defendants identified herein. At all relevant times, **Defendant McNealey** served as President of Foundation and exercised authority or control over the entity. Plaintiffs allege that Foundation participated in, received, controlled, transferred, retained, or otherwise benefited from funds, financial interests, or transactions associated with the Waverly Project as alleged more fully herein.

217. Defendant **Pinckney Center Operations, LLC (hereafter "POC")** is a limited liability company and one of the five Waverly-related entity Defendants identified herein. At all relevant times, **Defendant McNealey** served as President of POC and exercised authority or control over the entity. **Defendants Green, Anderson, Keith, and Parrott** served,

during relevant periods, as members of POC's Board of Managers. Plaintiffs allege that POC participated in, received, controlled, transferred, retained, or otherwise benefited from funds, financial interests, or transactions associated with the Waverly Project as alleged more fully herein.

218. Defendant **Waverly Hospital Owner, LLC (hereafter "Waverly Owner")** is a limited liability company and one of the five Waverly-related entity Defendants identified herein. At all relevant times, **Defendant McNealey** served as President of Waverly Owner and exercised authority or control over the entity. Plaintiffs allege that ownership or control of Allen University's Waverly Building, which the University had owned free and clear of any mortgage or other encumbrance, was transferred to Waverly Owner and that Waverly Owner thereafter participated in transactions through which the property was financed, encumbered, monetized, or otherwise used to generate financial benefits.

219. Defendant **Waverly Hospital MM, LLC (hereafter "WHMM")** is a limited liability company and one of the five Waverly-related entity Defendants identified herein. At all relevant times, **Defendant McNealey** served as President of WHMM and exercised authority or control over the

entity. Plaintiffs allege that WHMM participated in the financing, ownership, leasing, management, receipt, transfer, retention, or disposition of funds, contractual rights, financial interests, or other benefits associated with the Waverly Project, as alleged more fully herein.

220. Defendant **Waverly Hospital MT, LLC (hereafter "WMT")** is a limited liability company and one of the five Waverly-related entity Defendants identified herein. At all relevant times, **Defendant McNealey** served as President of WMT and exercised authority or control over the entity. Plaintiffs allege that WMT participated in the financing, ownership, leasing, management, receipt, transfer, retention, or disposition of funds, contractual rights, financial interests, or other benefits associated with the Waverly Project, as alleged more fully herein.

221. Plaintiffs allege that **Foundation, POC, Waverly Owner, WHMM, and WMT** were not unrelated entities operating independently of one another. Each was headed by **McNealey** as President and was allegedly used, individually or in combination with the others, in connection with the transfer, financing, encumbrance, monetization, renovation, leasing, management, or disposition of Allen University's Waverly property and the funds and financial benefits generated through transactions involving that property.

222. Plaintiffs further allege that the use of multiple entities under McNealey's overlapping leadership and control enabled University property, funds, contractual rights, financing proceeds, and other financial benefits associated with the Waverly Project to be received, transferred, distributed, retained, obligated, or controlled outside Allen University's ordinary financial and governance structure, while Allen University remained responsible for substantial expenditures and continuing financial obligations associated with the Waverly property.

223. Plaintiffs allege that each Waverly-related entity is named as a Defendant based upon its own alleged role in receiving, holding, controlling, transferring, retaining, benefiting from, or otherwise participating in transactions involving Allen University's property, funds, or financial interests. Plaintiffs do not allege that each Waverly-related entity performed every act alleged concerning the Waverly Project, and the particular conduct and financial relationships attributable to each entity are alleged more fully herein.

**F. Doe Defendants**

224. Defendant **Doe Corporations and Business Entities 1–10** are corporations, limited liability companies, business entities, affiliates, subsidiaries, or other entities whose identities or precise roles are presently

unknown to Plaintiffs and that, upon information and belief, participated in, received or controlled funds or financial benefits from, facilitated, enabled, or otherwise bear responsibility for one or more of the transactions or acts alleged herein, or exercised authority or control relevant to such conduct. Plaintiffs therefore name these Defendants in a "Doe" capacity and will seek leave to amend this Complaint to identify and substitute their true names and capacities when ascertained through discovery.

225. Defendants **John Doe Individuals 1–10** are individuals whose identities or precise roles are presently unknown to Plaintiffs and who, upon information and belief, participated in, directed, facilitated, enabled, or otherwise bear responsibility for one or more of the transactions or acts alleged herein; received, controlled, transferred, retained, or benefited from funds or assets involved in the challenged conduct; exercised fiduciary, governance, supervisory, financial, or other authority relevant to such conduct; or participated in the concealment, suppression of investigation, or failure to take corrective action alleged herein. Plaintiffs therefore name these Defendants in a "John Doe" capacity and will seek leave to amend this Complaint to identify and substitute their true names and capacities when ascertained through discovery.

## IV. JURISDICTION AND VENUE

226. This Court has original subject-matter jurisdiction over this action pursuant to **28 U.S.C. § 1331** because Plaintiffs assert claims arising under the laws of the United States, including **18 U.S.C. §§ 1961–1968, the Racketeer Influenced and Corrupt Organizations Act ("RICO").**

227. Plaintiffs allege, as set forth more fully herein, that certain Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of an association-in-fact enterprise through a pattern of racketeering activity affecting interstate commerce and causing injury to business or property as alleged herein.

228. This Court also has subject-matter jurisdiction pursuant to **28 U.S.C. § 1332(a)** because the matter in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship among the parties. Plaintiff Montgomery is a citizen of the State of Georgia, and Defendants are citizens of states other than Georgia.

229. This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to **28 U.S.C. § 1367(a)** because those claims are so related to the federal claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

230. Defendants' conduct, as alleged herein, involves an alleged pattern of racketeering activity and related acts of fraud, concealment, breach of fiduciary duty, and misuse of charitable and institutional assets, including conduct affecting federal programs and funds administered through federal agencies.

231. Plaintiffs' federal and state-law claims arise from an interconnected course of alleged conduct involving Allen University's governance, assets, charitable fundraising, financial transactions, contractual relationships, and institutional affairs, together with the alleged concealment, suppression of oversight, and resistance to investigation and corrective action described herein.

232. At all relevant times, the activities alleged herein affected interstate commerce through, among other things, interstate communications, financial transactions, electronic communications, and federal grant submission systems.

233. The enterprise described in this First Amended Complaint operated through and in connection with Allen University, an institution whose activities include fundraising, financial transactions, charitable relationships, and communications across state lines.

234. Venue is proper in the United States District Court for the District of South Carolina pursuant to **28 U.S.C. § 1391(b)(2)** because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this District and a substantial part of the property that is the subject of this action, including Allen University's Waverly property, is situated within this District.

235. Allen University is located in Columbia, South Carolina, within this District, and the governance, financial, charitable, contractual, and institutional activities challenged herein were conducted in substantial part through or in connection with the University and persons exercising authority over its affairs.

236. A substantial part of the alleged acts and omissions occurred within this District, including Allen University Board meetings and governance decisions; acts and omissions concerning University assets and financial affairs; the collection, disposition, and alleged diversion of charitable funds raised for Allen University; transactions involving the Waverly property; and acts or omissions relating to investigation, disclosure, accounting, oversight, and corrective action.

237. The conduct occurring within or directed toward this District also included the negotiations, representations, performance, and

subsequent Board proceedings concerning the contractual relationship between Allen University and 501S, which Plaintiffs allege formed part of the broader course of fraudulent conduct and concealment described herein.

238. This Court has personal jurisdiction over Defendants because, as alleged more fully herein, Defendants reside in, conduct or conducted activities in, hold or held positions involving entities located in, transacted business in, or purposefully directed conduct toward South Carolina, and the claims asserted herein arise out of or relate to Defendants' contacts with South Carolina and the conduct alleged herein.

239. Accordingly, this Court possesses subject-matter jurisdiction over this action, venue is proper in this District, and this Court possesses personal jurisdiction over Defendants as alleged herein.

## V. PLAINTIFFS' STANDING

### A. Plaintiff Karol Widemon Montgomery's Individual Standing

240. Plaintiff Montgomery brings this action individually as a former member of Defendant BOT, a donor of charitable funds, and an individual with a special interest in the proper administration and protection of Allen University's charitable and institutional assets.

241. Montgomery served as a trustee and director of Allen University during substantial portions of the conduct challenged herein.

242. During her service on the Board, Montgomery owed fiduciary duties to Allen University and was obligated to act in good faith, exercise appropriate oversight, protect the University's interests and assets, and address material financial, governance, and institutional matters coming to her attention.

243. While serving on the Board, Montgomery learned of and raised concerns concerning material financial and governance irregularities, including the attempted acquisition of federal funds through allegedly false or altered documentation; the transfer, monetization, and encumbrance of the Waverly property; the collection and alleged diversion of charitable funds raised for Allen University; the 501S contractual transaction and resulting liability; and the failure to investigate, account for, disclose, or correct matters affecting Allen University's assets and financial interests.

244. Montgomery repeatedly sought information, financial documentation, accountings, independent investigation, enforcement of Allen University's Bylaws, access to persons possessing firsthand knowledge, and corrective action concerning the matters challenged herein.

245. Plaintiffs allege that, because Montgomery continued to seek investigation, disclosure, accountability, and corrective action, she was subjected to retaliation, disparagement, interference with the performance of her fiduciary responsibilities, obstruction of Board procedures, efforts to discredit and silence her, and ultimately the purported removal of Montgomery from Allen University's Board of Trustees.

246. Montgomery alleges direct and particularized injuries separate and distinct from the injuries suffered by Allen University, including personal and reputational harm; interference with her ability to perform her duties and exercise her rights as a member of Defendant BOT; retaliation for attempting to perform those responsibilities; alleged violations of the Bylaws governing her service and participation on Defendant BOT; and her purported removal from the Board.

247. Allen University's Bylaws governed the operation of Defendant BOT and established the procedures under which Montgomery and the other trustees exercised their authority and responsibilities as members of the University's governing Board.

248. South Carolina law recognizes that bylaws governing a board member's relationship with an organization may be construed according to principles applicable to contracts.

249. Before the meeting at which Defendant BOT purported to remove Montgomery, Montgomery specifically notified Defendant Davis and the entire Board of Trustees in writing that the proposed meeting and proceedings did not comply with Allen University's Bylaws, including applicable notice and agenda requirements, and requested that the required agenda and information be provided.

250. Montgomery's objections were not corrected, the requested information was not provided, and the meeting proceeded notwithstanding her written objections.

251. Plaintiffs allege that Defendant BOT thereafter purported to remove Montgomery through proceedings that failed to comply with the Bylaws governing the Board and Montgomery's service as a trustee.

252. Montgomery did not voluntarily resign from or relinquish her position on Defendant BOT. Defendants' purported termination of her position was involuntary and is itself part of the wrongful conduct challenged in this action.

253. Montgomery therefore asserts direct claims arising from the alleged violation of rights governing her own Board service and removal, separate from the derivative claims she asserts for injuries suffered by

Allen University, and seeks appropriate declaratory and equitable relief, including reinstatement to the Board.

254. Montgomery further alleges her direct and particularized injuries separate and distinct from the injuries suffered by Allen University, are fairly traceable to the conduct of the Defendants responsible for those acts and are redressable through the damages and equitable relief sought in this action.

255. Montgomery also contributed charitable funds for the benefit of Allen University with the intent that those contributions support the University's educational and charitable mission and not be diverted, misused, or applied for undisclosed purposes.

256. Her interest in the proper administration and protection of Allen University's charitable assets is distinct from that of the general public because Montgomery was both a donor and a member of the University's governing Board, was directly involved in efforts to investigate and protect the University's assets, and was personally affected by the conduct alleged herein.

**B. Authority to Protect Allen University's Interests and Derivative Standing**

257. Montgomery also seeks relief derivatively on behalf of Allen University for claims and injuries belonging to the University.

258. Allen University is a South Carolina nonprofit corporation, and South Carolina law recognizes proceedings concerning corporate acts and the conduct of incumbent or former directors, officers, employees, or agents and expressly recognizes derivative suits on behalf of South Carolina nonprofit corporations in accordance with applicable rules of civil procedure, including S.C. Code §§ 33-31-304 and 33-31-630.

259. Montgomery served as a member of Allen University's Board of Trustees during substantial portions of the transactions, conduct, and omissions challenged herein and while the alleged injuries to Allen University were occurring or continuing.

260. Montgomery's purported removal from Defendant BOT occurred after she had repeatedly sought investigation, disclosure, accounting, enforcement of Allen University's Bylaws, and corrective action concerning the conduct challenged in this action.

261. Montgomery did not voluntarily resign from Defendant BOT, abandon her position, or otherwise voluntarily relinquish her status as a trustee. Her purported removal was involuntary and is itself part of the wrongful conduct challenged in this action.

262. Plaintiffs allege that Montgomery's purported removal was not independent of the controversy underlying this action, but occurred after and in connection with her continuing efforts to investigate, obtain disclosure and accounting, enforce Allen University's Bylaws, and obtain corrective action concerning the alleged misconduct.

263. Plaintiffs allege that Montgomery's purported removal was itself part of the challenged conduct and was undertaken, at least in part, to prevent or impede her continued efforts to investigate, obtain disclosure and accounting, and seek corrective action concerning alleged misconduct affecting Allen University.

264. Montgomery challenges both the validity and legal effect of her purported removal and alleges that it did not lawfully terminate her status as a trustee for the reasons set forth below.

265. Montgomery seeks, among other relief, a declaration that her purported removal was invalid and void ab initio, immediate reinstatement to Defendant BOT, and restoration of the rights, authority, and responsibilities associated with her position as a trustee.

**1. Montgomery's Purported Removal Was Invalid and Did Not Terminate Her Trustee Status**

266. Allen University is a South Carolina nonprofit corporation without members. Montgomery was presented to Defendant BOT for membership on the Board, and Defendant BOT voted to elect her as a trustee.

267. Montgomery was therefore a director "elected by the board" within the meaning of S.C. Code § 33-31-808(h).

268. Because Allen University is a nonprofit corporation without members, S.C. Code § 33-31-822(c) governed any action by Defendant BOT to remove Montgomery and expressly provides that a board action removing a director "is not valid" unless each director is given at least seven days' written notice that the matter will be voted upon at a directors' meeting, unless notice is waived pursuant to S.C. Code § 33-31-823.

269. Neither Montgomery nor the other members of Defendant BOT received written notice at least seven days before the March 20, 2025 Special Meeting informing them that Montgomery's removal would be considered or voted upon at that meeting.

270. Montgomery did not waive notice of the proposed removal or otherwise waive the statutory notice requirements governing Defendant BOT's consideration of her removal.

271. Allen University's Bylaws imposed independent and more stringent requirements governing Special Meetings. Article VI, Section 3 required written notice at least ten days in advance, required that the notice include "a clear statement of the general nature of business to be conducted," and mandated that "[t]he business of all special meetings shall be confined to the stated purposes for which the meeting was called."

272. Accordingly, Defendant BOT was required to comply with both the statutory notice requirement specifically governing removal and the independent ten-day notice and stated-purpose requirements imposed by Allen University's Bylaws before considering or voting upon Montgomery's removal.

273. Neither the written notice of the March 20, 2025 Special Meeting nor the subsequently provided agenda identified Montgomery's removal, disciplinary action against Montgomery, her continued qualification to serve as a trustee, or any purported cause for removal as business to be considered or voted upon at the meeting.

274. Before the Special Meeting, Montgomery expressly advised Davis and Defendant BOT in writing that the notice failed to comply with Article VI, Section 3, quoted the governing Bylaw provision, identified the deficiency, and requested compliance with the Bylaws.

275. Davis and Defendant BOT therefore had actual advance notice of Montgomery's objection and the governing Bylaw requirements but nevertheless proceeded with the Special Meeting and purported to consider and vote upon Montgomery's removal, even though removal had not been identified in either the notice or the subsequently provided agenda.

**2. Defendant BOT Did Not Obtain the Vote Required to Remove Montgomery**

276. Because Montgomery was elected by Defendant BOT, S.C. Code § 33-31-808(h) required the vote of two-thirds of the directors then in office to remove her without cause, unless the Articles or Bylaws required a greater number. The statutory requirement is based upon the number of directors then in office, not merely the number present at the meeting.

277. Allen University's Bylaws did not, at the beginning of Montgomery's term or at the time of her purported removal, set forth or define reasons constituting "cause" for her removal.

278. Although Montgomery's removal was characterized during the March 20, 2025 Special Meeting as being "for cause," S.C. Code § 33-31-808(i) applies where, at the beginning of the director's term, the Articles or Bylaws provide that the director may be removed for reasons set forth

therein. Allen University's Bylaws set forth no such reasons, and Montgomery received no advance notice identifying any alleged cause or conduct constituting cause for her removal.

279. Defendant BOT did not obtain the affirmative vote of two-thirds of the directors then in office required by S.C. Code § 33-31-808(h) for removal without cause.

280. Defendant BOT's purported removal of Montgomery therefore failed to satisfy multiple independent requirements governing a valid removal: the statutory notice requirement of S.C. Code § 33-31-822(c); the voting requirement applicable to a board-elected director under S.C. Code § 33-31-808(h); and the independent notice and stated-purpose requirements of Article VI, Section 3 of Allen University's Bylaws.

281. Because the statutory prerequisites to a valid removal were not satisfied, the required vote was not obtained, and Defendant BOT acted outside the stated purposes of the Special Meeting despite actual advance notice of the governing Bylaw requirements, Montgomery alleges that her purported removal was unauthorized, invalid, and void ab initio, and therefore did not lawfully terminate her status as a trustee of Allen University.

**3. Effect of Invalid Removal Upon Montgomery's Derivative Standing**

282. Because Montgomery's purported removal was invalid and void ab initio, Montgomery alleges that she remained a duly elected trustee notwithstanding Defendant BOT's purported removal and that the purported removal did not extinguish the trustee status upon which her derivative standing rests.

283. Montgomery does not rely upon prospective reinstatement to acquire derivative standing.

284. Rather, she alleges that the purported removal was legally ineffective when undertaken and therefore did not lawfully terminate her trustee status.

285. Montgomery separately seeks reinstatement as declaratory and equitable relief restoring her ability to exercise the position, rights, authority, and responsibilities from which Defendants have excluded her.

**4. Alternative Equitable Basis for Derivative Standing**

286. Alternatively, if the Court determines that Montgomery's purported removal was effective for purposes of determining trustee status notwithstanding the statutory and Bylaw violations alleged herein, Montgomery alleges that the circumstances of her involuntary and

challenged removal warrant application of equitable principles in determining her authority to pursue derivative relief on Allen University's behalf.

287. S.C. Code § 33-31-630 expressly provides for derivative suits on behalf of South Carolina nonprofit corporations in federal and state court "in accordance with the applicable rules of civil procedure." Because this action is pending in federal court, Montgomery further relies upon Fed. R. Civ. P. 23.1 and, to the extent applicable, equitable principles governing derivative proceedings.

288. Montgomery was a duly elected trustee when she discovered, investigated, challenged, and sought Defendant BOT action concerning substantial portions of the conduct forming the basis of the derivative claims asserted on Allen University's behalf.

289. Montgomery repeatedly sought internal investigation, disclosure, accounting, compliance with Allen University's Bylaws, and corrective action before resorting to litigation. She did not voluntarily resign, abandon her position, or otherwise voluntarily relinquish her trustee status. Her purported loss of trustee status resulted from the purported removal challenged in this action as unlawful and retaliatory.

290. Plaintiffs allege that Defendants who participated in, approved, concealed, failed to investigate, or otherwise were implicated in the challenged conduct should not be permitted to rely upon their own allegedly unlawful and retaliatory actions to manufacture the loss of Montgomery's trustee status and thereafter invoke that purported loss of status to bar derivative review of injuries allegedly inflicted upon Allen University.

291. Permitting the challenged removal itself to defeat derivative standing under these circumstances would allow the persons whose conduct was the subject of Montgomery's demands for investigation to use the allegedly unlawful removal as the means of preventing judicial review of that conduct and obtaining the benefit of their own challenged actions.

292. Accordingly, Montgomery alleges derivative standing on independent and alternative grounds: first, because her purported removal was invalid and void ab initio and therefore did not lawfully terminate her trustee status; and alternatively, because the circumstances alleged herein warrant recognition of her authority to pursue derivative relief under S.C. Code § 33-31-630, Fed. R. Civ. P. 23.1, and applicable equitable principles.

**5. Derivative Claims, Demand, and Compliance with Rule 23.1**

293. The claims Montgomery asserts on behalf of Allen University concern rights and injuries belonging to the University, including the alleged transfer, diversion, dissipation, misuse, monetization, or encumbrance of University property and assets; diversion or retention of charitable funds designated for Allen University; exposure of the University to substantial financial and contractual liabilities; misuse of the University's institutional identity and access to federal funding; and breaches of duties owed to Allen University.

294. Before commencing this action, Montgomery repeatedly sought action from Allen University's Board of Trustees concerning the matters challenged herein.

295. Among other things, Montgomery requested financial information and accountings, raised suspected financial irregularities with the Board, sought investigation of transactions and conduct affecting University assets, requested access to persons possessing firsthand knowledge, sought enforcement of the University's Bylaws and Board procedures, and requested corrective action concerning conduct she believed was causing or threatening injury to Allen University.

296. The requested action was not obtained.

297. Plaintiffs allege that material requests for information, accounting, investigation, and corrective action were ignored, resisted, obstructed, rejected, or otherwise left unresolved.

298. Defendants Goff, Britton, Temoney, Curry, Anderson, Keith, Parrott, Richburg, and Scott constituted the controlling majority of Defendant BOT during relevant proceedings and, as alleged more particularly herein, participated in votes or other Board actions that rejected or prevented meaningful investigation of matters concerning Allen University's financial interests and assets.

299. Plaintiffs allege that Montgomery's repeated demands and efforts to obtain Board action were unsuccessful and that further efforts became ineffective after the controlling governance structure rejected or prevented meaningful investigation and Montgomery was ultimately purportedly removed from the Board after continuing to demand investigation and accountability.

300. The specific demands made by Montgomery, the Defendants to whom those demands were directed, the Board's responses, votes, communications, conflicts, and circumstances demonstrating Montgomery's efforts to obtain action and the reasons such action was not obtained are alleged with greater particularity herein.

301. Montgomery's demands, the responses to those demands, the conflicts affecting the Board's ability to consider the matters independently, the refusal or failure to investigate, and the circumstances rendering further demand ineffective are alleged with particularity herein in accordance with Fed. R. Civ. P. 23.1.

302. Montgomery fairly and adequately represents Allen University's interests in seeking recovery, accounting, tracing, restoration, and protection of University property and assets and redress for injuries allegedly inflicted upon the University.

303. This action is brought for the purpose of protecting and enforcing Allen University's rights and recovering relief for the University's benefit and is not a collusive action brought to confer jurisdiction upon this Court that it would otherwise lack.

304. This First Amended Complaint is verified by Montgomery. Plaintiffs allege that the foregoing allegations, together with the particularized demand, governance, conflict, refusal-to-investigate, purported-removal, and retaliation allegations set forth herein, establish Montgomery's standing to pursue derivatively the claims asserted on behalf of Allen University under applicable South Carolina law and federal

procedural requirements, including on the independent and alternative grounds alleged above.

## VI. DERIVATIVE ALLEGATIONS ON BEHALF OF ALLEN UNIVERSITY

305. Plaintiff **Karol Widemon Montgomery ("Montgomery")** realleges and incorporates by reference all preceding paragraphs of this First Amended Complaint as if fully set forth herein, including the allegations concerning Defendants' alleged control of Allen University's Board of Trustees, misuse or diversion of University assets, suppression of oversight, Montgomery's efforts to obtain investigation and corrective action, and Defendants' failure or refusal to take corrective action after receiving notice of the challenged conduct.

306. Montgomery brings this action derivatively on behalf of Plaintiff Allen University to vindicate rights belonging to the University and to remedy injuries allegedly inflicted upon it through fraud, diversion or misuse of charitable and institutional assets, concealment of material financial information, breaches of fiduciary duty, self-interested or conflicted transactions, exposure of the University to substantial financial liabilities, suppression of independent oversight, and related misconduct described herein.

307. Allen University is the real party in interest with respect to the claims asserted derivatively on its behalf, and any recovery or equitable relief obtained on those claims is sought for the benefit and protection of Allen University.

308. During substantial portions of the transactions, conduct, and omissions challenged herein, Montgomery was a duly elected member of Allen University's Board of Trustees, having been presented for membership on Defendant BOT and elected by vote of the Board, and served as a trustee and director of Allen University. Montgomery was also a donor who contributed time, resources, and financial support to Allen University.

309. Montgomery further alleges, as set forth in Paragraphs 234–298 above, that Defendant BOT's purported removal of her was invalid and void ab initio and did not lawfully terminate her status as a trustee.

310. Alternatively, Montgomery relies upon the alternative equitable basis for derivative standing set forth in Paragraphs 234–298 above.

311. At all relevant times, Allen University was governed by Defendant BOT, which was charged with governing the University and safeguarding its property, assets, and institutional interests.

312. In carrying out those responsibilities, the members of Defendant BOT were required to discharge their duties in accordance with applicable law and Allen University's governing documents and to act in the interests of the University in exercising their governance and oversight responsibilities.

313. The duties owed by members of Defendant BOT included fiduciary duties of loyalty, care, and good faith to Allen University and responsibilities concerning legal compliance and the preservation of the University's charitable and educational mission.

314. As alleged herein, Defendants Green, Davis, McNealey, Anderson, Britton, Curry, Goff, Keith, Parrott, Richburg, Scott, and Temoney exercised substantial authority, control, or influence over Allen University's governance, financial decision-making, Board processes, and oversight functions during relevant periods.

315. Plaintiffs allege that certain members of this controlling group participated in, approved, ratified, enabled, knew of, failed to act upon, concealed, or resisted investigation of one or more components of the challenged conduct, including the Waverly transactions; diversion or retention of Allen-designated charitable funds; attempted acquisition of federal HUD funds through allegedly false or altered documentation;

exposure of Allen University to substantial contractual liability arising from the 501S transaction; and retaliation or adverse action against trustees, officers, employees, or other persons who raised concerns regarding suspected financial misconduct or legal compliance, possessed or provided information relevant to matters under review, or sought investigation, transparency, or accountability.

316. Plaintiffs do not allege that every member of the Board participated in every challenged transaction. Rather, as alleged more particularly herein, different Defendants possessed different knowledge, relationships, authority, involvement, or conflicts concerning the matters for which Montgomery sought investigation and corrective action.

**A. Demand, Board Response, and Futility**

317. Before commencing this action, Montgomery repeatedly sought action from Allen University's Board of Trustees concerning the conduct and transactions challenged herein.

318. Montgomery's efforts included requesting financial records, explanations, accountings, investigation, disclosure, access to persons possessing firsthand knowledge, enforcement of Allen University's Bylaws, properly convened Board proceedings, and corrective action concerning

matters affecting the University's assets, finances, contractual obligations, and governance.

319. Among other matters, Montgomery sought information, investigation, or corrective action concerning:

a. The Waverly property and related transactions, entities, financing, and disposition of funds;

b. Allen Days fundraising and the disposition of funds raised or designated for Allen University;

c. The circumstances surrounding Allen University's agreement with 501S, the promised $3,000,000 expedite payment, the University's nonpayment, and resulting contractual exposure;

d. The attempted acquisition of federal HUD funds through allegedly false or altered documentation;

e. Retaliation against Dr. Dub Taylor and matters concerning his knowledge of conduct under Board review; and

f. The conduct of persons responsible for governing, supervising, investigating, or taking corrective action concerning the foregoing matters.

320. Montgomery's requests did not result in the investigation, accounting, disclosure, or corrective action she sought.

321. Plaintiffs allege that requests were variously ignored, resisted, obstructed, rejected, delayed, or left unresolved and that members of the controlling Board majority rejected or prevented meaningful investigation of matters affecting Allen University's assets and financial interests.

322. Plaintiffs further allege that Montgomery requested that meetings be convened and Board procedures be followed pursuant to Allen University's Bylaws so that matters requiring Board consideration could be addressed, but those efforts did not result in effective independent Board action concerning the challenged conduct.

323. Specifically, Plaintiffs allege that a majority of Defendant BOT, including Defendants Green, Davis, McNealey, Anderson, Britton, Curry, Goff, Keith, Parrott, Richburg, Scott, and Temoney, lacked independence with respect to one or more matters for which Montgomery sought investigation or corrective action because members of this controlling group:

a. Participated in, approved, ratified, enabled, or knowingly ignored one or more components of the misconduct alleged herein;

b. Failed or refused to investigate credible allegations or information concerning financial improprieties, including the alleged misuse,

diversion, transfer, or dissipation of University or charitable funds and assets;

c. Knew of, failed to investigate, or failed to take appropriate action concerning the attempted acquisition of federal HUD funds through allegedly false or altered documentation;

d. Failed to investigate or take effective corrective action after receiving actual notice of alleged material misrepresentations, financial irregularities, potential fraud, breaches of fiduciary duty, or conduct exposing Allen University to substantial financial or contractual liability; and

e. Participated in, approved, condoned, failed to prevent, or failed to take effective corrective action concerning alleged retaliation or adverse action against Montgomery, employees, or others who raised concerns regarding suspected financial misconduct or legal compliance, possessed or provided information relevant to matters under review, or sought investigation, transparency, or accountability.

324. Plaintiffs allege that Green and Davis, during their respective tenures as Presiding Bishop of AMEC's Seventh Episcopal District and Chairman of Defendant BOT, exercised disproportionate influence over trustee appointments, Board leadership, governance procedures, and

oversight mechanisms, thereby creating and perpetuating a closed and controlled governance structure that undermined the independence and accountability necessary for disinterested consideration of the misconduct alleged herein.

325. Defendant BOT's ability to exercise independent and disinterested judgment was further impaired by structural conflicts of interest, including certain members' alleged participation in, knowledge of, approval of, failure to act upon, or benefit from challenged conduct; overlapping ecclesiastical, governance, financial, and organizational relationships; dependence upon or appointment by persons implicated in matters requiring investigation; and the continued service of certain trustees beyond their authorized terms.

326. Plaintiffs allege that persons possessing authority and responsibility to investigate, intervene, require an accounting, direct corrective action, or exercise available supervisory or disciplinary authority failed or refused to take effective action after receiving notice of suspected financial or institutional misconduct.

327. Montgomery's continued efforts to obtain investigation and accountability were met with alleged retaliation, disparagement, interference with her performance of Board responsibilities, resistance to

her efforts to obtain information and investigation, and ultimately her purported removal from Allen University's Board of Trustees.

328. Montgomery's efforts to obtain corrective action were not limited to Allen University's Board of Trustees. Montgomery also sought intervention from Defendants AMEC and the Council of Bishops concerning conduct by Davis that Montgomery alleged violated Allen University's Bylaws and impaired the Board's ability to function independently and lawfully.

329. Montgomery requested that AMEC and the Council of Bishops exercise their authority to intervene, direct corrective action, or take appropriate action concerning Davis and the governance violations brought to their attention.

330. Plaintiffs allege that AMEC and the Council of Bishops received notice of Montgomery's concerns and requests for intervention but failed or refused to take effective corrective action, notwithstanding their alleged authority within AMEC's ecclesiastical structure to supervise, direct, discipline, or remove Davis or otherwise require corrective action concerning conduct within his authority as Presiding Bishop.

331. Plaintiffs allege that their failure to intervene left in place the governance structure through which Davis continued to exercise

substantial influence over Allen University's Board and its response to the matters Montgomery sought to have investigated.

332. Plaintiffs allege that these circumstances demonstrate that Montgomery's efforts to obtain action from Defendant BOT and intervention from AMEC and the Council of Bishops were unsuccessful and that further demand upon the same governance structure to cause Allen University to pursue claims against persons whose conduct, interests, relationships, or failures to act were themselves implicated would have been futile and incapable of producing independent and disinterested consideration of the University's claims.

333. Accordingly, Plaintiffs allege with particularity that Montgomery made repeated efforts to obtain appropriate action from Allen University's governing authority and from AMEC and the Council of Bishops as entities alleged to possess authority to intervene concerning Davis, that the requested action and intervention were not obtained, and that the circumstances alleged herein demonstrate the reasons further demand was not reasonably capable of producing independent corrective action on behalf of Allen University.

**B. Necessity and Purpose of Derivative Action**

334. As a direct and proximate result of the conduct alleged herein, Allen University has suffered substantial financial, institutional, and operational injury, including alleged loss, diversion, dissipation, misuse, or encumbrance of assets; exposure to substantial financial and contractual liabilities; impairment of governance and oversight; and other injuries alleged more fully herein.

335. Plaintiffs allege that the injury to Allen University has also impaired resources devoted to the University's charitable and educational mission and therefore affects the institution's ability to serve the students and other constituencies for whose benefit those resources are held and administered.

336. Because the governing structure charged with protecting Allen University's interests allegedly failed or refused to obtain adequate investigation, accounting, recovery, or corrective relief after receiving notice of the challenged conduct, this derivative action is necessary to permit the University's rights and claims to be pursued independently.

337. Montgomery fairly and adequately represents Allen University's interests in seeking recovery, accounting, tracing, restoration, and protection of University property and assets and redress for injuries allegedly inflicted upon the University.

338. This derivative action is brought in good faith for the benefit of Allen University and not for the purpose of collusively creating federal jurisdiction.

339. Through this derivative action, Montgomery seeks on behalf of Allen University, as applicable to the claims and relief pleaded herein, to:

a. Recover, trace, and restore University assets and funds allegedly diverted, transferred, retained, misused, or dissipated;

b. Obtain an accounting concerning University property, charitable funds, and transactions challenged herein;

c. Obtain appropriate relief for breaches of duties owed to Allen University;

d. Impose a constructive trust, equitable lien, disgorgement, restitution, or other appropriate equitable remedy upon University property, funds, proceeds, or benefits wrongfully transferred, retained, received, or controlled by Defendants or other recipients, to the extent established by the evidence;

e. Restore lawful and independent governance and financial accountability; and

f. Prevent further injury to Allen University and protect its charitable and educational assets.

## VII. PROTECTION AND ENFORCEMENT OF ALLEN UNIVERSITY'S CHARITABLE ASSETS AND TRUST OBLIGATIONS

340. Plaintiffs reallege and incorporate by reference all preceding paragraphs of this First Amended Complaint as if fully set forth herein.

341. Allen University is a nonprofit educational institution organized and operated for charitable and educational purposes. Its charitable and institutional assets include funds, gifts, restricted donations, fundraising proceeds, real property, and other assets received, held, or administered for the University's charitable and educational purposes.

342. Individuals who control, manage, administer, or direct Allen University's charitable assets, including trustees, officers, and persons exercising de facto authority or control over the University or its assets, owe fiduciary and trust-based obligations to ensure that such assets are protected, administered, and used in accordance with applicable law, governing documents, donor restrictions where applicable, and the charitable and educational purposes for which such assets were received or held.

343. Plaintiffs do not rely upon the South Carolina Solicitation of Charitable Funds Act, S.C. Code §§ 33-56-10 et seq., as itself creating a

private statutory cause of action in Montgomery to enforce regulatory provisions committed by statute to the South Carolina Secretary of State.

344. Plaintiffs allege the charitable solicitation conduct described herein as evidence of the receipt, custody, control, retention, diversion, or misuse of funds solicited and designated for Allen University's charitable purposes and seek relief under the independent derivative, fiduciary, equitable, trust, restitutionary, and other causes of action alleged herein.

345. Plaintiffs further allege that the regulatory authority conferred upon the South Carolina Secretary of State does not extinguish Allen University's independent rights to recover funds or property belonging or intended to belong to the University, nor does it eliminate otherwise available derivative or equitable remedies to trace, recover, restore, or protect charitable assets allegedly diverted, retained, misapplied, or controlled by persons or entities not entitled to retain them.

346. The beneficiaries of Allen University's charitable assets and mission include its student body, a substantial majority of whom are economically disadvantaged and depend upon the University's proper stewardship of charitable and institutional resources to access and complete their education.

347. Plaintiffs allege that the diversion, withholding, dissipation, or misuse of such assets directly impairs resources intended to benefit those students and the University's educational mission.

348. Plaintiffs allege that Defendants AMEC, Green, Davis, McNealey, members of Defendant BOT, and other Defendants identified herein exercised authority, control, or substantial influence over Allen University's assets, governance structure, fundraising relationships, or financial affairs and used, enabled, or failed to restrain that authority in ways that diverted, concealed, withheld, misapplied, encumbered, or exposed charitable and institutional assets to unauthorized purposes, including through undisclosed transactions, misuse of institutional funds, diversion or retention of charitable contributions, and manipulation or suppression of financial and governance processes.

349. Plaintiffs allege that Defendants AMEC, Green, Davis, and persons acting through AMEC's Seventh Episcopal District solicited, collected, received, administered, or exercised control over charitable contributions during "Allen Days," Annual Conferences, and related fundraising activities conducted in Allen University's name and represented to participating churches, congregations, donors, and contributors as being

for the benefit of Allen University and its educational and charitable mission.

350. Defendants Green and Davis have admitted in their respective Answers filed in this action that funds were raised on behalf of Allen University at events related to AMEC's Seventh Episcopal District.

351. Green further avers that such funds were "held in trust specifically for Allen University" and provided to Allen University when requested.

352. Davis similarly avers that the funds were "held in trust specifically for Allen University" and provided to Allen University when requested or at an annual event in November.

353. Plaintiffs allege that the arrangement described by Green and Davis necessarily placed custody or control of funds raised for Allen University outside Allen University's immediate possession after collection.

354. Under Defendants' own description of the arrangement, funds raised for Allen University did not automatically pass into Allen University's possession or financial control when collected but instead remained in the custody or control of another person, office, account, or entity until requested by Allen University or later distributed.

355. Plaintiffs allege that the identity of the person or entity retaining such funds, the accounts in which such funds were maintained, the amounts received and retained, any conditions imposed upon Allen University's receipt of funds raised in its name, the amounts ultimately transferred to Allen University, and the disposition of funds not transferred to the University were material matters requiring disclosure and accounting.

356. Plaintiffs allege that substantial portions of funds publicly represented as having been raised for Allen University were not transferred to, deposited with, or placed under the independent control of Allen University and that the difference between the amounts publicly reported as having been raised and the amounts actually received by Allen University has not been fully accounted for to the University.

357. Donors were led to believe that they were making charitable contributions directly to Allen University and that their contributions would be received and used by Allen University for its charitable and educational purposes.

358. Checks made payable to Allen University and other charitable contributions were accepted in a manner suggesting that they were intended for Allen University, including through accounts or mechanisms bearing or using Allen University's name but which were not owned,

controlled, or authorized by Allen University. Plaintiffs allege that the use of Allen University's name in connection with accounts or mechanisms outside the University's financial systems and controls created the appearance that contributions intended for Allen University were being received and administered by the University.

359. Plaintiffs allege that the charitable fundraising structure was not independent of Defendant AMEC. Allen Days occurred within Annual Conferences of Defendant AMEC's Seventh Episcopal District; Green and Davis respectively served as Presiding Bishop of Defendant AMEC's Seventh Episcopal District during the relevant periods; and clergy trustees and other AMEC personnel participated in the conference and fundraising structure through which funds were solicited and collected for Allen University.

360. Plaintiffs allege that these overlapping ecclesiastical and governance relationships provided AMEC and its officers with knowledge of and institutional involvement in the fundraising conduct challenged herein.

361. Plaintiffs do not allege that Defendant Council of Bishops itself necessarily collected Allen Days contributions merely because Green and Davis were members of the Council. Rather, Plaintiffs allege that the Council of Bishops possessed supervisory, disciplinary, or other

ecclesiastical authority concerning Green and Davis as AMEC Bishops; received actual notice of alleged conduct affecting Allen University's governance and charitable interests; was requested by Montgomery to intervene concerning Davis; and failed or refused to take effective corrective action notwithstanding the authority Plaintiffs allege it possessed to intervene, direct, discipline, remove, or otherwise take action concerning Davis.

362. Plaintiffs further allege that Allen University's property, charitable status, institutional identity, funds, and other assets were used or placed at risk in connection with the Waverly transactions and related entities, including the transfer and encumbrance of University property, the use of University operating funds, financing and leasing arrangements, and financial obligations allegedly undertaken outside Allen University's ordinary financial and governance structure.

363. Plaintiffs also allege that Allen University's institutional identity and eligibility for federal funding were used in connection with efforts to obtain approximately $4.2 million in HUD funds through documentation alleged herein to have contained false or altered information, thereby exposing Allen University and its charitable interests to financial, regulatory, and reputational risk.

364. Plaintiffs allege that, through the conduct described herein, Defendants responsible for controlling, administering, protecting, or exercising authority over Allen University's charitable and institutional assets breached fiduciary and charitable trust obligations by diverting, concealing, withholding, misapplying, encumbering, dissipating, or otherwise misusing assets held or intended for charitable purposes, or by knowingly failing to protect such assets after receiving notice of their alleged misuse. Such conduct caused or threatened injury to Allen University, its charitable and educational mission, and its intended beneficiaries.

365. Plaintiffs further allege that Defendant Vision Center received, retained, used, or received the benefit of funds assessed, solicited, collected, or held for Allen University and that Green's and Davis's relationships with AMEC, Allen University's governance, and Defendant Vision Center are relevant to determining the receipt, control, disposition, and ultimate beneficiary of Allen-designated charitable funds, as alleged more particularly herein.

366. Plaintiffs allege that the scope, complexity, and duration of the conduct challenged herein, including the alleged use of multiple entities, accounts, fundraising mechanisms, property transactions, financing

arrangements, transfers, and distributions occurring over a period of years, render an ordinary accounting insufficient and necessitate comprehensive equitable intervention, including a forensic examination or audit to trace the flow of funds and assets, identify funds or property diverted, withheld, transferred, or misapplied, determine their disposition and present location, ascertain the full scope of the financial transactions challenged herein, and permit the recovery and restoration of assets belonging or intended to belong to Allen University.

367. Montgomery seeks relief in her capacity as a donor, trustee whose purported removal is challenged herein, and person alleging a special interest in the proper administration and protection of Allen University's charitable assets, as alleged more fully in the Standing section of this First Amended Complaint, and also seeks appropriate relief derivatively on behalf of Allen University with respect to injuries and claims belonging to the University.

368. Plaintiffs seek equitable relief necessary to preserve, trace, recover, restore, and protect charitable and institutional assets belonging or intended to belong to Allen University and to ensure that such assets are administered consistently with the charitable and educational purposes for which they were received or held.

369. Plaintiffs therefore seek equitable relief, as appropriate and authorized by law, including but not limited to an accounting; restitution; tracing and recovery of funds and property; imposition of a constructive trust upon assets or proceeds wrongfully obtained, transferred, retained, withheld, or misapplied; appropriate injunctive and governance-related relief concerning fiduciaries found to have breached duties owed to Allen University; and a court-ordered forensic examination or audit of relevant financial activity, accounts, transactions, and records necessary to ensure that Allen University's assets are identified, recovered, preserved, and administered for their lawful charitable and educational purposes.

370. Plaintiffs further seek such additional equitable relief as may be necessary to protect Allen University's charitable assets, prevent continuing or future misuse, diversion, withholding, or dissipation of those assets, and remedy breaches of duties established by the evidence and applicable law.

## VIII. FACTUAL ALLEGATIONS

### A. Allen University's Student Population and Dependence on Federal and Charitable Resources

371. Allen University is a historically Black university located in Columbia, South Carolina, whose charitable and educational mission includes providing higher-education opportunities to students who might

otherwise face substantial financial barriers to obtaining a college education.

372. Plaintiff Allen University serves a predominantly low-income and economically disadvantaged student population whose access to higher education depends directly on the proper administration of federal financial aid and charitable resources entrusted to the University.

373. Throughout the period relevant to this action, a substantial majority of Allen University's students have depended upon federal financial assistance to attend the University and complete their education.

374. At relevant times, at least approximately eighty percent of Allen University's students were eligible for federal Pell Grants, and in more recent years, approximately ninety-four percent of the University's students were Pell-eligible.

375. Federal Pell Grants are need-based federal grants awarded primarily to undergraduate students with exceptional financial need and are intended to assist eligible students in meeting the costs associated with obtaining a postsecondary education.

376. Pell Grant funds received for Allen University students were administered through the University and applied to students' educational charges.

377. When the application of federal student-aid funds to a student's account results in a Title IV credit balance, the balance is required to be paid to or for the benefit of the eligible student in accordance with applicable federal requirements.

378. Allen University also receives federal institutional funding, including funding under Title III programs intended to strengthen eligible institutions serving substantial populations of financially disadvantaged students.

379. Allen University's eligibility for Title III funding is based, in substantial part, upon statutory criteria reflecting the financial needs of the institution and the economically disadvantaged student population it serves.

380. Thus, the very student population most dependent upon Allen University's responsible stewardship of its resources is a substantial reason the University qualifies for federal institutional assistance intended to strengthen its ability to provide educational opportunities to those students.

381. In addition to federal assistance, Allen University depends upon charitable contributions, fundraising proceeds, institutional assets, and other financial resources entrusted to or raised for the University to maintain its operations, provide educational programs and student

services, maintain its facilities, and fulfill its charitable and educational mission.

382. Accordingly, the proper stewardship of Plaintiff Allen University's funds, including federal financial aid, charitable donations, and institutional resources, is essential not only to the University's operations, but also to the ability of its students to attend, remain enrolled, and successfully complete their education.

383. Defendants knew or reasonably should have known that Allen University's financial resources were not merely commercial assets, but included federal funds, charitable contributions, restricted or designated funds, and institutional resources intended to support the University and a student population substantially dependent upon those resources.

384. Plaintiffs allege that Defendant McNealey, while serving as President of Allen University and exercising authority over its administration and financial operations, failed or refused on one or more occasions to cause Title IV credit balances, including balances resulting from Pell Grant funds, owed to eligible Allen University students to be timely disbursed in accordance with applicable requirements.

385. Plaintiffs further allege that members of Defendant BOT were informed of concerns regarding the failure or refusal to release Pell-related

funds owed to students and failed to require an adequate investigation, accounting, or timely corrective action.

386. The failure to safeguard, properly administer, and timely distribute funds intended for Allen University and its students had consequences beyond the University's balance sheet.

387. Such conduct reduced or threatened resources available to students who depended upon those funds for tuition, books, housing, transportation, living expenses, and their continued ability to pursue and complete their education.

388. Plaintiffs allege that the financial and governance misconduct described herein—including the diversion or withholding of charitable funds raised for Allen University, misuse or unauthorized encumbrance of University assets, expenditure of University operating funds, exposure of the University to avoidable contractual and employment liabilities, and conduct placing federal funding and institutional resources at risk—depleted or threatened resources available to fulfill Allen University's charitable and educational mission.

389. The conduct alleged in this First Amended Complaint therefore did not occur in an institutional vacuum.

390. The charitable assets, federal funds, donations, real property, operating funds, and other resources entrusted to Allen University existed to advance its educational mission and serve a student population overwhelmingly dependent upon the University's responsible stewardship of those resources.

391. Plaintiffs allege that the diversion, withholding, misuse, dissipation, and unauthorized encumbrance of those resources injured Allen University, undermined its ability to fulfill its charitable and educational mission, and impaired or threatened resources intended to support its students.

392. Allen University's students, because of their substantial dependence upon financial aid and institutional resources, were particularly vulnerable to the consequences of the financial and governance misconduct alleged herein, including disruptions or reductions in resources affecting their ability to remain enrolled and complete their education.

## B. The African Methodist Episcopal Church (Defendant AMEC) Its Control Over Plaintiff Allen University

### 1. Plaintiffs' Claims Arise Under Neutral Principles of Civil Law

393. Plaintiffs' claims against AMEC, the Council of Bishops, and the other Defendants do not require this Court to decide any question

concerning religious doctrine, faith, worship, ecclesiastical teachings, or qualifications for religious office.

394. Plaintiffs' claims concern conduct governed by neutral principles of civil law, including the ownership, custody, transfer, and use of money and property; compliance with corporate governing documents; fiduciary and contractual obligations; alleged fraud and misrepresentations; charitable assets; and other financial and corporate conduct alleged herein.

395. Plaintiffs describe AMEC's ecclesiastical and organizational structure because that structure is relevant to determining the authority, positions, relationships, knowledge, conduct, and control of the Defendants and to explaining how Green and Davis came to exercise authority over Allen University and Defendant Vision Center.

396. Plaintiffs do not challenge AMEC's religious authority to select or assign bishops or to decide questions of faith, doctrine, or ecclesiastical office. The fact that certain Defendants are bishops, clergy, or members of AMEC does not require the Court to decide a religious question in determining whether those Defendants complied with generally applicable civil law.

397. Plaintiffs therefore seek adjudication only of civil rights, duties, transactions, and remedies capable of resolution through neutral principles

of law and do not ask this Court to resolve any theological or ecclesiastical controversy.

### 2. AMEC's Hierarchical and Connectional Structure

398. Defendant African Methodist Episcopal Church, Inc. ("AMEC") is a hierarchical and connectional religious organization whose ecclesiastical structure operates through interconnected governing bodies, Episcopal Districts, Annual Conferences, bishops, clergy, congregations, departments, and affiliated institutions.

399. At all relevant times, Defendants Green, Davis, Anderson, Britton, Curry, Goff, Keith, Parrott, Richburg, Scott and Temoney were and are members of Defendant AMEC.

400. Defendant Council of Bishops serves as the Executive Branch of Defendant AMEC's Connectional Church and exercises general oversight of Defendant AMEC during the interim between its quadrennial General Conferences.

401. Defendant Council of Bishops is composed of AMEC's active bishops, including, at relevant times, Defendants Green and Davis.

402. AMEC divides its ecclesiastical jurisdiction into Episcopal Districts, each headed by a Presiding Bishop exercising substantial ecclesiastical and administrative authority within the District.

403. AMEC's Seventh Episcopal District encompasses South Carolina and operates as a constituent part of AMEC's connectional structure rather than as an institution independent of AMEC.

404. During the periods relevant to this action, Defendant Green and thereafter Defendant Davis served as Presiding Bishop of AMEC's Seventh Episcopal District and, by virtue of that ecclesiastical office and Allen University's governing structure, simultaneously served as Chairman of Defendant BOT.

405. The office of Presiding Bishop of AMEC's Seventh Episcopal District also carried with it leadership authority over Defendant Vision Center. Defendants Green and Davis have admitted in their respective Answers that, by virtue of serving as Presiding Bishop of AMEC's Seventh Episcopal District, each also served as President of Defendant Vision Center during his respective tenure.

406. Accordingly, the same AMEC ecclesiastical office that placed Green and Davis at the head of Allen University's Board of Trustees also placed each, during his respective tenure, at the head of Defendant Vision Center, thereby concentrating leadership authority over Allen University and Vision Center in the same individual by virtue of his position as Presiding Bishop of AMEC's Seventh Episcopal District.

407. Plaintiffs allege that this overlapping structure is material to the claims asserted herein because Defendant Vision Center allegedly received, retained, used, or received the benefit of funds raised, assessed, collected, or held for Allen University, while the Presiding Bishop exercising leadership authority over Vision Center simultaneously served as Chairman of the governing Board charged with protecting Allen University's assets and financial interests.

408. Plaintiffs allege that the full Board of Trustees was not informed that the office of Presiding Bishop of AMEC's Seventh Episcopal District simultaneously placed the Presiding Bishop in the position of President of Defendant Vision Center, and that this dual leadership relationship and the resulting potential conflict of interest were not disclosed to the full Board before or in connection with decisions or proposals concerning the disposition, allocation, or sharing of funds raised or designated for Allen University.

409. Plaintiffs allege that this overlapping leadership structure created an actual or potential conflict of interest when funds raised or designated for Allen University were proposed to be divided with, transferred to, retained for, or used for the benefit of Defendant Vision Center.

410. As Chairman of Defendant BOT, the Presiding Bishop occupied a position charged with protecting Allen University's assets and financial interests while simultaneously serving as President of the separate entity alleged to have received, retained, used, or benefited from funds raised or designated for Allen University.

### 3. AMEC's Historical and Institutional Relationship With Allen University

411. Defendant AMEC established the institution now known as Allen University in or about 1870, originally as Payne Institute, for the purpose of advancing educational opportunities for African Americans, including persons historically denied or afforded limited access to higher education.

412. Allen University was subsequently organized as a nonprofit educational corporation; however, Defendant AMEC retained a substantial and continuing institutional relationship with the University through governance provisions connecting Allen University's Board of Trustees directly to AMEC's ecclesiastical structure.

413. Allen University's governing documents provide that the Presiding Bishop of AMEC's Seventh Episcopal District serves as

Chairman of Defendant BOT and further provide for representation on Defendant BOT associated with AMEC's Annual Conferences.

414. Through these requirements, AMEC's rules determine who occupies important positions governing Allen University, including the person who serves as Chairman of Defendant BOT and AMEC-affiliated representatives serving on the Board.

415. Defendants Green and Davis simultaneously exercised authority within AMEC and authority over Allen University. During their respective tenures as Presiding Bishop of AMEC's Seventh Episcopal District, each also served as Chairman of Defendant BOT and, as alleged above, President of Defendant Vision Center.

416. Plaintiffs allege that this concentration of authority affected the independence of Defendant BOT, particularly when the Board was required to investigate, evaluate, or take corrective action concerning the conduct of Green, Davis, other AMEC officials, Defendant Vision Center, or matters involving funds raised or designated for Allen University.

417. Through this structure, Defendant AMEC maintained substantial and continuing influence over the composition and leadership of Defendant BOT and, through the Board, over Allen University's governance and financial oversight.

418. The authority and influence exercised by the Presiding Bishop was not limited to presiding over meetings of Defendant BOT but extended to matters affecting Allen University's leadership and administration.

419. Defendant Green has admitted in his Answer filed in this action that he was involved in the recommendation of Defendant McNealey for the position of Interim President of Allen University.

420. Green's admitted involvement in recommending Allen University's chief executive provides a concrete example of the influence exercised over the University's leadership by the individual who simultaneously served as AMEC's Presiding Bishop for the Seventh Episcopal District and Chairman of Allen University's Board of Trustees.

421. Defendant BOT thereafter selected McNealey to serve as President of Allen University, placing him in a position of substantial authority over the University's operations, finances, personnel, assets, institutional relationships, and administration.

422. Plaintiffs allege that AMEC's influence over Allen University's governance was further reinforced by the presence on Defendant BOT of numerous AMEC members, clergy, officers, or persons occupying positions within AMEC's connectional structure, including the individually named trustees identified herein.

423. This overlapping ecclesiastical and institutional structure concentrated substantial authority over Allen University's governance and administration in persons who simultaneously occupied positions within AMEC's hierarchy and Allen University's governing structure.

424. Plaintiffs allege that the significance of this structure became particularly apparent when Defendant BOT was required to investigate, evaluate, or take corrective action concerning conduct involving McNealey, Green, Davis, AMEC-related fundraising, Defendant Vision Center, and transactions affecting Allen University's property, funds, contractual obligations, and financial interests.

425. In those circumstances, Defendants charged with protecting Allen University's interests and exercising oversight were called upon to investigate, evaluate, or take corrective action concerning other Defendants with whom they shared ecclesiastical, governance, appointment, supervisory, financial, or organizational relationships within Defendant AMEC.

426. As alleged more particularly herein, members of Defendant BOT were repeatedly placed on notice of matters requiring investigation, accounting, disclosure, or corrective action, yet meaningful independent

investigation and corrective action were repeatedly rejected, obstructed, delayed, or not undertaken.

427. Plaintiffs allege that Defendant AMEC's relationship with Allen University therefore extended beyond historical affiliation or denominational association and included formal governance mechanisms through which AMEC's ecclesiastical offices, officials, and organizational structure exercised substantial and continuing influence over Allen University's leadership, governance, financial oversight, and ability to investigate alleged misconduct independently.

**4. Trustee Term Limits and Continuation of the Board Majority**

428. Allen University's Bylaws limit both the duration of individual trustee terms and consecutive trustee service. Article II, Section 3 provides that trustees shall serve for one-, two-, or three-year terms, or until their successors are duly elected, and may succeed themselves in office.

429. The same provision further provides that trustees who have served three consecutive terms, including any partial term, are not eligible for reelection to Defendant BOT until one year has elapsed following the end of their term.

430. On information and belief, Defendants Anderson, Britton, Curry, Goff, Keith, Parrott, Richburg, Scott, and Temoney served continuously or

substantially continuously on Defendant BOT during substantial portions of Defendant Green's approximately eight-year tenure as Presiding Bishop of AMEC's Seventh Episcopal District and Chairman of Defendant BOT and continued serving on Defendant BOT after Defendant Davis succeeded Green as Presiding Bishop and Chairman in or about August 2024.

431. Thus, the service of these longstanding trustees extended beyond Green's approximately eight-year tenure and continued during Davis's tenure as Chairman.

432. Based upon the duration and continuity of that service, and because the Bylaws permit individual terms of no more than three years and require a one-year interruption after three consecutive terms, including any partial term, Plaintiffs allege on information and belief that one or more of these Defendants continued serving on Defendant BOT beyond the consecutive terms permitted by Allen University's Bylaws without the required interruption in Board service.

433. Notwithstanding the Bylaw limitation, these trustees continued exercising voting and governance authority over Allen University's financial, contractual, governance, and institutional affairs, and Defendant BOT did not undertake a review to determine whether their continued service complied with the Bylaws.

434. As alleged more particularly herein, Defendants Anderson, Britton, Curry, Goff, Keith, Parrott, Richburg, Scott, and Temoney comprised a group of longstanding trustees whose continued service formed the core of the Board majority during the relevant period.

435. The particular Defendants who participated in specific Board proceedings, votes, or actions concerning Montgomery's requests for investigation, disclosure, accounting, enforcement of the Bylaws, and corrective action are identified more particularly herein.

436. The concentration of authority within this governance structure was further reinforced by relationships between Defendant Davis and persons associated with members of Defendant BOT. Defendant Curry's husband, attorney Eduardo Curry, held positions including a pastoral appointment within AMEC's Seventh Episcopal District, General Counsel for the Seventh Episcopal District, and legal counsel for Allen University.

437. Plaintiffs allege that Davis, as Presiding Bishop of AMEC's Seventh Episcopal District, exercised appointment authority concerning Eduardo Curry's pastoral assignment, while simultaneously serving as Chairman of Defendant BOT on which Defendant Curry served as a trustee.

438. Plaintiffs allege that the Presiding Bishop's authority over appointments, assignments, employment, or professional positions affecting persons serving on Defendant BOT or members of their immediate families created relationships capable of affecting trustee independence when Defendant BOT was called upon to investigate, evaluate, or take corrective action concerning the Presiding Bishop or matters involving Davis, Green, McNealey, AMEC, Defendant Vision Center, or other persons and entities associated with the governance structure described herein.

439. As alleged more particularly herein, the significance of these overlapping governance, appointment, employment, familial, and supervisory relationships is demonstrated by the conduct of Defendant BOT itself.

440. When Montgomery sought independent investigation, financial accounting, disclosure, enforcement of Allen University's Bylaws, or corrective action concerning conduct involving McNealey, Green, Davis, AMEC-related entities, or Allen University's property and funds, the same longstanding group of trustees repeatedly participated in Board proceedings concerning whether such investigation or corrective action would occur.

441. Plaintiffs further allege that the governance structure created substantial and, in certain circumstances, irreconcilable conflicts between the independent fiduciary duties owed by trustees to Allen University and the authority exercised by the Presiding Bishop over matters affecting the livelihood, ministerial assignments, employment, positions, or professional advancement of trustees or members of their immediate families.

442. These conflicts were particularly significant when Defendant BOT was required to exercise independent judgment concerning whether to investigate, challenge, or take corrective action against the Presiding Bishop himself, persons acting with his knowledge or approval, or other persons and entities within the AMEC governance structure from which trustees' appointments, employment, assignments, or professional positions were derived.

443. Plaintiffs allege that this governance structure impaired Defendant BOT's ability to function as an independent mechanism for investigating and correcting alleged misconduct and enabled retaliation against persons who challenged those exercising authority within the structure, including Montgomery, without meaningful internal opposition.

444. As alleged more particularly herein, Montgomery's repeated efforts to obtain investigation, disclosure, accounting, enforcement of Allen

University's Bylaws, and corrective action were met with resistance, refusal or failure to investigate, efforts to terminate further inquiry, criticism of Montgomery's continued questioning, and ultimately her purported removal from Defendant BOT.

445. Plaintiffs allege that the resulting absence of meaningful independent oversight left Allen University without an effective internal mechanism to protect its property, funds, contractual interests, financial integrity, and institutional interests from the conduct alleged herein, permitting alleged injuries to the University to continue without effective corrective action by the governing body charged with protecting the University's interests.

**5. McNealey's Prior Institutional Leadership and Similar Governance Concerns**

446. Before becoming President of Allen University, Defendant McNealey served as President of Stillman College in Tuscaloosa, Alabama, beginning in 1997.

447. During McNealey's presidency at Stillman, student enrollment initially increased to more than 1,100 students in 2004 and 2005 but thereafter declined substantially, falling to approximately 800 students by 2006.

448. The American Association of University Professors ("AAUP") subsequently reported that the decline in enrollment was accompanied by a weakening financial condition at Stillman.

449. During McNealey's tenure at Stillman, faculty member Professor Ekow Hayford publicly questioned and criticized McNealey's leadership concerning matters that included declining enrollment, Stillman's financial condition, faculty and staff morale, and institutional governance.

450. Hayford communicated his concerns to McNealey and Stillman's Board of Trustees and later spoke publicly concerning Stillman's financial condition.

451. The AAUP thereafter investigated actions taken against Hayford and concluded, among other things, that McNealey violated Hayford's academic freedom by preventing him from speaking at a faculty meeting.

452. The AAUP investigation also identified broader concerns regarding shared governance at Stillman during McNealey's administration, including diminished faculty participation in institutional governance and conditions that the investigating committee concluded impaired the ability of faculty bodies to act independently.

453. The matters concerning McNealey's leadership at Stillman described above were documented and publicly available before McNealey was recommended and selected to lead Allen University.

454. Defendant Green recommended McNealey to serve as Interim President of Allen University, as Green has admitted in his Answer filed in this action. At the time Green made that recommendation, the publicly documented information concerning McNealey's prior institutional history at Stillman described above was available to Green and to Defendant BOT.

455. Defendant BOT thereafter selected McNealey to serve as Interim President of Allen University through a Board vote conducted during Green's tenure as Chairman of Defendant BOT, and McNealey subsequently became President of Allen University.

456. Plaintiffs allege that materially similar categories of institutional concern subsequently arose during McNealey's leadership of Allen University, including declining enrollment and financial distress, resistance to financial transparency and independent oversight, disputes concerning institutional governance, and adverse actions against persons who questioned, challenged, or sought investigation of McNealey's conduct.

457. As alleged more particularly herein, Montgomery repeatedly sought financial information, documents, accounting, investigation, and

independent Board review concerning McNealey's conduct and transactions affecting Allen University's property and financial interests, including the Waverly transactions, Allen Days funds, federal funding, and Allen University's contractual obligations.

458. Plaintiffs further allege that other persons who questioned, challenged, disclosed, or possessed material information concerning McNealey's conduct were subjected to adverse treatment, including Dr. Dub Taylor as alleged more particularly herein, while Montgomery was ultimately purportedly removed from Defendant BOT after repeatedly seeking investigation, disclosure, accounting, compliance with Allen University's Bylaws, and corrective action.

459. Plaintiffs do not allege that the circumstances at Stillman College and Allen University were identical.

460. Rather, McNealey's documented and publicly available history at Stillman is alleged as relevant to the information available to persons responsible for recommending, selecting, supervising, and retaining him and to their subsequent response when similar categories of concern involving financial condition, transparency, governance, institutional oversight, and treatment of persons challenging his administration arose at Allen University.

**6. Green and Davis Exercised Authority Through Their AMEC Offices and Allen University Positions**

461. During his tenure as Presiding Bishop of AMEC's Seventh Episcopal District and Chairman of Defendant BOT, Defendant Green exercised substantial authority and influence over Allen University's governance, including trustee composition, Board leadership, institutional oversight, fundraising relationships, and matters affecting the University's financial affairs.

462. Plaintiffs allege that Green acted in his official capacity as Presiding Bishop of AMEC's Seventh Episcopal District when exercising authority that came with that office.

463. Defendant Green became Chairman of Allen University's Board of Trustees because he held the AMEC office of Presiding Bishop of the Seventh Episcopal District.

464. Because Green's position as Presiding Bishop automatically made him Chairman of Defendant BOT, his AMEC office gave him direct authority and influence over Allen University's governance.

465. Defendant Davis succeeded Green as Presiding Bishop of AMEC's Seventh Episcopal District and Chairman of Defendant BOT and

likewise simultaneously exercised ecclesiastical authority within AMEC and substantial governance authority over Allen University.

466. Like Defendant Green, Defendant Davis became Chairman of Allen University's Board of Trustees because he held the AMEC office of Presiding Bishop of the Seventh Episcopal District.

467. Green and Davis were also members of Defendant Council of Bishops during relevant periods, thereby occupying positions within AMEC's broader governing hierarchy while exercising substantial authority over Allen University through their respective positions as Presiding Bishop and Chairman of Defendant BOT.

468. Plaintiffs do not seek to impose liability upon Defendant AMEC or Defendant Council of Bishops merely because Green, Davis, or other individually named Defendants were members of AMEC.

469. Plaintiffs allege that AMEC and the Council of Bishops are proper Defendants because of their own respective roles, conduct, authority, knowledge, participation, and failures to act within the AMEC structure described herein.

470. Green and Davis did not independently assume the office of Presiding Bishop of AMEC's Seventh Episcopal District. Each was assigned to the Seventh Episcopal District through Defendant AMEC's

ecclesiastical governance structure, including the Episcopal Committee at AMEC's quadrennial General Conference.

471. As a result of those AMEC assignments, Green and later Davis became Presiding Bishop of AMEC's Seventh Episcopal District. By virtue of holding that AMEC office, each also became Chairman of Allen University's Board of Trustees and President of Defendant Vision Center.

472. Thus, although Defendant Council of Bishops may not itself make Episcopal District assignments, Green's and Davis's authority over Allen University did not arise independently of AMEC. Their authority as Chairman of Defendant BOT arose directly from the AMEC office to which each had been assigned through AMEC's own ecclesiastical governance process.

473. Plaintiffs further allege that AMEC and the Council of Bishops had knowledge of and involvement in conduct alleged herein; that Green and Davis took actions affecting Allen University while exercising authority arising from their AMEC offices; and that AMEC and the Council of Bishops participated in, ratified, failed to investigate, failed to intervene in, or failed to take corrective action concerning alleged misconduct after receiving notice, as set forth more particularly herein.

**7. AMEC's Institutional Involvement Extended Beyond Board Composition**

474. AMEC's involvement with Allen University extended beyond the University's Board of Trustees. Through AMEC's established connectional structure, including its Seventh Episcopal District, Annual Conferences, bishops, clergy, and local churches, money was raised and collected in Allen University's name and for the stated benefit of Allen University.

475. Churches and congregations within AMEC's South Carolina connectional structure were required, requested, or expected to provide financial support for Allen University, and funds designated for Allen University were raised through Annual Conferences and Allen Days activities conducted within AMEC's Seventh Episcopal District.

476. As alleged more particularly herein, Defendants Green and Davis have admitted in their respective Answers that funds were raised on behalf of Allen University at events related to AMEC's Seventh Episcopal District and were "held in trust specifically for Allen University."

477. The funds described by Green and Davis as being "held in trust specifically for Allen University" were not held by Allen University.

478. Allen University did not possess or control the account or accounts in which those funds were held.

479. Donors and AMEC members who contributed money for Allen University and later requested documentation of their charitable contributions were directed to AMEC's Seventh Episcopal District, rather than Allen University, to obtain contribution or tax-deduction letters.

480. Plaintiffs allege that not all funds raised, collected, or held for Allen University through the Seventh Episcopal District were transferred to or accounted for to Allen University, and that substantial amounts raised in Allen University's name and for its benefit remained outside the University's possession and financial control.

481. Allen University therefore did not receive the full amount of the funds raised and held for its benefit.

482. The University was not provided a complete accounting showing the amounts collected, the accounts in which the funds were held, the persons or entities exercising control over those funds, the amounts transferred to Allen University, or the disposition of funds not transferred to the University.

483. Plaintiffs allege that these facts show that AMEC's Seventh Episcopal District, through its officers, personnel, or persons acting under its direction, received or controlled funds collected for Allen University,

maintained or controlled records of those contributions, and controlled whether and when the money was transferred to Allen University.

484. AMEC's relationship with Allen University was therefore not merely historical or religious. Through its Seventh Episcopal District, Annual Conferences, and Presiding Bishops, AMEC participated directly in raising, collecting, holding, and administering money raised in Allen University's name and for its benefit.

**8. Notice to AMEC and the Council of Bishops and Failure to Intervene**

485. Plaintiffs allege that AMEC and the Council of Bishops possessed institutional and ecclesiastical mechanisms through which allegations concerning the conduct of AMEC bishops, including Defendant Davis, could be reported, reviewed, investigated, supervised, disciplined, or otherwise subjected to corrective action.

486. Montgomery provided notice outside Defendant BOT concerning alleged financial misconduct, governance violations, obstruction of Board oversight, and other conduct affecting Allen University and specifically sought intervention from AMEC and the Council of Bishops concerning Defendant Davis's conduct as Presiding Bishop of AMEC's Seventh Episcopal District and Chairman of Defendant BOT.

487. Montgomery informed AMEC and the Council of Bishops that Davis was allegedly acting in violation of Allen University's Bylaws, obstructing properly authorized Board processes, impairing independent governance, and preventing meaningful investigation and corrective action concerning matters affecting Allen University's assets and institutional interests.

488. Montgomery sought intervention because the authority Davis exercised over Defendant BOT arose directly from his AMEC office as Presiding Bishop of the Seventh Episcopal District and because efforts to obtain independent review and corrective action through Defendant BOT had been unsuccessful.

489. Plaintiffs allege that AMEC and the Council of Bishops received notice of Montgomery's concerns and requests for intervention but failed or refused to take effective corrective action notwithstanding the supervisory, disciplinary, or other institutional authority Plaintiffs allege existed within AMEC's hierarchical structure.

490. Plaintiffs allege that AMEC's and the Council of Bishops' failure to intervene permitted Davis to continue exercising substantial authority over Defendant BOT and its response to the financial and governance matters Montgomery sought to have investigated.

491. Accordingly, Plaintiffs' claims against AMEC and the Council of Bishops are based upon their respective alleged institutional roles, authority, knowledge, notice, participation, conduct, and failures to act as alleged herein, and not merely upon the denominational membership or ecclesiastical status of the individually named Defendants.

### C. The Waverly Property Transactions and Diversion of Allen University Assets

#### 1. Allen University's Ownership of the Waverly Property and Creation of the Waverly Entities

492. At all relevant times before the transactions described below, Plaintiff Allen University owned valuable real property known as the Waverly property in Columbia, South Carolina.

493. Allen University owned the Waverly property free and clear before Defendant McNealey caused or participated in a series of transactions through which the property was transferred, encumbered, and used as part of a financing structure involving multiple separate entities.

494. Plaintiffs allege that Defendant McNealey created, controlled, directed, or exercised substantial authority over entities used in connection with the Waverly transactions, including **Foundation of Allen University, Pinckney Center Operations, LLC ("POC"), Waverly Hospital Owner,**

**LLC ("Waverly Owner"), Waverly Hospital MM, LLC ("WHMM"), and Waverly Hospital MT, LLC ("WMT").**

495. The Waverly transaction documents further demonstrate McNealey's simultaneous control of Allen University and the five Defendant entities participating in the transactions.

496. In a single Waverly transaction document, McNealey signed separately on behalf of Allen University and on behalf of each of the five Defendant Waverly entities, executing the same document in six separate representative capacities and thereby acting simultaneously for Allen University and each of the five Defendant entities in transactions involving Allen University's property, financing, financial obligations, and assets.

497. Through those entities, Allen University's real property was transferred out of the University's direct ownership or control and thereafter used to obtain financing, loans, investments, tax-credit proceeds, or other funds.

498. Defendant Green was Chairman of Defendant BOT and Presiding Bishop of AMEC's Seventh Episcopal District when material portions of the Waverly structure were created and implemented.

499. Plaintiffs allege that Green knew of, participated in, approved, facilitated, or permitted material transactions through which Allen

University's Waverly property was transferred and monetized through entities outside Allen University's direct ownership or control.

500. The full Board of Trustees was not provided complete information concerning the creation and ownership of the entities involved in the Waverly transactions, the transfer of Allen University's property to those entities, the financing obtained through the property, the disposition of proceeds generated through the transactions, or the obligations imposed upon Allen University as a result.

501. Plaintiffs allege that material portions of the Waverly transactions were undertaken without full disclosure to and informed approval by Defendant BOT notwithstanding the substantial effect of those transactions upon Allen University's property, finances, and continuing obligations.

**2. Monetization of the Waverly Property and Disposition of Proceeds**

502. After Allen University's Waverly property was transferred into the Waverly entity structure described above, the property was used to obtain financing and generate substantial funds through loans, investments, New Markets Tax Credit transactions, and other sources.

503. Plaintiffs allege that approximately $12 million in New Markets Tax Credit financing was obtained in connection with the Waverly project.

504. Plaintiffs further allege that the New Markets Tax Credits associated with the Waverly project were monetized or sold at approximately seventy-three cents on the dollar, generating substantial proceeds through the transaction.

505. In addition to the New Markets Tax Credit financing, funds associated with the Waverly project were obtained through loans, mortgages, investments, private contributions, and the use of Allen University funds.

506. Plaintiffs allege that more than $1 million of Allen University's own funds was transferred into or used in connection with the Waverly entity and financing structure.

507. The Waverly Closing Transfers Memorandum documents the movement of funds among Allen University and entities participating in the Waverly transaction, including funds transferred to Allen University and then transferred from Allen University into the Waverly entity structure.

508. Specifically, the Closing Transfers Memorandum directed Defendant Waverly Owner to transfer $1,114,847.38 to Allen University, with the transfer identified as a "Prior cost payoff."

509. The same Closing Transfers Memorandum directed Allen University to transfer $1,124,849.38 to Pinkney Center Operations, LLC ("POC"), an entity participating in the Waverly transaction and of which Defendant McNealey was President.

510. POC was then directed to transfer $1,114,847.38 to Defendant Waverly Owner and an additional $10,002.00 to Defendant Waverly Hospital MT, LLC ("WMT"), thereby transferring the entire $1,124,849.38 received from Allen University into Waverly-related entities.

511. Thus, although the Closing Transfers Memorandum identified $1,114,847.38 as a "Prior cost payoff" to Allen University, the same closing transaction required Allen University to transfer $1,124,849.38 to POC, which in turn transferred those funds to Defendant Waverly Owner and Defendant WMT.

512. Defendant Foundation, POC, Waverly Owner, WHMM, and WMT were entities involved in the Waverly transactions described herein. At all relevant times, Defendant McNealey served as President of each of these entities.

513. As a result of these transfers, Allen University did not retain the $1,114,847.38 identified as a "Prior cost payoff." Instead, the documented closing transactions resulted in Allen University transferring $1,124,849.38

to POC, after which the entire amount was transferred to Defendant Waverly Owner and Defendant WMT.

514. The Closing Transfers Memorandum further reflects that Allen University was entitled to reimbursement for costs it previously incurred in connection with the Waverly project and that a substantial portion of those reimbursement proceeds was directed to Defendant Foundation rather than retained by Allen University.

515. Specifically, the Closing Transfers Memorandum states that Allen University directed that $3,166,906.47 of its reimbursement proceeds be donated to Defendant Foundation. At the time of the transaction, Defendant McNealey served as President of both Allen University and Defendant Foundation.

516. Defendant Foundation thereafter participated in the Waverly financing structure as a leverage lender. The Closing Transfers Memorandum reflects that funds in Defendant Foundation's funding account were transferred into the New Markets Tax Credit financing structure, including a transfer of $8,873,900.00 to Chase NMTC Allen Columbia Investment Fund, LLC, after which the memorandum reflects a $0 balance remaining in Defendant Foundation's funding account.

517. Thus, the transaction documents reflect that substantial funds attributable to Allen University's property and prior expenditures were routed through Allen University and Defendant Foundation and then transferred into entities and accounts participating in the Waverly financing structure.

518. Defendant McNealey occupied positions of authority on both sides of these transactions. At all relevant times, he served as President of Allen University and also as President of Defendant Foundation, POC, Waverly Owner, WHMM, and WMT.

519. The full Defendant BOT was not provided a complete accounting identifying the ultimate disposition of the funds transferred through Allen University, Defendant Foundation, POC, Defendant Waverly Owner, Defendant WHMM, Defendant WMT, or the other entities and accounts participating in the Waverly financing structure.

520. Plaintiff Montgomery repeatedly sought information and a complete accounting concerning the disposition and use of the Waverly proceeds, but an accounting sufficient to trace the funds from their source through their ultimate disposition was not provided to Montgomery or the full Defendant BOT.

521. Accordingly, Plaintiffs presently cannot identify the ultimate disposition of all funds generated through the Waverly transactions because the relevant financial records and information concerning those funds have not been fully disclosed to Plaintiffs or Defendant BOT.

522. As a result, although the available transaction documents identify substantial amounts of money moving through Allen University and the Waverly-related entities, the full Defendant BOT was never provided a complete accounting showing the ultimate disposition and use of all funds generated through the Waverly transactions.

**3. Allen University's Use of Operating Funds to Renovate the Waverly Property**

523. Despite the substantial financing and other funds generated through the Waverly transactions described above, those funds were not retained by Allen University and made available to pay the full costs of renovating the Waverly property.

524. Instead, Allen University used approximately $8 million of its own operating funds to pay costs associated with renovating the Waverly property.

525. Allen University's operating funds consisted primarily of revenues derived from federal funding and other institutional resources

available to support the University's operations, educational programs, student services, employees, facilities, and charitable and educational mission.

526. As alleged above, Allen University serves a predominantly low-income and economically disadvantaged student population substantially dependent upon federal financial assistance.

527. The University's operations likewise depended substantially upon federal funding, making the preservation and proper use of its operating funds particularly important to its ability to serve its students and fulfill its educational mission.

528. Plaintiffs allege that the expenditure of approximately $8 million of Allen University's operating funds on the Waverly renovation substantially reduced University resources that otherwise would have remained available for Allen University's operations and educational mission.

529. The use of Allen University's operating funds for the Waverly renovation occurred after substantial financing and other funds had already been generated through the Waverly transactions and transferred through the entities and accounts described above.

530. Defendant BOT was not informed of the financing used in connection with the Waverly project, the mortgage or other indebtedness associated with the property, or the lease obligations imposed upon Allen University.

531. Defendant BOT also was not informed of the amount or disposition of funds generated through the Waverly transactions or the movement of those funds through the entities described above.

532. Defendant BOT was not provided an accounting of the Waverly transactions or of the funds generated, transferred, received, retained, or expended in connection with the project.

533. Thus, Allen University contributed its real property to the Waverly transaction, substantial financing and other funds were generated through the use and monetization of that property, substantial funds were transferred through entities headed by Defendant McNealey, and Allen University nevertheless used approximately $8 million of its own operating funds to renovate the property without the full Defendant BOT having been informed of the financing, disposition of proceeds, mortgage, lease, or resulting financial obligations.

**4. Defendants' Response to Montgomery's Requests for Waverly Documents and Investigation**

534. Plaintiff Montgomery repeatedly sought information concerning the Waverly transactions, including the sources and uses of funds, the disposition of proceeds, the entities involved in the transactions, the mortgage and lease, and the financial obligations imposed upon Allen University.

535. Montgomery specifically requested that Defendant McNealey provide Defendant BOT with documents and financial information concerning the Waverly transactions so that the Board could determine what had occurred with Allen University's property and funds and what financial obligations had been imposed upon the University.

536. Defendant McNealey did not provide the requested documents, financial information, or accounting.

537. When Defendant McNealey subsequently appeared before Defendant BOT in response to Montgomery's questions and requests, he appeared without the requested documents and did not provide them to the Board.

538. Defendant Davis presided over the meeting as Chairman of Defendant BOT and did not object to Defendant McNealey's failure to provide the documents and financial information requested by Montgomery

for review by Defendant BOT, nor did Davis direct McNealey to provide the requested information.

539. This was Defendant Davis's first official meeting presiding as Chairman of Defendant BOT after becoming Presiding Bishop of AMEC's Seventh Episcopal District.

540. Despite Defendant BOT's responsibility for oversight of Allen University's property and financial affairs, Davis did not require McNealey to provide the requested Waverly documents, financial records, or accounting before expressing his position concerning whether further inquiry into the Waverly transactions was necessary.

541. Instead, after McNealey appeared without the requested documents and failed to provide the requested financial information, Davis announced that he was "satisfied" with McNealey's explanation and stated that all of his questions had been answered, thereby communicating his position that no further inquiry was necessary.

542. Despite Montgomery's written request that an accounting be provided to Defendant BOT, neither Montgomery nor Defendant BOT received an accounting of the Waverly transactions, including an accounting sufficient to determine the ultimate disposition of the Waverly proceeds or to reconcile the substantial financing generated through the

Waverly transactions with Allen University's subsequent expenditure of approximately $8 million of its own operating funds on the project.

543. Nor did Defendant McNealey provide the full Defendant BOT with an accounting sufficient to identify the sources and uses of the Waverly funds, the disposition of the financing proceeds, the mortgage and lease obligations imposed upon Allen University, or the relationship between the substantial financing generated through the Waverly transactions and Allen University's expenditure of approximately $8 million of its operating funds on the project.

**5. December 2024 and January 2025 Waverly Review and Vote to End Further Inquiry**

544. At a meeting of Defendant BOT in December 2024, Defendant Davis arranged for attorney Ray Jones, who had prepared documents relating to the Waverly transactions, to address Defendant BOT concerning the Waverly project.

545. During that presentation, Montgomery questioned Jones concerning Allen University's lease payments and specifically asked for an explanation of where the lease payments went and how those payments were calculated and distributed.

546. Jones stated that he would provide Defendant BOT with a detailed financial analysis or breakdown of the lease payments.

547. Jones did not subsequently provide Defendant BOT with the promised financial breakdown.

548. Instead, in or about January 2025, Defendant BOT was provided approximately 500 pages of documents relating to the Waverly transactions.

549. After reviewing the documents, Montgomery informed Davis that the promised financial breakdown was not included and again requested the financial information explaining the lease payments.

550. Davis responded that the information was contained within the documents that had been provided.

551. Montgomery informed Davis that the requested financial breakdown was not contained in the documents and again requested that it be provided. No financial breakdown was thereafter provided to Montgomery or Defendant BOT.

552. Defendant Richburg subsequently stated that he had reviewed the Waverly documents.

553. Montgomery then asked Richburg who held the mortgage on the Waverly property and the amount of the mortgage.

554. Richburg did not answer those questions.

555. While Montgomery continued questioning the Waverly transactions and seeking the financial information that had not been provided, Defendant Davis interrupted and stated, in substance, that he knew members of Defendant BOT were "frustrated" with Montgomery's continued questioning.

556. Davis made that statement while presiding as Chairman of Defendant BOT and in the presence of the trustees whose responsibility included oversight of Allen University's property and financial affairs.

557. Defendant Richburg thereafter made a motion that Defendant BOT cease further review or investigation of the Waverly matter.

558. Defendants Goff, Britton, Temoney, Curry, Anderson, Parrott, Richburg, and Scott, who constituted the controlling majority of Defendant BOT during the relevant proceedings and had been appointed to Defendant BOT through the governance structure described herein, voted in favor of ending further Board inquiry into the Waverly matter.

559. The vote occurred without Defendant BOT having received the financial breakdown Jones had promised, an accounting of the Waverly proceeds, answers identifying the holder and amount of the mortgage, or a

complete explanation of the lease payments and other financial obligations imposed upon Allen University.

560. Defendant BOT also had not been provided an accounting showing whether Allen University had been repaid the substantial amounts of University funds contributed to the Waverly project, what happened to the approximately $12 million in New Markets Tax Credit financing generated through the project, or the ultimate disposition of the other funds generated through the financing and monetization of the Waverly property.

561. These unanswered questions were particularly important because, at the time Defendant BOT voted to end further inquiry, Allen University was experiencing financial distress and was in substantial need of available funds.

562. Defendant BOT also knew that Allen University had an outstanding financial obligation to 501S arising from the parties' informal settlement arrangement, which required Allen University to make recurring monthly payments.

563. Thus, at a time when Allen University was experiencing financial distress and had outstanding financial obligations, Defendants Goff, Britton, Temoney, Curry, Anderson, Parrott, Richburg, and Scott voted to end further inquiry into the Waverly transactions without first

determining whether money contributed by Allen University had been repaid to the University or what had happened to the substantial funds generated through the Waverly transactions.

564. As of March 2025, Allen University had not received and retained repayment of the funds it contributed to the Waverly project from the proceeds generated through the Waverly transactions.

565. Any federal funds subsequently received by Allen University for costs associated with the Waverly project were separate from the financing proceeds generated through the Waverly transactions and did not constitute repayment to Allen University from the funds generated through the financing and monetization of its property.

566. Plaintiffs allege that, based upon the financial information presently available to them, Allen University has not received and retained repayment from the Waverly transaction proceeds of the funds it contributed to the Waverly project.

567. Defendant BOT nevertheless voted to end further inquiry without obtaining an accounting sufficient to determine what happened to the Waverly proceeds, whether funds generated from Allen University's property had been returned to the University, or why Allen University had

been required to use substantial operating funds for the project despite the substantial financing generated through the Waverly transactions.

568. As a result of that vote, further Board inquiry into the Waverly transactions ended. Defendant BOT did not obtain the financial information and accounting Montgomery had repeatedly requested concerning Allen University's property, funds, financing proceeds, mortgage, lease, repayment of University funds, and other financial obligations.

**6. Defendant BOT Was Not Informed of the Waverly Entity Structure or the Funds Transferred Through It**

569. Defendant BOT was not informed that the Waverly entity structure described above had been created and was being used to receive, hold, transfer, finance, or administer substantial funds generated through Allen University's property and the Waverly transactions.

570. Defendant BOT did not approve the creation or use of Defendant Foundation, POC, Waverly Owner, WHMM, or WMT as a structure through which Allen University's property, funds, financing proceeds, or other assets would be transferred, held, or administered.

571. Although Defendant McNealey served as President of Allen University and, at all relevant times, also served as President of the Waverly-related entities identified above, those entities were legally

separate from Allen University, and funds transferred to or held by those entities were outside Allen University's direct possession and financial control.

572. Substantial funds generated from or attributable to Allen University's property and expenditures were transferred to or through these separate entities without Defendant BOT receiving an accounting showing the amounts received by each entity, how those funds were used, or their ultimate disposition.

573. Defendant BOT was not informed that substantial funds generated through Allen University's property and the Waverly transactions had been transferred to or through entities outside Allen University's direct financial control while Allen University itself remained responsible for substantial project costs and financial obligations.

574. Funds transferred to or through the Waverly-related entities were not available to Allen University for its ordinary operations, while Allen University nevertheless used approximately $8 million of its own operating funds to renovate the Waverly property.

575. Defendant BOT therefore did not have the information necessary to determine how much money had been generated through the Waverly transactions, how much had been transferred to each Waverly-

related entity, how those funds were used, whether funds belonging or payable to Allen University had been returned to the University, or what ultimately happened to those funds.

576. Defendant BOT likewise was not provided the information necessary to evaluate the financial risks and obligations created by the Waverly entity structure before Allen University's property and funds were committed to the transactions.

577. The Waverly entity structure therefore placed substantial funds generated from Allen University's property and expenditures into separate entities outside Allen University's direct financial control without prior disclosure to or approval by the full Defendant BOT and without an accounting to the Board concerning the ultimate disposition of those funds.

578. Notwithstanding the absence of this financial information and accounting, and despite Allen University's financial distress and need for available funds, Defendants Goff, Britton, Temoney, Curry, Anderson, Parrott, Richburg, and Scott voted to end further inquiry into the Waverly transactions without first determining the full amount of funds belonging or payable to Allen University or requesting that funds due or owing to Allen University be returned to the University.

**7. Montgomery's Requests Sought Compliance with Allen University's Bylaws and Defendant BOT's Oversight Responsibilities**

579. Montgomery's requests for documents, financial information, accounting, and investigation concerning the Waverly transactions were made in furtherance of her responsibilities as a trustee and Defendant BOT's obligations under Allen University's Bylaws to oversee the University's property, finances, major transactions, and institutional affairs.

580. Allen University's Bylaws assigned responsibility within Defendant BOT for financial oversight and for review of matters involving major acquisitions, investments, related projects, major renovations, and the fiscal soundness of projects affecting the University.

581. The Waverly transactions involved the transfer of valuable University real property, substantial financing, the creation and use of multiple separate entities, the transfer of substantial funds, mortgage and lease obligations, substantial renovation expenditures, and continuing financial obligations affecting Allen University.

582. Plaintiffs allege that these matters fell within the financial, property, and institutional oversight responsibilities established by Allen University's Bylaws and entrusted to Defendant BOT and its committees.

583. Montgomery's requests that Defendant BOT obtain the Waverly documents, determine the sources and uses of the funds, identify the mortgage and lease obligations, trace the disposition of the proceeds, and determine whether Allen University had been repaid were therefore requests that Defendant BOT exercise the oversight responsibilities established by the University's Bylaws.

584. Montgomery repeatedly sought compliance with those requirements and requested that Defendant BOT obtain the information necessary to determine whether the Waverly transactions had been authorized, whether Allen University's financial interests had been protected, and whether funds belonging or payable to Allen University should be recovered.

585. Rather than obtaining the requested accounting and financial information before deciding whether further review was warranted, the controlling majority of Defendant BOT voted to terminate further inquiry into the Waverly transactions as alleged above.

**8. McNealey's Dual Roles and Execution of the Waverly Agreements Without Board Review or Approval**

586. The Waverly transactions were implemented through a series of interrelated agreements among Allen University, Defendant Foundation,

POC, Waverly Owner, WHMM, WMT, lenders, investors, and other entities participating in the financing structure.

587. At all relevant times, Defendant McNealey served as President of Allen University and also served as President of Defendant Foundation, POC, Waverly Owner, WHMM, and WMT, the Waverly-related entities participating in the transactions described herein.

588. In those multiple capacities, McNealey participated in and executed agreements and transaction documents affecting Allen University's property, funds, and continuing financial obligations while simultaneously exercising authority over separate entities participating in or benefiting from the same Waverly transactions.

589. The transaction documents demonstrate that these entities were not merely administrative names associated with Allen University. They were separate entities through which substantial funds were received, transferred, financed, loaned, or otherwise administered as part of the Waverly transaction structure.

590. For example, the Closing Transfers Memorandum identifies Defendant Waverly Owner as the QALICB participating in the New Markets Tax Credit transaction and Defendant WMT as the Prime Tenant participating in the financing structure.

591. The same transaction documents directed substantial transfers among Allen University and entities over which McNealey exercised authority, including Allen University's transfer of $1,124,849.38 to POC, followed by POC's transfer of $1,114,847.38 to Defendant Waverly Owner and $10,002.00 to Defendant WMT.

592. The Closing Transfers Memorandum further reflects that $3,166,906.47 characterized as Allen University reimbursement proceeds was directed to Defendant Foundation and then used within the Waverly financing structure.

593. The Waverly agreements also created a lease structure under which Defendant Waverly Owner and Defendant WMT occupied contractual roles concerning property that had previously been owned directly by Allen University.

594. As a result of the Waverly transactions, Allen University, which had previously owned the Waverly property free and clear and without any lease obligation, was placed in the position of being financially obligated to make substantial payments associated with its continued use and occupancy of property it had previously owned.

595. This occurred without prior notice to or review and approval by the full Defendant BOT, without an accounting or explanation of the

disposition of the substantial funds generated through the Waverly transactions, and without independent Board oversight of the financial obligations imposed upon Allen University.

596. Allen University's audited financial records reflect that the University paid approximately $697,167 to Defendant WMT in connection with its use of the Waverly property.

597. Defendant McNealey occupied positions of authority affecting both Allen University, which bore the financial obligations arising from the Waverly transactions, and the separate entities through which the Waverly property, financing proceeds, and lease payments were administered.

598. Defendant BOT was not informed of McNealey's execution of the Waverly agreements in these multiple capacities before the transactions were undertaken and was not asked to independently review the conflicts arising from his simultaneous authority over Allen University and the separate entities participating in the transactions, including whether the transactions imposed obligations upon Allen University while providing financial or contractual benefits to entities over which McNealey also exercised authority.

599. Defendant BOT did not review or approve the lease obligations imposed upon Allen University before those obligations were undertaken

and an independent analysis was not provided addressing whether the terms of the transactions were fair to Allen University or in the University's financial interests.

600. Defendant BOT likewise was not informed of or asked to approve the mortgage or other indebtedness associated with the Waverly property before those financial obligations were undertaken.

601. The lease and other Waverly financial obligations were not separately disclosed as line-item expenses in the annual budgets presented to Defendant BOT for its review and approval.

602. Thus, McNealey exercised authority over Allen University while simultaneously exercising authority over separate entities participating in the Waverly transactions, substantial University property and funds were committed through those transactions, and continuing financial obligations were imposed upon Allen University without prior disclosure to, independent review by, or approval of the full Defendant BOT.

**9. McNealey's Conflicting Roles and Execution of Waverly Transaction Documents on Behalf of Multiple Entities**

603. The Waverly transaction documents further demonstrate the extent of Defendant McNealey's simultaneous authority over Allen

University and the separate entities participating in the Waverly transactions.

604. McNealey did not merely hold positions of authority in those entities. He executed material Waverly transaction documents in multiple capacities, including on behalf of Allen University and on behalf of separate Waverly-related entities participating in the same interconnected transactions.

605. At all relevant times, the Waverly transaction structure included, among other entities, Defendant Waverly Hospital Owner, LLC, Defendant Waverly Hospital MM, LLC, Defendant Waverly Hospital MT, LLC, and POC. These were separate legal entities performing different functions within the Waverly transaction structure.

606. The transaction documents identify Defendant Waverly Hospital Owner, LLC as the QALICB through which approximately $12 million in New Markets Tax Credit loans were received. Specifically, TRF NMTC Fund 53, LP transferred loans of $3,661,000 and $1,339,000 to Waverly Hospital Owner, LLC, while SCCLF Sub-CDE V, LLC transferred loans of $5,212,900 and $1,787,100 to Waverly Hospital Owner, LLC.

607. The transaction documents separately identify Defendant Waverly Hospital MT, LLC as the "Prime Tenant" and Defendant Waverly

Hospital MM, LLC as the "State HTC Partnership," confirming that the entities occupied separate positions within the transaction structure.

608. The transaction documents further demonstrate direct transfers among Allen University and these separate entities. Allen University transferred $1,124,849.38 to POC; POC transferred $1,114,847.38 to Waverly Hospital Owner, LLC and $10,002.00 to Waverly Hospital MT, LLC.

609. Allen University separately transferred $19,317.53 directly to Waverly Hospital MM, LLC, further demonstrating that Waverly Hospital MM, LLC was a separate entity receiving funds directly from Allen University.

610. The Performance, Completion and Operating Guaranty associated with the Waverly transaction bears McNealey's signature in multiple capacities, including on behalf of Allen University, Waverly Hospital Owner, LLC, POC, and Waverly Hospital MT, LLC.

611. The Prime Lease Agreement involves Waverly Hospital MM, LLC and Waverly Hospital MT, LLC, separate entities participating in the Waverly structure. The signature provisions of that agreement reflect McNealey's execution on behalf of Waverly Hospital MM, LLC and POC.

612. The Operating Agreement for Waverly Hospital MT, LLC separately reflects McNealey's execution of that agreement on behalf of POC.

613. The Operating Agreement for Waverly Hospital MM, LLC separately reflects McNealey's execution in multiple capacities, including on behalf of Waverly Hospital MM, LLC and Allen University.

614. McNealey's simultaneous exercise of authority on behalf of Allen University and the separate Waverly entities created potential conflicts requiring disclosure and independent review because Allen University's interests were not necessarily identical to those of the separate entities receiving University property or funds, borrowing against University property, or participating in contractual arrangements affecting Allen University's financial interests.

615. Defendant BOT was not informed before these transactions were undertaken that McNealey was executing material Waverly transaction documents in these multiple capacities and was not asked to independently review the potential conflicts created by his simultaneous authority over Allen University and the separate entities participating in the transactions.

616. No independent person or committee of Defendant BOT was appointed to evaluate or negotiate the transactions on Allen University's behalf, determine whether their terms were fair to Allen University, or determine whether Allen University's financial interests were adequately protected.

617. Nor was Defendant BOT provided an independent financial or legal analysis of the consequences to Allen University of transferring its property into the Waverly structure, permitting that property to become subject to substantial financing, transferring University funds into separate entities over which McNealey exercised authority, or obligating Allen University to make payments associated with its continued use of property it previously owned free and clear.

618. The absence of independent review was particularly material because approximately $12 million in New Markets Tax Credit loans were directed to Waverly Hospital Owner, LLC and the transaction documents authorized the distribution of substantial funds to other entities, transaction professionals, and reserve accounts while Waverly Hospital Owner, LLC retained a balance of approximately $6,992,583.13.

619. These transactions were undertaken without prior disclosure to, independent review by, or approval of the full Defendant BOT,

notwithstanding the substantial University property, funds, and continuing financial obligations involved.

620. On August 8, 2024, during a meeting attended only by Montgomery, Defendant McNealey, Defendant Richburg, and attorney Shannon Davis, McNealey stated, while discussing the Waverly transactions and his authority to undertake them, that he had acted with the knowledge and approval of Defendant Green.

621. Plaintiffs therefore allege that McNealey did not undertake the Waverly transactions without the knowledge of Defendant BOT's then-Chairman. Rather, Green, then Presiding Bishop of AMEC's Seventh Episcopal District and Chairman of Defendant BOT, knew of and approved McNealey's actions while the full Defendant BOT remained uninformed of material aspects of the transactions, including the entity structure, financing, disposition of proceeds, mortgage, lease obligations, and McNealey's multiple roles in the participating entities.

**10. Similarities Between the AMEC Retirement Plan Transactions and the Waverly Transactions**

622. The Waverly transactions did not occur in an institutional vacuum. Before and during the development of the Waverly entity and financing structure, AMEC's employee retirement plan had suffered losses

exceeding $90 million through transactions that became the subject of federal litigation in In re: AME Church Employee Retirement Fund Litigation, No. 1:22-md-03035-STA-jay (W.D. Tenn.).

623. Defendants Green, Davis, AMEC, and Council of Bishops were named defendants in the Retirement Plan litigation concerning the alleged loss or misappropriation of more than $90 million from AMEC's employee retirement plan.

624. Green and Davis also held supervisory responsibilities within AMEC's Department of Retirement Services during portions of the period in which the conduct challenged in the Retirement Plan litigation occurred.

625. During the relevant periods, the Executive Director responsible for administering AMEC's Retirement Plan operated within the Department of Retirement Services and was required to report through the Department's supervisory structure, including to Green and Davis during the respective periods in which each exercised supervisory authority over the Department.

626. The Retirement Plan litigation described a mechanism through which substantial retirement-plan assets were transferred, invested, loaned, or otherwise directed into multiple private entities, including entities owned, controlled, or associated with persons involved in administering or

investing the Retirement Plan's assets. Substantial amounts transferred through those arrangements were thereafter alleged to have been lost, unrecovered, diverted, or unaccounted for.

627. By virtue of their respective supervisory responsibilities within the Department of Retirement Services, the reporting relationship of the Executive Director, and their subsequent status as named defendants in litigation challenging the disposition of more than $90 million in retirement assets, Plaintiffs allege that Green and Davis were aware of the mechanisms through which Retirement Plan funds had been transferred or diverted into multiple private entities and of the resulting loss or inability to account for substantial Retirement Plan assets.

628. The Waverly structure subsequently employed materially similar transactional features.

629. Multiple separate entities were created or utilized; substantial funds associated with Allen University's property and expenditures were transferred through those entities; McNealey simultaneously exercised authority over Allen University and multiple entities participating in the transactions; substantial financing was generated through property previously owned by Allen University; and the full Defendant BOT was not

provided an accounting sufficient to trace the proceeds to their ultimate disposition.

630. The timing is significant. Plaintiffs allege that development and implementation of the Waverly structure began after substantial losses and irregularities had already occurred within the AMEC Retirement Plan and while Green occupied positions that gave him knowledge of, or access to information concerning, the Retirement Plan and its financial condition.

631. Montgomery was not aware of the Retirement Plan litigation or the transactional structure challenged in that litigation while she served on Defendant BOT. Her requests for documents, accounting, disclosure, and investigation concerning the Waverly transactions were based upon the Waverly information and circumstances independently brought to her attention and discovered during her service as a trustee.

632. Montgomery learned of the Retirement Plan litigation only after her purported removal from Defendant BOT. She thereafter reviewed the court proceedings and information concerning the transactions underlying that litigation and identified substantial similarities between the mechanisms described in the Retirement Plan litigation and the Waverly transactions she had previously questioned while serving on Defendant BOT.

633. Those similarities included the use of multiple separate entities through which substantial institutional or entrusted funds were transferred or invested; centralized authority over entities participating in the transactions; movement of funds outside the institution or fund for whose benefit the assets were intended; inadequate independent oversight; and substantial funds that were lost, unrecovered, diverted, or not fully accounted for.

634. The similarities were particularly significant because, unlike Montgomery, Green, Davis, AMEC, and Council of Bishops already had direct notice of the Retirement Plan litigation and its allegations, having themselves been named as defendants in that litigation.

635. After learning of the Retirement Plan litigation and reviewing the transactions described therein, Montgomery documented the similarities she identified between those transactions and Waverly and provided that information to members of Defendant BOT and other persons within AMEC's institutional structure.

636. Montgomery specifically identified the use of multiple entities, the transfer or diversion of funds into those entities, centralized control over the entities and financial decisions, the absence of meaningful independent oversight, and substantial funds whose ultimate disposition could not be

fully accounted for as features common to the Retirement Plan and Waverly transactions.

637. Montgomery's disclosures provided Defendant BOT with an additional and independent basis to revisit the Waverly transactions and obtain the accounting, financial records, and forensic review that had not been obtained while Montgomery served as a trustee.

638. Notwithstanding this additional information, Defendant BOT did not reopen its Waverly inquiry, require a forensic accounting sufficient to trace the Waverly proceeds, determine whether Allen University had received and retained repayment of the funds it contributed to the project, or determine the ultimate disposition of the substantial financing generated through Allen University's former property.

639. Davis's prior supervisory responsibilities concerning AMEC's Retirement Plan and his status as a named defendant in the Retirement Plan litigation are particularly significant in light of his subsequent response to Montgomery's requests for financial information and independent review of the Waverly transactions.

640. As alleged above, when McNealey appeared before Defendant BOT without the Waverly documents and financial information Montgomery had requested, Davis did not require production of the documents or an

accounting and instead stated that he was "satisfied" and that his questions had been answered.

641. Davis thereafter continued to express his position that further Waverly inquiry was unnecessary despite the absence of a complete accounting and ultimately presided over the proceedings in which the controlling majority of Defendant BOT voted to terminate further inquiry into the Waverly transactions.

642. Plaintiffs further allege that AMEC-affiliated clergy and trustees serving on Defendant BOT had notice, or reason to know, of the Retirement Plan litigation involving AMEC's retirement assets and leadership and nevertheless did not require an independent forensic accounting of the Waverly transactions after Montgomery provided information concerning materially similar transactional features and the continuing absence of an accounting.

643. Ultimately, the same Defendant BOT majority identified above voted to terminate further inquiry into Waverly without determining the ultimate disposition of the Waverly proceeds, whether Allen University had been repaid funds it contributed to the project, or why Allen University had expended approximately $8 million of its operating funds notwithstanding the substantial financing generated through the Waverly transactions.

## 11. Effort to Obtain Federal HUD Funds for the Waverly Project

### A. Initial HUD Submission and Rejection

644. In addition to the financing, New Markets Tax Credit proceeds, University operating funds, and other funds associated with the Waverly transactions described above, approximately $4.2 million in federal funding was secured for the Waverly project through the efforts of Congressman James Clyburn, who also serves as a member of Defendant BOT.

645. The federal funding was to be administered through the United States Department of Housing and Urban Development ("HUD") and was subject to federal eligibility requirements governing, among other things, the period during which reimbursable work was performed and the documentation required to establish eligibility for payment.

646. Allen University thereafter sought disbursement of the approximately $4.2 million in federal funds for costs associated with work performed on the Waverly project.

647. In connection with that request, Defendant McNealey caused or authorized the submission to HUD of invoices and supporting documentation representing that costs incurred for work performed on the Waverly project qualified for payment from the federal funds.

648. The initial submission identified dates associated with the work for which Allen University sought payment.

649. HUD reviewed the initial submission and determined that the dates reflected in the invoices or supporting documentation fell outside the period for which the work was eligible for payment from the federal funds.

650. HUD therefore declined to approve payment based upon the initial submission.

**B. Agreement to Change the Dates and Second HUD Submission**

651. After HUD rejected Allen University's initial request because the work did not qualify for reimbursement based upon the dates on which it had actually been performed, McNealey informed the contractor who had performed the work that HUD had denied payment.

652. McNealey and the contractor thereafter agreed that the dates on invoices for the Waverly work would be changed so that the invoices would show dates falling within the period for which HUD would authorize reimbursement.

653. As part of that agreement, McNealey offered to compensate the contractor by paying the contractor for work on a separate project unrelated to Allen University in exchange for the contractor's agreement to change the dates on the Waverly invoices.

654. The dates on the Waverly invoices were thereafter changed.

655. The changed dates were false because they did not accurately state when the Waverly work had actually been performed.

656. McNealey thereafter caused or authorized the altered invoices or supporting documentation containing the false dates to be submitted to HUD in a second attempt to obtain reimbursement from the approximately $4.2 million in federal funds.

657. The second submission sought federal payment for the same or substantially the same Waverly work HUD had previously determined did not qualify for reimbursement, but the altered documents now falsely represented that the work had been performed during the eligible period.

658. Plaintiffs allege that McNealey knew the dates reflected in the second submission were false and caused or authorized the altered documents to be submitted to HUD for the purpose of making previously ineligible work appear eligible and thereby obtaining approximately $4.2 million in federal funds.

659. McNealey's contemporaneous communications confirm that the second submission followed HUD's rejection of Allen University's earlier requests for reimbursement.

660. In a November 8, 2023 email concerning the $4.29 million federal appropriation for Waverly, McNealey acknowledged that Allen University was seeking reimbursement for previously performed work and that Allen University's prior reimbursement submissions had been rejected.

661. In the same email, McNealey stated that, following those rejections, new "invoices" had been prepared and directed the recipients to review, sign, and return them so that the signed invoices could be uploaded to the HUD portal in another effort to obtain reimbursement.

662. The dates on which the work was actually performed were material to HUD's determination because those dates determined whether the work qualified for payment from the approximately $4.2 million in federal funds.

663. The altered documentation and related communications seeking payment were transmitted electronically to HUD, including through HUD's electronic portal, in connection with Allen University's request for disbursement of the federal funds.

664. HUD identified discrepancies between the documentation originally submitted for the Waverly work and the documentation subsequently submitted seeking reimbursement for the same or substantially the same work.

665. HUD did not approve payment based upon the second submission containing the changed dates.

666. Plaintiffs allege that the changed dates were not submitted to correct an error concerning when the underlying work had actually been performed.

667. Rather, after HUD rejected the original request, the dates were changed in an effort to make work that did not qualify for federal reimbursement appear eligible so that approximately $4.2 million in federal funds would be released.

**12. Defendant BOT's Knowledge of the HUD Submissions and Failure to Investigate**

668. Members of Defendant BOT subsequently learned that Allen University's initial request for payment had been rejected and that, after the rejection, the dates on documents relating to the Waverly work had been changed to false dates and the documents resubmitted to HUD in an attempt to obtain approximately $4.2 million in federal funds.

669. Defendant BOT was therefore placed on notice that documents containing false dates had allegedly been submitted on behalf of Allen University to a federal agency in an attempt to obtain approximately $4.2 million in federal funds.

670. Trustee James Clyburn, who served as a member of Defendant BOT and whose efforts had assisted in securing the approximately $4.2 million in federal funding for the Waverly project, was among the trustees informed of the circumstances surrounding HUD's rejection of the initial submission and the subsequent submission of documents containing changed and allegedly false dates.

671. Plaintiffs do not allege that Clyburn participated in the preparation, alteration, or submission of those documents.

672. The information provided to Defendant BOT raised serious questions concerning who directed, authorized, prepared, altered, or submitted the documents containing the false dates and whether other persons participated in or had knowledge of the effort to obtain federal funds using those documents.

673. Notwithstanding the seriousness of the information presented, Defendant BOT did not commission an independent investigation to determine who directed, authorized, prepared, altered, or submitted the documents containing the false dates or whether the representations made to HUD accurately reflected when the underlying work had actually been performed.

674. Defendant BOT did not require an independent comparison of the documents originally submitted to HUD with the documents subsequently submitted to determine what information had been changed, who changed it, who authorized the changes, or why the changes were made.

675. Defendant BOT likewise did not require McNealey to account for his role in the preparation and submission of the altered documents or investigate the circumstances surrounding his agreement with the contractor to change the dates on the Waverly invoices.

676. Defendant BOT did not take corrective or disciplinary action against McNealey based upon the information concerning the HUD submissions, and McNealey remained President of Allen University.

677. Defendant Green continued to support McNealey as President notwithstanding the information concerning the HUD submissions and the other Waverly financial and governance matters alleged herein.

678. After succeeding Green as Presiding Bishop of AMEC's Seventh Episcopal District and Chairman of Defendant BOT, Davis likewise did not cause Defendant BOT to undertake an independent investigation of the HUD matter or require an accounting of McNealey's conduct concerning the federal funding request.

679. Montgomery specifically requested in writing that Davis, as Chairman of Defendant BOT, obtain and secure the documentation that had been submitted to HUD so that Defendant BOT could review the documents and determine what had been submitted on Allen University's behalf.

680. Davis did not obtain or secure the HUD documentation for review by Defendant BOT and did not direct McNealey or other Allen University personnel to produce the original and subsequently submitted documents so that Defendant BOT could determine what had been changed, who authorized the changes, and what representations had been made to HUD.

681. Davis also affirmatively discouraged an investigation of the HUD matter. In response to Montgomery's request for an investigation, Davis stated, in substance, that the word “investigation” had a “negative meaning” in the Black community and used that asserted concern as a reason not to pursue the investigation Montgomery had requested.

682. Davis's stated concern about the word “investigation” did not address the substance of the matter presented to Defendant BOT: that documents relating to Allen University's request for approximately $4.2 million in federal funds had allegedly been altered to contain false dates

after HUD rejected the University's initial request and had thereafter been resubmitted to the federal agency.

683. Nor did Davis propose that Defendant BOT conduct the requested review under another name, obtain the HUD documents without characterizing the process as an "investigation," or otherwise undertake an independent examination of what had occurred.

684. Plaintiffs allege that Davis's stated objection to the term "investigation" was not a legitimate impediment to Defendant BOT's review of the alleged submission of false information to a federal agency and that Davis instead used that asserted objection to discourage further Board inquiry into the HUD matter.

685. Thus, despite being placed on notice of the alleged submission of false documents to HUD and being specifically requested in writing to obtain the underlying documentation, Davis did not obtain the documents, did not cause Defendant BOT to investigate the matter, and affirmatively discouraged the investigation Montgomery requested.

686. The failure to investigate was particularly significant because the alleged conduct involved the submission of documents containing false information to a federal agency in an effort to obtain millions of dollars in

federal funds on behalf of Allen University, thereby exposing the University to potential legal, financial, regulatory, and reputational consequences.

687. The HUD matter also concerned the same Waverly project for which Allen University had transferred property it previously owned free and clear, participated in transactions generating substantial financing, and thereafter expended approximately $8 million of its own operating funds, as alleged above.

688. The information concerning the HUD submissions therefore provided Defendant BOT with an additional and independent reason to require a complete investigation and accounting of the Waverly project, including McNealey's management of the project, the accuracy of representations made to third parties, the disposition of Waverly financing proceeds, and Allen University's expenditure of substantial operating funds.

689. Defendant BOT nevertheless did not investigate.

690. Instead, despite the unanswered questions concerning the HUD submissions and the Waverly finances, Defendant BOT later voted to end further inquiry into Waverly without determining:

a. What happened to the Waverly proceeds;

b. Whether Allen University had been repaid the money it contributed to the project; or

c. Why the University had spent approximately $8 million of its own operating funds on Waverly despite the substantial financing generated through the project.

691. Despite being placed on notice of McNealey's alleged effort to obtain approximately $4.2 million in federal funds through documents containing false dates, Defendants Green, Davis, and BOT did not remove McNealey, require an independent investigation of his conduct, or require a complete accounting of the Waverly transactions.

692. McNealey remained President of Allen University and continued exercising authority over the University's financial and institutional affairs.

693. Plaintiffs allege that, by leaving McNealey in control of Allen University's financial and institutional affairs without investigating or taking corrective action concerning the conduct described above, Defendants Green, Davis, and BOT permitted the conditions that enabled the alleged misconduct described herein to continue.

### D. Allen Days Fundraising and Funds Raised for Allen University

#### 1. Fundraising for Allen University Through AMEC's Connectional Structure

694. Under AMEC's connectional structure, Bishops convene and preside over Annual Conferences within their assigned Episcopal Districts; Presiding Elders conduct Quarterly Conferences; and pastors conduct Church Conferences and congregational meetings.

695. These conferences and meetings provide established channels through which clergy communicate connectional financial obligations and solicit contributions from local churches and their members.

696. Within the Seventh Episcopal District, financial support for Allen University was not limited to voluntary or occasional charitable appeals. Plaintiffs allege that local churches were required to raise and submit financial assessments or budget obligations that included designated support for Allen University.

697. At Annual Conferences, local pastors were required to report and submit their churches' conference budgets or assessments. A designated portion of those connectional financial obligations was earmarked for educational purposes, including financial support for Allen University.

698. Accordingly, funds designated for Allen University were collected through established connectional financial obligations imposed

upon AMEC churches within the Seventh Episcopal District, in addition to voluntary contributions and offerings solicited from AMEC members.

699. At Quarterly Conferences, Presiding Elders requested and reviewed reports concerning these institutional assessments, including amounts local churches were obligated to raise or had collected for Allen University.

700. Presiding Elders tracked compliance with those obligations and the amounts collected in preparation for reporting and submission through the Annual Conference structure administered by the Presiding Bishop.

701. At the local church level, pastors communicated these financial obligations to their congregations and solicited contributions from members to satisfy the amounts assessed or expected for Allen University. Such funds were raised through designated offerings, special envelopes, “Allen University Days,” and other fundraising activities expressly represented as providing financial support to Allen University.

702. Thus, funds collected for Allen University within the Seventh Episcopal District came from both connectional financial obligations imposed upon local AMEC churches and contributions solicited from individual AMEC members to satisfy or supplement those obligations.

703. The collection and reporting of these funds occurred through AMEC's established connectional structure under the authority of the Presiding Bishop, Presiding Elders, pastors, and other clergy and officers acting by virtue of their positions within AMEC.

704. Compliance with these financial obligations formed part of the responsibilities of pastors and other clergy within the Seventh Episcopal District and was reported and reviewed through the AMEC conference structure.

705. The collection of funds designated for Allen University was therefore institutionally connected to the same episcopal structure through which the Presiding Bishop exercised authority over clergy appointments and continued ministerial service.

706. Plaintiffs do not allege these facts for the purpose of challenging AMEC's ecclesiastical structure, the authority of its Bishops, Presiding Elders, or pastors, or the manner in which AMEC organizes or governs its religious affairs.

707. Nor do Plaintiffs challenge the purpose of the connectional fundraising structure described above. To the contrary, the practice of mobilizing AMEC churches and members to provide financial support for

Allen University and its students served an important and beneficial purpose.

708. These facts are alleged because the connectional structure explains how funds designated for Allen University were solicited, raised, collected, reported, and transmitted through the Seventh Episcopal District and identifies the persons and offices participating in that process.

709. Plaintiffs' claims concern the implementation of that fundraising process after funds were raised for Allen University, including the alleged retention, control, transfer, diversion, and failure to account for funds intended for the University, rather than any question of religious doctrine, ecclesiastical law, or internal church governance.

710. Resolution of these allegations does not require the Court to interpret religious doctrine or determine questions of ecclesiastical authority.

711. Plaintiffs allege that the issues concerning the ownership, custody, transfer, disposition, and accounting of funds raised for Allen University can be resolved through neutral principles of civil law, including ordinary principles governing property, trusts, charitable funds, fiduciary obligations, accounting, and representations made in connection with the solicitation and disposition of funds.

712. Plaintiffs allege that the connectional fundraising structure was intended to generate financial support for Allen University. The alleged misconduct arose not from that purpose or structure, but from the manner in which funds raised through that structure were subsequently handled, including the alleged failure to transfer to Allen University all funds raised and held for its benefit.

**2. Fundraising Conducted in Allen University's Name and for Its Benefit ("Allen Days" Fundraising)**

713. For many years, AMEC's Seventh Episcopal District conducted fundraising for the benefit of Allen University in connection with its Annual Conferences and related activities, including fundraising commonly referred to herein as "Allen Days."

714. Allen Days was presented to AMEC congregations, clergy, members, and other donors as an opportunity to support Allen University and its educational mission, and substantial contributions were solicited and collected based upon the representation that the funds were being raised for Allen University.

715. Allen University students, faculty, and administrative personnel attended the Annual Conferences and participated in the Allen Days presentations.

716. The Allen University choir performed for the assembled AMEC members, and reports concerning Allen University and its students, programs, operations, and institutional activities were presented to the audience.

717. AMEC Presiding Elders, including Presiding Elders who also served as members of Defendant BOT, introduced McNealey during the Allen Days presentations at the Annual Conferences.

718. As President of Allen University, McNealey provided an update or report concerning the University to the assembled AMEC members.

719. McNealey's presentation was followed by remarks from Green during Green's tenure as Presiding Bishop of the Seventh Episcopal District and, after Davis succeeded Green, by remarks from Davis.

720. In connection with those presentations, Green and later Davis told the assembled AMEC members, in words or substance, to "look what your money is doing," expressly connecting the financial support provided by AMEC members with Allen University, its activities, and the students and programs the audience had just heard about and observed.

721. After the Allen University presentations, reports, and choir performance, Green and later Davis solicited an offering from the assembled AMEC members for Allen University.

722. The Allen University choir would perform another selection while the offering was collected, further connecting the solicitation and collection of funds with Allen University.

723. Green and later Davis instructed donors who contributed by check to make their checks payable to "Allen University," not to the Seventh Episcopal District, Defendant Vision Center, or any other person or entity.

724. Contributions for Allen University were also accepted electronically through online giving mechanisms made available in connection with the fundraising.

725. Green and later Davis publicly thanked the assembled AMEC members for giving money to Allen University.

726. Every part of the Allen Days presentation connected the requested donations to Allen University. Allen University students, faculty, and staff were present; the University's choir performed; McNealey reported on the University; Green and later Davis described what donor support was accomplishing; the Bishop then requested an offering for Allen University; donors were instructed to make their checks payable to Allen University; and donors were thanked for giving to Allen University.

727. In this context, donors were led to understand that the money they contributed was being given to Allen University for the benefit of the University, its students, and its educational mission.

728. Neither Green nor Davis informed donors during these solicitations that contributions represented to be for Allen University would instead be retained, controlled, or held by the Seventh Episcopal District after collection.

729. Nor were donors informed that the Seventh Episcopal District claimed a right to hold, administer, redirect, divide, or otherwise exercise control over funds they were being asked to contribute to Allen University.

730. To the contrary, donors contributing by check were expressly instructed to make their checks payable to Allen University, further representing that Allen University—not the Seventh Episcopal District or another AMEC entity—was the intended recipient of the contributions.

731. Defendant Green has admitted in his Answer filed in this action that funds were raised for Allen University.

732. Defendant Davis has likewise admitted in his Answer that funds were raised on behalf of Allen University at events related to AMEC's Seventh Episcopal District.

733. Davis further affirmatively alleges that the funds raised at those events were "held in trust specifically for Allen University" and given to Allen University when requested or at an annual event in November.

734. Thus, according to Davis's own Answer, funds raised for Allen University were not necessarily delivered to the University when collected but were instead held by the Seventh Episcopal District in trust for Allen University's benefit.

735. Plaintiffs allege, however, that only a portion of the funds raised and held for Allen University were ultimately transferred to the University and that substantial funds raised for Allen University were never received by Allen University.

736. Plaintiffs allege that, during the respective tenures of Green and Davis as Presiding Bishop, the Seventh Episcopal District maintained bank accounts in the name of Allen University that were separate from and not controlled by Allen University.

737. Checks that donors had been instructed to make payable to "Allen University" were deposited into or negotiated through those accounts rather than being delivered directly to Allen University.

738. Accordingly, the dispute is not whether the Allen Days funds were raised for Allen University or whether the Seventh Episcopal District

held funds after they were collected. Davis alleges in his Answer that the funds were "held in trust specifically for Allen University." The dispute includes whether all funds raised and held for Allen University's benefit were actually transferred to the University and what happened to the funds Allen University did not receive.

**3. Collection, Control, and Disposition of Funds Raised for Allen University**

739. During the relevant period, substantial amounts were raised for Allen University through the Seventh Episcopal District's connectional fundraising structure, Allen Days offerings, and related fundraising activities described above.

740. At the Annual Conferences, amounts raised for Allen University were publicly announced to the assembled clergy, delegates, members, trustees, and other persons in attendance.

741. The publicly announced amounts included funds raised for Allen University through local churches and the conference structure, together with additional contributions made in connection with Allen Days and related fundraising.

742. During Green's tenure as Presiding Bishop, the combined amounts publicly announced as raised for Allen University exceeded $1 million during individual annual fundraising cycles.

743. In addition to the Annual Conference fundraising, Green conducted or presided over other district meetings at which additional funds were solicited for Allen University.

744. Funds raised for Allen University through these additional district fundraising activities were likewise collected or controlled through the Seventh Episcopal District rather than being transferred directly to Allen University.

745. The Seventh Episcopal District therefore possessed and controlled substantial funds that had been raised, designated, or contributed specifically for Allen University.

746. As Davis has acknowledged in his Answer, the Seventh Episcopal District held funds raised for Allen University "in trust specifically for Allen University."

747. Notwithstanding the amounts raised and held for Allen University's benefit, Allen University did not receive all of the funds raised in its name or designated for its benefit.

748. Allen University's financial records reflected the amounts actually received by the University but did not reflect or account for all funds raised and held by the Seventh Episcopal District for Allen University's benefit.

749. The amounts publicly announced as raised for Allen University, together with other funds raised for the University through the Seventh Episcopal District, exceeded the amounts ultimately received and recorded by Allen University.

750. The difference between the amounts raised for Allen University and the amounts ultimately received by the University was substantial.

751. Because the Seventh Episcopal District collected and controlled the funds before transferring only a portion to Allen University, Allen University's records alone did not provide a complete accounting of the total amount collected for the University or the disposition of funds that were not transferred to it.

752. The Seventh Episcopal District did not provide Defendant BOT with a complete accounting identifying the total amount raised for Allen University, the accounts into which those funds were deposited, all transfers made from those accounts, the amounts ultimately delivered to Allen University, and the disposition of the remaining funds.

753. During the same period that the Seventh Episcopal District held funds raised for Allen University, Allen University experienced continuing financial needs and regularly sought additional funding and financial support.

754. Allen University's need for additional funding was repeatedly discussed during meetings of Defendant BOT and was known to Green and members of Defendant BOT.

755. McNealey informed Green on multiple occasions that Allen University needed additional funding and requested that Green provide financial support to the University. Green declined to provide the requested additional funding.

756. At the same time, the Seventh Episcopal District continued to hold funds that had been raised for Allen University's benefit and did not transfer all of those funds to the University.

757. Thus, funds that Davis has characterized in his Answer as having been "held in trust specifically for Allen University" remained outside Allen University's possession and control while Green was aware that Allen University needed additional financial resources and was declining McNealey's requests for additional funding.

758. The manner in which donor receipts were handled further demonstrated that funds solicited in Allen University's name were being administered outside the University.

759. When donors contacted Allen University seeking receipts or documentation for contributions they had made for Allen University, an Allen University vice president referred those donors to the Bishop's office or Seventh Episcopal District personnel pursuant to instructions that such requests be directed there.

760. Thus, although the contributions had been solicited in Allen University's name and donors had been instructed to make checks payable to Allen University, the Seventh Episcopal District exercised control over records necessary to document contributions made by donors for the University's benefit.

761. Plaintiffs allege, on information and belief, that portions of the funds raised and held for Allen University were transferred, directed, or used for the benefit of entities other than Allen University, including Defendant Vision Center.

762. Defendant Vision Center was not identified to donors during the Allen Days solicitations as an intended beneficiary of contributions made

for Allen University, and donors contributing by check were not instructed to make their checks payable to Defendant Vision Center.

763. Nor were donors informed that any portion of the funds raised for Allen University could be transferred, allocated, or used for the benefit of Defendant Vision Center or another entity rather than Allen University.

764. Plaintiffs allege that Allen University did not authorize the Seventh Episcopal District to retain or redirect funds raised specifically for Allen University's benefit to Defendant Vision Center or other entities.

765. The retention and disposition of funds outside Allen University deprived the University of substantial financial resources raised and held for its benefit and left Defendant BOT without a complete accounting of the amount collected for Allen University, the amount actually transferred to the University, the amount retained outside the University, and the ultimate disposition of the funds Allen University did not receive.

**4. Individual Trustees' Knowledge of Funds Raised and Held for Allen University**

766. Members of Defendant BOT had knowledge of the fundraising conducted for Allen University through multiple sources, including their participation in AMEC's connectional fundraising structure, attendance at Annual Conferences and Allen Days presentations, publicly announced

fundraising totals, Allen University's financial information provided to Defendant BOT, and matters expressly raised during meetings of Defendant BOT.

767. The connection between Allen University's governance and the fundraising structure was particularly direct with respect to trustees who simultaneously served as clergy within AMEC's Seventh Episcopal District.

768. Clergy trustees serving as pastors participated in raising and reporting funds designated for Allen University through their local churches, while clergy trustees serving as Presiding Elders were responsible for overseeing, tracking, or reporting financial obligations and funds designated for Allen University from churches within their respective districts.

769. These clergy trustees were therefore not merely members of Defendant BOT who later learned that fundraising had occurred. Through their ecclesiastical offices, they personally participated in the connectional process through which funds were raised, reported, collected, or overseen for Allen University.

770. Members of Defendant BOT also attended and participated in Annual Conferences and Allen Days presentations at which funds raised

for Allen University were publicly reported and additional contributions were solicited for the University.

771. Annual Conference proceedings were recorded or livestreamed, and members of Defendant BOT appear in one or more recordings of proceedings at which the amounts raised for Allen University were publicly announced.

772. Accordingly, the trustees appearing in those proceedings were present when substantial amounts were publicly represented as having been raised for Allen University and had direct knowledge of the amounts announced.

773. Defendant BOT received Allen University's budget materials and other financial information concerning funding reported as having been received by the University from the Seventh Episcopal District or in connection with Allen Days fundraising.

774. The budget materials provided to members of Defendant BOT reflected approximately $260,000 in annual funding associated with the Seventh Episcopal District or Allen Days, with the same or a similar amount reported each year, substantially less than the amounts publicly announced as having been raised for Allen University during those years.

775. Plaintiffs presently cannot confirm that Allen University actually received the approximately $260,000 reflected in the budget materials in each year because Defendant BOT did not obtain an independent accounting or documentation sufficient to verify the amounts actually transferred to Allen University.

776. Regardless of whether the approximately $260,000 amounts reflected in the budget materials were accurate, the financial information provided to Defendant BOT showed, year after year, amounts substantially below the amounts publicly announced as having been raised for Allen University.

777. Neither the donors whose contributions were solicited for Allen University nor the churches, clergy, or other contributors through whom funds were raised were informed that the amounts reported as received by Allen University were substantially less than the amounts publicly announced as having been raised for the University.

778. Donors and other contributors were likewise not provided an accounting identifying the amount of funds raised for Allen University that was actually transferred to the University, the amount retained by the Seventh Episcopal District, or the disposition of funds that were not transferred to Allen University.

779. Accordingly, while donors and other contributors were publicly thanked for the substantial amounts they had raised and contributed for Allen University, they were not informed that Allen University had reportedly received only a fraction of the amounts raised in its name and for its benefit.

780. The failure to disclose that Allen University received substantially less than the amounts publicly raised for its benefit was particularly difficult for donors and other contributors to detect because the fundraising itself was repeatedly presented in the context of Allen University's continuing need for financial support.

781. Allen University, as a historically Black college and university, operated in an environment in which the financial challenges historically experienced by HBCUs were widely recognized, and appeals for financial support for Allen University were consistent with the understanding among donors and supporters that the University required continuing financial assistance.

782. As a result, Allen University's continuing need for money after substantial fundraising did not necessarily alert donors, contributors, or others that the University had failed to receive all of the funds raised for its benefit.

783. The University's continuing financial need instead appeared consistent with the very circumstances that had caused donors to contribute in the first place.

784. Plaintiffs allege that this circumstance made the retention of funds outside Allen University more difficult to detect: substantial amounts could be raised publicly in Allen University's name, while the University's continuing financial needs remained visible because the University did not receive all of the funds raised for its benefit.

785. Thus, the same financial need that motivated AMEC churches, clergy, members, and other donors to contribute to Allen University also provided circumstances in which the failure to transfer all of those contributions to the University could remain undisclosed without immediately appearing inconsistent with Allen University's continuing requests for financial support.

786. At the December 2024 meeting, Montgomery reminded the trustees that the amounts publicly reported as having been raised for Allen University substantially exceeded the approximately $260,000 reflected in the financial information provided to Defendant BOT as funding associated with the Seventh Episcopal District or Allen Days.

787. Montgomery specifically called Defendant BOT's attention to the fact that the amount reported as having been received by Allen University did not account for the substantially greater amounts publicly reported as having been raised for the University's benefit.

788. No trustee present disputed that the amounts publicly reported as having been raised for Allen University substantially exceeded the amount reflected in the University's financial information, and no trustee identified or produced an accounting demonstrating that all funds raised for Allen University had been transferred to the University.

789. Defendant BOT was therefore expressly placed on notice of a substantial discrepancy between the amounts publicly raised for Allen University and the amount reported as having been received by the University.

790. This notice was in addition to the personal and individual knowledge acquired by members of Defendant BOT through their respective participation in the connectional fundraising structure, attendance at Annual Conferences and Allen Days presentations, observation of publicly announced fundraising totals, receipt of Allen University's financial information, and service on Defendant BOT.

791. Despite being expressly confronted with the discrepancy and the absence of an accounting establishing the disposition of the remaining funds, Defendant BOT did not require production of the Seventh Episcopal District's bank records, contribution records, deposit records, transfer records, or other financial documentation necessary to determine the total amount collected for Allen University and the disposition of funds the University did not receive.

792. Instead, as alleged more particularly below, members of Defendant BOT voted not to investigate the disposition of funds raised for Allen University.

**5. Davis's Knowledge and Continuation of the Practice**

793. In or about August 2024, Defendant Davis succeeded Green as Presiding Bishop of AMEC's Seventh Episcopal District and, by virtue of that office, became Chairman of Defendant BOT.

794. Upon assuming those positions, Davis acquired authority over the Seventh Episcopal District's connectional structure through which funds were raised for Allen University and simultaneously assumed leadership of Defendant BOT, the governing body charged with protecting Allen University's financial and institutional interests.

795. Shortly after assuming those positions, Davis became aware that substantial funds raised for Allen University through the Seventh Episcopal District had been retained and controlled outside Allen University and that Allen University had not received all funds raised for its benefit.

796. On or about September 13, 2024, approximately one month after becoming Presiding Bishop and Chairman of Defendant BOT, Davis met with McNealey and discussed funds that had been raised for Allen University and the disposition of those funds.

797. During that meeting, Davis and McNealey discussed the fact that funds raised for Allen University had not all been transferred to the University and had instead been retained or distributed outside Allen University.

798. Davis therefore had actual knowledge, no later than September 2024, that funds solicited and raised for Allen University were being controlled outside the University and that Allen University had not received all of the funds raised for its benefit.

799. Rather than requiring that the Seventh Episcopal District provide Allen University with a complete accounting of all funds raised and held for the University's benefit, Davis and McNealey discussed how those funds would be distributed going forward.

800. Upon information and belief, Davis and McNealey agreed that funds raised for Allen University would be divided or allocated between Allen University and another entity or entities rather than all such funds being transferred to Allen University.

801. Neither Davis nor McNealey disclosed to Defendant BOT that they had reached an agreement concerning the allocation or distribution of funds that had been raised for Allen University.

802. Nor did Davis seek authorization from Defendant BOT for the Seventh Episcopal District to retain, divide, redirect, or distribute to another entity any portion of funds raised and held for Allen University's benefit.

803. Donors, churches, clergy, and other contributors who had provided funds for Allen University were likewise not informed that Davis and McNealey had agreed that funds raised for Allen University could be divided or distributed between Allen University and another entity or entities.

804. The agreement was inconsistent with the representations made during the fundraising described above, where donors were told that they were giving to Allen University, checks were made payable to Allen University, and contributors were thanked for providing financial support to Allen University.

805. The agreement was also inconsistent with Davis's subsequent characterization in his Answer that funds raised on behalf of Allen University were "held in trust specifically for Allen University."

806. Although Davis has characterized the funds as being held "in trust specifically for Allen University," neither Davis nor McNealey disclosed any authority permitting them to determine privately that a portion of those funds could instead be retained, allocated, or distributed for the benefit of another entity.

807. Following the September 2024 meeting, Davis continued to preside over Annual Conferences and Allen Days fundraising at which substantial funds were solicited and publicly reported as having been raised for Allen University.

808. During Davis's tenure, the same fundraising practices described above continued: Allen University students, faculty, administrators, and the University choir participated; McNealey reported concerning Allen University; funds were solicited for Allen University; and substantial fundraising totals were publicly announced.

809. Upon information and belief, more than $1 million was publicly reported as having been raised for Allen University in connection with

Annual Conference fundraising during each of the 2024 and 2025 fundraising periods.

810. Notwithstanding Davis's knowledge concerning the prior retention and distribution of funds raised for Allen University, donors participating in the subsequent fundraising were not informed that Allen University had not received all funds previously raised for its benefit.

811. Nor were subsequent donors informed that funds raised for Allen University could be retained by the Seventh Episcopal District or divided, allocated, or distributed to another entity rather than transferred in full to Allen University.

812. Davis did not cause the Seventh Episcopal District to provide Defendant BOT with a complete accounting identifying the total funds raised for Allen University before or during his tenure, the amounts transferred to Allen University, the amounts retained outside the University, or the ultimate disposition of the retained funds.

813. Davis likewise did not cause Defendant BOT to undertake an independent investigation or accounting to determine the disposition of funds raised for Allen University and, as previously alleged, affirmatively discouraged an independent investigation into financial matters concerning Allen University.

814. Davis knew that Allen University had not received all of the funds raised for its benefit.

815. Nevertheless, he continued to raise funds in Allen University's name without requiring an accounting of the funds already collected, without informing donors that Allen had not received all of the funds previously raised for it, and without requiring an independent investigation to determine what happened to the funds.

816. Instead, Davis continued the practice of raising funds for Allen University's benefit while a portion of the funds raised for the University continued to be retained outside Allen University's possession and control.

**6. Montgomery's Request for an Accounting and Defendant BOT's Refusal to Investigate**

817. After identifying the substantial discrepancy between the amounts publicly reported as having been raised for Allen University and the substantially smaller amounts reflected in Allen University's financial information, Montgomery requested that Defendant BOT investigate the collection, retention, and disposition of funds raised for the University.

818. Montgomery sought an accounting sufficient to determine how much money had actually been raised for Allen University through the Seventh Episcopal District, how much had actually been transferred to

Allen University, how much had been retained outside the University, and what had happened to the funds Allen University did not receive.

819. The requested inquiry could have been conducted by obtaining and comparing the Seventh Episcopal District's fundraising records, bank and deposit records, contribution records, transfer records, and other financial documentation with Allen University's records of amounts actually received.

820. Such an accounting would also have permitted Defendant BOT to determine whether funds raised for Allen University had been transferred, allocated, or used for the benefit of Defendant Vision Center or any other person or entity.

821. By the time Montgomery requested the investigation, members of Defendant BOT had already received Allen University's budget materials reflecting the substantially smaller amounts reported as having been received by the University, and Montgomery had expressly called the discrepancy to the Board's attention.

822. Davis gave materially different explanations concerning the Allen Days funds as Montgomery continued to question why Allen University had not received the amounts raised for its benefit.

823. In September 2024, during an informal meeting of Defendant BOT, Davis told Montgomery and other members of Defendant BOT that he had spoken with both Green and McNealey concerning the Allen Days funds and represented that the funds had been given to Allen University, although not in the form of scholarships.

824. Plaintiffs allege that Davis's statement that the funds had been given to Allen University was knowingly false.

825. Before making that representation, Davis had already met with McNealey concerning the disposition of the Allen Days funds and had learned that the funds had been divided among four entities rather than transferred in full to Allen University.

826. During his prior discussion with McNealey, Davis had also proposed that, going forward, funds raised in connection with Allen Days be divided between Allen University and one other entity.

827. Thus, when Davis subsequently represented to Montgomery and other members of Defendant BOT that the funds had been given to Allen University, Davis already knew that Allen University had not received all of the funds raised for its benefit.

828. In October 2024, Davis offered a different explanation. He asserted that Defendant BOT did not have authority to determine how the Seventh Episcopal District raised its funds.

829. Montgomery responded that the issue was not Defendant BOT's authority over the Seventh Episcopal District's general fundraising activities. The issue was that funds had been raised during Allen Days in Allen University's name and for Allen University's benefit, and Defendant BOT therefore had a responsibility to determine how much had been raised for the University and what had happened to those funds.

830. Davis did not provide an accounting of the Allen Days funds in response and did not cause the Seventh Episcopal District to provide one.

831. In December 2024, when Montgomery again sought an investigation into the disposition of the Allen Days funds, Davis advanced another reason for declining further inquiry, stating, in substance, that an "investigation" had a "negative meaning" in the Black community.

832. Davis's objection to the word "investigation" did not address the underlying financial issue Montgomery had presented: substantial amounts had been publicly raised for Allen University, Allen University's financial information reflected substantially smaller amounts, and no accounting had been provided explaining the difference.

833. Davis did not propose that Defendant BOT obtain an accounting or review the financial records without calling the process an "investigation," nor did he propose any other means of determining how much had been collected for Allen University and what happened to the funds the University did not receive.

834. Instead, after Davis discouraged the requested investigation, the matter was put to a vote of Defendant BOT.

835. No accounting was presented to Defendant BOT demonstrating that all funds raised for Allen University had been transferred to the University.

836. No records were presented to Defendant BOT accounting for the disposition of the difference between the amounts publicly reported as having been raised for Allen University and the substantially smaller amounts reflected in Allen University's financial information.

837. Defendant BOT nevertheless declined to require an independent accounting or investigation of the Allen Days funds.

838. Defendants Anderson, Britton, Curry, Goff, Parrott, Richburg, Scott, and Temoney voted against investigating the disposition of funds raised for Allen University.

839. By voting against an investigation, those trustees declined to determine how much money had actually been collected in Allen University's name, how much Allen University had actually received, where the remaining funds had been deposited or transferred, and who ultimately received those funds or received a financial benefit from them.

840. The vote also left unresolved whether funds represented to donors as being raised for Allen University had been transferred or used for the benefit of Defendant Vision Center or other entities without authorization from Defendant BOT or disclosure to donors.

841. Defendant BOT did not thereafter require the Seventh Episcopal District, Green, Davis, McNealey, Defendant Vision Center, or any other person or entity involved in the collection or disposition of the funds to provide a complete accounting.

842. Defendant BOT likewise did not notify donors, churches, clergy, or other contributors that Allen University's financial information reflected receipt of substantially less than the amounts publicly reported as having been raised for the University.

843. As a result, the amount of money actually collected for Allen University, the amount actually received by Allen University, the amount

retained outside the University, and the ultimate disposition of the remaining funds were left unresolved.

844. The refusal to investigate also permitted the fundraising and retention practices described above to continue without an independent determination of what had happened to funds previously raised for Allen University's benefit.

845. Plaintiffs allege that Defendant BOT's refusal to investigate was not the result of an absence of information raising questions concerning the funds.

846. The trustees had before them the publicly reported fundraising amounts, Allen University's financial information reflecting substantially smaller amounts, Montgomery's express identification of the discrepancy, and Davis's materially different explanations concerning the disposition of the Allen Days funds.

847. Nevertheless, the trustees charged with protecting Allen University's financial interests affirmatively voted not to determine how much had actually been raised for the University, how much Allen University had actually received, where the remaining funds had gone, or who ultimately received those funds or received a financial benefit from them.

848. As a result, Allen University was deprived not only of substantial funds raised for its benefit, but also of the independent investigation and accounting necessary to identify the disposition of those funds, recover funds belonging to the University, and prevent the continued withholding or diversion of funds raised in Allen University's name and for its benefit.

**E. Improper Compensation, Self-Dealing, and Unauthorized Board Action**

849. On or about May 11, 2024, Defendant Green, then Chairman of Defendant BOT, convened an impromptu Board meeting without providing the notice required by Allen University's Bylaws. Certain trustees, including Montgomery, were not informed of the meeting in advance and did not attend.

850. At that meeting, Green sought approval of an agreement providing substantial compensation and personal benefits to McNealey, including:

a. Extension of McNealey's employment for one year beyond June 30, 2024, with an additional one-year option through June 30, 2026;

b. A six-percent increase in McNealey's compensation for the 2024–2025 term;

c. If either party declined the optional 2025–2026 term, a one-year sabbatical at one-half of McNealey's 2024–2025 salary; and

d. Continuation of McNealey's existing employment benefits during the 2024–2025 term.

851. Green also sought approval of additional personal benefits for McNealey, including:

a. Continuation of employee and spousal benefits, including Medicare F coverage, through June 30, 2027;

b. Transfer to McNealey of ownership of a University-assigned vehicle;

c. A $50,000 retention stipend for each year completed under the agreement; and

d. Satisfaction of the mortgage on a University-owned residence and transfer of the residence to McNealey.

852. The proposed transfer of the University-owned residence would have transferred Allen University real property to McNealey for his personal benefit. Plaintiffs allege that the property had been donated to Allen University for charitable purposes.

853. Montgomery objected to the meeting and the proposed actions, advising Defendant BOT that:

a. The meeting did not comply with the notice requirements of the Bylaws;

b. Defendant BOT lacked authority to give University-owned real property to McNealey for his personal benefit;

c. The proposed transfer constituted an improper use of charitable assets; and

d. The proposed actions exposed Allen University to legal and financial risk.

854. At a subsequent properly noticed meeting, Defendant BOT approved certain benefits for McNealey, including transfer of a University vehicle and continued health-related benefits for McNealey and his spouse.

855. Defendant BOT also considered the proposed transfer of the University-owned residence to McNealey. Montgomery again objected and advised the Board that it lacked authority to give University property to McNealey.

856. Notwithstanding Montgomery's objection, at least two trustees voted in favor of transferring the University-owned residence to McNealey.

857. When Montgomery reiterated that Defendant BOT lacked authority to make the proposed transfer, Davis responded that the matter would be put to a vote.

858. The foregoing actions were not inadvertent. Montgomery expressly advised Defendant BOT that the proposed actions violated the University's Bylaws, exceeded the Board's authority, and would improperly use University assets for McNealey's personal benefit.

859. Notwithstanding those warnings, members of Defendant BOT proceeded to consider and approve personal benefits for McNealey, and certain trustees voted in favor of transferring University-owned real property to him.

860. Plaintiffs allege that this conduct constituted a deliberate abuse of the authority entrusted to Defendant BOT over Allen University's assets and placed McNealey's personal interests above the financial and institutional interests of Allen University.

**F. 50 + 1 Sports–Columbia Contract and Resulting Liability to Allen University**

**1. Original Agreement and $3 Million Expedite Fee**

861. On or about July 13, 2023, McNealey, acting as President of Allen University, entered into a Memorandum of Understanding ("MOU") with 50 + 1 Sports–Columbia, LLC ("501S") for the development of a football stadium and student union for Allen University.

862. The parties also entered into a Master Ground Lease under which 501S would develop income-producing facilities on University-owned land, with revenues to be shared between Allen University and 501S over an extended period. The arrangement was expected to generate substantial long-term revenue for Allen University.

863. On or about October 13, 2023, McNealey asked 501S to accelerate construction of the stadium and offered to pay 501S a $3 million expedite fee in exchange for the accelerated performance.

864. In seeking the accelerated construction, McNealey represented that his continued employment as President was in jeopardy and that Defendant BOT would terminate him if the stadium was not completed in 2024.

865. Plaintiffs allege that representation was false and that Defendant BOT had not threatened to terminate McNealey if the stadium was not completed in 2024.

866. Defendant BOT had not required completion of the stadium in 2024. On the contrary, the original agreement provided for completion in 2025.

867. At the time McNealey offered the $3 million expedite fee, Allen University did not have sufficient funds available to satisfy the promised

payment, and McNealey knew that Allen University lacked the funds necessary to make the payment.

868. In reliance upon McNealey's representations and promise of payment, 501S accelerated its performance and incurred substantial project expenses.

869. On January 16, 2024, McNealey executed an amended MOU incorporating the accelerated construction schedule and the $3 million expedite fee, with payment obligations beginning on or about January 26, 2024.

870. McNealey executed the amended MOU notwithstanding his knowledge that Allen University lacked the funds necessary to satisfy the payment obligation, thereby committing Allen University to a substantial contractual obligation it could not then perform.

**2. Green's Knowledge and Concealment from Defendant BOT**

871. Green knew of the amended agreement, the $3 million payment obligation, and Allen University's inability to satisfy that obligation.

872. After the amended MOU was executed, Green and McNealey met with Monti Valrie, President of 501S, and asked him to make a substantial personal investment in Defendant Vision Center. Valrie declined.

873. Allen University thereafter failed to make the payments required under the amended MOU, including the $3 million expedite fee, and 501S eventually ceased further performance because of the nonpayment.

874. McNealey and Green did not disclose the amended agreement, Allen University's nonpayment, or the resulting contractual liability to the full Defendant BOT at its Spring 2024 meeting.

875. In or about May 2024, Green instructed 501S to submit a written demand for payment and represented that he would present the matter to Defendant BOT.

876. 501S submitted the requested demand, but Green did not present it to Defendant BOT and instead represented to 501S that the Board considered his request and had declined to act.

877. Plaintiffs allege that Green's representation was false because Montgomery and other members of Defendant BOT had not been informed of 501S's demand, Defendant BOT had not considered the demand, and the Board had not voted to reject it.

878. On or about July 26, 2024, 501S sent its demand directly to Defendant BOT, seeking approximately $4.2 million for costs incurred in connection with the project.

879. Defendant BOT did not convene the requested special meeting to address the contractual dispute and Allen University's potential liability.

**3. McNealey's False Statements to Defendant BOT**

880. On September 17, 2024, after Defendant BOT had been placed on notice of the dispute, McNealey denied that he had offered 501S the $3 million expedite fee and represented to Defendant BOT that 501S had requested the fee.

881. McNealey's representation was false. He had personally offered 501S the $3 million expedite fee in exchange for accelerating construction of the stadium.

882. On October 4, 2024, McNealey admitted to Defendant BOT that he—not 501S—had offered the $3 million expedite fee.

883. McNealey further admitted that the fee had not been paid and stated, in substance, that Allen University did not have the money to pay it.

884. Davis was present when McNealey denied offering the $3 million fee on September 17 and when McNealey admitted on October 4 that he had offered it.

885. Davis therefore knew that McNealey had provided materially false information to Defendant BOT concerning a substantial contractual obligation McNealey had created on Allen University's behalf.

**4. Defendant BOT's Knowledge and Failure to Protect Allen University**

886. Montgomery also informed Defendant BOT that McNealey had referred to Valrie as a "thug" and had questioned the legitimacy of invoices submitted by or on behalf of 501S in connection with the contractual dispute.

887. McNealey did not deny Montgomery's report to Defendant BOT that he had made those statements.

888. Defendant BOT subsequently received a legal opinion concerning the validity of the amended MOU and Allen University's potential liability under the agreement.

889. Defendant BOT therefore had notice of the amended agreement, McNealey's offer of the $3 million expedite fee, Allen University's nonpayment, 501S's demand for payment, McNealey's false statement to Defendant BOT concerning who offered the expedite fee, his subsequent admission that he had offered the fee, and Allen University's potential contractual liability.

890. Despite that information, Defendant BOT did not take effective action to:

a. Resolve or limit Allen University's contractual exposure;

b. Hold McNealey accountable for committing Allen University to an obligation he knew the University could not satisfy; or

c. Hold McNealey accountable for providing materially false information concerning that obligation to Defendant BOT.

891. Davis likewise continued to support McNealey and did not support his removal as President of Allen University, despite his knowledge of the conduct alleged above.

892. As a result of the conduct described above, Allen University was exposed to substantial contractual and financial liability arising from an agreement McNealey entered into despite knowing that the University lacked the funds necessary to perform it.

**G. Retaliation Against Dr. Dub Taylor and Defendant BOT's Failure to Protect Allen University**

**1. Taylor's Testimony to Defendant BOT**

893. Dr. Dub Taylor served as Allen University's Vice President of Institutional Development from approximately July 19, 2019, through April 15, 2025.

894. In that position, Taylor worked closely with McNealey and was involved in fundraising and institutional development matters, including the Waverly project and the 501S project.

895. Taylor attended the October 13, 2023 meeting between McNealey and Valrie and personally heard McNealey's statements concerning the accelerated construction of the stadium and the $3 million expedite fee.

896. Taylor also personally heard McNealey falsely state that Defendant BOT would terminate him as President of Allen University if the stadium was not completed in 2024.

897. After McNealey provided conflicting information to Defendant BOT concerning the 501S agreement, members of Defendant BOT sought independent confirmation from Taylor concerning what had occurred.

898. Following the September 17, 2024 Board meeting, multiple trustees asked Davis to contact Taylor and obtain information concerning the 501S agreement. Davis declined to do so.

899. At the October 4, 2024 meeting of Defendant BOT, Davis informed the Board that he had decided not to contact Taylor despite the trustees' prior requests that he do so.

900. Montgomery then requested that Defendant BOT hear directly from Taylor concerning the 501S agreement.

901. Davis required Montgomery's request to be presented as a motion and put to a vote. Defendant BOT voted to hear from Taylor.

902. Before Taylor appeared before Defendant BOT, McNealey contacted him and attempted to influence what he would tell the Board.

903. McNealey told Taylor, in substance, that Montgomery was "killing" Taylor by seeking his testimony and asked Taylor to provide false or misleading information to Defendant BOT.

904. Taylor refused and instead provided Defendant BOT with truthful information concerning the October 13, 2023 meeting.

905. Taylor confirmed that McNealey had told Valrie, "Brother, I need your help," represented that his employment was in jeopardy if the stadium was not completed in 2024, and offered 501S the $3 million expedite fee.

906. Taylor further informed Davis and Defendant BOT that, based upon his knowledge of Allen University's financial condition, the University did not have sufficient funds to pay the $3 million expedite fee when McNealey offered it.

**2. McNealey's Retaliation Against Taylor**

907. On the same day that Taylor provided truthful information to Defendant BOT contradicting McNealey's prior representations concerning the 501S agreement, McNealey began retaliating against Taylor.

908. Following the October 4, 2024 Board meeting, McNealey convened a meeting of senior University personnel and accused a member of his leadership team of being a "Judas" and "Benedict Arnold," statements understood by Taylor and others present to refer to Taylor.

909. McNealey thereafter informed Taylor that he intended to terminate his employment and that Defendant BOT either could not or would not intervene.

910. McNealey also made statements to University employees and others attacking Taylor's honesty, loyalty, and professional integrity after Taylor provided information to Defendant BOT that contradicted McNealey's prior representations concerning the 501S agreement.

911. During the period in which McNealey was retaliating against Taylor, Taylor was also interviewed by the FBI concerning matters involving Allen University.

912. Plaintiffs allege that McNealey told Taylor, in substance, that if Taylor wanted to get back into McNealey's "good graces" or similar words, Taylor should tell the FBI that Montgomery and Valrie had paid Taylor $1 million to lie.

913. Taylor refused to make the requested statement. McNealey thereafter continued the retaliatory conduct against Taylor, and Taylor was soon thereafter terminated from his employment with Allen University.

914. Taylor sought assistance from Defendant BOT and requested protection from McNealey's retaliation.

**3. Davis and Defendant BOT Were Warned and Refused to Intervene**

915. Montgomery informed Davis and members of Defendant BOT that McNealey was retaliating against Taylor because Taylor had truthfully responded to questions Defendant BOT had asked him.

916. Montgomery expressly warned Davis and Defendant BOT that permitting the retaliation to continue and allowing McNealey to terminate Taylor under those circumstances would expose Allen University to liability.

917. Taylor likewise informed Defendant BOT that he had retained legal counsel and repeatedly requested the Board's intervention and protection.

918. Davis and Defendant BOT did not intervene.

919. In December 2024, Montgomery again raised McNealey's retaliation against Taylor during a meeting of Defendant BOT and warned

that Allen University would have no viable defense if McNealey were permitted to terminate Taylor in retaliation for his testimony to the Board.

920. Montgomery specifically advised Davis that permitting McNealey to retaliate against Taylor in Davis's presence amounted to condoning the conduct.

921. Davis responded, "It was Dr. McNealey's call."

922. Davis did not direct McNealey to stop the retaliation, investigate Taylor's complaints, or take other action to protect Allen University from the liability Montgomery had expressly warned would result.

923. The remaining members of Defendant BOT likewise did not take action sufficient to prevent the threatened termination.

**4. Notice to the Council of Bishops and Failure to Intervene**

924. Montgomery also personally notified Defendant AMEC and Defendant Council of Bishops that McNealey was retaliating against Taylor after Taylor provided information to Defendant BOT concerning the 501S agreement.

925. Montgomery informed Defendant AMEC and Defendant Council of Bishops of the circumstances surrounding the retaliation and sought their intervention to prevent McNealey from continuing the retaliatory conduct and to protect Allen University from the resulting liability.

926. Montgomery specifically requested that Defendant Council of Bishops direct Davis, as Presiding Bishop of the Seventh Episcopal District and Chairman of Defendant BOT, to intervene and stop McNealey's retaliation against Taylor.

927. Despite that notice and request for intervention, Defendant AMEC and Defendant Council of Bishops did not direct Davis to intervene or otherwise take action to stop McNealey's retaliation.

**5. Termination and Resulting Harm to Allen University**

928. McNealey continued the retaliatory conduct and terminated Taylor's employment on or about April 15, 2025.

929. Taylor again appealed to Defendant BOT and requested review and reversal of his termination, but Defendant BOT allowed the termination to stand.

930. Taylor, through counsel, thereafter asserted claims against Allen University arising from his termination.

931. Upon information and belief, Allen University ultimately resolved Taylor's claims through a settlement exceeding $1 million.

932. The resulting liability to Allen University was substantial and avoidable.

933. Before Taylor was terminated, Davis and Defendant BOT knew that Taylor had provided information to the Board contradicting McNealey, knew that McNealey was retaliating against Taylor, knew that Taylor had retained counsel, and had been expressly warned that terminating Taylor under those circumstances would expose Allen University to liability.

934. Before Taylor was terminated, Defendant AMEC and Defendant Council of Bishops had likewise been notified of McNealey's retaliatory conduct, informed that Davis and Defendant BOT had failed to intervene, and asked to intervene while there was still an opportunity to prevent Taylor's termination and the resulting liability to Allen University.

935. Despite that knowledge and opportunity to intervene, Davis, Defendant BOT, Defendant AMEC, and Defendant Council of Bishops took no effective action to stop the retaliation or protect Allen University from the resulting liability.

936. Plaintiffs allege that the resulting liability was not an unavoidable consequence of an ordinary employment decision.

937. It resulted after the governing officials and bodies identified above were repeatedly placed on notice of McNealey's retaliation, were warned of the consequences to Allen University, and nevertheless allowed McNealey to proceed without meaningful intervention or accountability.

938. By failing to intervene despite advance notice and an opportunity to prevent the harm, Davis, Defendant BOT, Defendant AMEC, and Defendant Council of Bishops permitted McNealey to continue exercising substantial authority over Allen University's personnel and institutional affairs without effective oversight or restraint, leaving Allen University to bear the financial consequences of conduct they had been asked to stop.

### H. Retaliation Against and Removal of Montgomery from Defendant BOT

#### 1. Notice to Defendant BOT and Montgomery's Initial Inquiry

939. Montgomery served as an elected member of Defendant BOT and, in that capacity, owed fiduciary duties to protect Allen University's financial, charitable, and institutional interests.

940. Beginning in or about July 2024, members of Defendant BOT, including Montgomery, began receiving letters, emails, and other communications concerning activities and financial and governance matters at Allen University.

941. Those communications placed Montgomery and other members of Defendant BOT on notice of matters concerning Allen University that warranted further inquiry and Board attention.

942. In response to the information being received, Trustee Yvonne Saxon requested that Defendant BOT convene a Special Meeting, and several members of Defendant BOT agreed that a Special Meeting should be held.

943. Green, who was then Chairman of Defendant BOT, scheduled a Special Meeting for August 8, 2024.

944. Green scheduled the meeting to take place at Defendant Vision Center in Columbia, South Carolina.

945. At the time, Defendant Vision Center did not have functioning running water, notwithstanding that Green had designated it as the location for the Special Meeting of Defendant BOT.

946. On the evening of August 7, 2024, Green cancelled the Special Meeting, stating that there would not be a quorum.

947. At the time Green cancelled the meeting, Montgomery had already traveled to Columbia to attend the August 8 meeting.

948. In response to the cancellation, Montgomery notified the Board that she was already present in Columbia and asked what number of trustees was required to constitute a quorum.

949. Green cancelled the meeting before the trustees assembled and before attendance at the meeting could establish whether a quorum would be present.

950. The circumstances surrounding the cancellation caused Montgomery to question why a Special Meeting requested and agreed to by multiple trustees had been cancelled before the trustees assembled.

951. McNealey subsequently informed Montgomery that "the attorney" was also already in Columbia and offered to meet with Montgomery the following morning.

952. Because Montgomery had already traveled to Columbia for the cancelled Board meeting, she agreed to meet with McNealey.

953. Montgomery did not know Attorney Shannon Davis and had never met or communicated with her before August 8, 2024.

954. On August 8, 2024, Montgomery met with McNealey, Defendant Richburg, and Attorney Shannon Davis.

955. During the meeting, McNealey made derogatory statements concerning Taylor and Monti Valrie, including falsely stating that Taylor worked for Valrie and referring to Valrie as a "thug."

956. McNealey encouraged those present to refer to Valrie as a "thug." Montgomery and Attorney Shannon Davis declined to do so.

957. Defendant Richburg, however, referred to Valrie as a "thug" after McNealey stated, in substance, that it was permissible for those present to call Valrie a "thug."

958. At the time of the August 8 meeting, Montgomery, Attorney Shannon Davis, and Defendant Richburg had never met Valrie in person and had no personal knowledge of Valrie's business practices, professional conduct, or business ethics.

959. McNealey's statements concerning Taylor and Valrie were among the information Montgomery learned during the August 8 meeting that caused her to become concerned about McNealey's conduct and other matters affecting Allen University.

960. Montgomery did not attend the August 8 meeting with McNealey with a predetermined agenda or accusation of wrongdoing. She agreed to the meeting to obtain information and better understand the matters that had prompted concerns among members of Defendant BOT.

961. During the meeting, Montgomery and Attorney Shannon Davis discussed with McNealey possible means of resolving Allen University's dispute with Valrie and avoiding litigation arising from the 501S agreement. Montgomery and Attorney Davis proposed a course of action intended to facilitate a resolution of the dispute.

962. Montgomery and Attorney Davis also discussed possible steps Allen University could take to address and resolve the problems concerning the HUD grant.

963. Montgomery's conduct during the August 8 meeting was consistent with the objective she repeatedly expressed to McNealey: to understand the problems confronting Allen University and, where problems existed, identify ways to correct them and protect the University rather than create conflict or pursue litigation.

964. Montgomery subsequently reiterated that position in writing, explaining that her objective was to determine whether problems existed and, if so, to work through Allen University's governance structure to correct them.

965. Montgomery further stated in writing that she continued to support McNealey as President of Allen University and was not seeking to create conflict or remove him from office.

966. Based upon the information provided during the August 8 meeting, documentation Montgomery received at or following the meeting, and additional information she subsequently obtained, Montgomery became increasingly concerned about Allen University's financial affairs and governance.

967. As Montgomery continued to receive and review information, her concerns developed into serious questions regarding matters requiring Board attention and independent oversight, including the Waverly Building transactions, the HUD grant, Allen Days funds, the 501S agreement, and other matters alleged herein.

**2. Montgomery's Exercise of Her Fiduciary Responsibilities**

968. Montgomery's subsequent actions were undertaken in response to the information she learned and in furtherance of her responsibilities as a trustee to protect Allen University's financial, charitable, and institutional interests.

969. Montgomery did not participate in the misconduct alleged herein.

970. As she learned additional facts, she sought records and supporting documentation, requested explanations and accountings, questioned representations made to Defendant BOT, sought independent verification, and sought corrective action concerning matters she believed threatened Allen University's interests.

971. Montgomery initially sought to address the matters she identified through Allen University's existing governance structure. She

repeatedly communicated that her objective was to identify and correct problems affecting the University, not to create conflict or initiate litigation.

972. At the time Montgomery began making these inquiries, she did not know the full extent of the conduct alleged herein, including the disposition of funds raised for Allen University, the circumstances surrounding the Waverly and HUD transactions, or the extent of the financial and contractual obligations McNealey had undertaken on Allen University's behalf.

973. Montgomery initially expected Davis and the other trustees to investigate legitimate concerns brought to their attention and to take appropriate action to protect Allen University.

974. As Montgomery obtained additional information and continued seeking records, investigation, and corrective action, however, her efforts increasingly met resistance from Davis, McNealey, Green, and members of Defendant BOT who opposed or declined further inquiry into the matters she raised.

**3. Davis's Obstruction of Defendant BOT's Oversight**

975. During the October 4, 2024 meeting, Defendant Goff, who was seated next to McNealey, stated that certain trustees had conflicts of interest while looking toward Montgomery.

976. Goff then stated that certain trustees were in violation of SACSCOC standards.

977. Although Goff did not identify Montgomery by name, his statements and conduct, including looking toward Montgomery as he made the statements, caused Montgomery to understand that the accusations were directed at her.

978. Later during the October 4, 2024 meeting, Davis recessed Defendant BOT and represented that the meeting would reconvene the following week.

979. Davis did not reconvene the meeting as represented.

980. Montgomery repeatedly contacted Davis and requested that he reconvene the meeting so Defendant BOT could address unresolved matters affecting Allen University, including Allen University's potential liability arising from the 501S agreement.

981. Resolution of Allen University's dispute with 501S required action by Defendant BOT, and Montgomery sought to have the Board reconvene so that Allen University could address and reduce its potential liability.

982. Davis did not respond to Montgomery's requests and did not reconvene the meeting.

983. Montgomery thereafter sought a Special Meeting pursuant to Allen University's Bylaws.

984. The Bylaws permitted a Special Meeting to be called upon the request of one-third of the members of Defendant BOT, and at least one-third of the trustees agreed to the requested meeting.

985. Montgomery attempted to coordinate the scheduling of the Special Meeting with Davis, but Davis again failed to respond.

986. Davis instead communicated with Defendant BOT and represented that only the Chairman had authority to call a meeting of Defendant BOT.

987. Montgomery had expressly identified the Bylaw provision permitting a Special Meeting upon the request of one-third of the trustees, and Plaintiffs allege that Davis knew his representation that only the Chairman could call a meeting of Defendant BOT was false.

988. Montgomery thereafter contacted Defendant AMEC and Defendant Council of Bishops and requested that they intervene and require Davis to comply with Allen University's Bylaws.

989. Montgomery specifically challenged as false Davis's representation that only the Chairman had authority to call a meeting of Defendant BOT, provided Defendant AMEC and Defendant Council of

Bishops with the governing Bylaws supporting her position, and provided them with a copy of Davis's written communication containing the challenged representation.

990. Montgomery asked Defendant AMEC and Defendant Council of Bishops to intervene and require Davis, as Chairman of Defendant BOT and Presiding Bishop of the Seventh Episcopal District, to comply with Allen University's Bylaws and permit the requested Special Meeting to proceed.

991. Despite Montgomery's express notice that Davis's representation was false, the supporting Bylaw provision, a copy of Davis's written communication, and her specific request for intervention, Defendant AMEC and Defendant Council of Bishops did not respond to Montgomery, acknowledge receipt of her communication, or take action to require Davis to comply with Allen University's Bylaws.

992. Davis's actions prevented the requested Special Meeting from proceeding and delayed Defendant BOT's consideration of financial, contractual, and governance matters Montgomery was attempting to place before it.

**4. Escalation of Retaliation and December 2024 Targeting of Montgomery**

993. As Montgomery continued seeking Board action and accountability, she reported concerns regarding Allen University's governance and financial affairs to Defendant AMEC and Defendant Council of Bishops and sought intervention concerning Davis's and Defendant BOT's failure to address those matters.

994. Defendant AMEC had assigned Davis to the Seventh Episcopal District and, as alleged herein, Defendant Council of Bishops possessed authority within AMEC's episcopal structure concerning his assignment and conduct as a Bishop.

995. Despite receiving Montgomery's reports concerning Davis and circumstances affecting Allen University, Defendant AMEC and Defendant Council of Bishops did not take effective action in response.

996. On December 2, 2024, approximately two months after recessing the October meeting, Davis reconvened Defendant BOT.

997. At the outset of the meeting, Davis announced that trustee qualifications would be reviewed.

998. During the December 2, 2024, meeting, Goff renewed the accusations he had first raised during the October 4, 2024 meeting concerning alleged trustee conflicts of interest and violations of SACSCOC standards.

999. Goff's renewed accusations continued the criticism that Montgomery understood had been directed toward her during the October meeting.

1000. When Montgomery objected to those assertions, Davis joined and escalated the criticism, accusing Montgomery of having manipulated him into violating SACSCOC standards by requesting that Taylor appear before Defendant BOT and provide the Board with information concerning matters Taylor had personally observed relating to the 501S agreement.

1001. Davis's accusation concerned Montgomery's request at the October 4, 2024, Board meeting that Defendant BOT hear directly from Taylor after Davis had declined requests that he contact Taylor concerning McNealey's representations about the 501S agreement.

1002. As previously alleged, Davis required a motion and vote before Taylor was permitted to appear, Defendant BOT voted to hear from Taylor, and Taylor thereafter appeared before Defendant BOT and provided information concerning matters he had personally witnessed.

1003. Davis nevertheless accused Montgomery of manipulating him into violating SACSCOC standards by causing Taylor to appear before Defendant BOT and represented that attorneys supported his position.

1004. Davis also characterized Montgomery's communications and oversight efforts as inappropriate, including her efforts to bring McNealey's retaliation against Taylor to Defendant BOT's attention.

1005. Davis further suggested that Montgomery had improperly communicated with persons outside Defendant BOT, including the media, which Montgomery denied.

1006. Montgomery attempted during the meeting to obtain information concerning Allen University's financial affairs, including whether University property was encumbered, but Davis terminated or prevented further inquiry.

1007. Montgomery again raised McNealey's retaliation against Taylor and warned that permitting the retaliation to continue exposed Allen University to substantial liability.

1008. When Montgomery advised Davis that allowing McNealey to retaliate against Taylor in his presence constituted condonation of McNealey's conduct, Davis responded, "It was Dr. McNealey's call."

1009. Montgomery also sought an independent investigation into financial matters concerning Allen University, including the Waverly Building transactions, Allen Days funds, the 501S agreement, and related matters alleged herein.

1010. Davis opposed and discouraged an independent investigation, and a majority of members of Defendant BOT voted against investigating the matters Montgomery had raised, as alleged more particularly above.

1011. When Montgomery offered to provide documentary evidence supporting her concerns, Davis instructed her not to do so.

1012. Plaintiffs allege that, rather than investigate the financial and governance matters Montgomery was attempting to place before Defendant BOT, Davis increasingly directed the Board's attention toward Montgomery, criticized her efforts to obtain information and accountability, and characterized her exercise of Board oversight as improper.

**5. Montgomery Seeks Independent Clarification from SACSCOC**

1013. Following the December 2, 2024, meeting, Montgomery sought to determine whether the accusations made against her concerning SACSCOC standards were correct.

1014. Rather than relying upon her own interpretation, legal opinions, or representations by persons associated with Allen University or AMEC, Montgomery contacted SACSCOC directly and requested written answers concerning the governance issues that had been raised.

1015. Montgomery sought that clarification because the statements made during the December meeting caused her to question whether she had violated an accreditation requirement or other governing standard.

1016. Montgomery subsequently informed Defendant BOT that she had felt personally attacked during the December meeting; that she believed her reputation as both a trustee and practicing attorney had been damaged; and that she had felt threatened, humiliated, dismissed, and bullied.

1017. Montgomery nevertheless explained that she wanted to determine whether she had actually violated a rule or policy of which she was unaware and that she was willing to acknowledge a mistake if she had made one.

1018. On January 31, 2025, Dr. Sandra Jordan, Chief of Staff of SACSCOC, provided Montgomery with written responses to her questions concerning the matters raised during the December meeting.

1019. Jordan explained that SACSCOC does not prohibit a governing board from seeking truthful information concerning matters affecting the institution, including information concerning representations made by the President to the Board.

1020. In response to Montgomery's question concerning whether Defendant BOT could question University employees who possessed firsthand knowledge after the President made false statements to the Board, Jordan stated that SACSCOC would not have a standard permitting a President to be dishonest with the Board and explained that SACSCOC requires institutions, their chief executive officers, and their governing boards to act with integrity.

1021. Jordan further explained that the Board hires and evaluates the President and that it would be inconsistent with that relationship for a President to withhold information from the Board or lose the Board's trust.

1022. Jordan identified SACSCOC standards requiring a governing board to carry out its fiduciary responsibilities and explained that those responsibilities include oversight of the President and the institution.

1023. Jordan further explained that if a Board Chairman failed to concern himself with the Board's fiduciary responsibilities, the institution could be in violation of SACSCOC standards governing fiduciary responsibility.

1024. Jordan stated that if a Board Chairman was placing the institution at risk, the Board should look to its applicable removal policy or

Bylaws and could take action to remove the Chairman and address the risk.

1025. Jordan also explained that SACSCOC expects institutions to operate in accordance with their own bylaws and policies and that failure to follow those governing provisions could place the institution at odds with SACSCOC expectations.

1026. With respect to the President's obligation to provide information necessary for Board oversight, Jordan explained that the President should not hamper the Board's ability to carry out its fiduciary responsibilities.

1027. Jordan's responses directly addressed the SACSCOC accusations made by Goff and Davis concerning Montgomery's conduct.

1028. Rather than supporting their contention that Montgomery had violated SACSCOC standards by seeking information from Taylor and attempting to exercise Board oversight, Jordan's responses confirmed the Board's responsibility to obtain truthful information, oversee the President, carry out its fiduciary responsibilities, and protect the institution from financial and institutional risk.

1029. Jordan's response directly contradicted the accusations made by Goff and Davis and made clear that Montgomery had not violated SACSCOC standards by seeking truthful information from University

employees, questioning representations made to Defendant BOT, or attempting to fulfill the Board's fiduciary responsibilities.

1030. To the contrary, the actions for which Montgomery had been criticized were consistent with the governance and fiduciary principles identified by SACSCOC.

1031. On February 7, 2025, Montgomery forwarded Jordan's written responses to Davis and the members of Defendant BOT and advised them that she had contacted SACSCOC directly to obtain an accurate understanding of the standards rather than relying upon third-party interpretations or her own opinion.

1032. Montgomery informed Defendant BOT that Jordan's responses did not support the accusations that Montgomery had violated SACSCOC standards by requesting that Defendant BOT hear from Taylor concerning matters he had personally observed.

1033. Montgomery further informed Defendant BOT that Jordan's responses confirmed Defendant BOT's continuing responsibility to exercise independent oversight, obtain information necessary to fulfill its fiduciary obligations, and protect Allen University from financial and institutional harm.

1034. Thus, before Montgomery was purportedly removed from Defendant BOT, Davis and the other trustees had received written information directly from SACSCOC addressing the very accreditation standards Goff and Davis had invoked in criticizing Montgomery's efforts to obtain information and exercise Board oversight.

1035. Notwithstanding that information, Davis did not retract or correct his accusations against Montgomery or advise Defendant BOT that SACSCOC's written response did not support his contention that Montgomery had manipulated him into violating SACSCOC standards.

**6. FBI Interview and Montgomery's Purported Removal from Defendant BOT**

1036. In or about February 2025, Montgomery was interviewed by a Special Agent of the Federal Bureau of Investigation concerning matters involving Allen University.

1037. On or about March 20, 2025, Davis convened a Special Meeting of Defendant BOT.

1038. The notice of the Special Meeting did not identify its purpose or include an agenda advising Montgomery that her continued service as a trustee would be considered.

1039. Before the meeting, Montgomery requested information concerning its purpose, but Davis did not provide the requested information.

1040. During the meeting, Davis asked whether any members of Defendant BOT had been contacted by the FBI.

1041. Montgomery disclosed that she had been interviewed by the FBI.

1042. Less than thirty minutes after Montgomery disclosed that she had been interviewed by the FBI, during the same meeting and without prior notice that her Board membership would be considered, action was initiated to purportedly remove Montgomery from Defendant BOT.

1043. Defendant Curry recommended that Montgomery be “removed” for "cause," but did not identify conduct by Montgomery constituting cause for purported removal under Allen University's Bylaws.

1044. Montgomery was not afforded meaningful advance notice of the asserted grounds for her purported removal or a meaningful opportunity to prepare a response before Defendant BOT considered her purported removal.

1045. Defendant Richburg made the motion to "remove" Montgomery from Defendant BOT. The motion was seconded and the trustees identified herein voted to purportedly remove her.

1046. Plaintiffs allege that Montgomery's purported removal did not comply with the notice and procedural requirements of Allen University's Bylaws governing Board action regarding removal of trustees.

1047. Plaintiffs further allege that Montgomery's purported removal did not comply with statutory law.

1048. Upon information and belief, Montgomery was the only trustee purportedly removed from Defendant BOT during the relevant period.

1049. Montgomery's purported removal occurred after she had repeatedly sought information concerning financial transactions affecting Allen University, requested records and accountings, sought independent investigation, challenged false or inconsistent information presented to Defendant BOT, objected to McNealey's retaliation against Taylor, reported concerns to Defendant AMEC and Defendant Council of Bishops, obtained written clarification directly from SACSCOC, and disclosed that she had been interviewed by the FBI.

1050. In contrast, trustees and officers whose conduct Montgomery had questioned were not subjected to comparable investigation, discipline, or purported removal by Defendant BOT.

**7. Retaliatory Purpose and Resulting Harm**

1051. Plaintiffs allege that Montgomery's purported removal was not based upon a legitimate concern regarding her qualifications or performance as a trustee.

1052. Rather, Montgomery was purportedly removed after she repeatedly sought to understand, investigate, and obtain corrective action concerning matters that Davis, McNealey, Green, and other Defendants had resisted investigating, disclosing, or correcting.

1053. Montgomery's conduct progressed from seeking information concerning matters first brought to the attention of Defendant BOT, to requesting records and explanations as additional facts emerged, and ultimately to seeking independent investigation and corrective action when the information she obtained raised serious concerns regarding Allen University's financial and institutional interests.

1054. Montgomery's purported removal eliminated from Defendant BOT a trustee who had repeatedly sought financial records, accountings, independent investigation, compliance with Allen University's Bylaws,

accountability for misconduct, and protection of Allen University's assets and financial interests.

1055. Plaintiffs allege that the timing and circumstances of Montgomery's purported removal—including the criticism directed at her during the December meeting, the subsequent written SACSCOC response addressing the accreditation-related assertions used to criticize her, her continuing requests for investigation and accountability, her reports to Defendant AMEC and Defendant Council of Bishops, and her disclosure that she had been interviewed by the FBI—support the inference that her purported removal was retaliatory.

1056. Plaintiffs further allege that Defendants acted together to purportedly remove Montgomery to prevent her from continuing to scrutinize and challenge the financial and governance practices alleged in this First Amended Complaint.

1057. Montgomery's purported removal also communicated to the remaining trustees that continued challenges to the conduct of those controlling Allen University's affairs, and continued demands for investigation and accountability, could jeopardize their continued service on Defendant BOT.

1058. As a direct and proximate result of Defendants' conduct and her purported removal, Montgomery suffered injury to her reputation and emotional distress.

1059. Montgomery's purported removal also harmed Allen University by eliminating independent Board oversight at the very time she was seeking investigation and accountability concerning substantial financial transactions, charitable funds raised for the University's benefit, contractual liabilities, and misconduct by University leadership.

1060. After Montgomery's purported removal, the persons whose conduct she had sought to investigate remained in positions of authority or influence, while Defendant BOT was deprived of a trustee who had persistently sought records, independent investigation, and accountability concerning the matters alleged herein.

1061. Plaintiffs allege that Montgomery's purported removal was therefore both retaliatory as to Montgomery and detrimental to Allen University: it purportedly removed and punished a trustee who sought information, investigation, and corrective action while further insulating from independent Board scrutiny the conduct she had attempted to address.

**I. Misuse of Federal Funds and Programs**

1062. As alleged above, Allen University and its students depend substantially upon federal funding, including Pell Grant funds, Title III funding, and other federal financial assistance, the continued receipt of which requires compliance with applicable federal requirements.

1063. During McNealey's tenure as President, Allen University received federal Pell Grant funds on behalf of eligible students, including funds that, after satisfaction of authorized institutional charges, were required to be paid to students as credit-balance refunds.

1064. Allen University students reported that Pell Grant funds remaining after satisfaction of institutional charges were not being released to students entitled to receive those funds.

1065. The failure to release the funds was brought to the attention of Montgomery and members of Defendant BOT by a student with personal knowledge of the circumstances.

1066. As alleged more particularly above, McNealey failed or refused to cause the Pell Grant credit balances to be timely disbursed to students entitled to receive them, notwithstanding the students' entitlement to those funds and their dependence upon such funds for educational and living expenses.

1067. Defendant BOT was thereby placed on notice of concerns regarding Allen University's administration of federal student-aid funds but failed to require an adequate investigation, accounting, or corrective action to determine whether all Pell Grant funds due to students had been properly and timely disbursed.

1068. As alleged more particularly above, after HUD rejected an initial request for reimbursement because the work fell outside the applicable eligibility period, documentation concerning the same work was resubmitted using altered dates in an effort to obtain payment from HUD.

1069. HUD did not approve the requested payment, and the attempted submission exposed Allen University to potential federal scrutiny and jeopardized federal funding intended for the University's benefit.

1070. Members of Defendant BOT were informed of the circumstances surrounding the HUD submission but did not require an independent investigation sufficient to determine who authorized the altered documentation, how it was prepared and submitted, or the extent of Allen University's resulting exposure.

1071. The conduct concerning Pell Grant funds and the HUD grant subjected Allen University to avoidable financial, regulatory, and

institutional risk in connection with federal programs upon which Allen University and its students substantially depended.

1072. Rather than ensuring that federal funds intended for Allen University and its students were administered in accordance with their designated purposes and applicable requirements, Defendants responsible for the University's management and oversight failed to prevent, investigate, or correct the conduct alleged above.

1073. Plaintiffs allege that these failures further demonstrate the consequences of permitting McNealey to exercise control over Allen University's financial affairs without effective independent oversight by Defendant BOT.

**J. Pattern of Racketeering Activity**

1074. Plaintiffs allege that the conduct described above included multiple related acts of racketeering activity within the meaning of 18 U.S.C. §§ 1961 and 1962, occurring over a period of years and involving the use of Allen University's governance, financial systems, charitable fundraising, assets, and federally funded programs.

1075. The alleged predicate acts include acts of mail fraud and wire fraud arising from the schemes alleged herein, including: (a) the solicitation, collection, retention, transfer, and disposition of funds raised in

Allen University's name and for its benefit through the Seventh Episcopal District and Allen Days fundraising, as alleged in Paragraphs 694-848; (b) the transfer and movement of funds through interstate wire transactions in connection with the Waverly Building and NMTC transactions, as alleged in Paragraphs 492-643; and (c) the submission and resubmission of false or misleading documentation in an effort to obtain approximately $4.2 million in federal HUD funding, as alleged in Paragraphs 644-693.

1076. The Allen Days and Seventh Episcopal District fundraising conduct included the solicitation, collection, retention, transfer, and disposition of charitable contributions solicited in Allen University's name and represented to donors and contributors as being raised for Allen University's benefit, while substantial portions of the funds were not transferred to Allen University and their retention and disposition were not disclosed to donors, contributors, or Defendant BOT. [See Allen Days and Seventh Episcopal District Fundraising Allegations, Paragraphs 694-848.]

1077. The alleged acts further include the use of electronic communications, financial transactions, and other interstate instrumentalities in connection with the solicitation, collection, control, transfer, and disposition of funds raised and held for Allen University's benefit, including funds Davis has acknowledged were held "in trust

specifically for Allen University." [See Collection, Control, and Disposition of Funds Raised for Allen University; Davis's Knowledge and Continuation of the Practice, Paragraphs 694-848.]

1078. The alleged acts also include the submission and resubmission of documentation to HUD in an effort to obtain approximately $4.2 million in federal funding for the Waverly Building project after the initial submission was rejected, including the use of altered dates concerning the same work to create the appearance that the expenditures satisfied applicable eligibility requirements. [See HUD Grant Allegations, Paragraphs 644-693.]

1079. The Waverly transactions alleged herein involved the transfer of Allen University's property and the movement of substantial financial resources through entities outside Allen University's ordinary financial structure, including Defendant Foundation, POC, Waverly Owner, WHMM, and WMT. [See Waverly Building and NMTC Transaction Allegations, Paragraphs 492-643.]

1080. Plaintiffs allege that interstate electronic communications, transfers, financial transactions, and other instrumentalities were used in connection with the Waverly transactions and the acquisition, transfer, financing, distribution, and disposition of funds and assets associated with

those transactions. [See Waverly Building and NMTC Transaction Allegations, Paragraphs 492-643.]

1081. The conduct alleged concerning the 501S agreement forms part of the factual circumstances concerning the alleged enterprise and its operation and included materially false representations by McNealey concerning the need to accelerate construction, including his false representation that his continued employment was threatened if the stadium was not completed in 2024, his offer of a $3 million expedite fee despite Allen University's inability to pay it, and his subsequent materially false statements to Defendant BOT concerning who had proposed the fee. [See 50 + 1 Sports–Columbia Contract and Resulting Liability to Allen University, Paragraphs 861–892.]

1082. Plaintiffs further allege that Defendants used their positions within Allen University, Defendant BOT, AMEC, and the Seventh Episcopal District to prevent or impede discovery and independent examination of the financial conduct alleged herein, including by withholding material information from Defendant BOT, providing materially false or inconsistent explanations, refusing or discouraging accountings and investigations, and opposing efforts to obtain independent financial records. [See Individual Trustees' Knowledge; Davis's Knowledge and Continuation of the Practice;

Montgomery's Request for an Accounting and Defendant BOT's Refusal to Investigate, Paragraphs 694-848; Retaliation Against Taylor and Failure to Intervene, Paragraphs 893-938; and Retaliation Against and Purported Removal of Montgomery, Paragraphs 939-1061.]

1083. The retaliation against Taylor and Montgomery, obstruction of Defendant BOT's efforts to obtain information and convene meetings, and refusal to investigate financial discrepancies are alleged as conduct undertaken to prevent or impede effective oversight, investigation, disclosure, and accountability concerning the financial conduct described herein. [See Retaliation Against Taylor and Failure to Intervene Paragraphs 893-938; Retaliation Against and Purported Removal of Montgomery from Defendant BOT, Paragraphs 939-1061.]

1084. The proposed transfer of Allen University real property and other substantial personal benefits to McNealey, despite express objections concerning Defendant BOT's authority and the charitable nature of University assets, further demonstrates the manner in which Defendants exercised control over Allen University's assets and governance for purposes inconsistent with Allen University's interests. [See Improper Compensation, Self-Dealing, and Unauthorized Board Action, Paragraphs 849-860.]

1085. The alleged racketeering acts were related in that they involved overlapping participants, methods, financial structures, purposes, and victims and repeatedly involved the use or control of Allen University's name, assets, governance structure, charitable fundraising, or financial resources.

1086. The alleged acts were not isolated events but occurred over multiple years and involved repeated solicitations, representations, communications, transactions, transfers, and efforts to prevent or impede disclosure or independent review. [See Waverly Building and NMTC Transactions, Paragraphs 492-643; HUD Grant Allegations, Paragraphs 644-693; Allen Days and Seventh Episcopal District Fundraising Allegations, Paragraphs 694-848; and related allegations herein.]

1087. Plaintiffs allege that the related predicate acts described herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961–1962, were related to the purposes and activities alleged herein, and were undertaken in connection with an enterprise affecting interstate commerce.

1088. Plaintiffs allege that the conduct described herein caused the injuries alleged throughout this First Amended Complaint. Allen University suffered financial and property losses, including the deprivation or loss of

money, charitable assets, contractual and financial interests, property, and funds raised or intended for Allen University's benefit. Montgomery separately suffered the individual injuries alleged herein, including injury to her reputation, humiliation, emotional harm, and harm resulting from the retaliatory, bullying, intimidating, and threatening conduct directed against her.

## IX. FRAUD ALLEGATIONS (RULE 9(b))

### A. Fraudulent Scheme Relating to the Waverly Building

1089. Plaintiffs allege the circumstances constituting fraud with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure and incorporate the detailed allegations concerning the Waverly Building and related transactions set forth in Paragraphs 492-643.

1090. As alleged in Paragraphs 492-643, McNealey and Green participated in a series of transactions through which the Waverly Building, previously owned by Allen University free and clear, was transferred from Allen University and used in a financing structure involving Defendant Foundation, POC, Waverly Owner, WHMM, WMT, and other persons and entities identified therein.

1091. McNealey caused or participated in the transfer of the Waverly Building from Allen University to Waverly Owner, an entity he controlled or

caused to be controlled, without disclosing to the full Defendant BOT the material terms and consequences of the transaction or obtaining the authorization alleged herein to have been required for the transfer of Allen University's property.

1092. The Waverly transaction documents further evidence McNealey's personal participation and control. In a single Waverly transaction document, McNealey signed separately on behalf of Allen University and on behalf of each of the five Defendant Waverly entities, executing the same document in six separate representative capacities.

1093. Green knew of and participated in the Waverly transactions and, as Chairman of Defendant BOT and Presiding Bishop of AMEC's Seventh Episcopal District, failed to disclose material information concerning the transactions to the full Defendant BOT despite his knowledge of the transactions and his fiduciary responsibilities to Allen University.

1094. During the August 8, 2024, meeting with Montgomery, Defendant Richburg, and Attorney Shannon Davis, at which the HUD/Waverly and 501S matters were discussed, McNealey represented that Green knew of and approved everything McNealey did.

1095. Plaintiffs allege that McNealey's statement further supports Green's knowledge of and approval of McNealey's conduct concerning the Waverly transactions.

1096. Through the Waverly transactions, the Waverly Building and related financing were used to obtain substantial funds, including approximately $12 million associated with New Markets Tax Credits, together with loans, financing, investments, donations, and other funds alleged more particularly in Paragraphs 492-643.

1097. Funds generated through the Waverly transactions were transferred or distributed among Defendant Foundation, POC, Waverly Owner, WHMM, WMT, and other persons or entities as alleged above, while Allen University did not receive the financial benefit represented by the value of the property and funds generated through the transactions.

1098. At the same time, Allen University incurred substantial financial obligations associated with the Waverly transactions, including mortgage and lease obligations, and approximately $8 million of Allen University's operating funds were used in connection with renovation of the Waverly Building.

1099. McNealey and Green did not disclose to the full Defendant BOT material facts concerning the Waverly transactions, including:

a. the transfer of Allen University's ownership interest in the Waverly Building;

b. the complete financing structure through which the property was transferred, financed, and controlled;

c. the amounts of money obtained through the transactions;

d. the identity of the persons and entities that received or controlled those funds;

e. the amounts distributed to each recipient;

f. the use of Allen University operating funds in connection with renovation of the property; and

g. the financial obligations imposed upon Allen University as a result of the transactions.

1100. The foregoing information was material because Defendant BOT could not meaningfully exercise its authority over Allen University's property and financial affairs without knowing that University property had been transferred, how the transaction had been financed, where the resulting funds had gone, and what financial obligations had been imposed upon Allen University.

1101. McNealey and Green knew the material facts concerning the Waverly transactions that they failed to disclose, including their own

participation in or knowledge of the transactions, and Plaintiffs allege that their omissions were intentional and were made for the purpose of preventing the full Defendant BOT from discovering, investigating, or interfering with the transactions and disposition of the resulting funds.

1102. The concealment continued after questions were raised concerning the Waverly transactions.

1103. McNealey, Green, and other Defendants identified in Paragraphs 492-643 failed or refused to provide the complete financial records, transaction documents, distribution records, and accounting necessary to determine the source, receipt, transfer, and ultimate disposition of the funds associated with the Waverly transactions.

1104. The Flow of Funds documentation for the Waverly transactions reflects that funds generated through the transactions were transferred by wire to multiple parties and entities involved in the Waverly financing structure. Those recipients included financial institutions and entities located outside South Carolina, and the transfers therefore involved the use of interstate wires, as alleged more particularly in Paragraphs 438–589.

1105. The interstate wire transfers were integral to the execution of the Waverly transactions because they were the means by which funds

generated through the financing structure were transferred and distributed among the participating persons and entities, including entities located outside South Carolina, rather than transferred to Allen University, as alleged more particularly in Paragraphs 492-643.

1106. McNealey's and Green's omissions and concealment were material and intentional, and permitted the Waverly transactions and movement of funds to occur without informed consideration, independent scrutiny, or effective intervention by the full Defendant BOT.

1107. As a direct and proximate result of the conduct alleged herein and in Paragraphs 492-643, Allen University lost or was deprived of property and financial interests associated with the Waverly Building and funds generated from the transactions, expended substantial University operating funds, incurred financial obligations, and suffered the additional financial injuries alleged above.

**B. Fraudulent Scheme Relating to HUD Funding**

1108. Plaintiffs incorporate the detailed allegations concerning the approximately $4.2 million in federal HUD funding for the Waverly Building set forth in Paragraphs 644-693.

1109. As alleged therein, approximately $4.2 million in federal funding was secured for Allen University in connection with work associated with the Waverly Building.

1110. An initial submission of documentation was made to HUD seeking payment or reimbursement from the approximately $4.2 million in federal funds for work associated with the Waverly Building.

1111. The initial submission sought federal payment or reimbursement for work performed during dates that did not satisfy the applicable requirements for reimbursement, and HUD rejected or declined the submission on that basis.

1112. After the initial submission was rejected, Sunya Young, with McNealey's knowledge and approval, submitted a second set of documentation to HUD concerning the same work.

1113. The second submission contained different or altered dates for the same work, representing that the work had occurred during a period that would qualify for federal reimbursement.

1114. In discussing the HUD/Waverly matter with Montgomery, McNealey represented that Green knew of and approved everything McNealey did.

1115. Plaintiffs allege that McNealey's statement further supports Green's knowledge of and approval of McNealey's conduct concerning the HUD/Waverly matter, including the conduct alleged herein.

1116. Plaintiffs allege that the changed dates were materially false because they altered when the same work was represented as having been performed and were used to create the appearance that expenditures previously determined to fall outside the eligible period satisfied the requirements for payment from the approximately $4.2 million in federal funds.

1117. McNealey knew of and approved Young's submission of the revised documentation and knew that the dates associated with the work had been changed from those reflected in the prior submission.

1118. Plaintiffs allege that McNealey approved the second submission for the purpose of obtaining HUD approval of federal funding for expenditures that had not qualified for payment based upon the dates previously submitted.

1119. HUD did not approve payment based upon the resubmitted documentation and refused payment, as alleged more particularly in Paragraphs 644-693.

1120. The submission and resubmission of documentation to HUD were undertaken in connection with an effort to obtain approximately $4.2 million in federal funds.

1121. The second submission, made by Young with McNealey's knowledge and approval, used the revised dates described above in an effort to obtain federal payment that had not been approved based upon the dates previously submitted.

1122. Plaintiffs allege that the foregoing conduct constituted an intentional effort to obtain federal funds through materially false representations concerning facts necessary to establish eligibility for payment and that McNealey acted with knowledge of and approved the material alteration of the dates contained in the resubmitted documentation.

**C. Fraudulent Scheme Relating to Allen Days and Seventh Episcopal District Fundraising**

1123. Plaintiffs incorporate the detailed allegations concerning the solicitation, collection, control, retention, transfer, and disposition of funds raised in Allen University's name and for its benefit through the Seventh Episcopal District and Allen Days fundraising set forth in Paragraphs 694-848.

1124. During Allen Days and related fundraising conducted through AMEC's Seventh Episcopal District, churches, clergy, congregations, donors, and other contributors were solicited to contribute funds represented as being raised for Allen University and for the University's benefit.

1125. Substantial amounts were publicly reported as having been raised for Allen University through those fundraising activities, including amounts announced or reported in connection with the Annual Conferences and Allen Days events alleged in Paragraphs 694-848.

1126. Funds solicited and collected in Allen University's name were controlled outside Allen University's ordinary financial system, and contributors were not informed that funds represented as being raised for Allen University were being retained outside the University, divided among other entities, or otherwise not transferred in full to Allen University.

1127. As alleged more particularly in Paragraphs 694-848, Davis subsequently acknowledged that funds raised for Allen University had been held "in trust specifically for Allen University," further confirming that the funds were collected and held for Allen University's benefit.

1128. Green, while serving as Presiding Bishop of the Seventh Episcopal District and Chairman of Defendant BOT, knew of and exercised

authority over the fundraising and collection practices through which funds were solicited in Allen University's name and for its benefit, as alleged more particularly in Paragraphs 694-848.

1129. Davis, after succeeding Green as Presiding Bishop and Chairman of Defendant BOT, learned that funds raised in connection with Allen Days had not been transferred in full to Allen University and that the funds had instead been divided among multiple entities.

1130. Before disclosing that information to Defendant BOT, Davis represented to Montgomery and other trustees in September 2024 that the Allen Days funds had been given to Allen University, although not in the form of scholarships.

1131. Plaintiffs allege that Davis's representation was knowingly false because, before making it, Davis had discussed the disposition of the Allen Days funds with McNealey and knew that the funds had been divided among four entities rather than transferred in full to Allen University.

1132. Davis had also proposed to McNealey that, going forward, funds raised in connection with Allen Days be divided between Allen University and another entity, further demonstrating his knowledge that funds raised in Allen University's name were not necessarily being transferred in full to the University.

1133. When Montgomery continued seeking an accounting of the difference between the amounts publicly represented as having been raised for Allen University and the substantially smaller amounts reflected in Allen University's financial information, Davis did not provide an accounting and instead discouraged or opposed further investigation, as alleged in Paragraphs 694-848.

1134. The fundraising and disposition practices alleged herein involved electronic communications, fundraising communications, financial transactions, and transfers used to solicit, collect, control, transfer, or retain funds represented as being raised for Allen University's benefit.

1135. Plaintiffs allege that the representations that contributions were being raised for Allen University were material to donors and contributors because those representations identified the intended charitable beneficiary of their contributions and were capable of influencing whether and for what purpose contributors donated their money.

1136. Plaintiffs further allege that the failure to disclose that funds raised in Allen University's name would be retained outside Allen University, divided among other entities, or otherwise not transferred in full to Allen University was material to donors, contributors, Allen University, and Defendant BOT.

1137. Plaintiffs allege that the representations and omissions concerning the intended beneficiary, collection, retention, and disposition of the funds enabled the continued solicitation and collection of contributions in Allen University's name while preventing donors, contributors, Allen University, and Defendant BOT from knowing the complete disposition of the funds.

1138. As a direct and proximate result of the conduct alleged herein and in Paragraphs 694-848, Allen University was deprived of funds raised in its name and for its benefit and of the use and benefit of those funds, and the amount and ultimate disposition of funds retained outside Allen University remain unaccounted for as alleged herein.

## X. RICO ENTERPRISE AND PATTERN OF RACKETEERING ACTIVITY

### A. The Enterprise

1139. Plaintiffs allege the existence of an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), consisting of persons and entities associated through Allen University's governance, financial affairs, charitable fundraising, affiliated entities, and related financial transactions, as alleged herein.

1140. The enterprise included:

a. **McNealey**, who exercised substantial authority over Allen University's operations and financial affairs and over the Waverly entities as alleged herein;

b. **Green,** who served as Chairman of Defendant BOT, Presiding Bishop of AMEC's Seventh Episcopal District, and President of Defendant Vision Center during substantial portions of the conduct alleged herein;

c. **Davis**, who succeeded Green as Chairman of Defendant BOT, Presiding Bishop of the Seventh Episcopal District and President of Vision Center;

d. **Defendant AMEC** and **Defendant Council of Bishops**, to the extent of their participation in, authority over, or relationship to the conduct specifically alleged herein;

e. **Defendant BOT** and the **individually named trustee Defendants**, to the extent of their respective participation in the conduct specifically attributed to them herein;

f. **Defendant Foundation, POC, Waverly Owner, WHMM**, and **WMT**, which participated in the Waverly ownership, financing, transfer, receipt, or disposition of property and funds alleged herein;

g. **Defendant Vision Center**, to the extent of its participation in or receipt, control, or use of funds as specifically alleged herein; and

h. other persons or entities whose participation in the affairs of the enterprise is specifically alleged in this First Amended Complaint.

1141. Allen University constituted the principal institution through whose governance structure, property, charitable identity, financial resources, and operations substantial portions of the enterprise's activities were conducted, while Allen University itself was also an alleged victim of the conduct described herein.

1142. The persons and entities associated with the enterprise were connected through:

a. Allen University's governance structure and Defendant BOT;

b. AMEC and the Seventh Episcopal District;

c. the Waverly entities and transactions;

d. fundraising conducted in Allen University's name and for its benefit;

e. the control, transfer, financing, receipt, or disposition of Allen University's property and financial resources; and

f. efforts to prevent or impede independent investigation, disclosure, or accountability concerning the financial conduct alleged herein.

g. the simultaneous service of Green and, subsequently, Davis as Presiding Bishop of the Seventh Episcopal District, Chairman of Defendant BOT, and President of Defendant Vision Center.

1143. The enterprise had purposes extending beyond the commission of any single alleged predicate act, including:

a. maintaining control over Allen University's governance and financial systems;

b. obtaining, controlling, transferring, or diverting money and assets associated with Allen University;

c. concealing or preventing independent examination of material financial transactions;

d. maintaining control over funds solicited or held for Allen University's benefit; and

e. preserving the participants' ability to continue exercising control over those activities.

1144. The enterprise possessed sufficient longevity to permit its associates to pursue those purposes and functioned as a continuing unit over a period of years through recurring governance, fundraising, financial, property, and institutional activities.

1145. The enterprise affected interstate commerce through:

a. interstate wire transfers and financial transactions associated with the Waverly transactions;

b. transactions involving entities organized or operating in multiple states;

c. federal HUD funding;

d. New Markets Tax Credit transactions;

e. charitable fundraising and related financial transactions; and

f. interstate electronic communications and other interstate financial activities alleged herein.

**B. Conduct and Participation in the Enterprise**

1146. Plaintiffs allege that McNealey, Green, Davis, and the other Defendants identified herein participated, to differing degrees and through the conduct specifically attributed to them, in the operation or management of the enterprise's affairs.

1147. McNealey exercised substantial authority over Allen University's operations and financial affairs and, as alleged in Paragraphs 492-643, simultaneously exercised authority over the Waverly entities used in transactions involving Allen University's property and financial resources.

1148. McNealey's simultaneous authority is reflected in the Waverly transaction documentation in which, on a single transaction document, he

signed separately on behalf of Allen University and each of the five Defendant Waverly entities, executing the same document in six separate representative capacities.

1149. Green exercised authority through his simultaneous positions as Presiding Bishop of AMEC's Seventh Episcopal District, Chairman of Defendant BOT, and President of Defendant Vision Center and, as alleged herein, knew of, approved, participated in, facilitated, or permitted material financial activities involving Allen University, including conduct concerning the Waverly transactions.

1150. As further alleged herein, during the August 8, 2024, meeting at which the HUD/Waverly and 501S matters were discussed, McNealey represented that Green knew of and approved everything McNealey did, further supporting Plaintiffs' allegations concerning Green's knowledge of and approval of McNealey's conduct concerning those matters.

1151. Davis succeeded Green as Presiding Bishop of AMEC's Seventh Episcopal District, Chairman of Defendant BOT, and President of Defendant Vision Center and thereafter simultaneously exercised authority through those positions concerning Allen University's governance, Seventh Episcopal District financial and fundraising activities, Defendant Vision Center, and Defendant BOT's response to the financial matters alleged

herein, including decisions concerning investigation, accounting, Board meetings, and continued oversight of McNealey.

1152. The roles of the remaining Defendants in the enterprise are alleged according to their respective conduct, knowledge, participation, votes, financial activities, receipt or control of funds or assets, and other actions specifically attributed to them throughout this First Amended Complaint.

**C. Pattern of Racketeering Activity**

1153. Plaintiffs allege that persons associated with the enterprise conducted or participated in its affairs through a pattern of racketeering activity consisting of related acts indictable as mail fraud and wire fraud under 18 U.S.C. §§ 1341 and 1343, as alleged more particularly throughout this First Amended Complaint and in the Rule 9(b) allegations above.

1154. The alleged pattern of racketeering activity includes related acts arising from:

a. the Waverly Building and NMTC transactions, through which Allen University's property was transferred and used in a multi-entity financing structure, substantial funds were generated and distributed, and material information concerning the transactions and disposition of funds was allegedly concealed;

b. the HUD funding scheme, involving the submission and resubmission of documentation in an effort to obtain approximately $4.2 million in federal funding, including the second submission containing changed dates for the same work;

c. the Allen Days and Seventh Episcopal District fundraising scheme, through which funds were repeatedly solicited and collected in Allen University's name and represented as being raised for Allen University's benefit while substantial portions allegedly were not transferred to Allen University; and

d. the uses of the mails, interstate wires, electronic communications, financial transactions, and transfers alleged herein in furtherance of those schemes.

**1. Waverly Building and NMTC Transactions**

1155. As alleged in Paragraphs 492-643 and the Rule 9(b) allegations above, the Waverly scheme included:

a. the transfer of Allen University's Waverly property from the University's direct ownership or control;

b. the use of Defendant Foundation, POC, Waverly Owner, WHMM, and WMT in the ownership, financing, transfer, receipt, control, or disposition of property and funds;

c. the generation of substantial funds through financing, loans, investments, donations, New Markets Tax Credit transactions, and other sources;

d. the transfer and distribution of funds among multiple persons and entities;

e. the use of substantial Allen University operating funds in connection with renovation of the property;

f. the imposition of substantial financial obligations upon Allen University; and

g. the alleged concealment or nondisclosure of material information concerning the transactions, funds, distributions, and obligations from the full Defendant BOT.

1156. The Flow of Funds documentation reflects that funds generated through the Waverly transactions were transferred by wire to multiple parties and entities participating in the financing structure.

1157. The Waverly transactions involved:

a. wire transfers and financial transactions involving multiple persons and entities;

b. entities organized or located in multiple states, including entities organized under Delaware law;

c. financial institutions operating across state lines;

d. New Market Tax Credit financing; and

e. other interstate financial activities alleged herein.

1158. Plaintiffs allege that the interstate wire transfers and related communications and transactions were integral to the execution of the Waverly scheme because they were used to obtain, transfer, distribute, finance, or otherwise control funds and assets associated with the Waverly transactions.

**2. HUD Funding Scheme**

1159. As alleged in Paragraphs 644-693 and the Rule 9(b) allegations above, the HUD scheme involved an effort to obtain approximately $4.2 million in federal funds for work associated with the Waverly Building.

1160. The HUD scheme included:

a. an initial submission seeking federal payment or reimbursement for work performed during dates that did not satisfy applicable requirements;

b. HUD's rejection or refusal of payment based upon the initial submission;

c. a second submission concerning the same work containing different or altered dates;

d. submission of the revised documentation by Sunya Young with McNealey's knowledge and approval; and

e. McNealey's alleged knowledge that the dates had been changed and approval of the second submission for the purpose of obtaining federal payment that had not been approved based upon the dates previously submitted.

1161. Plaintiffs allege that the revised dates were material because they were used to create the appearance that expenditures previously determined to fall outside the eligible period satisfied the requirements for payment from the approximately $4.2 million in federal funds.

**3. Allen Days and Seventh Episcopal District Fundraising**

1162. As alleged in Paragraphs 694-848 and the Rule 9(b) allegations above, the Allen Days and Seventh Episcopal District fundraising scheme involved:

a. repeated solicitation of churches, clergy, congregations, donors, and contributors for funds represented as being raised for Allen University and for its benefit;

b. public reporting of substantial amounts as having been raised for Allen University;

c. collection and control of funds outside Allen University's ordinary financial system;

d. Allen University's receipt of substantially less money than the amounts publicly represented as having been raised for its benefit;

e. retention, division, transfer, or disposition of portions of those funds outside Allen University;

f. failure to provide a complete accounting of the difference between the amounts represented as having been raised and the amounts received by Allen University; and

g. representations and omissions concerning the collection, control, retention, transfer, and disposition of those funds.

1163. The Allen Days fundraising and disposition practices involved:

a. electronic and fundraising communications;

b. financial transactions and transfers;

c. repeated solicitations conducted through the Seventh Episcopal District;

d. funds represented as being raised for Allen University's benefit; and

e. the collection, control, transfer, retention, or disposition of those funds as alleged herein.

1164. Plaintiffs allege that the representations concerning the intended beneficiary of the contributions and the omissions concerning the retention and disposition of those funds were material because they were capable of influencing whether donors contributed money and the charitable purpose for which those contributions were made.

1165. Plaintiffs allege that the foregoing Waverly, HUD, and Allen Days conduct involved repeated uses of the mails and interstate wires in furtherance of the alleged schemes and constitutes racketeering activity within the meaning of 18 U.S.C. § 1961(1), to the extent specifically alleged herein.

1166. Plaintiffs allege that the Waverly, HUD, and Allen Days schemes were not isolated or unrelated activities but formed part of a broader course of conduct involving overlapping participants, Allen University's governance and financial systems, the use or control of Allen University's property, funds, name, and charitable identity, and efforts to prevent effective oversight and accountability.

1167. The 501S conduct, retaliation against Taylor and Montgomery, obstruction of Board oversight, and refusal to investigate the financial

matters alleged herein further demonstrate the relationships among the participants and the means by which scrutiny of the alleged financial conduct was resisted or impeded.

**D. Relatedness and Continuity**

1168. The alleged predicate acts were related because they:

a. involved overlapping participants;

b. repeatedly involved Allen University's name, property, charitable identity, governance structure, or financial resources;

c. involved related purposes of obtaining, controlling, transferring, retaining, or disposing of money or property associated with Allen University;

d. utilized recurring methods involving representations, omissions, financial transactions, communications, and transfers; and

e. involved efforts to conceal, prevent investigation of, or avoid accountability concerning the underlying financial activities.

1169. The alleged predicate acts were not isolated events but occurred over multiple years and involved:

a. repeated financial transactions and transfers;

b. repeated charitable solicitations;

c. multiple representations and omissions;

d. multiple persons and entities;

e. federal and multistate financial transactions; and

f. recurring efforts to prevent or impede independent examination of the conduct alleged herein.

1170. Plaintiffs allege that the duration, repetition, number of transactions and communications, involvement of multiple persons and entities, and recurrence of the alleged conduct establish closed-ended continuity.

1171. Plaintiffs further allege open-ended continuity because:

a. the persons associated with the enterprise continued to exercise substantial authority over Allen University's governance, finances, fundraising, property, or institutional affairs;

b. the alleged activities formed part of recurring methods of conducting financial and governance affairs rather than a single completed transaction; and

c. absent investigation, intervention, or judicial relief, the manner in which the enterprise operated presented a threat that the alleged conduct would continue.

**E. Concealment, Retaliation, and Protection of the Enterprise's Activities**

1172. In addition to the predicate acts alleged above, Plaintiffs allege that Defendants engaged in conduct intended to prevent or impede discovery, investigation, disclosure, or accountability concerning the enterprise's financial activities, including:

a. withholding material financial information from Defendant BOT;

b. refusing or discouraging accountings and independent investigations;

c. preventing or obstructing Board meetings and inquiries;

d. providing materially false or inconsistent information concerning financial and contractual matters;

e. opposing efforts to obtain independent documentation concerning transactions and funds;

f. voting against investigation of financial matters after being placed on notice of alleged discrepancies;

g. retaliation against Taylor after he provided information to Defendant BOT contradicting McNealey; and

h. obstruction of Montgomery's efforts to obtain information, accountings, investigation, and independent oversight, followed by her purported removal from Defendant BOT.

1173. The conduct concerning the 501S agreement included McNealey's materially false and inconsistent representations to Defendant BOT concerning:

a. whether he had offered the $3 million expedite fee;

b. who had proposed the fee;

c. Allen University's obligation under the amended MOU; and

d. related matters alleged in the 501S factual allegations above.

1174. Plaintiffs allege that the retaliation against Taylor after he provided truthful information to Defendant BOT, together with the failure of Davis, Defendant BOT, Defendant AMEC, and Defendant Council of Bishops to intervene despite advance notice of the retaliation and resulting risk to Allen University, impaired effective oversight and accountability concerning matters affecting Allen University.

1175. Plaintiffs further allege that the obstruction of Montgomery's efforts to:

a. obtain financial records and supporting documentation;

b. obtain accountings;

c. convene meetings of Defendant BOT;

d. obtain independent investigation of the Waverly, Allen Days, 501S, and related matters;

e. report concerns to Defendant AMEC and Defendant Council of Bishops; and

f. obtain independent oversight and corrective action,

followed by Montgomery's purported removal from Defendant BOT, further impaired independent examination and scrutiny of the financial activities alleged herein.

1176. Plaintiffs do not rely upon retaliation, governance failures, refusal to investigate, or the 501S contractual conduct as independent predicate acts except to the extent particular conduct independently satisfies 18 U.S.C. § 1961(1).

1177. Rather, Plaintiffs allege those facts as evidence concerning the enterprise's operation, concealment, protection, purpose, continuity, and the knowledge and participation of the persons associated with it.

**F. Injury to Business or Property**

1178. As a direct and proximate result of the alleged racketeering activity, Allen University suffered injury to its business and property, including:

a. loss or deprivation of University property and financial interests;

b. loss or deprivation of funds raised, solicited, collected, or held for its benefit;

c. loss of the use and benefit of those funds;

d. expenditure of substantial University operating funds in connection with the Waverly Building;

e. financial obligations associated with the Waverly transactions;

f. depletion or impairment of University assets and financial resources; and

g. the additional financial and property injuries alleged throughout this First Amended Complaint.

1179. Montgomery suffered the injuries alleged throughout this First Amended Complaint. To the extent Montgomery seeks relief under 18 U.S.C. § 1964(c), she alleges injury to business or property directly and proximately caused by the alleged racketeering activity, separate from personal injuries, emotional distress, humiliation, reputational injury, and other non-property injuries for which relief is sought under other applicable claims.

1180. Plaintiffs allege that the foregoing injuries were not merely derivative of injury to the public generally but resulted from the particular financial transactions, transfers, solicitations, representations, and conduct directed toward or affecting Plaintiffs and their respective business or property interests as alleged herein.

# XI. CAUSES OF ACTION

## COUNT I

## RETALIATION IN VIOLATION OF THE FALSE CLAIMS ACT

## 31 U.S.C. § 3730(h)

**(Direct Claim by Plaintiff Montgomery Against Defendants McNealey, Green, Davis, BOT, the Trustee Defendants, AMEC, Council of Bishops, and Other Defendants Shown to Have Participated in or Caused the Retaliatory Conduct Alleged Herein)**

1181. Plaintiff Karol Widemon Montgomery repeats and realleges the preceding paragraphs of this First Amended Complaint as though fully set forth herein.

1182. The False Claims Act ("FCA"), 31 U.S.C. § 3730(h), protects an employee, contractor, or agent from discharge, suspension, threats, harassment, or other discrimination because of lawful acts undertaken in furtherance of an action under the FCA or other efforts to stop one or more violations of the FCA.

1183. Section 3730(h) authorizes all relief necessary to make a person subjected to prohibited retaliation whole, including reinstatement and the additional relief provided by statute.

**A. Montgomery's Status and Protected Activity**

1184. At all relevant times, Montgomery served as an elected member of Defendant BOT and acted as an agent and fiduciary of Allen University in carrying out her responsibilities to oversee, protect, and safeguard Allen University's financial, charitable, institutional, and federal-funding interests.

1185. In that capacity, Montgomery received and developed information raising substantial concerns concerning Allen University's effort to obtain approximately $4.2 million in federal HUD funding associated with the Waverly Building.

1186. As alleged more particularly in the HUD Grant Allegations, the initial documentation submitted to HUD sought federal payment or reimbursement for work performed during dates that did not satisfy the applicable requirements, and HUD rejected or declined payment based upon that submission.

1187. Thereafter, Sunya Young, with McNealey's knowledge and approval, submitted a second set of documentation concerning the same work that contained different or altered dates representing that the work had been performed during a period that would qualify for federal reimbursement.

1188. Montgomery learned information concerning the HUD matter and undertook efforts to investigate, address, correct, report, and prevent Allen University from obtaining or attempting to obtain federal funds through documentation that she reasonably believed contained materially false information concerning eligibility for federal payment.

1189. Montgomery's protected activities included, but were not limited to:

a. seeking information and documentation concerning the HUD funding and related Waverly transactions;

b. questioning representations concerning the eligibility of expenditures submitted for federal reimbursement;

c. investigating the circumstances surrounding the submission and resubmission of documentation to HUD;

d. seeking explanations from McNealey and others concerning the HUD matter;

e. proposing corrective measures intended to resolve the HUD problem and prevent further exposure to Allen University;

f. requesting investigation and appropriate action by Defendant BOT;

g. seeking independent review, transparency, and accountability concerning the matters she identified;

h. reporting her concerns to AMEC and the Council of Bishops when Allen University's internal governance mechanisms failed to address them; and

i. cooperating with and providing information to federal law-enforcement authorities concerning matters involving Allen University.

1190. Montgomery undertook these actions for the purpose of investigating, preventing, correcting, reporting, and stopping conduct that she reasonably believed involved an effort to obtain federal funds through materially false representations concerning eligibility for payment.

1191. Montgomery's actions constituted lawful efforts to stop one or more violations of the False Claims Act within the meaning of 31 U.S.C. § 3730(h).

**B. Defendants' Knowledge**

1192. McNealey, Green, Davis, members of Defendant BOT, Defendant AMEC, Defendant Council of Bishops, and the other Defendants identified in the retaliation allegations knew that Montgomery was investigating, questioning, reporting, and seeking corrective action concerning the HUD matter, including the effort to obtain approximately $4.2 million in federal funding through the submission and resubmission of

documentation concerning the Waverly Building, as well as the related financial and governance matters alleged herein.

1193. Montgomery repeatedly sought records, explanations, accountings, Board meetings, independent investigation, and corrective action and communicated her concerns to persons exercising authority over Allen University's governance and financial affairs.

1194. Defendants' knowledge of Montgomery's protected activities increased as Montgomery continued seeking investigation and corrective action concerning the HUD matter, challenged efforts to prevent Defendant BOT from investigating the matters she raised, reported her concerns outside Allen University's internal governance structure, and ultimately cooperated with federal law enforcement concerning matters she had investigated as a trustee.

**C. Retaliatory Conduct**

1195. Following and because of Montgomery's protected activities, Defendants subjected Montgomery to escalating resistance, intimidation, threats, humiliation, obstruction, and retaliation, as alleged more particularly in the Retaliation Against and Purported Removal of Montgomery allegations.

1196. Defendants' retaliatory conduct included obstructing Montgomery's efforts to obtain information and convene meetings, publicly criticizing and humiliating her, falsely accusing her of improper conduct, opposing efforts to investigate the matters she raised, interfering with her ability to perform her duties as a trustee, and ultimately taking action to unlawfully remove her from Defendant BOT.

1197. Montgomery subsequently cooperated with the Federal Bureau of Investigation and was interviewed by an FBI Special Agent concerning matters involving Allen University.

**D. March 20, 2025 Special Meeting and Purported Removal**

1198. On March 20, 2025, Davis caused Defendant BOT to assemble for a purported Special Meeting.

1199. Neither the written notice of the purported Special Meeting nor the subsequently provided agenda identified Montgomery's purported removal, disciplinary action against Montgomery, her continued qualification to serve as a trustee, or any purported cause for her removal as business to be considered or voted upon at the meeting.

1200. During the Special Meeting, Davis asked the members of Defendant BOT whether any trustee had been contacted by the FBI.

1201. Montgomery truthfully disclosed that she had been interviewed by an FBI Special Agent concerning matters involving Allen University.

1202. Less than thirty minutes later, Curry proposed or recommended Montgomery's "removal" purportedly "for cause," and Defendant BOT proceeded to consider and vote upon Montgomery's purported removal.

1203. Montgomery's purported removal occurred after months of opposition to and retaliation for her efforts to investigate and obtain corrective action concerning the conduct alleged herein and immediately after she disclosed to Defendant BOT that she had been interviewed by the FBI.

1204. Montgomery's purported removal prevented her, as a practical matter, from continuing as a sitting trustee to demand records, seek investigations, participate in Defendant BOT's oversight, and pursue corrective action concerning the conduct she had been investigating.

**E. Causation**

1205. The temporal sequence and circumstances alleged herein, including Defendants' knowledge of Montgomery's continuing investigations and efforts to obtain corrective action, the escalating retaliation directed against her, her cooperation with federal law enforcement, her disclosure

during the March 20, 2025 Special Meeting that she had been interviewed by the FBI, and the ensuing action to remove her, support the inference that Montgomery's protected activities were a cause of the adverse actions taken against her.

1206. Plaintiffs allege that Montgomery's purported removal was not an independent or unrelated governance decision, but the culmination of Defendants' escalating efforts to prevent her from investigating, exposing, reporting, and seeking corrective action concerning the financial and federal-funding conduct alleged herein.

1207. By discriminating and retaliating against Montgomery because of her lawful acts undertaken in furtherance of efforts to investigate, prevent, correct, report, or stop conduct she reasonably believed violated the False Claims Act, the responsible Defendants violated 31 U.S.C. § 3730(h).

**F. Injury and Statutory Relief**

1208. As a direct and proximate result of the retaliation alleged herein, Montgomery suffered loss of her position, status, rights, and authority as a trustee; interference with her ability to carry out her fiduciary and oversight responsibilities; damage to her reputation; humiliation and

emotional harm; and the other injuries and special damages alleged throughout this First Amended Complaint.

1209. Pursuant to 31 U.S.C. § 3730(h)(2), Montgomery is entitled to all relief necessary to make her whole, including reinstatement, together with all other relief authorized by statute.

1210. Montgomery therefore seeks immediate reinstatement to Defendant BOT, restoring her to the position, status, rights, authority, and term of service she would have possessed but for Defendants' retaliatory conduct.

1211. Montgomery further seeks preliminary and permanent injunctive relief necessary to prevent Defendants from continuing to give effect to the action purporting to remove her or otherwise interfering with her reinstatement and exercise of the rights and responsibilities attendant to her position as a trustee.

1212. Montgomery additionally seeks all damages, costs, attorneys' fees to the extent recoverable, and other relief authorized by 31 U.S.C. § 3730(h).

1213. WHEREFORE, Plaintiff Montgomery respectfully requests judgment in her favor and against Defendants McNealey, Green, Davis, BOT, the Trustee Defendants, AMEC, Council of Bishops, and any other

Defendant shown to have participated in or caused the retaliation alleged herein, including:

a. immediate reinstatement of Montgomery to Defendant BOT;

b. preliminary and permanent injunctive relief necessary to effectuate and protect her reinstatement;

c. all compensatory and special damages recoverable under 31 U.S.C. § 3730(h);

d. litigation costs and reasonable attorneys' fees to the extent recoverable;

e. declaratory relief; and

f. such other relief as the Court deems just and proper.

**COUNT II**

**BREACH OF FIDUCIARY DUTY**

**(Derivative on Behalf of Allen University Against Defendants McNealey, Green, Davis, Anderson, Britton, Curry, Goff, Keith, Parrott, Richburg, Scott, and Temoney)**

**A. Existence of Fiduciary Duties**

1214. Plaintiff Karol Widemon Montgomery, derivatively on behalf of Allen University, repeats and realleges the preceding allegations of this First Amended Complaint, including the Standing allegations in Paragraphs

234–298 and the Derivative Allegations in Paragraphs 299–333, as if fully set forth herein.

1215. At all relevant times, Defendants McNealey, Green, Davis, Anderson, Britton, Curry, Goff, Keith, Parrott, Richburg, Scott, and Temoney served as officers and/or members of Defendant BOT and occupied positions of trust and responsibility concerning Allen University's governance, property, finances, charitable assets, institutional affairs, and legal obligations.

1216. By virtue of those positions and responsibilities, the foregoing Defendants owed fiduciary duties to Allen University, including duties of loyalty, care, good faith, candor and disclosure, obedience to governing law and governing documents, protection of charitable and institutional assets, and faithful administration of the University's affairs in Allen University's best interests.

1217. Those fiduciary obligations included, as applicable to each Defendant, duties to:

a. safeguard Allen University's property, funds, and other assets;

b. exercise appropriate oversight over the University's financial and institutional affairs;

c. disclose material information concerning transactions affecting University property, finances, liabilities, and legal interests;

d. avoid or appropriately disclose and address conflicts of interest and self-dealing;

e. investigate credible information concerning misuse, diversion, fraud, financial irregularities, or other misconduct affecting Allen University;

f. prevent or remedy the unauthorized transfer, diversion, dissipation, or misuse of University and charitable assets; and

g. act in accordance with Allen University's governing documents and in the University's best interests.

1218. McNealey owed fiduciary duties to Allen University arising from his service as President and his exercise of authority over the University's assets, finances, contracts, personnel, institutional affairs, and transactions.

1219. Green and Davis owed fiduciary duties to Allen University arising from their respective service as Chairmen of Defendant BOT and their exercise of authority and control over Allen University's governance and financial affairs.

1220. Green and Davis simultaneously occupied multiple positions through which they exercised or possessed authority affecting Allen University, including their respective positions as Presiding Bishop of AMEC's Seventh Episcopal District, Chairman of Defendant BOT, and President of Defendant Vision Center, as alleged more particularly herein.

1221. Plaintiffs allege that those overlapping positions created or presented conflicts of interest requiring heightened disclosure, independent consideration, and faithful protection of Allen University's interests where transactions, funds, decisions, or entities implicated more than one of the institutions over which Green or Davis exercised authority.

1222. Green's and Davis's authority and influence over Allen University's governance were not limited to their positions as Chairmen of Defendant BOT.

1223. As alleged more particularly herein, each simultaneously served as Presiding Bishop of AMEC's Seventh Episcopal District and exercised ecclesiastical authority and influence associated with that office while serving as Chairman of Defendant BOT and President of Defendant Vision Center.

1224. Plaintiffs allege that Green and Davis used the authority, influence, and relationships associated with their AMEC positions in

connection with their exercise of control over Allen University's governance, trustees, finances, and institutional affairs.

1225. Anderson, Britton, Curry, Goff, Keith, Parrott, Richburg, Scott, and Temoney owed fiduciary duties to Allen University by virtue of their service as members of Defendant BOT and their participation in the governance and oversight of the University.

**B. Breaches of Fiduciary Duty**

1226. Plaintiffs allege that the foregoing Defendants breached their respective fiduciary duties through the acts and omissions alleged throughout this First Amended Complaint. The nature and extent of each Defendant's breach depended upon that Defendant's position, knowledge, participation, authority, votes, omissions, conflicts, and response to information brought before Defendant BOT.

**1. Waverly Property, Financing, and University Assets**

1227. As alleged more particularly in the Waverly allegations, McNealey caused, participated in, authorized, executed, or exercised control over transactions through which Allen University's Waverly property, previously owned by the University free and clear, was transferred, encumbered, financed, or otherwise used through Defendant Foundation, POC, Waverly Owner, WHMM, WMT, and related entities.

1228. McNealey executed transaction documents on behalf of Allen University and the five Defendant entities involved in the Waverly structure, signing the same transaction documentation in multiple representative capacities, as alleged more particularly herein.

1229. Plaintiffs allege that McNealey's simultaneous execution of transaction documents for Allen University and the other entities participating in the transaction presented substantial conflicts between Allen University's interests and the interests of the entities on whose behalf he simultaneously acted.

1230. Plaintiffs allege that Green knew of and approved McNealey's conduct concerning the Waverly transactions, including as reflected by McNealey's representation that Green knew of and approved what McNealey had done concerning Waverly.

1231. Plaintiffs further allege that material information concerning the ownership structure, financing, receipt and distribution of proceeds, use of Allen University operating funds, mortgage and lease obligations, and other consequences of the Waverly transactions was not fully disclosed to Defendant BOT.

1232. The trustee Defendants breached their respective fiduciary duties to the extent alleged herein by failing to investigate, obtain an

independent accounting, require disclosure of material transaction documents and financial information, remedy conflicts of interest, recover or protect University assets, or otherwise take appropriate action after acquiring knowledge of the Waverly transactions and the financial concerns associated with them.

**2. HUD Federal Funding**

1233. As alleged more particularly in the HUD allegations, documentation was submitted and subsequently resubmitted to HUD in an effort to obtain approximately $4.2 million in federal funding associated with the Waverly Building.

1234. After the initial submission failed to qualify for reimbursement based upon the dates of the work reflected therein, a second submission concerning the same work contained changed dates and was submitted by Sunya Young with McNealey's knowledge and approval.

1235. Plaintiffs allege that McNealey breached his fiduciary duties to Allen University by knowingly approving the resubmission of documentation containing materially changed or altered dates concerning the same work in an effort to obtain federal funds and thereby exposing Allen University to potential investigation, loss of federal funding, regulatory consequences, reputational injury, and other institutional harm.

1236. Plaintiffs further allege that Green knew of and approved McNealey's conduct concerning the HUD matter, as alleged more particularly herein.

1237. The trustee Defendants breached their respective fiduciary duties to the extent alleged herein by failing to undertake or require an independent investigation, corrective action, disclosure, or other appropriate response after receiving information concerning the HUD submissions and the circumstances surrounding the changed dates.

**3. Allen Days and Seventh Episcopal District Fundraising**

1238. As alleged more particularly in the Allen Days and Seventh Episcopal District fundraising allegations, substantial charitable contributions were solicited and collected in Allen University's name and represented as being raised for Allen University's benefit, while Allen University's financial records reflected receipt of substantially less than the amounts publicly represented as having been raised.

1239. Green knew of, participated in, exercised authority over, or permitted the fundraising and collection practices alleged herein while simultaneously serving as Presiding Bishop of the Seventh Episcopal District, Chairman of Defendant BOT, and President of Defendant Vision Center.

1240. Davis subsequently acquired knowledge that funds raised for Allen University had not been transferred in full to the University and had been divided among multiple entities, and acknowledged that funds had been held "in trust specifically for Allen University," as alleged more particularly herein.

1241. Plaintiffs allege that Green and Davis breached their fiduciary duties by failing to ensure that funds solicited and held for Allen University's benefit were properly accounted for, transferred, protected, and used for Allen University's benefit and by failing to provide or require a complete accounting concerning the disposition of those funds.

1242. The trustee Defendants breached their respective fiduciary duties to the extent alleged herein by failing or refusing to investigate discrepancies between the amounts represented as having been raised for Allen University and the amounts reflected as received by the University and by voting or otherwise acting to prevent or terminate meaningful investigation of those discrepancies.

**4. Contractual and Employment-Related Liability**

1243. Defendants' fiduciary breaches further included conduct that exposed Allen University to substantial contractual and employment-related liabilities.

1244. As alleged more particularly in the 50 + 1 Sports–Columbia allegations, McNealey caused Allen University to enter into or undertake contractual obligations, including the $3 million expedite-fee obligation, under circumstances in which Plaintiffs allege he knew Allen University lacked the financial ability to satisfy the obligation as represented, thereby exposing Allen University to substantial contractual liability.

1245. Plaintiffs allege that Green knew of and approved McNealey's conduct concerning the 501S transaction and that Defendant BOT thereafter received information concerning the agreement, Allen University's nonperformance, McNealey's materially inconsistent representations concerning the agreement, and Allen University's resulting potential liability.

1246. The trustee Defendants breached their respective fiduciary duties to the extent alleged herein by failing to take appropriate action after receiving notice of the contractual circumstances, McNealey's representations to Defendant BOT, and the resulting exposure of Allen University to substantial liability.

1247. As alleged more particularly in the allegations concerning Dr. Taylor, McNealey retaliated against Taylor after Taylor possessed or was sought as a source of information concerning matters being investigated by

Defendant BOT, and Allen University thereafter was exposed to substantial employment-related liability.

1248. When Montgomery advised Davis that permitting retaliation against Taylor constituted unlawful conduct, Davis responded, "It was Dr. McNealey's call."

1249. Plaintiffs allege that Davis and the trustee Defendants breached their respective fiduciary duties to the extent alleged herein by failing to prevent, investigate, remedy, or take appropriate action concerning retaliation against Taylor and the resulting injury and liability to Allen University.

**5. Failure of Oversight, Investigation, and Independent Governance**

1250. Plaintiffs further allege that Defendants breached their respective fiduciary duties by failing to exercise independent and informed oversight over Allen University's affairs after receiving information concerning the matters alleged herein.

1251. Such breaches included, as applicable to the respective Defendants:

a. failing to investigate known or credibly alleged misconduct by McNealey;

b. refusing or failing to obtain complete financial records and accountings;

c. failing to investigate the Waverly transactions and disposition of funds;

d. failing to investigate or obtain an accounting concerning Allen Days and Seventh Episcopal District funds;

e. failing to take appropriate action concerning the HUD matter;

f. permitting trustees to continue serving beyond authorized terms as alleged herein;

g. failing to act after receiving information concerning materially false or inconsistent statements made to Defendant BOT;

h. failing to address conflicts arising from overlapping ecclesiastical, Board, and affiliated-entity relationships;

i. voting or otherwise acting to prevent or terminate meaningful investigation; and

j. placing personal, ecclesiastical, institutional, or relational loyalties above their fiduciary obligations to Allen University.

**6. Retaliation and Suppression of Oversight**

1252. As alleged more particularly in the allegations concerning Dr. Taylor, McNealey retaliated against and terminated Taylor after Taylor

provided truthful information to Defendant BOT contradicting McNealey, refused McNealey's alleged request that he provide false information to the FBI concerning Montgomery and Valrie, and otherwise possessed information concerning matters under investigation.

1253. Davis and the trustee Defendants knew of the circumstances surrounding Taylor's termination and the resulting risk of substantial liability to Allen University. When Montgomery advised Davis that permitting retaliation against Taylor was unlawful and exposed Allen University to liability, Davis responded, "It was Dr. McNealey's call."

1254. Plaintiffs allege that Davis and the trustee Defendants breached their respective fiduciary duties by failing to prevent, investigate, remedy, or take appropriate action concerning McNealey's retaliation against Taylor. Allen University was thereafter required to pay more than $1 million to resolve claims arising from Taylor's termination, causing direct financial injury to the University.

**C. Causation and Injury to Allen University**

1255. As a direct and proximate result of the respective fiduciary breaches alleged herein, Allen University suffered injury including, as applicable:

a. loss, diversion, dissipation, or deprivation of University property and funds;

b. loss or deprivation of charitable funds raised or held for Allen University's benefit;

c. expenditure of substantial University operating funds;

d. mortgage, lease, contractual, employment-related, and other financial liabilities;

e. loss of the use and benefit of University assets and funds;

f. costs and financial consequences associated with transactions and conduct undertaken contrary to Allen University's interests;

g. impairment of Allen University's governance and financial oversight; and

h. reputational and institutional injury.

1256. The foregoing injuries belong to Allen University, and Montgomery seeks recovery for those injuries derivatively on Allen University's behalf.

**D. Knowing and Bad-Faith Conduct**

1257. Plaintiffs allege that the breaches identified herein were not merely the result of inadvertence or ordinary negligence but, as applicable to the respective Defendants, involved knowing participation, conscious

disregard of known information, intentional failure to investigate or act, undisclosed or inadequately addressed conflicts of interest, ratification of misconduct, or actions taken in bad faith and contrary to Allen University's interests.

1258. The alleged breaches occurred over a period of years and continued after Defendants received repeated notice of financial discrepancies, governance concerns, potential misconduct, contractual exposure, requests for investigation, and demands for corrective action.

**E. Relief**

1259. As a direct and proximate result of the breaches of fiduciary duty alleged herein, Montgomery, derivatively on behalf of Allen University, seeks all relief available to Allen University, including:

a. compensatory damages in an amount to be determined at trial;

b. restitution, disgorgement, and restoration of University funds, assets, proceeds, and benefits wrongfully transferred, retained, dissipated, or received;

c. an accounting and tracing of University property, funds, charitable assets, and proceeds;

d. imposition of a constructive trust, equitable lien, or other appropriate equitable remedy upon property, funds, proceeds, or benefits shown to belong in equity to Allen University;

e. removal or other appropriate equitable relief concerning fiduciaries found to have breached duties owed to Allen University;

f. injunctive and declaratory relief necessary to protect Allen University's property, governance, finances, and charitable mission; and

g. such other relief as the Court deems just and proper.

**COUNT III**

**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

**(Derivative on Behalf of Allen University Against Defendants African Methodist Episcopal Church, Inc. ("AMEC") and African Methodist Episcopal Church Council of Bishops ("Council of Bishops"))**

**A. Underlying Fiduciary Duties and Breaches**

1260. Plaintiff Karol Widemon Montgomery, derivatively on behalf of Allen University, repeats and realleges the preceding allegations of this First Amended Complaint, including the Standing allegations in Paragraphs

234–298, the Derivative Allegations in Paragraphs 299–333, and Count II for Breach of Fiduciary Duty, as if fully set forth herein.

1261. As alleged in Count II, Green and Davis served as successive Chairmen of Defendant BOT, McNealey served as President of Allen University, and the other trustee Defendants served as members of Defendant BOT. Each owed fiduciary duties to Allen University.

1262. Those duties required them to act in Allen University's best interests, protect its property and funds, disclose material information, address conflicts of interest, exercise proper oversight, and act in good faith.

1263. Plaintiffs allege that Green, Davis, McNealey, and the trustee Defendants breached those duties through the conduct described in Count II and throughout this First Amended Complaint.

**B. AMEC's and the Council of Bishops' Relationship to Green and Davis**

1264. AMEC and the Council of Bishops knew of Green's and Davis's positions and the authority they exercised over Allen University.

1265. Green and Davis served successively as Presiding Bishops of AMEC's Seventh Episcopal District while also serving as Chairmen of Defendant BOT and Presidents of Defendant Vision Center.

1266. Their positions as AMEC bishops gave Green and Davis substantial authority, influence, and institutional standing within the Seventh Episcopal District.

1267. As alleged herein, Green and Davis used that authority and influence in connection with Allen University's governance, Defendant BOT, the University's finances and institutional affairs, and responses to requests for investigation and accountability.

1268. AMEC and the Council of Bishops knew that Green and Davis held these overlapping positions and knew of the authority and influence they exercised as Presiding Bishops.

**C. Notice of the Alleged Misconduct at Allen University**

1269. Montgomery and others provided AMEC and the Council of Bishops with information concerning alleged financial improprieties, conflicts of interest, failures of oversight, retaliation, and other misconduct affecting Allen University.

1270. The reports identified specific concerns involving Allen University's property, finances, charitable fundraising, governance, and the conduct of Green, Davis, McNealey, and members of Defendant BOT.

1271. AMEC and the Council of Bishops were also informed that Green and Davis were using the authority and influence associated with

their positions as AME bishops while simultaneously serving as Chairmen of Defendant BOT and Presidents of Defendant Vision Center.

1272. Montgomery and others asked AMEC and the Council of Bishops to intervene and take action concerning the alleged misconduct.

1273. Plaintiffs allege that these reports and requests gave AMEC and the Council of Bishops actual notice of the alleged breaches of fiduciary duty and the risk of continuing harm to Allen University.

**D. Prior Knowledge Concerning Green and Davis and the AMEC Retirement Plan**

1274. Before Montgomery reported the alleged financial improprieties at Allen University, AMEC and the Council of Bishops already knew of serious allegations concerning the loss, diversion, or disappearance of approximately $92 million from the AMEC retirement plan.

1275. AMEC, the Council of Bishops, Green, and Davis were all named as defendants in the litigation concerning the AMEC retirement plan, as alleged more particularly herein.

1276. As named defendants, each had direct notice of the allegations concerning the approximately $92 million in retirement-plan funds and the alleged scheme through which those funds were claimed to have been lost, diverted, or otherwise misused.

1277. AMEC and the Council of Bishops also knew that Green and Davis had held positions of oversight and responsibility concerning the retirement plan during the period in which those funds were alleged to have been lost, diverted, or otherwise unaccounted for.

1278. Green and Davis likewise knew of the allegations concerning their own roles and responsibilities in connection with the retirement plan.

1279. Thereafter, Montgomery and others reported alleged financial improprieties at Allen University involving Green and Davis to AMEC and the Council of Bishops.

1280. Thus, when AMEC and the Council of Bishops received the reports concerning Allen University, they knew that the allegations involved the same two bishops who had held oversight responsibilities concerning the AMEC retirement plan during the period in which approximately $92 million was alleged to have been lost, diverted, or otherwise unaccounted for.

1281. The allegations concerning Allen University therefore were not the first serious financial and oversight concerns involving Green and Davis known to AMEC and the Council of Bishops.

1282. AMEC had assigned Green and, subsequently, Davis to serve as Presiding Bishop of the Seventh Episcopal District. Through those

positions, Green and Davis exercised substantial authority and influence within the Seventh Episcopal District and over Allen University's governance, as alleged herein.

1283. AMEC and the Council of Bishops had authority within AMEC to address Green's and Davis's conduct and their continued exercise of authority as AME bishops.

1284. Despite their prior knowledge concerning the retirement plan and their later receipt of specific allegations concerning Allen University, AMEC and the Council of Bishops did not take effective action to prevent Green and Davis from continuing to exercise their authority and influence over Allen University.

1285. Instead, AMEC and the Council of Bishops continued to allow Green and Davis to hold and exercise the authority and influence that came with their positions as AME bishops while the alleged misconduct at Allen University remained unresolved.

1286. Plaintiffs allege that this allowed Green and Davis to continue exercising substantial influence over Allen University and Defendant BOT and enabled the underlying breaches of fiduciary duty to continue.

1287. Plaintiffs do not base this claim merely on AMEC's and the Council of Bishops' failure to investigate or intervene.

1288. Plaintiffs allege that AMEC and the Council of Bishops had actual knowledge of the matters described above and nevertheless continued to provide Green and Davis with the authority and institutional support that allowed them to exercise substantial influence over Allen University.

**E. Knowing Participation and Assistance**

1289. When AMEC and the Council of Bishops learned of the alleged misconduct at Allen University, they had authority within AMEC over Green and Davis in their positions as AME bishops.

1290. Montgomery and others asked AMEC and the Council of Bishops to intervene and provided them with information concerning Green's and Davis's alleged misconduct, conflicts of interest, and use of their authority at Allen University.

1291. Despite that knowledge, AMEC and the Council of Bishops continued to allow Green and Davis to hold and exercise the authority and influence that came with their positions as AME bishops.

1292. AMEC and the Council of Bishops did not restrict Green's or Davis's authority or prevent them from continuing to use their positions as bishops to exercise influence over Allen University and Defendant BOT.

1293. Plaintiffs allege that AMEC and the Council of Bishops knew of the alleged misconduct and nevertheless continued to provide Green and Davis with the authority and institutional support they used in connection with Allen University's governance and affairs.

1294. Plaintiffs allege that this support enabled Green and Davis to continue the breaches of fiduciary duty alleged herein and helped prevent effective investigation and corrective action at Allen University.

**F. Retaliation and Suppression of Oversight**

1295. AMEC and the Council of Bishops knew that Montgomery had repeatedly asked for an investigation, financial records, an accounting, compliance with Allen University's Bylaws, and corrective action concerning the alleged misconduct at Allen University.

1296. AMEC and the Council of Bishops also knew that Montgomery faced retaliation after she continued to raise these concerns and demand investigation and accountability.

1297. Despite that knowledge, AMEC and the Council of Bishops continued to allow Green and Davis to exercise the authority and influence that came with their positions as AME bishops over Allen University and Defendant BOT.

1298. Plaintiffs allege that allowing Green and Davis to continue exercising that authority after AMEC and the Council of Bishops learned of the alleged misconduct and retaliation helped prevent an independent investigation and allowed the alleged breaches of fiduciary duty to continue without corrective action.

**G. Causation and Injury**

1299. Plaintiffs allege that AMEC and the Council of Bishops had actual knowledge of the underlying breaches of fiduciary duty and knowingly assisted those breaches by continuing to provide Green and Davis with the authority and institutional support described above.

1300. Plaintiffs allege that this assistance enabled the underlying breaches to continue and delayed or prevented investigation and corrective action that could have protected Allen University from further harm.

1301. As a direct and proximate result of the underlying breaches and AMEC's and the Council of Bishops' knowing assistance, Allen University suffered the financial, property, contractual, governance, institutional, and reputational injuries alleged throughout this First Amended Complaint and in Count II.

1302. Those injuries include loss or diversion of University property and funds; loss of charitable funds raised or held for Allen University's

benefit; expenditure of University operating funds; mortgage, lease, contractual, employment-related, and other liabilities; and harm to Allen University's governance and financial oversight.

**H. Relief**

1303. Montgomery, derivatively on behalf of Allen University, seeks all relief available against AMEC and the Council of Bishops for aiding and abetting breach of fiduciary duty, including:

a. compensatory damages in an amount to be determined at trial;

b. restitution, disgorgement, or restoration to the extent available and supported by the evidence;

c. equitable and injunctive relief necessary to prevent further assistance in breaches of fiduciary duties owed to Allen University;

d. relief necessary to protect Allen University's governance, property, charitable assets, and institutional independence; and

e. such other relief as the Court deems just and proper.

**COUNT IV**

**CIVIL CONSPIRACY**

**(Individual Claim by Montgomery and Derivative Claim on Behalf of Allen University Against Defendants McNealey, Green, Davis,**

**Anderson, Britton, Curry, Goff, Keith, Parrott, Richburg, Scott, Temoney, AMEC, and Council of Bishops)**

1304. Plaintiff Karol Widemon Montgomery, individually and derivatively on behalf of Allen University, repeats and realleges the preceding allegations of this First Amended Complaint, including the Standing allegations in Paragraphs 234–298 and the Derivative Allegations in Paragraphs 299–333, as if fully set forth herein.

**A. Agreement and Common Purpose**

1305. Plaintiffs allege that McNealey, Green, Davis, Anderson, Britton, Curry, Goff, Keith, Parrott, Richburg, Scott, Temoney, AMEC, and the Council of Bishops agreed, expressly or through their conduct, to protect the persons and transactions challenged herein, prevent investigation and accountability, and maintain the control necessary to do so.

1306. These Defendants did not all play the same role. Some carried out the underlying conduct, some used their positions and votes to prevent investigation or corrective action, and others provided the authority, support, or protection that allowed the conduct to continue.

1307. Plaintiffs allege that AMEC and the Council of Bishops joined the common plan after receiving actual notice of the alleged misconduct and requests for intervention.

1308. They knew that Green and Davis exercised substantial authority over clergy trustees and that this authority helped Green and Davis maintain control over Defendant BOT and resist investigation and corrective action.

1309. Despite that knowledge, AMEC and the Council of Bishops continued to allow Green and Davis to exercise their authority as AME bishops and did not restrict or prevent the use of that authority over clergy trustees and Defendant BOT.

1310. The common purposes included:

a. controlling Allen University's governance and financial affairs;

b. protecting the transfer, use, or control of Allen University's property and funds from independent review;

c. concealing or withholding material financial information;

d. preventing or stopping investigations into the Waverly transactions, Allen Days funds, HUD submissions, and other alleged misconduct;

e. protecting Green, Davis, McNealey, and others involved in the alleged misconduct from investigation and accountability; and

f. retaliating against Montgomery and others who sought investigation, disclosure, and corrective action.

**B. Acts Taken to Carry Out the Agreement**

1311. Plaintiffs allege that the participating Defendants carried out different parts of the agreement through the acts described throughout this First Amended Complaint, including:

a. transferring, financing, and using Allen University's Waverly property through affiliated entities without full disclosure to Defendant BOT;

b. transferring or distributing funds generated through the Waverly transactions while failing to provide a complete accounting of where the funds went;

c. failing to account fully for funds raised in Allen University's name through Allen Days and Seventh Episcopal District fundraising;

d. submitting or approving the submission of documentation containing changed or altered dates to HUD in an effort to obtain approximately $4.2 million in federal funds;

e. withholding financial records, transaction documents, and accountings;

f. failing or refusing to investigate alleged financial misconduct after receiving notice of it;

g. voting against or otherwise preventing independent investigations;

h. allowing Allen University to remain exposed to substantial contractual and employment-related liabilities;

i. retaliating against Dr. Taylor after he became involved in matters concerning the alleged misconduct and could provide information concerning matters Montgomery and Defendant BOT were seeking to investigate;

j. retaliating against Montgomery after she continued to demand investigation, disclosure, accounting, and compliance with Allen University's Bylaws; and

k. participating in, approving, supporting, or giving effect to Montgomery's purported removal from Defendant BOT.

**C. The 501S Transaction**

1312. The conduct concerning 50 + 1 Sports–Columbia, LLC ("501S") is also relevant to the alleged conspiracy because Defendants' actions concerning that transaction exposed Allen University to substantial contractual liability.

1313. As alleged more particularly herein, McNealey caused Allen University to undertake contractual obligations to 501S, including the $3 million expedite-fee obligation, despite knowing that Allen University lacked the financial ability to satisfy the obligation as represented.

1314. Green knew of and approved McNealey's conduct concerning the 501S transaction, as alleged herein.

1315. Green, Davis, and the trustee Defendants later received information concerning the agreement, Allen University's failure to perform, McNealey's inconsistent statements concerning the agreement, and Allen University's resulting potential liability.

1316. Plaintiffs allege that Green, Davis, and the trustee Defendants who thereafter acted to conceal, protect, ratify, or prevent investigation of that conduct furthered the common purpose of protecting the alleged misconduct from review and accountability.

**D. Retaliation Against Montgomery**

1317. Montgomery repeatedly sought investigation, disclosure, financial records, accountings, compliance with Allen University's Bylaws, and corrective action concerning the alleged misconduct described herein.

1318. Plaintiffs allege that, as Montgomery continued those efforts, participating Defendants acted to discredit her and prevent or limit her

efforts to obtain information and investigation, and that Green, Davis, and the trustee Defendants identified herein ultimately participated in or supported her purported removal from Defendant BOT.

1319. Acts taken against Montgomery included, as alleged more particularly herein:

a. making false or misleading statements concerning her conduct;

b. interfering with or preventing Board action on her requests for investigation;

c. opposing or voting against independent investigation;

d. criticizing or discrediting her after she continued to raise concerns;

e. failing to follow Allen University's Bylaws and the legal requirements governing her purported removal; and

f. Green, Davis, and the trustee Defendants identified herein participating in, approving, supporting, or giving effect to Montgomery's purported removal from Defendant BOT.

1320. Plaintiffs allege that these actions were not separate or unrelated events. They were taken in response to Montgomery's continuing efforts to investigate the alleged misconduct and were intended to stop or limit her ability to continue those efforts.

1321. Plaintiffs allege that Defendants acted to silence Montgomery, prevent further investigation of the alleged financial misconduct, deter independent oversight, and maintain control over Allen University's governance and assets.

**E. Agreement Shown by Defendants' Conduct**

1322. Plaintiffs allege that the agreement among the participating Defendants is shown by their coordinated conduct, including their repeated actions to prevent investigation, withhold information, protect the challenged transactions and persons involved, and retaliate against persons seeking accountability.

1323. Plaintiffs do not allege that McNealey, Green, Davis, Anderson, Britton, Curry, Goff, Keith, Parrott, Richburg, Scott, Temoney, AMEC, and the Council of Bishops each participated in every act. Their respective participation is based on the specific acts, communications, decisions, votes, knowledge, authority, and assistance attributed to them throughout this First Amended Complaint.

1324. Plaintiffs allege that the participating Defendants knew of the common plan and knowingly acted to further one or more of its purposes described above.

**F. Injury to Allen University**

1325. As a direct and proximate result of the alleged conspiracy, Allen University suffered injury including:

a. loss or diversion of University property and funds;

b. loss of charitable funds raised or held for Allen University's benefit;

c. expenditure of University operating funds;

d. mortgage, lease, contractual, employment-related, and other liabilities;

e. loss of effective and independent financial oversight; and

f. harm to Allen University's governance, finances, property, and institutional interests.

1326. Montgomery seeks recovery for those injuries derivatively on behalf of Allen University.

**G. Individual Injury to Montgomery**

1327. Montgomery also suffered injuries separate from the injuries suffered by Allen University as a result of the alleged conspiracy directed against her.

1328. Those injuries include her purported removal from Defendant BOT, injury to her reputation and other individual harm caused by the alleged retaliatory conduct directed at her.

1329. Montgomery seeks recovery individually for the injuries caused directly to her by the alleged conspiracy, to the extent recoverable under South Carolina law.

**H. Intent and Resulting Harm**

1330. Plaintiffs allege that the participating Defendants acted knowingly and intentionally to carry out the common purposes described above.

1331. Plaintiffs further allege that the conspiracy allowed the underlying conduct to continue, prevented or delayed investigation and corrective action, and caused additional injury to Allen University and Montgomery.

1332. As a direct and proximate result of the alleged conspiracy, Allen University and Montgomery suffered damages in amounts to be determined at trial.

**I. Relief**

1333. Montgomery, individually and derivatively on behalf of Allen University, seeks all relief available for the injuries caused by the alleged conspiracy, including:

a. compensatory damages in an amount to be determined at trial;

b. punitive damages to the extent permitted by law and supported by the evidence;

c. restitution, disgorgement, and other equitable relief to the extent available;

d. injunctive and declaratory relief as appropriate; and

e. such other relief as the Court deems just and proper.

**COUNT V**

**FRAUD / FRAUDULENT MISREPRESENTATION**

**(Derivative on Behalf of Allen University Against Defendants McNealey, Green, and Davis)**

1334. Montgomery, derivatively on behalf of Allen University, repeats and realleges the preceding allegations of this First Amended Complaint, including the Standing allegations in Paragraphs 234–298, the Derivative Allegations in Paragraphs 299–333, and the Fraud Allegations under Rule 9(b) in Paragraphs 1031-1080, as if fully set forth herein.

**A. Fraudulent Statements and Concealment**

1335. Plaintiffs allege that McNealey, Green, and Davis made false statements or concealed material facts concerning matters affecting Allen University's property, finances, contracts, charitable funds, and federal funding.

1336. As alleged more particularly herein, McNealey participated in or approved false or misleading representations concerning:

a. the HUD submission seeking approximately $4.2 million in federal funds, including the resubmission of documentation containing changed or altered dates concerning the same work;

b. the 501S agreement and Allen University's obligation to pay the $3 million expedite fee;

c. his statements to Defendant BOT concerning whether he had offered the $3 million expedite fee and whether 501S had demanded that payment;

d. the ownership, financing, use, and financial structure of the Waverly Building; and

e. Allen University's financial obligations and liabilities arising from the Waverly and 501S transactions.

1337. As alleged more particularly herein, Green knew of and approved McNealey's conduct concerning the Waverly transactions, HUD funding, and the 501S transaction. Plaintiffs further allege that Green failed to disclose material information concerning those matters while serving as Chairman of Defendant BOT and exercising substantial authority over Allen University.

1338. As alleged more particularly herein, Davis made false or misleading statements concerning Allen Days funds, including representing to Montgomery and other trustees that the funds had been given to Allen University when he knew that the funds had been divided among other entities and had not been transferred in full to the University.

**B. Knowledge and Intent**

1339. Plaintiffs allege that McNealey, Green, and Davis knew that the statements attributed to them were false or misleading when made and knew that the material facts they concealed or failed to disclose were important to Allen University's financial and governance decisions.

1340. Plaintiffs allege that McNealey, Green, and Davis made the false statements or concealed material information to obtain or retain control over funds and transactions, obtain approval or payment, prevent investigation, or keep Defendant BOT and others from learning the true facts concerning the matters described above.

**C. Reliance and Harm to Allen University**

1341. Plaintiffs allege that Allen University, acting through its governance structure and persons responsible for its affairs, was provided false or incomplete information and was deprived of material information

needed to protect the University's property, finances, contracts, and charitable assets.

1342. As a direct and proximate result of the alleged fraud, Allen University suffered substantial financial and property injury, including the loss of ownership of the Waverly Building, one of the University's most valuable real property assets; loss or diversion of funds generated through the Waverly transactions; expenditure of University operating funds; exposure to mortgage, lease, contractual, and other liabilities; and harm to its financial and institutional interests.

### D. Particularity of the Fraud Allegations

1343. The specific statements, omissions, persons involved, dates or time periods, communications, transactions, and circumstances supporting this claim are alleged in detail throughout this First Amended Complaint, including the allegations concerning the Waverly transactions, HUD submissions, Allen Days fundraising, and the 501S transaction.

## COUNT VI

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (OUTRAGE)

## (Individual Claim by Montgomery Against Defendants Green, Davis, McNealey, Anderson, Britton, Curry, Goff, Keith, Parrott, Richburg, Scott, and Temoney)

1344. Montgomery, individually, repeats and realleges the preceding allegations concerning the retaliation, intimidation, disparagement, interference with her duties as a trustee, and her purported removal from Defendant BOT, as if fully set forth herein.

**A. Conduct Directed at Montgomery**

1345. Montgomery alleges that the Defendants named in this Count engaged in a continuing course of conduct against her after she began raising concerns and demanding investigation, financial records, accountings, compliance with Allen University's Bylaws, and corrective action.

1346. That conduct included, as alleged more particularly herein:

a. publicly criticizing, humiliating, and disparaging Montgomery during meetings of Defendant BOT;

b. making false or misleading statements concerning her conduct and actions as a trustee;

c. interfering with her efforts to obtain information and investigate the alleged financial misconduct;

d. preventing or opposing her efforts to obtain independent investigation and corrective action;

e. retaliating against her after she continued to raise concerns and demand accountability; and

f. participating in, approving, supporting, or giving effect to her purported removal from Defendant BOT after she continued those efforts.

**B. Intentional or Reckless Conduct**

1347. Montgomery alleges that the conduct directed at Montgomery was intentional or undertaken with reckless disregard for the substantial likelihood that it would cause her severe emotional distress.

**C. Extreme and Outrageous Conduct**

1348. Montgomery alleges that the conduct was not a single disagreement or ordinary dispute concerning University governance. It was a sustained course of retaliation directed at Montgomery after she sought investigation of serious alleged financial misconduct affecting Allen University and continued after she refused to stop seeking investigation and accountability.

**D. Severe Emotional Distress and Causation**

1349. As a direct and proximate result of the conduct alleged above, Montgomery suffered severe emotional distress that no reasonable person could be expected to endure. Her distress included significant sleep

disruption and deprivation, difficulty functioning normally, physical manifestations of emotional distress, physical illness, emotional withdrawal and isolation from friends and family, and substantial interference with her work and daily activities. Montgomery also sought and received mental-health counseling and treatment as a result of the distress. The changes in Montgomery's physical condition, emotional well-being, and behavior were observed by others.

1350. Montgomery's employment was also terminated during and as a result of the course of conduct alleged herein, further contributing to the severe emotional distress she suffered.

## COUNT VII

## DEFAMATION

## (Individual Claim by Montgomery Against Defendants Davis, Goff, and Parrott)

1351. Montgomery, individually, repeats and realleges the preceding allegations concerning the false and disparaging statements made about her, the circumstances in which those statements were made, the persons to whom they were communicated, and the resulting harm to her reputation, as if fully set forth herein.

### A. False Statements Concerning Montgomery

1352. Davis and Goff made false statements concerning Montgomery's conduct as a trustee and her efforts to carry out her duties to Allen University.

1353. As alleged more particularly herein, Davis and Goff accused Montgomery of conduct that violated or caused violations of SACSCOC accreditation requirements and accused her of improperly seeking to influence Davis to act in violation of those requirements.

1354. These statements represented to members of Defendant BOT and others that Montgomery had acted improperly in carrying out her responsibilities as a trustee and called into question her integrity, judgment, and fitness to serve in a position of trust.

1355. At the March 2025 meeting of Defendant BOT, Parrott also accused Montgomery of wrongdoing for contacting the Council of Bishops concerning matters she had been attempting to investigate. Parrott stated, in substance, that Montgomery had no right to contact the Council of Bishops and that, even though Montgomery acknowledged doing so, her conduct was nevertheless wrong.

1356. Montgomery alleges that her communication with the Council of Bishops was proper and was made as part of her efforts as a trustee to

obtain investigation and corrective action concerning alleged misconduct affecting Allen University.

### B. Publication to Others

1357. Davis, Goff, and Parrott made or communicated the statements described above in the presence of members of Defendant BOT and others, thereby publishing the statements to persons other than Montgomery.

### C. Falsity and Knowledge

1358. The statements concerning Montgomery were false. After Davis and Goff accused Montgomery of conduct that violated or caused violations of SACSCOC accreditation requirements, Montgomery contacted SACSCOC concerning those accusations. SACSCOC's Chief of Staff confirmed that Montgomery's actions were appropriate and consistent with her responsibilities as a trustee.

1359. Montgomery provided the SACSCOC Chief of Staff's response to the entire Board of Trustees, including Davis and Goff, thereby informing them that SACSCOC had confirmed that Montgomery's conduct was appropriate. Despite receiving that information, neither Davis nor Goff retracted or corrected the accusations they had made against Montgomery, leaving those accusations uncorrected before the Board.

**D. Fault, Malice, and Purpose**

1360. Montgomery alleges that Davis, Goff, and Parrott made the statements attributed to them knowing they were false or with reckless disregard for whether they were true.

1361. Montgomery further alleges that the statements were made to discredit her, undermine her credibility, and interfere with her continuing efforts to obtain investigation and accountability concerning the alleged misconduct at Allen University.

**E. Injury to Montgomery**

1362. Montgomery alleges that the false statements harmed her reputation, credibility, and standing among members of Defendant BOT and others to whom the statements were communicated. The statements accused her of misconduct in carrying out responsibilities requiring judgment, fiduciary responsibility, and institutional trust and were part of the continuing effort to portray her as unfit to serve as a trustee.

1363. As a direct and proximate result of the defamatory statements, Montgomery suffered injury to her reputation, credibility, and standing in the University, professional, and broader communities, as well as humiliation, emotional distress, and other damages recoverable under South Carolina law.

## COUNT VIII

## UNJUST ENRICHMENT

## (Derivative on Behalf of Allen University Against Defendants Foundation, POC, Waverly Owner, WHMM, WMT, Vision Center, and Other Defendants Shown to Have Received or Retained Allen University Property, Funds, or Financial Benefits)

1364. Montgomery, derivatively on behalf of Allen University, repeats and realleges the preceding allegations of this First Amended Complaint, including the Standing allegations in Paragraphs 234–298, the Derivative Allegations in Paragraphs 299–333, and the allegations concerning the Waverly transactions, Allen Days funds, and other transfers or uses of Allen University's property and funds, as if fully set forth herein.

1365. Montgomery brings this claim against Foundation, POC, Waverly Owner, WHMM, WMT, Vision Center, and any other Defendant shown through discovery to have received or retained Allen University property, funds, proceeds, compensation, distributions, or other financial benefits under circumstances in which it would be unjust to permit that Defendant to retain the benefit.

### A. Benefits Provided by Allen University

1366. As alleged more particularly herein, Allen University provided property, funds, and other financial benefits that were received, controlled, used, or retained by one or more Defendants, including:

a. ownership, possession, or use of the Waverly Building, which Allen University owned free and clear before ownership was transferred from the University;

b. funds and financial value generated through the transfer, financing, and use of the Waverly Building;

c. proceeds generated through the NMTC transactions involving the Waverly Building;

d. Allen University operating funds used to renovate or support the Waverly Building after ownership had been transferred from the University;

e. lease payments and other payments made by Allen University arising from the Waverly transactions;

f. charitable funds raised in Allen University's name and for its benefit through Allen Days and Seventh Episcopal District fundraising but not transferred to Allen University; and

g. other Allen University property, funds, proceeds, or financial benefits transferred to or retained by persons or entities identified herein or through discovery.

**B. Receipt and Retention of Benefits**

1367. Plaintiffs allege that Foundation, POC, Waverly Owner, WHMM, WMT, Vision Center, and other Defendants identified through discovery received, controlled, retained, or obtained financial value from Allen University's property or funds as alleged herein.

1368. As alleged more particularly in the Parties and Waverly allegations herein, certain trustee Defendants held positions, membership interests, or other roles in the Waverly entities that entitled or permitted them to receive compensation, payments, distributions, or other financial benefits from those entities.

1369. Montgomery questioned McNealey concerning whether the trustee Defendants holding positions in the Waverly entities had received compensation. McNealey represented that they had not been paid.

1370. Montgomery also requested that McNealey produce the documents and financial records concerning the Waverly entities and transactions. McNealey refused to produce the requested documents and records.

1371. Davis was present when Montgomery requested the Waverly documents and records and McNealey refused to produce them.

1372. Despite his position as Chairman of Defendant BOT, Davis did not require McNealey to produce the requested documents or otherwise provide Montgomery and Defendant BOT with the records necessary to determine where the Waverly funds went and who received them.

1373. As a result, Montgomery and Defendant BOT were denied access to records necessary to determine whether McNealey's representation concerning compensation was accurate and whether trustee Defendants or others received salaries, compensation, payments, distributions, reimbursements, or other financial benefits from the Waverly entities or from funds generated through Allen University's property.

1374. The financial records showing the receipt, transfer, distribution, and ultimate disposition of those funds remain within the possession or control of Defendants and the entities involved in the transactions.

1375. Plaintiffs allege, on information and belief, that discovery and an accounting of those records will identify additional persons or entities, including Defendants, who received Allen University funds, proceeds generated from Allen University's property, compensation, distributions, or other financial benefits arising from the transactions alleged herein.

1376. Plaintiffs allege that each Defendant who received or retained such a benefit knew or should have known that the property or funds belonged to Allen University, were derived from Allen University's property, were provided by Allen University, or were raised or held for Allen University's benefit.

**C. Inequitable Retention**

1377. Allen University did not receive the full value of the property, funds, proceeds, and other financial benefits transferred, used, or retained as alleged herein.

1378. Under the circumstances alleged herein, it would be inequitable to allow any Defendant who received or retained Allen University property, funds, proceeds, compensation, distributions, or other financial benefits to keep those benefits without returning the property or its value to Allen University.

**D. Relief**

1379. Montgomery, derivatively on behalf of Allen University, seeks restitution from each Defendant to the extent that Defendant is shown to have been unjustly enriched, disgorgement to the extent available, restoration of Allen University's property or funds where appropriate, an accounting sufficient to identify the recipients and amounts of the benefits

described herein, and such other equitable relief as the Court deems just and proper.

## COUNT IX

## CONVERSION

**(Derivative on Behalf of Allen University Against Defendants McNealey, Green, Davis, AMEC, Foundation, POC, Waverly Owner, WHMM, WMT, Vision Center, and Other Defendants Shown to Have Exercised Unauthorized Control Over Allen University Property or Funds)**

1380. Montgomery, derivatively on behalf of Allen University, repeats and realleges the preceding allegations of this First Amended Complaint, including the Standing allegations in Paragraphs 234–298, the Derivative Allegations in Paragraphs 299–333, and the allegations concerning the Waverly transactions, Allen Days funds, and other transfers or uses of Allen University's property and funds, as if fully set forth herein.

### A. Allen University's Right to the Property

1381. Allen University owned or had the immediate right to possess the real property, specific funds, proceeds, accounts, charitable contributions, and other property described herein, including the Waverly

Building and the identifiable funds and proceeds generated from, derived from, or used in connection with that property.

1382. For purposes of this conversion claim, Plaintiffs seek recovery for the specific funds, proceeds, accounts, charitable contributions, and other personal property over which Defendants exercised unauthorized dominion or control, including funds and proceeds generated from or connected to Allen University's real property.

1383. That property included, as alleged more particularly herein:

a. identifiable proceeds generated from the transfer, financing, or monetization of Allen University's Waverly property;

b. Allen University operating funds transferred or used in connection with the Waverly transactions;

c. funds paid by Allen University in connection with obligations created through the Waverly transactions;

d. charitable funds raised in Allen University's name and for its benefit through AMEC and its Seventh Episcopal District, including Allen Days and Annual Conference fundraising, but not transferred to Allen University; and

e. other specific funds or proceeds belonging to Allen University and transferred to or controlled by Defendants as alleged herein.

## B. Unauthorized Control Over Allen University's Property

1384. Plaintiffs allege that McNealey, Green, Davis, AMEC, Foundation, POC, Waverly Owner, WHMM, WMT, Vision Center, and other Defendants identified herein exercised or participated in the exercise of control over Allen University's funds or other personal property in a manner inconsistent with Allen University's ownership and right to possession.

1385. Plaintiffs allege that the Seventh Episcopal District is part of AMEC and that AMEC directed its Episcopal Districts to conduct Annual Conferences and fundraising activities. AMEC acted through its Seventh Episcopal District, its presiding bishops, and other persons responsible for those activities, including the fundraising conducted in Allen University's name and for its benefit as alleged herein.

1386. That conduct included, as applicable to the respective Defendants:

a. transferring or directing the transfer of identifiable proceeds generated from Allen University's property to affiliated entities;

b. transferring, retaining, or controlling Allen University operating funds outside the purposes for which those funds were authorized;

c. receiving or retaining identifiable funds or proceeds belonging to Allen University;

d. receiving, retaining, transferring, or controlling charitable funds raised in Allen University's name and for its benefit but not delivered to Allen University; and

e. preventing Allen University from exercising possession or control over funds and proceeds to which it was entitled.

1387. Plaintiffs allege that the exercise of control described above was unauthorized and inconsistent with Allen University's ownership of or immediate right to possess the property.

**C. Identification and Control of the Converted Funds**

1388. The funds and proceeds alleged to have been converted were not merely general debts owed to Allen University. Plaintiffs allege that they consisted of identifiable funds, proceeds, accounts, charitable contributions, or determinate sums derived from or belonging to Allen University.

1389. As alleged herein, Montgomery requested records and accountings concerning the Waverly transactions and the disposition of Allen University's funds and proceeds, but McNealey refused to provide the

requested records. Davis was present and did not require production of the records.

1390. The records identifying the accounts, transfers, recipients, amounts, and ultimate disposition of the funds are within the possession or control of Defendants and the entities involved in the transactions.

1391. Plaintiffs allege, on information and belief, that discovery and an accounting of those records will further identify the specific funds converted, the Defendants who exercised control over those funds, and the persons or entities that ultimately received them.

**D. Injury to Allen University**

1392. As a direct and proximate result of the alleged conversion, Allen University was deprived of possession, use, and control of its funds, proceeds, charitable contributions, and other personal property and suffered financial loss in an amount to be determined through discovery and at trial.

**E. Relief**

1393. Montgomery, derivatively on behalf of Allen University, seeks recovery of the value of the personal property and funds converted, return of the converted personal property where appropriate, compensatory and

other damages permitted by law, and such other relief as the Court deems just and proper.

**COUNT X**

**CONSTRUCTIVE TRUST AND ACCOUNTING**

**(Derivative Claim on Behalf of Allen University Against Defendants McNealey, Foundation, POC, Waverly Owner, WHMM, WMT, Vision Center, and Other Defendants Shown to Have Received, Retained, Possessed, or Controlled Allen University Property, Funds, or Traceable Proceeds)**

1394. Montgomery, derivatively on behalf of Allen University, repeats and realleges the preceding allegations of this First Amended Complaint, including the Standing allegations in Paragraphs 234–298, the Derivative Allegations in Paragraphs 299–333, and the allegations concerning the Waverly transactions, Allen Days funds, unjust enrichment, conversion, fraud, and breaches of fiduciary duty, as if fully set forth herein.

1395. Plaintiffs seek the imposition of a constructive trust as an equitable remedy for the wrongful acquisition, transfer, receipt, or retention of Allen University's property, funds, proceeds, and other financial benefits described herein.

1396. Plaintiffs seek imposition of a constructive trust against Defendants McNealey, Foundation, POC, Waverly Owner, WHMM, WMT, and Vision Center, and against any other Defendant shown through discovery to have received, obtained, retained, possessed, or exercised control over Allen University's property, funds, proceeds, or other identifiable assets, or property traceable thereto, under circumstances in which continued retention would be inequitable.

**A. Property Subject to the Constructive Trust**

1397. As alleged more particularly herein, Defendants acquired, received, transferred, controlled, or retained property and financial benefits derived from:

a. Allen University's ownership and transfer of the Waverly Building;

b. funds and proceeds generated through the transfer, financing, monetization, or use of the Waverly Building;

c. NMTC proceeds and other funds generated through the Waverly transactions;

d. Allen University operating funds used in connection with the Waverly Building and related entities;

e. lease payments and other payments made by Allen University arising from the Waverly transactions;

f. charitable funds raised in Allen University's name and for its benefit through AMEC and its Seventh Episcopal District, including Allen Days and Annual Conference fundraising, but not transferred to Allen University; and

g. other Allen University property, funds, proceeds, or financial benefits identified herein or through discovery.

**B. Basis for Equitable Relief**

1398. Plaintiffs allege that the property, funds, proceeds, and financial benefits described above were acquired, transferred, received, or retained through the fraud, breaches of fiduciary duty, diversion of charitable funds, conversion, unjust enrichment, abuse of positions of trust, and other wrongful conduct alleged in this First Amended Complaint.

1399. Plaintiffs allege that Defendants who received or retained Allen University's property, funds, proceeds, or other financial benefits should not be permitted to keep property or benefits that rightfully belong to Allen University.

**C. Tracing, Accounting, and Constructive Trust**

1400. Montgomery, derivatively on behalf of Allen University, seeks equitable relief including:

a. an accounting of Allen University's property, funds, proceeds, charitable contributions, and other financial benefits transferred, received, controlled, or retained as alleged herein;

b. tracing of those assets through all transfers, accounts, distributions, transactions, and affiliated entities;

c. identification of each person or entity that received or retained such property, funds, proceeds, or financial benefits and the amount or value received;

d. imposition of a constructive trust over identifiable property, funds, proceeds, accounts, or other assets shown to have been wrongfully obtained or retained from Allen University or through the use of Allen University's property;

e. imposition of a constructive trust over the Waverly Building or interests therein based upon the wrongful transfer of Allen University's real property alleged herein;

f. restitution, disgorgement, restoration, or return of property and funds to Allen University to the extent permitted by law; and

g. such other equitable relief as the Court deems just and proper.

**COUNT XI**

**DECLARATORY AND INJUNCTIVE RELIEF**

**(Individual Relief for Montgomery and Derivative Relief on Behalf of Allen University Against Defendant BOT, Davis, the Trustee Defendants, AMEC, Council of Bishops, and Other Defendants Whose Authority, Conduct, or Control Is Subject to the Declaratory or Injunctive Relief Sought)**

1401. Montgomery, individually and derivatively on behalf of Allen University, repeats and realleges the preceding allegations of this First Amended Complaint, including the Standing allegations in Paragraphs 234–298, the Derivative Allegations in Paragraphs 299–333, and the allegations concerning Allen University's governance, Defendant BOT, the Waverly transactions, Allen Days funds, Montgomery's purported removal, and the continuing exercise of authority over Allen University, as if fully set forth herein.

**A. Actual Controversy**

1402. An actual and continuing controversy exists concerning the governance, property, funds, and affairs of Allen University, including:

a. whether Defendant BOT has been constituted and operated in accordance with Allen University's Bylaws;

b. whether trustees who continued serving beyond the terms permitted by the Bylaws had authority to participate in and vote on actions taken by Defendant BOT;

c. whether actions taken by Defendant BOT without compliance with the Bylaws are valid;

d. whether Montgomery's purported removal from Defendant BOT complied with Allen University's Bylaws, applicable law, and the requirements governing her removal;

e. whether Montgomery remains entitled to recognition as a duly elected trustee or is entitled to reinstatement to Defendant BOT;

f. whether Allen University's property and funds were transferred, encumbered, controlled, or used without proper authorization, disclosure, or approval;

g. whether funds raised in Allen University's name and for its benefit through AMEC and its Seventh Episcopal District, including Allen Days and Annual Conference fundraising, were required to be delivered and accounted for to Allen University; and

h. whether Defendants may continue to exercise authority or control over Allen University's governance, property, and financial affairs in the manner challenged herein.

**B. Declaratory Relief**

1403. Montgomery, individually and derivatively on behalf of Allen University, seeks declarations concerning the parties' rights and responsibilities, including declarations that:

a. Allen University's Bylaws govern the composition, terms, meetings, voting, and operation of Defendant BOT and must be followed;

b. actions taken by trustees who lacked authority to serve or vote are invalid or voidable to the extent provided by law;

c. Montgomery's purported removal from Defendant BOT was invalid because it did not comply with Allen University's Bylaws and the requirements governing her removal;

d. Montgomery is entitled to reinstatement as a duly elected trustee of Defendant BOT or other appropriate relief restoring the trustee status from which she was improperly removed;

e. Allen University is entitled to possession, control, and a complete accounting of its property and funds;

f. funds raised in Allen University's name and for its benefit must be accounted for and delivered to Allen University to the extent those funds belong to or were raised for the University; and

g. Allen University's property and funds may not be transferred, encumbered, diverted, or used except through lawful authority and in accordance with the University's governing requirements.

**C. Need for Injunctive Relief**

1404. Plaintiffs allege that the governance conditions and financial practices challenged herein have caused continuing harm to Allen University and create a continuing risk that Allen University's governance, property, funds, and charitable interests will remain subject to actions taken without proper oversight, disclosure, or compliance with the University's Bylaws.

1405. Plaintiffs further allege that monetary damages alone will not fully remedy the continuing governance injuries alleged herein, including the disputed composition and authority of Defendant BOT, Montgomery's purported removal, the lack of complete financial records and accountings, and the continuing control over Allen University's property and affairs.

**D. Injunctive and Equitable Relief**

1406. Montgomery, individually and derivatively on behalf of Allen University, seeks appropriate injunctive and equitable relief, including:

a. requiring compliance with Allen University's Bylaws and governing documents;

b. requiring Defendant BOT to be constituted and operated in accordance with Allen University's Bylaws;

c. reinstating Montgomery to Defendant BOT or otherwise restoring the trustee status affected by her purported removal;

d. requiring a complete accounting of Allen University's property, funds, proceeds, charitable contributions, and other financial interests described herein;

e. requiring production of records necessary to determine the receipt, transfer, use, and ultimate disposition of Allen University's property and funds;

f. prohibiting further unauthorized transfer, diversion, encumbrance, solicitation, retention, or use of Allen University's property or funds;

g. prohibiting persons who lack lawful authority under Allen University's Bylaws from exercising trustee authority or voting as members of Defendant BOT;

h. requiring appropriate corrective action concerning trustees or fiduciaries shown to be serving unlawfully or acting in breach of duties owed to Allen University; and

i. granting such other declaratory, injunctive, and equitable relief as the Court determines necessary to protect Allen University and Montgomery's individual rights.

**COUNT XII**

**RICO – 18 U.S.C. § 1962(c) and (d)**

**(Derivative Claim on Behalf of Allen University Against the Participating RICO Defendants Identified Below)**

1407. Montgomery, derivatively on behalf of Allen University, repeats and realleges the preceding allegations of this First Amended Complaint, including the Standing allegations in Paragraphs 234–298, the Derivative Allegations in Paragraphs 299–333, the Fraud Allegations under Rule 9(b) in Paragraphs 1089–1138, and the allegations concerning the Waverly transactions, HUD submissions, Allen Days funds, retaliation against Dr. Taylor and Montgomery, and the conduct of the Defendants identified below, as if fully set forth herein.

**A. The Enterprise**

1408. Plaintiffs allege that Defendants McNealey, Green, Davis, Anderson, Britton, Curry, Goff, Keith, Parrott, Richburg, Scott, Temoney, AMEC, and the Council of Bishops, together with Foundation, POC, Waverly Owner, WHMM, WMT and Vision Center, participated in an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), connected through Allen University's governance, AMEC and its Seventh Episcopal District, Defendant BOT, and the Waverly entities.

1409. The members of the enterprise had different but related roles.

a. Green and Davis used the authority and influence arising from their positions as AMEC bishops and Presiding Bishops of the Seventh Episcopal District in connection with Allen University's governance.

b. McNealey exercised control over Allen University's executive, financial, and contractual affairs.

c. AMEC and the Council of Bishops provided the ecclesiastical structure and authority through which Green and Davis exercised substantial authority and influence within the Seventh Episcopal District and over Allen University's governance. AMEC also provided the structure through which the Seventh Episcopal District conducted Annual Conferences and raised

funds in Allen University's name and for its benefit. After AMEC and the Council of Bishops received notice that funds raised for Allen University were allegedly not being delivered to the University and received notice of other alleged financial misconduct involving Green and Davis, they did not restrict Green's or Davis's authority, require an accounting of the missing funds, or take effective action to prevent the alleged conduct from continuing.

d. Anderson, Britton, Curry, Goff, Keith, Parrott, Richburg, Scott, and Temoney participated through the specific acts, decisions, votes, failures to act after receiving notice, and other conduct attributed to them throughout this First Amended Complaint, including actions that prevented or limited investigation and corrective action.

e. Foundation, POC, Waverly Owner, WHMM, and WMT participated in the transfer, financing, receipt, distribution, or control of Allen University's Waverly property and funds, as alleged herein.

f. Vision Center participated through the receipt, control, use, or retention of funds or financial benefits connected to Allen

University and the Seventh Episcopal District fundraising, as alleged herein.

1410. Plaintiffs allege that the enterprise functioned for the common purposes of exercising and maintaining control over Allen University's governance, property, and funds; obtaining, transferring, or controlling money and property through the Waverly transactions, charitable fundraising, and federal funding; concealing the receipt and disposition of funds; preventing investigation and accountability; and protecting the persons and transactions involved from independent review.

1411. Plaintiffs further allege that Defendants acted to silence Montgomery, prevent further investigation of the alleged financial misconduct, deter independent oversight, and maintain control over Allen University's governance and assets.

1412. The enterprise had continuing relationships among its participants, operated over a period of years, and engaged in activities affecting interstate commerce.

**B. Conduct of the Enterprise**

1413. Plaintiffs allege that the Defendants identified herein participated in the conduct of the enterprise's affairs through their

respective acts, decisions, communications, transactions, use of authority, and other conduct alleged throughout this First Amended Complaint.

1414. Plaintiffs do not allege that every Defendant participated in every act. Plaintiffs allege that the respective Defendants participated through the particular conduct attributed to them herein and that the participating RICO Defendants conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

**C. Pattern of Racketeering Activity**

1415. Plaintiffs allege a pattern of related racketeering activity involving multiple acts occurring over a period of years and directed toward obtaining, controlling, transferring, or concealing Allen University's property and funds and preventing investigation and disclosure of the alleged conduct.

1416. As alleged more particularly in Paragraphs 1089-1138, and elsewhere herein, the pattern included acts of mail fraud and wire fraud under 18 U.S.C. §§ 1341 and 1343, including interstate electronic and other communications used in connection with the Waverly transactions, HUD submissions, Allen Days and Annual Conference fundraising,

transfers and control of Allen University funds, and communications used to further or conceal the alleged schemes.

1417. Plaintiffs allege that the mail and wire communications were not incidental to the alleged schemes but were used to obtain, transfer, control, solicit, conceal, or retain money or property and to communicate materially false or misleading information in furtherance of the conduct alleged herein.

**D. HUD-Related Fraud**

1418. As alleged more particularly herein, McNealey and other participating Defendants sought approximately $4.2 million in federal HUD funds for work associated with the Waverly Building. After HUD rejected the initial submission because the work did not fall within the required time period, documentation concerning the same work was changed and resubmitted in an effort to make the work appear eligible for payment.

1419. Plaintiffs allege that the HUD-related submissions and communications were knowingly made or caused to be made through interstate communications for the purpose of obtaining federal money through materially false or misleading representations concerning the timing and eligibility of the work.

**E. Witness Tampering and Retaliation**

1420. Plaintiffs allege that McNealey attempted to influence the information Dr. Taylor provided to the FBI. McNealey told Taylor, in substance, that if Taylor wanted to get back into McNealey's good graces, Taylor should tell the FBI that Montgomery and Valrie had paid Taylor $1 million to lie.

1421. Plaintiffs allege that McNealey made that statement to cause or persuade Taylor to provide false information to the FBI concerning Montgomery, Valrie, and the matters under federal investigation. Taylor refused to make the requested statement and was subsequently terminated from his employment with Allen University.

1422. Plaintiffs allege that this conduct constituted or attempted witness tampering within the meaning of 18 U.S.C. § 1512. Section 1512(b)(3) covers corrupt persuasion or attempted corrupt persuasion intended to hinder, delay, or prevent communications to federal law enforcement concerning a possible federal offense.

1423. Plaintiffs further allege that, during the meeting at which Montgomery was purportedly removed from Defendant BOT, Montgomery was asked whether she had been interviewed by the FBI. Montgomery disclosed that she had been interviewed. Less than thirty minutes after that

disclosure, during the same meeting, Montgomery was purportedly removed from Defendant BOT.

1424. Montgomery's purported removal was harmful action taken, at least in part, in retaliation for her providing truthful information to federal law enforcement concerning the possible commission of federal offenses and was intended to silence Montgomery, prevent further investigation and disclosure, and deter independent oversight.

1425. Plaintiffs allege that this conduct constituted retaliation within the meaning of 18 U.S.C. § 1513.

**F. Continuity and Relationship**

1426. Plaintiffs allege that the predicate acts were related because they involved overlapping participants, purposes, transactions, property, methods, and efforts to obtain or control Allen University's property and funds and to prevent investigation or disclosure. The alleged conduct continued over multiple years and constituted a continuing pattern rather than isolated or unrelated events.

**G. Injury to Allen University**

1427. Plaintiffs allege that Allen University suffered direct injury to its business and property as a result of the alleged racketeering activity, including loss of ownership and value associated with the Waverly Building,

loss or diversion of Allen University operating funds and charitable funds raised for its benefit, loss of proceeds generated from its property, mortgage and lease obligations, other financial liabilities, and additional financial losses alleged herein.

### H. RICO Conspiracy and Relief

1428. Plaintiffs allege that the participating RICO Defendants knowingly agreed to further the enterprise's common purposes and agreed that one or more participants would commit predicate acts in furtherance of those purposes, in violation of 18 U.S.C. § 1962(d).

1429. Montgomery, derivatively on behalf of Allen University, seeks the relief available under 18 U.S.C. § 1964(c), including recovery of Allen University's damages, treble damages to the extent authorized by law, costs, reasonable attorney's fees to the extent recoverable, and such other relief as the Court deems appropriate.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Karol Widemon Montgomery, individually and derivatively on behalf of Plaintiff Allen University, respectfully requests that the Court enter judgment in her favor and in favor of Allen University, as applicable to the respective individual and derivative claims, and grant the following relief:

**A. Declaratory Relief**

1. Declare the rights and responsibilities of the parties under Allen University's Bylaws and governing documents;
2. Declare that Allen University's Bylaws govern the composition, terms, meetings, voting, and operation of Defendant BOT and must be followed;
3. Declare that actions taken by trustees who lacked authority to serve or vote are invalid or voidable to the extent provided by law;
4. Declare that Montgomery's purported removal from Defendant BOT was invalid because it did not comply with Allen University's Bylaws and applicable requirements governing her removal;
5. Declare that Montgomery is entitled to reinstatement or other appropriate relief restoring the trustee status affected by her purported removal;
6. Declare that Allen University is entitled to possession, control, and a complete accounting of its property, funds, proceeds, and charitable contributions;
7. Declare that funds raised in Allen University's name and for its benefit must be accounted for and delivered to Allen University to the extent those funds belong to or were raised for the University; and

8. Declare that Allen University's property and funds may not be transferred, encumbered, diverted, retained, or used except through lawful authority and in accordance with the University's governing requirements.

**B. Injunctive and Governance Relief**

9. Require compliance with Allen University's Bylaws and governing documents;

10. Require Defendant BOT to be constituted and operated in accordance with Allen University's Bylaws;

11. Reinstate Montgomery to Defendant BOT or otherwise restore the trustee status affected by her purported removal;

12. Prohibit persons who lack lawful authority under Allen University's Bylaws from exercising trustee authority or voting as members of Defendant BOT;

13. Prohibit further unauthorized transfer, diversion, encumbrance, solicitation, retention, or use of Allen University's property or funds;

14. Require appropriate corrective action concerning trustees or fiduciaries shown to be serving unlawfully or acting in breach of duties owed to Allen University; and

15. Grant such other injunctive relief as the Court determines necessary to protect Allen University's governance, property, funds, and charitable interests and Montgomery's individual rights.

**C. Accounting, Tracing, and Financial Records**

16. Order a complete accounting of Allen University's property, funds, proceeds, charitable contributions, and other financial interests described in this First Amended Complaint, including:

a. the transfer, financing, monetization, renovation, leasing, and use of the Waverly Building;

b. the NMTC transactions and proceeds associated with the Waverly Building;

c. Allen University operating funds used in connection with the Waverly Building and related entities;

d. funds raised in Allen University's name and for its benefit through AMEC and its Seventh Episcopal District, including Allen Days and Annual Conference fundraising;

e. HUD-related transactions and submissions;

f. payments, transfers, distributions, compensation, reimbursements, or other financial benefits received by Foundation, POC, Waverly

Owner, WHMM, WMT, Vision Center, or other persons or entities from Allen University's property or funds; and

g. such other transactions involving Allen University's property or funds as identified through discovery.

17. Require production of the financial records and documents necessary to determine the receipt, transfer, use, distribution, and ultimate disposition of Allen University's property and funds;

18. Order tracing of Allen University's property and funds through all transfers, accounts, distributions, transactions, and affiliated entities; and

19. Require identification of each person or entity that received or retained Allen University property, funds, proceeds, compensation, distributions, or other financial benefits and the amount or value received.

**D. Constructive Trust, Restitution, and Other Equitable Relief**

20. Impose a constructive trust over identifiable property, funds, proceeds, accounts, or other assets shown to have been wrongfully obtained or retained from Allen University or through the use of Allen University's property;

21. Impose a constructive trust over the Waverly Building or interests therein to the extent the evidence establishes that Allen University's real property was wrongfully transferred and is subject to equitable restoration;

22. Order restitution, disgorgement, restoration, or return of Allen University's property, funds, proceeds, and financial benefits to the extent permitted by law;

23. Require each Defendant shown to have been unjustly enriched through receipt or retention of Allen University's property or funds to restore the benefit or its value to Allen University;

24. Order return of property or payment of the value of property shown to have been converted from Allen University; and

25. Grant such other equitable relief as is necessary to restore to Allen University property, funds, proceeds, or financial benefits wrongfully transferred, received, controlled, or retained.

**E. Damages**

26. Award Allen University compensatory damages for the financial and property injuries established on the derivative claims, in amounts to be determined at trial;

27. Award Montgomery compensatory damages for the individual injuries established on her individual claims, in amounts to be determined at trial;

28. Award consequential and other damages to the extent permitted by law and established by the evidence;

29. Award punitive damages against the appropriate Defendants to the extent permitted by law and supported by the evidence; and

30. Award prejudgment and post-judgment interest to the extent permitted by law.

**F. RICO Relief**

31. Award Allen University the damages recoverable under 18 U.S.C. § 1964(c) for injury to its business or property caused by the RICO violations alleged herein;

32. Treble the damages recoverable under 18 U.S.C. § 1964(c) as provided by law; and

33. Award the costs and reasonable attorney's fees recoverable under 18 U.S.C. § 1964(c), to the extent applicable.

**G. Costs and Other Relief**

34. Award costs of this action and reasonable attorney's fees to the extent permitted by statute, contract, or other applicable law;

35. Grant such additional declaratory, injunctive, equitable, and monetary relief as the Court determines appropriate on the respective individual and derivative claims; and

36. Grant such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Montgomery, individually and derivatively on behalf of Allen University, demands a trial by jury on all claims and issues so triable.

Dated: August 20, 2026

Respectfully submitted,

**Karol Widemon Montgomery**
Plaintiff, Pro Se
P.O. Box 143574
Fayetteville, GA 30214
(916) 296-8928
karolwidemon@gmail.com

## VERIFICATION OF PLAINTIFF KAROL WIDEMON MONTGOMERY

I, **Karol Widemon Montgomery**, declare as follows:

I am the Plaintiff in this action and bring claims individually and derivatively on behalf of Plaintiff Allen University.

I have read the foregoing First Amended Complaint and know its contents.

The factual allegations stated therein are true and correct based upon my personal knowledge, except as to matters stated upon information and belief, and as to those matters, I believe them to be true.

I make this Verification pursuant to **Federal Rule of Civil Procedure 23.1.**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 20th day of August 2026, in Fayetteville, Georgia.

**Karol Widemon Montgomery**
Plaintiff, Pro Se

RCVD - USDC COLA SC
AUG 21 '26 AM9:11